```
 1
 2          THE COURT:  All right.  Let's take up a few pretrial
 3   matters before we go out there and pick a jury.  I have a list of
 4   open items.
 5          First off, I've got a flurry of briefing on this motion
 6   in limine.
 7          MR. DAVID:  I apologize, Your Honor.  Most of that is
 8   my fault.
 9          THE COURT:  This is a bit over the top.  Friday's
10   ruling will create a new standard for treating physician
11   disclosures and will send shock waves across the legal community
12   in the Western District.
13          MR. DAVID:  My partner said I should put at the top.  I
14   had it at the bottom.
15          I will say this, Your Honor.  There are going to be
16   lots of CLEs about this because this is -- I mean, we have actual
17   notice to everyone.  There's no surprise, there's no prejudice,
18   and it's a windfall for the defense at the last minute and a huge
19   kick in the stomach to the plaintiff when there's no one
20   surprised here.
21          I felt like Document 60 just didn't get addressed much
22   in the ruling.  I thought maybe that was an oversight.  It was a
23   Friday afternoon when we talked about it.  I didn't know if it
24   got --
25          THE COURT:  We reviewed that document and what the rule
```

1    requires, and my sense is -- you didn't cite me any Western

2    District cases that have addressed similar types of situations.

3    Most of the cases that I have seen have been out of the Eastern

4    District.  Judge Barbier, for example.  They seem to be taking,

5    since the 2010 amendments, a very strict view of this, and what

6    they require is the subject matter on which the witness is

7    expected to testify.

8         And I look at Document 70.  They plan to testify as to

9    all aspects of their treatment, examination, procedure, future

10   medical treatment, and medical causation based on the evidence

11   and facts outlined in their reports, which is the stack of

12   documents.  That would satisfy one, but, two, the facts and

13   opinions to which the witness is expected to testify.

14        And the cases -- and this is Judge Barbier who I have

15   great respect for in the Eastern District.  Disclosures

16   consisting of medical records alone are insufficient to satisfy

17   the disclosure standard of Rule 26(a).

18        And what we did, we -- and this is why this was issued

19   on Friday.  We spent a lot of time going through documents and

20   looking at things that were not pointed to us to dig through.

21   That's why we did the ruling, entered the ruling that we did on

22   Dr. Muldowney.  You know, Dr. Weir, you know, I don't find that

23   this Document 60 satisfies those two elements, those two

24   requirements of Rule 26.

25        So the question is we have to dig through all the rest

1    of this and figure out whether there's enough facts and opinions

2    that are reflected in these documents that would put the other

3    side on notice with the caveat that the courts have said

4    providing a stack of reports alone is not sufficient.

5              You know, give us some help here.

6              MR. DAVID:  Yes, sir.

7              THE COURT:  And this is not inconsistent with how

8    Judge Barbier has ruled in the Eastern District and how

9    Judge Vance has ruled.  And Judge Vance has two very good

10   opinions that dice this.  On one side of it, she said disclosures

11   are not sufficient.  Medical records aren't sufficient.  Cuts it

12   off.

13             Another case, an almost identical case, but there

14   was -- the defendants were able to get a medical expert to

15   address the plaintiff's expert that was not properly disclosed,

16   and she said I'll allow that because they had -- they were able

17   to get an expert to address that, and you suggest that in your

18   request for reconsideration and that's one of the things I wanted

19   to hear about more here.

20             MR. DAVID:  Thank you, Your Honor, and I apologize for

21   the late briefing.

22             I will say this -- and I do think it's groundbreaking

23   because it's really the totality of the circumstances and the

24   context.

25             And I guess I'll start first from this.  There was no

1   surprise here.  There was no sandbagging.  The second we got

2   reports, every time we gave them to them.  Larry Stokes, our

3   expert life care planner, has issued several reports, talking to

4   these doctors and issuing reports timely telling them exactly

5   what these doctors are testifying to in terms of future treatment

6   and exactly what they're testifying to in terms of future

7   treatment and exactly what they're testifying to in terms of

8   disability.

9          The doctors in question, Muldowney, Henderson, and

10  Weir, have all testified about disability and about future

11  treatment and about causation and their records contain those

12  opinions.

13         Many of these cases that -- and the Eastern District is

14  where the cases come out of.  There's really nothing much -- I've

15  never had this motion in the Western District before.  This is

16  the first time I've had it.  No one typically finds -- files

17  these, at least in my cases, because we disclose things and no

18  one's being sandbagged.  This is a very technical argument and

19  there are some cases in the Eastern District that aren't that

20  good.  I think Judge Barbier would let this in every day and

21  twice on Sunday.

22         THE COURT:  He excluded it in his case.

23         MR. DAVID:  But it was just the medical records.  Here

24  we have a pleading that lays out that these doctors will testify

25  about causation and future treatment and their treatment and

1   procedures consistent with their medical records attached, 340

2   pages, and consistent with their deposition testimony they've

3   already given.  So that's what we're pointing them to.

4          I guess we could have written a much longer brief and

5   quoted each thing in their testimony, but we attached to say,

6   look, they're going to testify consistent with this.  There's no

7   mystery.

8          THE COURT REPORTER:  Mr. David, please slow down.

9          MR. DAVID:  I'm so sorry.  I'll try to slow down.

10  Please tell me the whole time because I get excited and I talk

11  very fast.

12         So when you look at the totality here, that's what's

13  groundbreaking is that there is no prejudice.  To say that they

14  didn't know Dr. Weir was going to testify that Mr. Bradley has

15  chronic headaches and needs medicine and will need medicine in

16  the future is just not -- it's beyond the facts of this case.

17  They deposed him on all of those issues.  They paid him an expert

18  fee.  They went laboriously through his qualifications.  No one

19  filed a Daubert motion on Dr. Weir.

20         And then to be as over-the-top helpful, which we didn't

21  have to do, timely with lots of discovery, we produced an expert

22  report that says, look, our expert has talked to Dr. Weir.  He's

23  going to say this about disability.  He's going to say this about

24  the future headache treatment and medication and causation, which

25  is already in all of his reports and already in all the

1    depositions they've taken.

2           So they have actual notice.  And they've been disclosed

3    through Dr. Stokes, through Dr. Weir's deposition, through

4    Dr. Weir's very clear medical records where he talks about the

5    treatment in the future and through Document 60 where we say,

6    look, he's going to talk about all of these things.  Look at all

7    he's said.  Look at his deposition.  Look at his records.  He's

8    going to testify consistent with that.  And that's what -- really

9    the thing that gets to me, Your Honor, is Dr. Weir has been a

10   neurologist in Louisiana for years.  No one's every questioned

11   his ability to be a neurologist.

12           THE COURT:  And that's not what's been questioned here.

13           MR. DAVID:  And I agree.  It's about were they put on

14   notice, did we properly disclose that he was an expert, and I'd

15   say absolutely.  In Document 60 we said he's a neurologist, he's

16   going to testify as an expert about these things, and they had

17   notice about exactly what's he's going to testify to.  He's not

18   going beyond what he told Dr. Stokes -- or Mr. Stokes.  He's not

19   going beyond what he said in medical records or in his

20   deposition.  There's no 11th hour surprise here.

21           So, one, I think the disclosure was made, and that's

22   what our first brief said.  There's been disclosure.  There's no

23   requirement that it be titled a certain way.  And usually

24   disclosures are one paragraph.

25           THE COURT REPORTER:  Mr. David.

1        MR. DAVID:  I'm sorry.

2        It's one paragraph that's kind of a catchall.  They

3    even referenced that in their opposition yesterday, if we'd just

4    give them a nice little paragraph that would have told them what

5    Dr. Weir was going to say, that's in Document 60, and they have

6    all of that.

7        I guess my last thing would be that when you put it all

8    together, that's where you say, wait a second, there's no case

9    that says that, that, wait, they had actual notice.  They deposed

10   him.  The records were clear.  There was a pleading that said

11   he's going to testify to all of these things.  And then there's

12   an extra expert report -- or actually a series of extra reports

13   with the last one produced timely that lays it out in paragraph

14   form and they never said this is a shock.  They never said we

15   want to go redepose Dr. Weir because they had asked him all of

16   those questions already.  That's why I'm like -- so basically

17   under the rules, if on May 2nd I put a little paragraph saying

18   essentially what we said in Document 60, we would have met every

19   requirement under the rule, and that just seems unfair.  So if we

20   didn't meet the letter of the law for Rule 26, to me it's at the

21   very least harmless error.

22        THE COURT:  Let me ask y'all, y'all have an expert that

23   is going to be addressing Dr. Weir?

24        MR. DILL:  I don't have a neurologist.  I don't.

25        THE COURT:  Okay.  I thought I saw in the motion for

1   reconsideration that they had an expert that would speak to...

2           MR. DAVID:  They have a neuropsychologist who's mostly

3   responding to Jensen Bergeron, I believe.  That's why I was

4   saying Jenson Bergeron would have to be a lay witness.  Their

5   person has never seen Mr. Bradley.

6           MR. DILL:  I didn't get an IME on him, Judge.  I don't

7   have a doctor who's seen him and can comment on the things.  So

8   it does put me in a precarious position.

9           He talked about notice.  I'll start with the one I lost

10  which was Dr. Muldowney.  Dr. Muldowney is going to talk about

11  adjacent segment syndrome.  He never mentioned it in any of his

12  reports.  Not one of his reports has that in it.  And he says,

13  well, Stokes said it.

14          Well, the rule says that the expert has to prepare his

15  own report himself and he has to lay out the facts that he relies

16  upon and the opinions he reaches and there's none of that.  I

17  have no idea.  And it gets sprung on me in a deposition.  I don't

18  have any of the studies he's relying upon or any of the facts.

19  He couldn't cite me to any of the information.

20          And, again, I'm okay with the Court's ruling.  I will

21  deal with it at trial, but this is the same arguments we did for

22  almost an hour in that pretrial conference.  It's the same exact

23  position that we were in.  We didn't get the underlying facts

24  upon which these opinions are based and that's the problem.

25          THE COURT:  And what I'm trying to do is drill down on

1   this because this is -- I'm going to take Mr. David at his word

2   that this is a critical witness, and I'm talking about Weir, a

3   critical witness, and it's the Court's obligation, before I

4   basically relegate him to the status of a lay witness, to drill

5   down on this and ensure that -- you know, there is a statement,

6   for example -- and, again, I'm stretching here because the courts

7   make it very clear that a record dump in itself is not a

8   sufficient disclosure.

9           The statement in Document 60 as to what they plan to

10  testify to would satisfy the first part of the rule, but really

11  the second part of the rule is probably even more important,

12  which is the facts and opinions to which the witness is expected

13  to testify, and that's not only notice.  That defines the playing

14  field.  You know, that tells them this is what I'm dealing with,

15  and I'm not -- they're not going to spring something on me at the

16  last minute.

17          Now, I'm not inviting argument at this point because I

18  want to talk a little bit through this.

19          There is a paragraph, an excerpt, from the report.  My

20  view is that the law is pretty clear that merely providing

21  reports is not sufficient to satisfy that.  I have that from

22  Judge Vance.  I have that from Judge Barbier.  I have that in the

23  Western District from Judge Brown in the *Logan* case, but there is

24  an excerpt that highlights those -- he's pulled out an excerpt

25  from the reports that is basically Dr. Weir's impressions and

1    conclusions based on the first visit.  I take it that's what that

2    is.

3            MR. DAVID:  Yes, sir.

4            THE COURT:  Now, do you have an expert that has

5    reviewed Dr. Weir's?

6            MR. DILL:  I don't.

7            THE COURT:  You have no expert that has reviewed

8    Dr. Weir's documents?

9            MR. DILL:  I think Greve looked at them, but he's a

10   neuropsychologist.

11           THE COURT:  Well, he reviewed them.  Is he going to

12   opine on them?

13           MR. DILL:  Judge, he was a may call to refute

14   Mr. Bergeron, and given that you've moved him to a fact, it was

15   not my intention to call Dr. Greve.

16           I'm in a mixed field now.  I've got a neurologist

17   versus a neuropsych who didn't meet with or perform any testing

18   on the plaintiff.

19           THE COURT:  All right.  Let me stop you a minute.

20           MR. DAVID:  Yes, sir.

21           THE COURT:  I'm trying to dig down.

22           MR. DAVID:  I only want to respond to what they're

23   saying, but go ahead.

24           THE COURT:  The question is assuming that you had lost

25   Weir, how are you going to address Weir?  What have you -- you

1   know, you have this statement in Mr. David's opposition to the

2   motion in limine filed in September of 2021.  I mean, I find that

3   it's an insufficient disclosure.  It does not satisfy Rule 26,

4   but the question is before I exclude it, I have to go through, as

5   Judge Barbier refers to it, the four factors.

6          And the question is, you know, at least with respect to

7   what's been highlighted in this document, you're put on notice at

8   that point of some -- the likely testimony of this witness.  You

9   know, couldn't you have gotten an expert at that time based on

10  what you saw in this document and the likely testimony that you

11  would receive from Dr. Weir?

12         MR. WYNNE:  Respectfully, Your Honor, that statement

13  has been reviewed in other cases involving Rule 26 and you know

14  that and so I'm not going to recount that.

15         THE COURT:  It's not that statement.  It's the excerpt

16  from the report that's very detailed.

17         MR. WYNNE:  The excerpt itself has certain opinions

18  outlined and that's an excerpt that appears in Dr. Stokes'

19  report.  It's from a medical record.

20         MR. DAVID:  Dr. Weir's record.

21         MR. WYNNE:  So I understand it's an excerpt that's been

22  pulled from almost 300 pages of medical records that outlines his

23  opinions.  It does not have a short and plain summary of how he

24  got to those opinions.  So our position would be that it doesn't

25  satisfy it in the first place.

1          And the other issue I would raise here is I think the

2     Court's ruling considered Dr. Weir as a (c) expert rather than a

3     (b)(2) expert, but based upon the attorney referral in this case

4     of Dr. Weir, what has been our position throughout, and based

5     upon certain other existing parts to that relationship, that

6     Weir's actually a (b)(2) expert in the first place.

7          MR. DAVID:  And I'm happy to respond.

8          THE COURT:  So if Dr. Weir were to testify, you have no

9     expert lined up, but you were on notice that these were some of

10    Dr. Weir's conclusions back in September of 2021.

11         MR. DILL:  Yes, sir.

12         MR. WYNNE:  As gleaned from the medical records.

13         Yes, Your Honor.

14         THE COURT:  You know, again, these are all running

15    together and we're having to dig into this because it would have

16    been a simple matter to do these disclosures correctly.  You

17    know, I had a case with Mr. Brahan two ago where there was no

18    issue on these disclosures, you know, just some minor other

19    issues.  I mean, having complied with Rule 26 would have made

20    this a much simpler and cleaner process.

21          If I were to allow Dr. Weir to testify as to the

22    matters that are highlighted in this report, Document 60, this

23    excerpt, is there -- I seem to recall that there were some issues

24    that -- it may have been Dr. Muldowney, but some issues that were

25    sprung at the last minute in a deposition that weren't addressed

1   in anything until you got to the deposition.  Is that the case

2   with Weir?  Did something come up with Weir that was completely

3   new?

4           MR. WYNNE:  No, not in terms of what he -- we could

5   figure out from the medical records.  However, if Weir is going

6   to go and talk about a traumatic injury, that would certainly

7   change the game.

8           MR. DAVID:  He's never testified to that.  We said that

9   last week or two weeks ago.

10          THE COURT:  And it would have been a lot easier if we

11  had been pointed to this earlier instead of having all of the

12  what I think is over the top accusing this Court of essentially

13  implementing a version of Rule 26 that is completely outside the

14  norm.

15          MR. DAVID:  That's my fault.  I moved that up and put

16  that in there, Your Honor.  I'm sorry about that.  And it's just

17  -- I'll say this.  I'd love to be on the committee with Mr. Dill

18  to say you know what?  Let's add Rule 26 disclosure deadlines on

19  the scheduling order 90 days before trial.

20          THE COURT:  It's on the scheduling order.

21          MR. DAVID:  Well, it's only for reporting experts as it

22  is right now.

23          THE CLERK:  It cites to the rule for true experts, but

24  the headline is disclosures.

25          MR. DAVID:  Yes, ma'am.

1       THE COURT:  Yeah.  That's a relic.  That's a relic.

2   I've been on the bench a fairly short time within the scheme of

3   things and, you know, we've got some things going on and we may

4   revisit that now that we have a full complement of judges here,

5   but the point is if -- you know, I think I'm in line with almost

6   every other judge, judges that some consider pro-defendant, some

7   that are considered pro-plaintiff, that the 2010 amendments make

8   a difference and they're looking at that disclosure requirement.

9   You have to meet both elements of that, but if there's a failure

10  to comply with that rule, they really dig in and try to figure

11  out whether or not this was truly prejudicial.

12          And, you know, I'm always -- I'm of the view that a

13  disclosure failure, the reason for not an automatic mandatory

14  disclosure that you have to go through that process is it harms

15  the plaintiff because of the actions of the lawyers in the case.

16          And, you know, I'm inclined to modify the Court's

17  ruling and allow Dr. Weir to testify as to his conclusions that

18  are represented on Document 60.  It's against my better judgment

19  because I do think that the bulk of the case law says that

20  medical records alone are not sufficient.  What distinguishes

21  this case is that you've highlighted a provision.  I take it at

22  Dr. Weir's deposition, you had the ability to examine him on the

23  medical records that were provided?

24          MR. WYNNE:  Yes, sir.

25          THE COURT:  Okay.  So I will allow him to testify.

1    Were those medical records documented as –– or entered

2    as exhibits to that deposition?

3         MR. DAVID:  Offhand, I cannot recall.

4         THE COURT:  I will allow him to testify on the

5    conclusions that are in Document 60 as well as what you were able

6    to elicit from him during the deposition from those documents.

7    If there is an area in the deposition where he testified as to a

8    subject matter for the first time that's not reflected in any of

9    the reports that you have, I will sustain an objection to that.

10        THE CLERK:  I don't have it printed.  I thought I did.

11   What was attached to 60.  I have what was attached to 83.

12        MR. DAVID:  That was 300?

13        THE CLERK:  With the reconsideration, you filed a 300

14   and something page exhibit, but Document 60 does not have any

15   300–page exhibit attached.

16        MR. DAVID:  Okay.  I must be mistaken.

17        MR. DILL:  Judge, the ruling doesn't go so far as to

18   allow him to testify as to future medical which was not included

19   is my recollection?

20        THE COURT:  That was not addressed in the deposition?

21        MR. WYNNE:  We asked him what he was on and that was

22   about it.

23        MR. DAVID:  I thought you asked about the future, but I

24   don't know if he had a report at that point.

25        MR. WYNNE:  He didn't tell me –– yeah.  I didn't have a

1    report from Stokes talking about his new medications, the

2    Aimovig.  All the old reports were on Maxalt and other -- a

3    different chain of treatment because of the kidney issues.

4            THE COURT:  And we had an issue there that at some

5    level going into futures elevates it from (c) to (b) and it would

6    have to require a report if it deals with matters that are

7    outside of his treatment of this, but, you know, I'm not sure

8    about futures if it was not covered.

9            MR. DAVID:  And, Your Honor, with respect to futures,

10   Larry Stokes will be here to testify.  He met with Dr. Weir.  He

11   met with Dr. Muldowney.  He formulated a life care plan spelling

12   out exactly what he said to them, exactly what they told him,

13   exactly where the input came from.

14           THE COURT:  Based on his own conclusions.

15           MR. DAVID:  Based on his own conclusions to rely on

16   that because he's allowed to rely on the treating physicians and

17   what they say and he produced it timely.  The defendants didn't

18   even hire a life care planner to counter that.  They have a

19   neurosurgeon who's testifying in this trial who could easily have

20   commented on any neurological issues.

21           THE COURT:  Let me stop you because I don't want to

22   keep the jury waiting too long.

23           I will allow that expert to testify as to his own

24   conclusions based on relying on the reports that Dr. Weir -- that

25   were covered in the deposition, the matters that were covered in

1    the deposition to the extent he's relying on that in coming to

2    his own independent conclusions.  I don't think that there was a

3    disclosure issue with respect to him.

4              MR. DAVID:  Thank you, Your Honor.

5              MR. DILL:  I'm a little bit confused and I want to make

6    sure I understand, Judge.  Dr. Weir at the time of his

7    deposition, if my memory serves me correct, had not expressed his

8    opinions on future medical care.  Are you going to allow his to

9    testify --

10             THE COURT:  No future medical care, not Weir's -- his

11   individual view, if it's not -- if it was not covered, if y'all

12   were not allowed or were unable to fully address that in the

13   deposition.

14             MR. DAVID:  And, again, Your Honor, this is not -- I

15   don't want to surprise the Court and have to have this issue in

16   front of the jury.  So I'm happy to have it right here.

17             There's no shock at all with Dr. Weir's future rate.

18   It's basically continue the treatment that he's on.  So

19   Dr. Stokes I assume can rely on his personal conversations with

20   Dr. Weir, the reporting and signed documents he got from Dr. Weir

21   saying that on the future treatment, that the defendant had --

22   and they had rebuttal periods for their neurosurgeon to say

23   something about it or for their voc rehab and life care planner,

24   Mr. Frenzel, to say anything on it and they didn't.

25             THE COURT:  Okay.  Let me stop you.  Let's parse

1    through it.

2          Treating physician stating that he's recommending, as

3    part of his treatment of the patient, that certain things

4    continue.  That was covered at the deposition.

5          MR. WYNNE:  What was covered at the deposition, Your

6    Honor, was that he was on a treatment regime that was essentially

7    the typical Maxalt and the like.  He had transitioned to Aimovig

8    and he hadn't taken the Aimovig consistently, and then he was

9    told to continue to take the Aimovig and see how it went and to

10   return back in six months.  Is that a fair -- that's my

11   recollection.

12         MR. DAVID:  I don't remember.

13         THE COURT:  I'll allow him to testify as to that.  That

14   was covered at the deposition, but that's that the extent of it.

15         MR. DILL:  So an opinion that he'll be on it for the

16   rest of his life is out?

17         THE COURT:  No, because that's going to require future

18   treatments and that would cross the line into expert opinion

19   because you'd have to base that on other patients, I've had other

20   patients that have had similar and this is my experience with

21   them, and probably medical studies to show and I think that would

22   cross the line.

23         MR. DAVID:  And I know we need to get to the jury, but

24   it sounds like Larry Stokes can say based on his investigation

25   and his expertise, that would need to go forward in the future.

1          MR. DILL:  He's not a doctor.  He can't express a

2    medical opinion on the need for medications in the future.

3          MR. DAVID:  He can absolutely do that if he's relying

4    on sound methodology, which he is.  He's talked to all the

5    doctors and came to his conclusions.  You had that report timely.

6          MR. WYNNE:  Respectfully --

7          THE COURT:  All right.  We've got a record.  One at a

8    time.

9          MR. DAVID:  You had that report and life care plan

10   timely.  No one's even objected to the Stokes life care plan and

11   report because its methodologies are sound as can be.  He met

12   with every single doctor and did it the right way.  If Dr. Weir

13   can't testify, I would certainly think that Dr. Stokes could

14   testify that he's relying upon dealing with the physicians in

15   formulating this plan and this is what it is.

16         THE COURT:  You can't use an expert, though, to bring

17   in evidence that is barred for failure to timely disclose under

18   Rule 26.  They can use and rely on evidence that is not

19   admissible, but this isn't a question of it being admissible.

20   You know, you have to establish a foundation.  For example, with

21   the case that we tried two weeks ago, we had a life care planner

22   -- I think that's my recollection -- a life care planner that was

23   also a doctor and could make those determinations, could take,

24   for example, what Dr. Weir testified to and what Dr. Muldowney

25   testified to and make that conclusion about futures.  This seems

1    to be in a different position.

2         MR. DAVID:  And I guess my only point would be, Your

3    Honor, the Rule 26 disclosure would have been due 90 days ago on

4    May 2nd.  Any neurologist they hire, any life care plan would

5    have been done well before that when their expert deadlines were

6    due in rebuttal to mine.  If mine were due in December of '21, I

7    assume in January their expert reports were due.

8         So even if we had done the disclosure for Dr. Weir,

9    they had all the notice on this issue.  There's no notice issue.

10   If they had gotten a paragraph saying Dr. Weir will talk about

11   future treatment, which they already have, and they had said, oh,

12   my goodness, we didn't know, you'd say, well, shoot, guys.

13   Here's the life care plan.  You got it timely.  You have a

14   rebuttal period.  You have a neurologist.  You have a life care

15   planner.  Why didn't you have them rebut that?

16        I don't see why Mr. Stokes and Mr. Wilfred get punished

17   for my lack of diligence.  And I'm not asking for much.  It's not

18   like I'm saying there's something new and crazy that wasn't

19   disclosed timely on the life care plan.  It's just continuing his

20   medication.  And if Dr. Weir can't say it, I would think an

21   expert like Dr. Stokes can rely on his methodology and his

22   personal direct communication with experts that he disclosed

23   fully in paragraph form, what he talked to them about and

24   everything else.

25        THE COURT:  I'm giving you something on this.  Weir can

1    talk about the future to the extent it was covered in the

2    deposition and nothing more, and if you want somebody else to

3    testify about the future, they have to be qualified to do so.

4            Bergeron.  My concern -- and this again came up in the

5    first instance on the motion for reconsideration, the argument

6    that the defendants have a countervailing witness that will be

7    able to testify as to Bergeron.

8            And my question to defendants, there are two very good

9    cases, *Rogers* and *Shepherd*.  One year apart.  Both by the same

10   judge.  In one where she states the standard rule for Rule 26,

11   she concluded that the experts were not sufficiently disclosed

12   because all that was provided were disclosures consisting of

13   medical records alone which were inconsistent.  That was in

14   *Shepherd*.

15           *Rogers*, same case.  Only medical records were provided,

16   but in that case, in the *Rogers* case, the defendants were able to

17   use those medical records and obtain an expert issued a report

18   that relied in part on those medical records.

19           Do we have a -- did your expert, was he able to review

20   Bergeron's medical records and rely on those records?

21           MR. WYNNE:  Dr. Greve was, Your Honor.  However, he

22   wasn't able to -- we had asked for an IME with Dr. Greve in

23   person and we were told that he wasn't -- that the plaintiff

24   wasn't treating with a neuropsych.  He would not submit to a

25   neuropsych, correct?

1          MR. DAVID:  That was a long time prior, but yes.  A

2   neuropsychological examination is a two-day battery of tests.  My

3   client saw a counselor six times, I think, and very detailed

4   notes actually for this counselor who I've never had in a trial

5   before, but now -- who lives here in town, but that's who he was

6   seeing.

7          So I said, sure, you can have him see a psychologist as

8   an IME, but he doesn't get the two-day battery of Greve

9   neuropsych this guy is a faker malingerer testing.  That's what

10  Greve does.  It's his specialty.  But there are cases where

11  neuropsychs are important.

12         Like I told Mr. Dill from the get-go.  They liked

13  Dr. Weir because he didn't say he has a traumatic brain injury

14  that's caused cognitive impairment in this case.  He hit his head

15  and had a concussion and has headaches, but we're not saying he

16  has cognitive impairment in a true brain injury sense in this

17  case.

18         So that's the only thing we said no to.  We didn't say

19  no to a psychological IME, just not the two-day neuropsych

20  battery.  And Mr. Bergeron will be on the stand for a very short

21  period of time.

22         THE COURT:  You know, a short period of time, that

23  pretty much undercuts one of the elements of whether or not to

24  allow him.

25         MR. DAVID:  No.  He's seen him six times.  That's very

 1   important testimony because the PTSD and what he's going through

 2   depression and anxiety-wise I think is the worst injury he has.

 3          So I think it's -- I'm just saying there's only so much

 4   a licensed counselor or Bergeron, who I've never even spoken to

 5   in this case, is going to say at trial, but it's very important

 6   that he documents it.  And I don't think Dr. Greve disputes that

 7   he has PTSD.  He just says he should go back to work and he'll be

 8   better.

 9          THE COURT:  This fits more in line with Judge Vance's

10   opinion in *Rogers*.  Since y'all have an expert that's retained,

11   I'm going to allow the testimony, but only to the extent that it

12   reflects what is in records that the defendants' expert was able

13   to review to prepare for his testimony.

14          You know, again, I'm going to say this would have been

15   a lot easier if we had full and timely disclosure, and I would

16   hope -- and especially given the multiple opportunities to do it,

17   and if for some reason there is a lapse, you've got to help us

18   make a record for those elements as far as harm and prejudice and

19   whatnot.

20          MR. DAVID:  And, Your Honor, I apologize for not fully

21   doing the 26, and really to me I thought their briefing was more

22   about -- it changed -- I guess our pretrial conference was more

23   about Savant and Blalock.  I felt like that we would meet the

24   disclosure requirements for the other doctors and that's my

25   fault.

1          THE COURT:  There's mention of Henderson.  Henderson is

2    not on the table.

3          MR. DILL:  We didn't have any issues with

4    Dr. Henderson.

5          MR. DAVID:  I just wanted to make sure.  That's why I

6    put him in there.

7          THE COURT:  The U.S. Xpress driver logs.  I believe

8    I've got a full copy of them.

9          The objection to those driver logs is that there's no

10   longer an independent negligence claim.  So the question I have,

11   though, is in reviewing these, it seems to be a record around the

12   time of the accident, at least the portion I've got, and I'm not

13   sure why that might not be relevant to an argument that the

14   driver himself may have been negligent as far as, for example,

15   not taking breaks.  You know, there's nothing really here that

16   ties in directly to the company.

17         So my one question is why -- you know, the objection

18   that there's no claim for independent liability, why wouldn't

19   this be separately admissible as relevant to the driver's

20   potential negligence?

21         MR. DILL:  Judge, his own expert has reviewed all of

22   the driver logs and indicated that he saw no hours of service

23   violations.  Those were all what we call form and manner.  He

24   didn't document a break.  It was right around the time that they

25   changed the rule that required him to document, in the first

1    eight hours, a 30-minute break, but if you look at his logs, he

2    delivered to Walmarts and he had numerous stops throughout the

3    morning.  So in my view it's completely irrelevant.

4              THE COURT:  Well, it seems if we've got an expert

5    addressing it, you know, that just goes more to the weight.  You

6    can deal with that on cross-examination.  I mean, you have

7    somebody that could testify and say that there were no violations

8    here.  Is that a yes?

9              MR. DILL:  His expert is the one that opined on it and

10   in his report said I don't see any violations in his logs.

11             THE COURT:  And you can cross-examine him on that.  If

12   it got brought on in direct, you could cross-examine him on that.

13   And point me to anything.  If you think that there's something in

14   here that is -- because I think that is relevant to the question

15   of, you know, whether or not he took breaks and the interplay

16   with the claims.  I don't see anything in here that would go

17   beyond that that would be unduly prejudicial, for example.  I

18   think it's relevant.  So I'm going to allow that and overrule the

19   objection.

20             We don't need -- we've got an intervenor stip.  We

21   don't need to read that to the jury.

22             MR. DILL:  Agreed.

23             THE COURT:  Okay.  Surveillance.  There was some

24   briefing on surveillance.  I'm overruling the objections on

25   surveillance.  I'm assuming we're not going to show five hours of

1   surveillance, you know, to the jury as long as what is going to

2   be shown to the jury, Mr. David has an opportunity to review that

3   and supplement, if he wants, additional surveillance video shown.

4   So I'm going to overrule the objection to that.

5           And, again, the Court will grant the motion for

6   reconsideration on the motion in limine to the extent that I've

7   outlined here.  In all other respects, the motion is denied.

8           Were y'all working on a revised verdict form?

9           MR. DAVID:  Yes, we did, Your Honor.  I think we agree

10  on everything except, of course, the blanks, Your Honor.  We can

11  send that to you this afternoon.

12          THE COURT:  Yeah.  That's to be filled in by somebody

13  higher than my pay grade.

14          And as far as -- we're going through the final jury

15  instructions.  We'll schedule a charge conference -- y'all still

16  think this is going to be five days?

17          MR. DAVID:  It may be four.  It may go quicker than

18  that.  I anticipate turning the case over sometime Wednesday.

19          MR. DILL:  With the change on Bergeron, I'm probably

20  going to need to bring Greve.

21          MR. DAVID:  I still think it could be four days.

22          THE COURT:  We'll schedule a charge conference,

23  probably look at Wednesday, but we'll play it by ear, if there's

24  a time where we can break early or we can do it early in the

25  morning.  What we'll do is we'll go through them and rule on the

1    parties' positions on each of the charges and we'll hammer it out

2    at that point.

3              All right.  Y'all got a copy of the voir dire?

4              MR. DAVID:  Yes, sir.

5              MR. DILL:  Yes.

6              THE COURT:  Okay.  Again, y'all have 20 minutes a side

7    on voir dire questions.  I don't want any arguments of the case.

8    No arguments.

9              MR. DAVID:  There is one juror, number 26 -- is it 26?

10   I can't imagine we're going to get to them, Your Honor.  I don't

11   know if he's number 26, but he's deep, whatever he is.  He's in a

12   wheelchair.  He clearly can't hear.  I'm happy to release him.

13   Even though I'd love him as a juror, I'm happy to release him

14   because I don't want to just waste his morning.

15             THE COURT:  Do y'all have an objection to that?

16             MR. DILL:  No.  We actually agree.  Paula was trying to

17   get his attention and the lady was having to nudge him to tell

18   him to raise his hand.

19             MR. DAVID:  There's a Ms. Dauterive.  She put that she

20   can't hear well.  She clearly can't hear well.  I guess we can

21   explore that with her to see how bad it is.

22             MR. DILL:  She has the ears on now.

23             THE CLERK:  Yeah.  They got her the earphones.

24             THE COURT:  And those should be -- I'm happy to release

25   number 22.  We saw that late on Friday and we don't like to

```
 1   release anybody unless we have an agreement amongst counsel, and,
 2   you know, since he showed up, he'll get paid now.
 3              MR. DAVID:  I think it's number 26, Your Honor.
 4              MR. DILL:  I believe that's correct.  It's Mr. Daigle.
 5              Judge, there's another juror that I'm going to request
 6   that we request that we question out of the presence of the other
 7   jurors.  He has an anxiety and depression issue.  That is an
 8   issue in this case and I don't want to embarrass him in front of
 9   the whole room.
10              MR. DAVID:  Which number is that?
11              MR. DILL:  I think he's 13, Austin Leblanc.
12              THE COURT:  And what I intend to do is I'm going to go
13   through my questions.  I'll give you your 20 minutes.  I may have
14   a few questions based on the questionnaires, and then we'll call
15   -- we'll make a list of those who we are bringing back to consult
16   with in private, but I'll confer with y'all at sidebar if you
17   want to add to that list.
18              MR. DAVID:  Your Honor, is there like a clock on the 20
19   minutes?  My last question is always I talk really fast.  Don't
20   hold it against my client.  I don't want you to say I'm done and
21   not be able to say that at the end.
22              THE COURT:  No.  That's fine.  What I don't want is
23   arguing the case.
24              MR. DAVID:  I'm not going to do that.
25              THE COURT:  And y'all have the questionnaires.  You can
```

1   ask follow-up questions if you hear something in my questioning

2   that you want to follow up on.  That's what I like to allow y'all

3   to do.

4           All right.  Thank you.

5       (Whereupon, a jury was duly selected and sworn and the

6   proceedings were had as follows:)

7           THE COURT:  I'm going to read what we call our

8   preliminary instructions.  I'll be instructing you at the

9   beginning and you'll get some more detailed instructions on the

10  law at the end of the case.  Some of this is going to be

11  repetitive and it's only repetitive because of how important it

12  is.

13          Now that you have been sworn in as the jury in this

14  case, as the judge, I will decide questions of law and procedure.

15  As the jury, you are the judges of the facts.  At the end of

16  trial, I will instruct you on the rules of the law that you must

17  apply to the facts as you find them.

18          You may take notes during trial.  Do not allow your

19  note-taking to distract you from listening to the testimony.

20  Your notes are an aid to your memory.  If your memory should

21  later be different from your notes, you should rely on your

22  memory.  Do not be unduly influenced by the notes of other

23  jurors.  A juror's notes are not entitled to any greater weight

24  than each juror's recollection of the testimony.

25          Until this trial is over, do not discuss this case with

1  anyone and do not permit anyone to discuss this case in your

2  presence.  This includes your spouse, children, relatives,

3  friends, co-workers, and people with whom you commute if you do

4  commute to court, those with whom you drive to court each day.

5          During your jury service you must not communicate any

6  information about this case by any means, by conversation or by

7  any tools of technology.  For example, do not talk face-to-face

8  or use any electronic device or media such as a telephone, a cell

9  or smart phone, camera, recording device, PDA, computer, the

10  internet, internet service, any text or instant messaging

11  service, any internet chat room blog or website such as Facebook,

12  YouTube, Snapchat, Instagram, or Twitter, or any other way to

13  communicate to anyone any information about this case until I

14  accept your verdict and excuse you as a juror.  Do not even

15  discuss the case with the other jurors until the end of the case

16  when you retire to deliberate.

17          It is unfair to discuss the case before all the

18  evidence is in because you may become an advocate for one side or

19  the other.  The parties, the witnesses, the attorneys, and

20  persons associated with the case are not allowed to communicate

21  with you, and you may not speak with anyone else in or around the

22  courthouse other than your fellow jurors and with court

23  personnel.

24          Do not make any independent investigation of this case.

25  You must rely solely on what you see and hear in this courtroom.

1   Do not try to learn anything about this case from any other

2   source.  In particular, you may not use any electronic device or

3   media such as a telephone, cell phone, smart phone, computer, to

4   research any issue touching on this case.  Do not go online or

5   read any newspaper accounts of this trial, to the extent there

6   are any newspaper accounts of this trial, or listen to any radio

7   or television newscast about it.  Do not visit or view any place

8   discussed in this case and do not use internet programs or other

9   devices to search for or view any place discussed in the

10  testimony.  In sum, you may not research any information about

11  this case, the law, or the people involved, including the

12  parties, the witnesses, the lawyers, or the judge, until after

13  you have been excused as jurors.

14          From time to time the lawyers will make objections to

15  evidence or to questions directed at witnesses.  Neither those

16  objections nor my rulings to those objections are evidence that

17  you should consider, nor should you construe my rulings

18  sustaining or overruling objections as an indication that I am

19  favoring one party over another.

20          From time to time counsel may request what we call a

21  private sidebar conference, and you've already seen that once,

22  where counsel approach the bench and we talk in private.  There

23  are some issues of law or procedure that I must decide and that I

24  must discuss with the attorneys.  These issues are not part of

25  what you must decide and they are not properly discussed in your

1    presence.  To avoid having you leave the courtroom and to save

2    time, I'll discuss these issues with counsel up here at the

3    bench.  When I confer with lawyers at the bench, please do not

4    listen to what we are discussing.  If the discussions require

5    more time, I may have you leave the courtroom until the lawyers

6    and I resolve the issue.

7            As I pledged from the beginning, we will try to make

8    this as painless of a process as we can, and that includes my

9    efforts to ensure that we don't waste your time.  So I'll try to

10   keep these interruptions as few and as brief as possible.

11           The trial will now begin.  The lawyers for each side

12   will make an opening statement.  These opening statements are

13   intended to assist you in understanding the significance of the

14   evidence that will be presented.  The opening statements -- and

15   this is important.  The opening statements themselves are not

16   evidence.

17           After the opening statements, the plaintiff will

18   present his case through witness testimony and documentary or

19   other evidence.  Next the defendants will have an opportunity to

20   present their case.  The plaintiff may then present rebuttal

21   evidence.

22           After all the evidence is introduced, the lawyers will

23   make closing arguments.  Closing arguments, like opening

24   statements, are not evidence, but rather the attorneys'

25   interpretation of what the evidence has shown or not shown.

```
 1   After closing arguments, I will instruct you on the law that
 2   applies to this case.  Finally you will go to the jury room to
 3   deliberate and reach a verdict.
 4           I caution you to keep an open mind through the entire
 5   time.  Do not decide the case until you have heard all of the
 6   evidence, the closing arguments, and my instructions.
 7           You have been permitted to bring your cell phones into
 8   the courthouse.  However, when you retire to the jury room, when
 9   you come in in the morning -- you don't have to do it now, but
10   when you come in in the morning, you are to leave your phones in
11   the jury room.  Do not bring the phones into the courtroom.  The
12   sole reason being that the cell phones can interfere with the
13   audio equipment.  You will be able to use the phones when you go
14   back to the jury room.
15           At this time we are prepared for opening statements.
16   We'll start with the plaintiff.
17           Mr. David, are you ready?
18           MR. DAVID:  Yes, sir, Your Honor.
19           THE COURT:  You may proceed when ready.
20           MR. DAVID:  Thank you, Your Honor.
21           An 18-wheeler operator waiting to make a left turn at a
22   stop sign has a duty to yield the right-of-way to oncoming
23   traffic.  If he fails to do that and someone is injured, his
24   company, the insurance company, are responsible for the harms and
25   losses caused.
```

1          Let me tell you the story of what happened in this

2   case.

3          February 14th, 2018, four and a half years ago,

4   Mr. Fiorucci was driving an 18-wheeler with U.S. Xpress coming

5   from Spring, Texas, coming from Houston, down I-10 on a Walmart

6   run.  He's very familiar with this run.  This is a run that U.S.

7   Xpress makes all the time.  They hit the Walmart in Jennings.

8   Then they go up to Oakdale and drop off at that Walmart, hit the

9   Walmart in Eunice, and then head on back to Houston.

10         As Mr. Fiorucci is coming down I-10 past Lake Charles

11  early in the morning -- it's very, very dark -- he noticed some

12  fog starting to set in.  He stops in Jennings, drops off a load,

13  gets up to go up LA 26 up to Jennings.  Still very dark, still

14  fog.  He gets up to the stop sign at the intersection of US 190.

15         I don't know if you can see the picture, but to give

16  you an idea, just to give you a little bit, here's Lafayette.

17  Here's Jennings.  Here's Lake Charles.  This is I-10.  Parallel

18  to I-10 is US 190.  It's called the old I-10.  Opelousas.

19  Eunice.  Elton right where our accident happens.  Goes all the

20  way to Texas and all the way to the border of Louisiana the other

21  bay.

22         So as Mr. Fiorucci drops off in Jennings and comes up

23  LA 26, he comes to a stop sign right there.  He has two red

24  lights blinking and stop signs.  The other traffic has amber

25  flashing lights and the right-of-way.

1        He goes through that stop sign without incident.  He

2   goes straight up to Oakdale.  He goes straight up to Oakdale and

3   then he has a choice.  He's going back to Eunice.  He can come

4   down 26 again to face that same stop sign in the dark with some

5   fog and have to make a left turn across that or he can go the

6   other way with a couple of right turns that's actually five or

7   six miles shorter to Eunice.  He opts to come back the same way

8   he came and knowing he had to face that stop sign on US 190.

9        As he approaches US 190, his testimony will be that he

10  came to a stop at the stop sign, and you're going to see a video

11  today from a nearby convenience store, a Chevron, that's going to

12  show you -- here's the scene of the accident.  Here's the

13  Chevron.  There's some surveillance video here.  And he's coming

14  down this direction to the stop sign right there.  He comes to a

15  stop in the dark, still some fog, and has to make a left turn.

16       Mr. Fiorucci will testify that his visibility, even

17  with the fog, was an eighth to a quarter mile, 660 to 1,320 feet.

18  He has plenty of vision to make a safe turn.  He looks left down

19  the westbound lane -- this is a collision involving westbound

20  traffic on US 190 -- and he sees a white Yukon XL slowing down to

21  make a turn, a left turn, right at that Chevron gas station.

22  When that SUV starts to make the turn, he starts to make his left

23  turn.  He never sees the Volkswagen Passat operated by Wilfred

24  Bradley until it's 60 to 90 feet from hitting his tractor

25  trailer.  Even though he could see 660 to 1,300 plus feet based

1   on his own testimony, he doesn't see the oncoming lights of

2   Wilfred Bradley's Volkswagen Passat until it's 60 to 90 feet from

3   the impact and he's blocking the westbound lane, the turn lane,

4   and the eastbound lane of 90.  There's nowhere to go.  A horrific

5   crash ensues.  Mr. Fiorucci takes the 18-wheeler and continues

6   and parks kind of in this area over here with his 18-wheeler and

7   he said he never went to go check on Mr. Bradley.  His first call

8   was to the dispatcher.

9         The same morning -- back it up a little bit -- Wilfred

10  Bradley wakes up about 4:00 o'clock like he always does.  He's a

11  scaffold builder, a lead man, for Apache Construction.  He's

12  worked in Texas and Baton Rouge and all over.  For Apache

13  Construction, he's actually working in Sulphur at the Indorama

14  plant doing scaffolding, sometimes over a hundred feet in the

15  air.  It's a heavy duty job.  And he gets up at 4:00, gets ready,

16  usually leaves the house in time to be at the plant 45 minutes

17  early.  He likes to have time to kind of decompress before he

18  starts his arduous work and he's on plenty of time.  He's on the

19  same pace this morning.  He's not in any rush.  You'll hear no

20  evidence that he was distracted on a phone or anything like that.

21        He starts heading down from Eunice where he's drove his

22  whole life, Eunice in this direction, heading westbound on US

23  190.  He's following a white Yukon XL you'll see on the video

24  that makes a left turn and an 18-wheeler pulls out right in front

25  of him and blocks the entire road.  Thankfully he has time to

1    duck his head and hit the brakes at the last minute or this would

2    be a wrongful death case.

3           The collision is horrific.  It takes 20 minutes for the

4    ambulance to arrive to the scene in Elton, and in that time,

5    Wilfred Bradley will testify when he comes to, there's a nice

6    good Samaritan lady there talking to him telling him to stay put.

7    He could feel that there's blood everywhere.  He wakes up with

8    glass in his mouth.  You're going to see the images when the

9    trooper testifies in a few minutes.  It's amazing that someone

10   survived this accident.

11          When the fire department shows up and use the jaws of

12   life to open the vehicle to try to extract him, they still can't

13   get him out.  They have to cut off his seat belt and take out

14   parts of the back seat to extract his body.

15          Wilfred Bradley, in the time before the paramedics show

16   up, has testified that he blacked out a few times, but he

17   remembers the fear of seeing the smoke from his car and thinking

18   it's going to catch on fire and there's nothing he can do.

19          He sees blood everywhere.  He can look at his dominant

20   right hand mangled, his small finger, fifth digit, almost

21   completely gone.  He's got blood on his head.  He's in pain.  The

22   ambulance checks him out.  He has neck pain.  He has a mangled

23   right hand.  He has head pain.  There's a ten centimeter gash in

24   his head that's flapped open that he didn't even know that was a

25   source of the some of the blood.  That was some of the blood he

1    had.  He complains of immediate low back pain.  He thinks he has

2    a broken back.  They do CT scans at the ER to rule that out.  And

3    injuries to his leg and chest and upper back and midback

4    necessitating multiple surgeries on his right hand, disc

5    replacement surgery in his neck, and a fusion of his back.

6    Probably the worst things you'll hear about are the nightmares

7    and ruminations that go through his head.  The depression and

8    anxiety associated with losing your identity as a person who does

9    things the right way.

10             In this case you won't hear one bit of evidence of

11   Wilfred Bradley not being just a great person.  Never been in

12   trouble.  Always been a worker.  Always paid his taxes.  He was a

13   service member for his family.  I don't mean that in the military

14   sense, but took care of his mother financially and doing

15   everything she needed to take care of his 74-year-old mother in

16   Eunice.  His sister.  His adopted -- pseudo-adopted child, his

17   ex's child, and her grandchildren he's raised since they were

18   eight months old.  They're like his kids.  And he was always kind

19   of the rock who kept things together.

20             You'll hear evidence that not only was his job a really

21   heavy duty job, but he was one of these high intensity trainer

22   folks.  Almost like Rocky IV type stuff where he would do these

23   outdoor intense trainings.  That was kind of his release.  He

24   even trained boxers and trained some of his friends sometimes for

25   free and sometimes for some extra cash.

1          So why are we here and who are we suing and why?

2          Oh, I didn't tell you this.  This portion of US 190 is

3   straight as a board.  There's no visual obstructions.  There's no

4   hills or anything like that.  The direction from where

5   Mr. Bradley was coming, there's no impediment, and you'll see

6   there's no evidence of any reason for why an 18-wheeler driver

7   wouldn't see headlights coming for hundreds of feet.

8          In the video that you're going to see, there's

9   important factors you'll see in the video.  It's very short, but

10  you'll see one video scene shows kind of where the crash

11  happened.  You can't see the exact crash, but you can see the

12  vehicles as they're coming together.  It's grainy, convenience

13  store video.  And the other video kind of shows Mr. Bradley's

14  vehicle and the white SUV approaching.

15         But the important thing you'll see is, one, you can see

16  the 18-wheeler's headlights in the distance coming down LA 26.

17  Right when it appears behind these trees, you can see its

18  headlights appear, and we know that's 770 feet away from this

19  camera right here at the Chevron.  So you know the visibility is

20  at least 770 feet because that's when his headlights appear.

21  You're going to know that where the video starts is about right

22  here, about 350 feet from the intersection, and that's where even

23  on the video you can see the profile, a side shot, of

24  Mr. Bradley's low beam headlights.  Both vehicles have low beam

25  headlights.  You'll also see the 18-wheeler stop at the stop

1  sign, see that white SUV start to turn and then pull out, block

2  all three lanes, and the accident happened.

3        So the reason we're here is we're suing U.S. Xpress,

4  its insurer and its driver.  And why are we doing that?  Well,

5  one, it's pretty basic.  You've got to stop at a stop sign.  You

6  have to yield the right-of-way before you go.  You have to make

7  sure it's safe.

8        At this particular intersection, there are two stop

9  signs on each side for the truck driver in this case coming down

10 LA 26.  There's two red lights blinking.  There's two stop signs

11 on each side and there's two little yellow signs under each stop

12 sign saying, "Cross traffic does not stop."  Mr. Fiorucci,

13 working for U.S. Xpress, has to make sure that lane is clear

14 before he pulls out.

15       Also you're going to hear that left turning motorists,

16 they're presumed to be at fault in a crash.  So if you're making

17 a left turn, it's your job to make sure it's safe, and now the

18 burden is on you to prove that someone else did something to

19 cause this crash.

20       Another reason that we're suing U.S. Xpress and their

21 driver is who had the best opportunity to see the other person

22 coming.  The 18-wheeler is at a stop sign.  He has to make sure

23 it's clear before he goes, and he has the ability to look down

24 that driver's side window and see those headlights coming.  He

25 has these bright -- no, not bright, but these low beam headlights

 1   you could see from hundreds of feet away.  That's his visual cue

 2   to look for to see if a vehicle is coming.  He saw the white SUV.

 3   Never looked and saw Mr. Bradley.

 4          Mr. Bradley from the other way is going 55 miles an

 5   hour.  You'll hear from the judge that he has a right to assume

 6   the vehicle was going to be free -- that the roadway is going to

 7   be free of people pulling out and causing crashes.  He has a duty

 8   to look and use caution.  He's got these amber flashing lights in

 9   his direction.  The evidence will be that he was going 55 miles

10   an hour in a 55-mile per hour zone, but his visual cue is only

11   the running lights of this 18-wheeler on this dark morning with

12   some fog.  It affected visibility.  By the time he saw that

13   18-wheeler, there was nothing he could do except slam on the

14   brakes and duck his head to avoid the collision.

15          You will hear evidence that if Mr. Fiorucci had looked,

16   one, he should have seen Mr. Bradley's vehicle coming.  Two, once

17   he starts going, if he just looks again, he's going so slow he

18   can stop again probably before the fog lane if he just sees him

19   coming or maybe just a few feet in the intersection giving

20   Mr. Bradley a chance to avoid him, but he never sees him until 60

21   to 90 feet before impact and that's his own testimony.

22          Why else are we suing U.S. Xpress?

23          It's just a bad choice.  Why put this dangerous left

24   turn with these double stop sign red lights into your route that

25   day?  You're right here at the Walmart.  Go this way.  Take these

1    right turns and go straight into Eunice down 10 and 13 instead of

2    going down when you know you've got to cross US 190 at night with

3    some fog making a left turn that the experts will say is going to

4    take 10 or 11 seconds that he's going to be blocking that

5    roadway.

6            Another reason is because U.S. Xpress's truck drivers

7    are professional truck drivers.  They're held to a higher

8    standard than the motoring public.  We treat everyone equally in

9    court, but the judge is going to tell you professional truck

10   drivers, when they're –– he was hauling about 30,000 pounds.

11   When they're carrying these big ole' trucks, they have to be more

12   cautious.  They have to know the laws better.  They have to do

13   extra because they're held to a higher standard.  That's why they

14   have the commercial driver's license.

15           The last reason we're suing U.S. Xpress is because four

16   and a half years later we're still here talking about liability

17   in a case that ought to be very simple.  They refuse to accept

18   responsibility and that's why Mr. Bradley had to come here today.

19           So what is U.S. Xpress going to say about this?  What

20   evidence will they bring?  Well, U.S. Xpress is going to bring

21   their expert, an accident reconstruction person from College

22   Station, Texas.  His name is Eric Burson.  He's going to come

23   here and say that Mr. Bradley was speeding.  The only reliable

24   evidence in this case is Mr. Bradley is going 55 miles an hour.

25   That's what his testimony was.

1          That's what accident reconstructionist, Michael

2    Gillen –– you'll hear from him tomorrow morning.  He started up

3    the Baton Rouge Traffic Fatality Unit, worked for the Baton Rouge

4    Police Department for years and has been an expert accident

5    reconstructionist for a long time.  He says, look, you can figure

6    out speed.  It's not like a laser because we don't have the laser

7    from this gas station parking lot, but you can figure out speed

8    by triangulation and figure out a distance that's traveled, and

9    when you do that, he's going 55 miles an hour.

10          You'll hear Mr. Eric Burson say, no, he thinks it was

11   over 60 miles an hour, but his math was wrong.  He used the wrong

12   data points.  Mr. Gillen pointed that out and he's never come

13   back to correct that and that's why he got the speed he did.

14          What else is U.S. Xpress going to tell you in this

15   case?  They're going to tell you that Mr. Bradley should have

16   been going slower than the speed limit because there was some fog

17   and there's yellow caution lights.  Now, look, we all drive –– I

18   don't know if you've driven on US 190 before, but we all drive on

19   straight open highways.  If you're going 55 miles an hour, it's

20   pretty doggone good, especially when you're familiar with the

21   roadway.

22          And there's nothing in the law that says you have to

23   slow down for an amber flashing light.  What you have to do is

24   you have to use caution and Mr. Bradley did.  We know that.  He

25   was able to duck and hit the brake before he hit this dark truck

1   -- this truck coming out on a dark morning right in front of him.

2          You're also going to hear Mr. Burson, the person that

3   U.S. Xpress has hired, come here and say, hey, if Wilfred Bradley

4   had done this, the accident wouldn't have happened.  He's going

5   to go through things -- and he'll say this -- that you can put it

6   in any crash forever.  He'll say if Mr. Bradley was going slower,

7   maybe the accident didn't happen.  If Wilfred had just hit his

8   brakes sooner and stopped sooner, well, maybe the accident hadn't

9   happened.  That's not the law.  The 18-wheeler has to yield at

10  the stop sign.  You can't pull in front of somebody and say you

11  should have been going slower and stop faster.

12         THE COURT:  Let me stop you there, Mr. David.

13         As a reminder to the jury, it's the Court and not

14  counsel that instructs you on what the law is.  That will be the

15  ultimate when I give you those instructions as to what the law

16  is.

17         You may proceed.

18         MR. DAVID:  Thank you, Your Honor.  I appreciate it.

19         U.S. Xpress has also hired Mr. Burson to come here --

20  and this is U.S. Xpress's expert saying this.  He said this in

21  his report and he'll be here tomorrow or this week to testify

22  that this maneuver by Mr. Fiorucci and his 18-wheeler pulling out

23  from this stop sign with a vehicle coming and in view is

24  perfectly normal and okay.  The accident is all Wilfred's fault

25  and none of its driver's fault and there's nothing wrong with

1    what he did.  That's U.S. Xpress's expert testimony and opinion

2    in this case.  They did nothing wrong.  It's fine to pull out in

3    front of somebody on a dark foggy morning and it's their job to

4    stop.

5            The harms and losses and what happened.  This is a list

6    of providers that Wilfred Bradley has seen since the incident.

7            You're going to hear testimony from Dr. David

8    Muldowney, a board certified spine specialist, spine surgeon,

9    here in Lafayette.  He's been practicing for decades.  He did

10   neck and back surgery on Mr. Bradley, had multiple cervical

11   epidural injections that Mr. Bradley had to endure, lumbar

12   injections.  You'll hear that the pain has been very limiting and

13   going forward he's going to need future back surgery as well.

14           You're also going to hear about the sutures he got in

15   his head, and that from the concussion he had in the accident,

16   he's had headaches that have never gone away.

17           You'll hear from his neurologist, a board certified

18   neurologist, Dr. David Weir, who specializes in treating

19   headaches, that to abort these headaches, that Mr. Bradley has

20   had to take injections to keep them from happening and had some

21   additional medicine for when they'd come on, to try to stop them

22   so they're not as bad, and it has helped.  Mr. Bradley will tell

23   you that, too, and his doctors.

24           The surgeries helped.  The neck surgery has made his

25   neck pain and the radicular problems into his shoulders better.

1   The back fusion with those four screws into his back has made the

2   numbness in his legs and his back feel better.  There's no

3   surgical option for his upper back pain.

4          We haven't talked much about his hand.  His hand was

5   damaged horribly in the accident, damage to his ring finger, loss

6   of his little finger.  It was amputated.  It was basically

7   amputated in the accident, but they amputated what was left and

8   left a nub that day in Lafayette General.

9          Then Dr. Darrell Henderson, a board certified plastic

10  surgeon and hand surgeon, took care of him, took the stitches out

11  and followed him, and eventually to make his hand less painful

12  and more functional, took off the rest of the nub of the finger

13  and the entire bottom portion of the hand.  So his hand basically

14  is a four-finger hand without the bottom portion of the hand.

15  He's right-handed.  He'll never have the strength that he had

16  before.  He'll never have the strength in that four-finger right

17  hand than he has in his left hand.  It will always be weaker.

18         You're going to hear from Jenson Bergeron, a licensed

19  therapist.  Mr. Bradley also treated with Dr. Shelly Savant, a

20  psychiatrist, for his post-traumatic stress disorder and his

21  anxiety and depression.

22         And you're going to hear about how just about every

23  aspect of who he is and what he did before this accident is gone.

24  He would take sledgehammers and beat tires.  He would run

25  sprints.  He would lift dumbbells and do this high intensity

1    training.  He would work doing the scaffolding work lifting

2    100 pounds and getting 100 feet in the air, and as the lead man,

3    he was the guy on top who would set the tone for everyone else

4    and do a lot of the heavy lifting.  He's lost that identity.

5           He had the identity in his family and his community as

6    a person who owned a house.  He had a great job.  He had a

7    vehicle.  He had a good, you know, romantic life with his

8    girlfriends and friends and that has changed.  He's not the

9    service person anymore who helps out his sister with a car note.

10   You're going to hear evidence that he's not able to go and buy

11   his mom groceries and buy her clothes and held her move around

12   when she needs help moving around in her place like he did

13   before.  He still does what he can.  That loss of identity has

14   plagued him since this incident and it's probably going to plague

15   him for the rest of his life.  You'll hear evidence of that in

16   this case.

17          You're going to hear from these treating physicians,

18   and those treating physicians see him over time.  They've seen

19   him, some of them, for four and a half years now.  Dr. Muldowney

20   and Dr. Henderson have been seeing him that long, and Dr. Weir

21   and Dr. Bergeron now, it's been a couple of years.

22          With that experience of seeing him and doing those

23   exams, they're given greater weight than a doctor who either

24   never sees him or is just hired by an insurance company to do an

25   exam and give a report for litigation.

1        And medical causation is going to be an issue in this

2   case you're going to hear about, and every doctor who testifies

3   in this case, all of his treating doctors will say that his back

4   injury, his neck injury, his head injury, this cut to his head,

5   his concussion, and post-concussive headaches, his PTSD, his

6   hand, his anxiety and depression, are related to this accident.

7   That's going to be the evidence you'll hear.

8        And like the judge told us, it's not about which lawyer

9   you like the most or who argues the best.  It's about the

10  evidence and the facts that you hear in the case.

11       There's also going to be a presumption of injury and

12  you're going to hear that in this case, that if someone's healthy

13  before and working out strong -- and you'll see pictures of him

14  working out in the year before this accident.  You'll know that

15  he was working for Apache Construction a year before this

16  accident without issue.  If he's healthy and has a horrific

17  accident like this, it's presumed, if he had immediate

18  complaints -- and he did in his back, in his neck, in his head,

19  in his hand -- that those injuries were caused by the accident.

20       The defense wants to show you that some other incident

21  caused those problems, and there is no other incident after this

22  February 14th, 2018, crash.

23       You're going to hear that he was a good earner.  He

24  made good money, and with a humble education, did a whole lot

25  with what he had.  Never graduated high school.  Finished eighth

1    grade.  Did get his GED.

2              And his work involved a lot of manual labor.  We're

3    going to talk about things that he can do to try to go back to

4    work, but everything he's known in his past, the 21 years he has

5    as a scaffolder, that is over.  The construction work is done and

6    all of his doctors agree with that.

7              He's going to have future medical expenses.  You heard

8    about his back surgery.  He had a back fusion.  His doctor,

9    Dr. Muldowney, will testify that he will need another back fusion

10   in the future.

11             He's going to need medicine to take care of his

12   headaches and take care of his back and spine.  And I'll say this

13   about Mr. Bradley.  He does not like taking narcotic pain

14   medication.  You'll see that.  He's been offered it by doctors

15   and he's scared of it.  So other than taking it after surgeries

16   to recover from a surgery, he tells them no.  He's relied on

17   NSAIDs, over-the-counter Aleve and things like that.  You'll also

18   hear evidence that his surgery for his back was postponed because

19   his liver condition had gotten worse from that NSAID use.

20             When it comes time to make your decision in this case,

21   it's going to be -- when you come to figure out how much money to

22   award for the damages Wilfred suffered, you're going to look to

23   see in what ways has his life been affected, and I think when you

24   hear the evidence, you're going to wonder in what ways is it not.

25   He can't do the job he loved.  He can't be the servant he loved

1    being.  He can't do the working out and the tennis and softball.

2           You're going to hear evidence that when we were coming

3    in, one of the marshals downstairs in security recognized him and

4    said hey.  They played softball against each other before this

5    accident.  Can't train boxers anymore.  He does what he can.

6    He's not just sitting down.  He's trying to do what he can.

7           So what will U.S. Xpress say about that?

8           Well, the first thing they're going to say is, well,

9    we're going to argue that the back injury is not related, but you

10   have to hear the evidence.  The day of the accident he tells the

11   ambulance technician and the ER he's got bad low back pain.

12   You'll see the CT scan they do that show there's some issues at

13   L4-5 where he has a surgery a few years later and that they were

14   ruling out fractures in his back.  That's how bad his pain was.

15          You'll see a few months later he complains -- he goes

16   to the doctor.  His main problem is his neck, and you'll hear

17   that from Dr. Muldowney and his doctors and Mr. Bradley.  His

18   main concern early on was his neck, his head, and his hand, but

19   even when they're doing exams, they note the limited range of

20   motion in his back.  They'll note that he has tenderness in his

21   low back as well.

22          And, you know, what will they say?  They're going to

23   say, well, look, before this accident, we got medical records

24   from his family doctor to see if he had any back problems in the

25   past.  And they did.  No stone left unturned.  U.S. Xpress got

1   Wilfred Bradley's medical records back to 1977 when he was 11.

2   He's been seeing the same doctor, Dr. Segar, for all that time.

3   In the several visits before this accident, zero mention of any

4   back pain.

5           In 2015, about three years before the accident, he goes

6   in to the doctor.  He complains of a urological problem.  It's

7   his annual checkup.  And the second thing, he says I have some

8   low back pain and stiffness.  It's been going on for years from

9   working out.  The doctor gives him medication one time to help it

10  and that was it.  He comes back later that year.  No mention of

11  back pain.  He comes back again before the accident.  No mention

12  of back pain.  He sees other doctors before the accident.  And

13  you can look in the decade before that where he sees his doctor

14  almost every year, no mention of back pain or injury before that.

15          I think the evidence will show he's a 40 something year

16  old guy who works out and works hard.  He went to his doctor and

17  said, look, for years I've had stiffness when I'm doing some

18  working out, and that's what that was.  That wasn't a horrific

19  accident that changed his life and had treatment with a spine

20  surgeon going forward.

21          His family doctor didn't refer him -- you'll hear

22  evidence -- to any doctor.  He didn't ask for any x-rays or MRIs

23  like he's had since this accident.  And you'll see.  The doctors

24  will walk through the MRIs and the disc problem he had at L4-5

25  that needed to be fused and the problem at C3-4 in his neck where

1   the disc is out and it needed to be fixed with a disc replacement

2   surgery, permanent hardware in his neck and his back, and both of

3   those surgeries improved his condition.

4           You're also going to hear them say, well, he might have

5   a past history of psychological problems, too.  Before this

6   accident Wilfred Bradley never saw a psychologist, never saw a

7   licensed counselor, never saw a psychiatrist.  And they'll say,

8   well, back, you know, 15 years before the accident, 15 years ago

9   he had a heart episode, a heart attack that he in his deposition

10  said was about stress.

11          You know, he had a rough few years, rough years that no

12  one needs to have.  You'll hear evidence that in 2005, Wilfred's

13  only biological son, his child, his 12-year-old, was sick.

14  Wilfred took him to the hospital one night.  UMC said he would be

15  fine and his son never woke up again.  He lost three siblings in

16  the next two years.  He had some stress and had a heart -- he

17  didn't know he had a heart attack.  When he was having his back

18  surgery, they said you know you had a heart attack.  He knew he

19  had a heart episode.

20          But other than that, he didn't miss work.  He went

21  right back to work.  Didn't see a psychologist or have stress or

22  anxiety he was dealing with on a regular basis until this

23  accident and it changed it.

24          You're going to hear from their vocational counselor --

25  and this is a search for truth and evidence.  Their vocational

1  counselor gave his report years ago on records that are years old

2  and never even updated his thoughts or concerns for Mr. Bradley.

3  Is that a search for truth?

4         The last thing they'll do is they'll show you some

5  surveillance they've taken.  For months they had people following

6  Mr. Bradley around.  It's been a few years since it happened, in

7  '18 and '19, and there's nothing in that evidence that Wilfred

8  Bradley has ever said he can't do and nothing that his doctors

9  said he couldn't do.  He gets in and out of his car a few times.

10  He's walking around his front porch.  He meets some of his

11  neighbors and friends who stop by.  You don't see any big time

12  activity.  He's not moving furniture.  He's not running races.

13         He'll testify he's doing everything he can to work out,

14  but now that's mostly walking.  He tried some sprinting.  He used

15  to sprint 300 yards at 85 percent.  He could do that over and

16  over again, and now, since this accident, he's tried to sprint a

17  few times and sprinting for him is a light jog and he can't do

18  that.

19         THE COURT:  Mr. David, you're at 30 minutes.  You need

20  to wrap up.

21         MR. DAVID:  Thank you so much.  I appreciate it, Your

22  Honor.

23         When you hear the evidence in this case of the past and

24  future medical expenses, the past and future lost earning and

25  lost earning capacity, and the past and future mental and

1    physical pain and suffering, the loss of enjoyment of life, the

2    disfigurement, the lost identity, the lost mobility, the lost

3    independence that Wilfred Bradley has, the evidence will show

4    that this case is worth seven million dollars.

5              Thank you very much.

6              THE COURT:  Mr. Dill, you may proceed when you're

7    ready.

8              MR. DILL:  Thank you.

9              Good afternoon, ladies and gentlemen.

10             As I mentioned before, I represent George Fiorucci,

11   U.S. Xpress, Mountain Lake Risk Retention.

12             I did not introduce my team before we started.  Karen

13   Guidry is my paralegal.  You met Mr. Wynne who's an attorney with

14   me, and our corporate representative here is Ms. Sidney Crawford,

15   and I apologize for not doing that earlier.

16             I sat here and I listened to Mr. David talk about this

17   accident and I couldn't help but think, wow, we really do see

18   things differently.  Maybe I'm missing half a file here or

19   something, but after all this time, I think I know the file

20   pretty well.

21             We agree that the accident happened on

22   February 14th of 2018 and you saw the satellite video, and --

23   or satellite image.  You're going to see a video that is going to

24   show you two different angles and show you everything that was

25   out there.

1           It was in the early morning hours around 5:00 a.m. --

2     and there's a little discrepancy because the police officer put

3     it happened at 5:10 in the morning, but the video shows it

4     happens at 5:42 in the morning.  I'm sorry.  4:52, not 5:42.  I'm

5     getting my numbers mixed up.

6           It happened at the intersection of Highway 90 and

7     Highway 26 in Elton.  It was dark and it was foggy.  You're going

8     to hear the two witnesses that are -- the only two witnesses that

9     are going to talk about the actual accident are going to be

10    Mr. Wilfred Bradley and Mr. George Fiorucci and both of them said

11    it was moderately foggy that morning.  They were out in the

12    country in Elton on Highway 26 and Highway 190.  The

13    intersection, as you heard earlier, was controlled by a flashing

14    yellow caution light for east and westbound traffic on Highway

15    190, and there were stop signs and a flashing red light for

16    traffic north and southbound on Highway 26.

17          The little gas station that you saw in that corner is

18    lit.  There's a Chevron sign on the corner that lights up the

19    corner.  The canopy lights for the gas pumps shine light all the

20    way across Highway 190.  And then across the road there's a

21    little ice vending machine, the kind you go up with your ice

22    chest and you put your money in and it goes straight in your ice

23    chest.  It's there and it's got lights set off the road a

24    distance that shed light on that entire corner.

25          As I said, the relevant facts of this case are all

1    captured on video.  You get to watch the accident.  It doesn't

2    matter what I say.  It doesn't matter what he says.  You get to

3    look at it and say I see what I see and you can make your own

4    determinations of what happened.

5            George pulls up to the stop sign on Highway 26 about

6    ten feet from the fog line of Highway 190.  You see him stop.  He

7    sits for 10 or 11 seconds.  You can see him just sitting there.

8    He's got all the lights on in his truck.  He's got a row of amber

9    lights across the cap at the top.  He's got the two headlights on

10   at the bottom.  The door has "U.S. Xpress."  And you've seen the

11   picture and you saw how it kind of reflected.  You'll see it in

12   the video reflect.

13           He had what we call conspicuity tape in the industry.

14   It's red and white tape all the way down the side of the truck.

15   He had a side marker light at the top of the trailer in the

16   front, and then on the side of the trailer in the middle he had

17   an amber marker light that was a turn arrow that flashed and

18   you'll see it flashing in the video.  And then you can see the

19   marker light at the rear of the trailer, and you actually see the

20   flood of the red lights from him holding the brakes on the

21   ground.

22           You will watch him for ten seconds from a camera that's

23   300 feet away.  You'll get an idea of what visibility was like at

24   that intersection because it captures that particular area.

25           George begins his turn at the gas station -- I say

1    into.  It's at the gas station.  And let me back up.  He sits and

2    watches.  You're going to hear his testimony that he's watching a

3    white SUV that's coming in.  It doesn't have a signal on, but

4    he'll testify that I knew he was going to do something.  He was

5    either turning on Highway 26 or he was going to turn in the gas

6    station, but he was slowing down.  And he watches him.  That

7    vehicle turns in and George goes, and George is going to testify

8    that when he went, he saw nothing to his left.  There were no

9    lights behind that white SUV that he could see.

10          He takes off, head on a swivel looking back to see if

11   there's anything coming from the other light to make sure he's

12   got room to clear, and about two seconds after he takes off,

13   you'll be able to see from the other camera angle that

14   Mr. Bradley appears and that distance is just under 500 feet

15   away.

16          And what you will see from that video is a lot of

17   information, and we're going to play it over and over with the

18   experts just to make sure that you see every little piece of what

19   we see, but Mr. Bradley's driving -- I think it's a 1999

20   Volkswagen Passat and you see it appear in the right frame of the

21   picture and it comes across, and you can see the black vehicle,

22   not just the headlights.  You can see the black vehicle in the

23   video.  That's the ambient light that you have in the area.

24          And you're going to hear from plaintiff's expert that

25   he drives, according to their expert, 55 miles an hour from the

1   time he enters that video until he slams into the side of that

2   truck, which is seven and a half seconds into its turn.  He never

3   slowed down.  He never reacted.

4           You're going to hear Mr. Bradley testify that he did

5   not see the 18-wheeler at all until he got to the gas station or

6   about 130 feet from impact with the side of the truck.  He had

7   all of the ambient light, and you'll be able to see from 300 feet

8   away, you'll have that vantage point from the video, what he

9   should have seen.

10          Their expert, as Mr. David said in his opening remarks,

11  said he could see the truck's headlights at 770 feet using the

12  video and finding a mark, and then he says that it would be

13  reasonable that George should have been able to see 770 feet down

14  Highway 190 based on that, saying that the fog should have been

15  uniform, but you have both Mr. Bradley and Mr. Fiorucci who

16  dispute the level of the fog and the ability to see that far.  We

17  are going to submit to you that Mr. Bradley could have seen at

18  least the 500 feet from when he comes into view and could have

19  seen that truck.

20          Now, Mr. Gillen, plaintiff's expert, did a bunch of

21  calculations, and you're going to -- this gets into the technical

22  aspect of this case.  There's something we call

23  perception-reaction time, that you as a driver -- and the judge

24  is going to give you the jury instructions -- are required -- it

25  is your duty to keep a proper lookout as you drive and you're

1    supposed to perceive and react to those things that are in your

2    way.

3              Mr. Gillen testifies that typical perception-reaction

4    time is about 1.5 seconds, meaning when something happens, you

5    see it and it takes you three-quarters of a second to see it and

6    then three-quarters of a second to react to it.  So just seeing

7    it and applying your brakes would take a second and a half, and

8    at night, he extends it to two seconds.

9              You'll hear Mr. Gillen say that if Mr. Bradley had

10   perceived and reacted in the 500 feet before, that he had enough

11   room to stop not once, but twice in that area.  He had enough

12   room to just slow down.  Mr. Gillen will testify if he had slowed

13   his speed to 45, he would have actually arrived after the truck

14   had cleared the lane.  There would have been enough room for

15   Mr. Fiorucci to complete his turn.

16             So, as I said, the testimony from Mr. Bradley and

17   Mr. Gillen will be that there were no brakes applied actually

18   until the moment of impact.  Mr. Gillen believes he can see a

19   brake light coming on at that point.

20             You will also hear from Mr. Gillen that if there was no

21   fog, the sightline along Highway 190 was such that at 900 feet

22   out, you could actually see where the truck was.  There was

23   nothing along the road.  There were no trees or any obscurements

24   that would prevent Mr. Bradley from seeing it.  So once he clears

25   through the fog, there's nothing that's going to block his view

1    of the truck as it sits at the corner or pulls out onto the road.

2    As I said, you're going to be able to see all of those conditions

3    yourself.

4              What are the duties?  Mr. David stood up here and told

5    you about presumptions and duties and obligations, and I want to

6    make it very clear that that has to come from the bench.  That's

7    his job.  That's our boss when it comes to what we call a duty

8    under the law.  The judge is going to give you those instructions

9    and those are the instructions that you're going to follow, not

10   what he said because we disagree.  I can tell you right now I

11   disagree with some of the things he said in his opening

12   statements vehemently.  And you can't rely on what I say.  You

13   have to do what the judge says, but what we anticipate is he is

14   going to give you instructions on various parts of our law.  One

15   is our general speed law in Louisiana which says you can't drive

16   faster than conditions allow.  That's common sense.  It's our

17   duty under the law to reduce our speed when the weather

18   conditions require it.  If it's foggy and we can't see, you're

19   supposed to slow down.

20             A driver faced with a yellow flashing light is required

21   to proceed with caution which I would submit means slow down and

22   watch out because there's a reason they put those caution lights

23   up.  They put them up because the state has identified the

24   intersection as a dangerous intersection.  The driver faced with

25   a red flashing light is required to stop.  Again, common sense.

1          And then the other thing -- well, there's two other
2  things.
3          The judge is going to instruct that you have to keep a
4  proper lookout.  Not only are you required to look, but you're
5  required to see what should have been seen.  So even if
6  Mr. Bradley didn't see the truck, if you find that he should have
7  seen the truck, then you have to hold him accountable for that.
8          And then finally there's one that we call preemption of
9  the intersection, and that means if a driver who does not have
10 the right-of-way preempts an intersection, then the other
11 motorists have to now yield to him.  And what preemption means is
12 he entered when it was reasonable to do so, and I submit to you
13 the common sense thing is if a truck pulled out of an
14 intersection and broke down in the middle of the day and was just
15 sitting there, you can't just drive your car into the side of it
16 and say it's your fault.  It's common sense.  I don't want to get
17 into the weeds of the argument of this case, but just giving you
18 an idea of what preemption is.
19         Damages.  Mr. David presumed to tell you what I'm going
20 to say in this trial, and I'll speak for myself and I'll speak
21 for my client.  This was a horrific accident.  There's no two
22 ways about it.  It was a bad accident and Mr. Bradley got hurt.
23 He lost his pinky finger.  It was basically traumatically
24 amputated.  It had to be amputated at the hospital and then
25 revised later.  He had complaints of back pain neck pain and

1    upper back pain from the accident and it took them a while to

2    extricate him.

3           Nobody in this courtroom wants accidents to happen.

4    That's the last thing that my clients want to have happen.  They

5    hate having to send me to court to talk about cases.  As human

6    beings, we sympathize with Mr. Bradley and we understand he had

7    some injuries and we hope that he recovers from those injuries

8    completely and fully to the best that he can.  He'll never get

9    the finger back, but hopefully he's gotten some use of the hand

10   and can do things.

11          He had a neck injury.  Mr. David talked very fast, but

12   the progression of the injuries in this case are the things that

13   we're going to talk about because when Mr. Bradley got to the

14   hospital, he met with the ER doctor and, yes, they did scans of

15   his entire spine, but the ER doc says he's got a gash on his

16   head, the injury of his hand, and he's got neck and upper back

17   pain.  That was it.  That was the diagnosis you're going to see

18   from the emergency room physician.

19          He then gets referred by counsel, by the attorney, to

20   Dr. Muldowney and he begins treatment and he treats for a long

21   time for the neck and upper back pain.  And he actually sees a

22   doctor at our request, Dr. Bertuccini, and you'll hear from

23   Dr. Bertuccini.  Dr. Bertuccini said I don't think he needs a

24   surgery.  It's not going to fix what he's got.

25          Mr. Bradley had the surgery and he says he got some

1  relief, but he still has pain in his neck and you'll have to
2  decide whether or not that was necessary, but he had the neck
3  surgery.  He did have that.
4        And then almost three years after the accident, after
5  treating with Dr. Muldowney —— and we'll go through that ad
6  nauseam with Dr. Muldowney —— he begins complaining of back pain.
7        I took his deposition and went through all of his
8  complaints, and you'll hear he never brought up low back pain
9  until three years after the accident after he had the neck
10  surgery and after he had gone back to working out.  And you're
11  going to hear from his physicians and from his experts that he
12  went back to some of those HIT or high intensity training
13  activities.  He was running sprints, he was using boxing bands,
14  and he was doing other of things, and three years later he begins
15  to have this low back issue.  We're going to take issue with that
16  and its causal relation to this accident.
17        Mr. David brought up what we call the *Housley*
18  presumption, that if after an accident you develop problems, that
19  it's presumed that they're related to the accident, but the
20  actual law says the problems begin immediately thereafter.
21        Ladies and gentlemen, at the end of this case we're
22  going to ask you to render a verdict based on the evidence in
23  this case, to perform your duty as a jury to determine whether or
24  not the two operators in this case performed their duties as
25  motorists and decide who was at fault and to what degree, and at

1    the end of this case, if you decide –– I get one shot at this.

2    So I have to talk about damages as a part of it.  If you decide

3    that there is any fault on Mr. Fiorucci, to render a fair and

4    just verdict on what they prove, no more and no less, and that's

5    what we're going to ask that you do.

6           I thank you so much for your time, I thank you for your

7    service, and we very much appreciate it.

8           THE COURT:  Okay.  We've been going almost –– thank

9    you, counsel.  We've been going almost an hour.  I'm going to go

10   ahead and let the jury stretch their legs and take a break.

11          What I would ask is –– I'm instructing you that again

12   you're not to discuss this case while you're on break.  Don't

13   discuss the case with each other at this point.  I want you to

14   keep an open mind as you listen to the testimony and the evidence

15   that is presented in this case.  Do not talk to anybody.  Don't

16   get on your phone and do any research on this case.  We'll come

17   back in about ten minutes.

18          Thank you.

19             (Jury Exited the Courtroom)

20                (Recess)

21          THE COURT:  Please be seated.

22          MR. DAVID:  Your Honor, I'm anxious to get started.

23          We have a couple of preliminary matters.  They're

24   agreed-to exhibits.  We'd like to enter some exhibits.

25          The first thing we're going to do is show the video of

```
1    the incident.  Then put on the trooper.  He's still sequestered.

2    He'll come in after the video, which will be very short, and then

3    maybe Acadian Ambulance EMT.

4              Do you plan on stopping at 5:00 or 5:30?

5              THE COURT:  I will go no later than 5:30.  I would

6    prefer to stop at 5:00, but if we're making progress and we can

7    do some good in 15 or 20 minutes, I'll go to 5:15 or 5:20.

8              We're going to get air until after 5:30 right, Paula?

9              THE COURTROOM DEPUTY:  Yes, sir.

10             MR. DAVID:  We're going to get what?

11             THE COURT:  Air conditioning.

12             MR. DAVID:  That's important.

13             THE COURT:  This is a government building.  The air

14   conditioning shuts off at 5:00 o'clock.

15             MR. DAVID:  Thank you, Your Honor.

16             THE COURT:  All right.  So what are we going to

17   introduce?

18             MR. DAVID:  We're going to introduce -- plaintiff and

19   defendant are going to put in some evidence.  I think -- I want

20   to make sure -- we can go piece by piece or the whole book?

21             MR. DILL:  Your call.

22             THE COURT:  We've got to have a record.

23             MR. DAVID:  Okay.  We'll go ahead.

24             The plaintiffs offer, file, and introduce into the

25   record items already identified in plaintiff's bench book,
```

1   Index 1, Exhibit 1, property evidence photos; two, the Custard

2   Insurance photos; three, injury photos; four, photos of prior

3   activity; five, crash report; six, medical recap.  That reminds

4   we have a stipulation as well, Your Honor.  Seven, excerpts of

5   medical records, 7A through -- well, let me go ahead and read the

6   exact ones we have because we didn't want to duplicate.

7            And before I do that, Your Honor, I want to make sure I

8   clarify a couple of things.  I think everything I've said thus

9   far is unopposed from opposing counsel.

10            Where's that stipulation?  Right here.

11            We also have an association with Plaintiff's Exhibit 6,

12   the medical expense recap.  All parties stipulate to the

13   authenticity and admissibility of plaintiff's recap of Wilfred

14   Bradley's medical expenses totaling $293,108.44, Plaintiff

15   Exhibit 6, with defendants specifically reserving any and all

16   causation defenses.

17            Is that right?

18            MR. DILL:  Yes.

19            MR. DAVID:  The second, the parties stipulate to the

20   authenticity and completeness of the submitted records and bills

21   reflecting the past medical treatment and expenses in plaintiff's

22   exhibits and the defendants' exhibits.

23            And, three -- and this is the unique one, Your Honor.

24   The parties stipulate that though the medical records will be

25   filed into the record, no such medical records will be published

1    to the jury without the redaction of submitted medical record

2    bills to conceal the personal information of plaintiff like

3    Social Security and date of birth and any reference to a

4    collateral source.

5            We've done a good job in trying to redact that, but

6    there are so many records, particularly with the defendants who

7    have kind of everything, plaintiffs have more excerpts, that that

8    was just our provision to protect Wilfred Bradley and the record

9    to make sure we're okay with it going into the record, but we

10   don't want collateral source information or sensitive personal

11   information going to the jury.

12           Any problem with that, Jim?

13           MR. DILL:  No problems with that, Your Honor.

14           MR. DAVID:  We have one more stipulation we'll do

15   tomorrow or the next day about the surveillance as well, Your

16   Honor.

17           MR. DILL:  Judge, there was one he read off and it was

18   a traffic crash accident report and I don't think we had an

19   objection, but that's a hearsay document, and there are some

20   conclusions reached by the trooper that would be expert opinion

21   as opposed to just fact reporting and I've got to raise that.

22           THE COURT:  Typically I will require that you redact

23   the hearsay witness statements and the expert portions where they

24   express an opinion.  The rest of it, you know, usually I'll allow

25   in.  Can that be done?

1          MR. DAVID:  These have been in the bench book since we

2     submitted them.  There was no objection ever submitted.  I'm

3     happy to what the Court wants to do, but it's one of those --

4          THE COURT:  I'm sustaining the objection.  Hearsay

5     statements -- no hearsay statements unless you have an exception

6     to the hearsay rule, and as far as the opinion testimony or the

7     opinion statements of the trooper, those need to be redacted

8     unless you have some independent basis for that.

9          MR. DILL:  Judge, there is one other item.

10         He issued a citation.  My client pled no contest to a

11    non-moving violation.

12         THE COURT:  I usually will strike that.  I'll sustain

13    that objection.

14         MR. DAVID:  Okay.  There was no objection before.  So

15    I'm not sure how we redact this right now.

16         What pages do you want?

17              (Attorneys Conferring)

18         THE COURT:  All right.  If y'all want this on the

19    record, y'all are going to have to talk at a microphone and not

20    talk over each other.

21         MR. DAVID:  I think we can talk off the record, Your

22    Honor.

23         THE COURT:  Okay.  LaRae, we can go off the record.

24              (Off the Record)

25         THE COURT:  We can go back on the record now.

1          MR. DAVID:  So we did 1 through 4.  We're not going to

2    do Plaintiff's 5, the crash report.  We did 6, the medical

3    expense recap, and then 7, we have basically everything that

4    y'all have seen.  We can go through each one, but I believe the

5    first is a series of bills that we had in Exhibit 7.  G was

6    excerpts from Lafayette Bone and Joint.  7I is Dr. Henderson.  7S

7    is Dr. Weir.  7T is Mr. Bergeron.  7Z is Ms. Savant.  7CC is

8    Renal Physicians.

9          Going to Volume 2.

10         And then Exhibit 8, this is -- again, this is the

11   policy which is not published to the jury.

12         We'll agree to that, right?

13         Exhibit 8 the dec sheet of the policy, not published to

14   the jury.  Exhibit 9, that's the Stokes CV.

15         We're going to keep our CVs out of it right now?  What

16   do you think?

17         MR. DILL:  It doesn't bother me to put a CV in.

18         MR. DAVID:  Okay.  Exhibit 9 is Larry Stokes' CV.

19   Exhibit 10 is John Theriot's CV.  Exhibit 11 are some -- all the

20   exhibits from Mike Gillen.  Exhibit 12, plaintiffs are not going

21   to submit.  Exhibits 13 and 14 will not be an exhibit.

22   Exhibit 15 is the logs we talked about this morning, Your Honor.

23   I think the defendants lodged an objection, but it was overruled.

24         THE COURT:  Yes.

25         MR. DAVID:  Exhibit 16 are some excerpts of CT and

1   x-ray images.  Exhibit 17 is the actual video about the Chevron

2   convenience store video.  Exhibit 18 are the defendants' answers

3   to the petition in discovery.  And Exhibit 19 are the aerial

4   Google -- actually, I think the aerial Google images are going to

5   be demonstrative.  We've already talked about that, Your Honor.

6   So that's it.  Plaintiff's 1 through 18 as we discussed.

7              Any objection?

8              MR. DILL:  None other than those expressed already,

9   Judge.

10             THE COURT:  Okay.  The Court sustains certain

11  objections.  With respect to the rest, it's admitted.

12             MR. DILL:  Judge, the defense will go ahead at this

13  point and introduce Volume 1, medical records under Exhibit A:

14             One, Acadian Ambulance; two, Cardiovascular Institute

15  of the South; three, Dr. Segar; four, Walmart; five, Lafayette

16  General Medical Center; six, Acadian Medical Center/Mercy

17  Regional; seven, Dr. David Muldowney.

18             Continuing in Binder Number 2:

19             Exhibit Number 7, Dr. Muldowney, and Exhibit 8,

20  Dr. Henderson.

21             In Volume 3:

22             Exhibit 8A, Therapy Center; 8B, the Oil Center Surgical

23  Plaza; 8C -- I'll hold 8C for right now, Judge.  Exhibit 9,

24  Lafayette Specialty Surgical Center; Exhibit 10 in Volume 5,

25  Neurodiagnostic Monitoring; 11 -- I'm sorry, 12, Therapy Center;

1   13, Jenson Bergeron; 14, University Hospital and Clinics; 15,

2   Falcon Pharmacy; 16, Southern Spine Institute; 17, Practical

3   Healthcare Supply; 18, Acadiana Renal Physicians.

4           I'll not offer 19 at this time, Judge.

5           THE COURT:  You're not offering 19?

6           MR. DILL:  I'm not offering Dr. Savant.

7           20, Acadiana Vascular Center; 21, Teche Drugs; 22,

8   Eunice Medical Laboratory; 23, Rehab Xcel of Eunice; 24,

9   Performance Physical Therapy.

10          And then in Volume 6 under item Exhibit C:

11          Number 1, the Louisiana State Police photographs;

12  Number 2, Custard Insurance adjuster's photographs; Number 3,

13  surveillance videos of plaintiff; and, Number 4, a video of the

14  scene.

15          And we'll hold the rest of the exhibits at this time,

16  Judge.

17          MR. DAVID:  And, Your Honor, plaintiffs don't object to

18  any of those except we renew our objection to the wholesale

19  introduction of five hours of surveillance video, but the Court's

20  already ruled on that as well.

21          THE COURT:  And, again, my understanding was you're not

22  going to obviously show the full five hours.

23          MR. DILL:  We are not watching five hours of video,

24  Judge.

25          I'm going to send them to Mr. David tonight.  I have

1     them clipped out.  I have a few short 30 seconds.  I think the

2     longest might be -- I have one that's eight minutes that I'm not

3     even sure I'm going to show the whole eight minutes.  I'll

4     probably segregate that, too, but it's one eight-minute video and

5     the rest are vignettes.

6               THE COURT:  And, Mr. David, you have the full five

7     hours, so you can -- like a deposition transcript.  If you don't

8     like the excerpts, you can supplement.

9               MR. DAVID:  And, again, we have not yet seen the

10    excerpts.  We reserve our right to object to the excerpts as

11    well.

12              THE COURT:  And that reservation is valid.

13              Those documents are admitted.

14              MR. DAVID:  Thank you, Your Honor.

15              Our plan now is to play the video for the jury.  I

16    would like, with the Court's indulgence without giving any

17    steering, it probably would be nice for me to kind of give them

18    an idea of where the 18-wheeler is as it shows up -- I won't go

19    out of bounds on that -- just because it takes four or five times

20    of watching it to see.

21              MR. DILL:  Can we establish the boundaries, Judge?

22              MR. DAVID:  Only identify where the 18-wheeler is and

23    maybe identify the white SUV coming in so they don't think it's

24    Mr. Bradley and identify Mr. Bradley.

25              THE COURT:  Any objection to that?

1          MR. DILL:  None, Judge.

2          THE COURT:  And I will say I was a bit taken aback by

3     the legal arguments in the opening statement.  There wasn't an

4     objection and I never like to intrude on a party's opening

5     statement because of the impact that could have on the jury's

6     perception of the client, but we should never have gotten there

7     as far as not so much the law if it was undisputed, but there are

8     disputed statements of law and that's why I allowed Mr. Dill to

9     venture into that.

10         What I would have preferred is that neither side had

11    ventured into that until the Court's made a determination, and

12    what I'm going to do is I'm going to give the jury an instruction

13    when they come in, basically the substance of which is much like

14    the facts -- the lawyers disagree on the facts.  They also

15    disagree on the law.  The law that you apply is the law I

16    ultimately give you and not what the lawyers say the law is, and

17    that's -- I think that that will clear up any issue and I'm

18    assuming we can move forward from that point.

19         MR. DAVID:  Yes, sir.

20         THE COURT:  All right.  Very good.  Thank you.

21         Let's go ahead and bring the injury in.

22              (Jury Entered the Courtroom)

23         THE COURT:  Okay.  Everybody may be seated.

24         Just to tell the jury where we're headed next, before

25    you came in, the parties and counsel, we did some housekeeping to

1    try to speed things along and get some exhibits introduced.  So

2    what we are doing now is we're going to go into the plaintiff's

3    case.  They get to start first.  Mr. David will call his first

4    witness.

5              I do want to clarify and just make sure that I give you

6    the instruction.

7              During opening arguments counsel for both sides talked

8    a lot about the law.  You probably will not be surprised the

9    lawyers dispute the facts.  They also dispute what the law is.

10   Ultimately you're not to credit the plaintiff or the defendants'

11   statement of the law.  The statement of the law that you will

12   apply is what I give you because I'll be the final arbiter as to

13   what the law is and that will be done right before you

14   deliberate.  I just want to clarify that.

15             Well, are we ready for your first witness?

16             MR. DAVID:  Thank you, Your Honor.

17             And we've submitted a bunch of exhibits and uniquely

18   our plaintiff's first witness is the video.  We want the jury to

19   see the video of what happened first and then our next witness

20   will be the trooper to come in and talk about that.

21             THE COURT:  Okay.  And you're going to make just a few

22   statements with respect to --

23             MR. DAVID:  I'm going to do my best to not lean in any

24   one direction even though I'm partial to one side and only

25   identify vehicles in the video, Your Honor.

1      THE COURT:  And if we have an issue here, just ask to

2  approach and we can iron out any issues for the jury.

3      MR. DAVID:  For the Court's point of view and the jury,

4  it's going to start out with a view right here from the camera at

5  the Chevron station that kind of shows the intersection.  It's

6  dark and it's not a great video, but it's the best we have, and

7  you're going to see the 18-wheeler is going to come somewhere in

8  this direction and you'll see some lights in the distance.  It

9  will come right here and come to a stop.  You'll see its running

10  lights and its blinkers.  You'll see a white SUV coming here and

11  turn into the gas station.  Then after that, you'll see the

12  lights of Mr. Bradley's -- Mr. Wilfred Bradley's vehicle hit the

13  18-wheeler or disappear behind the 18-wheeler.

14      THE COURT:  Paula can dim the lights.

15      MR. DAVID:  That might be very helpful.

16      Thank you, Paula.  I appreciate it.

17      And the next video will be a little further down.  You

18  won't see the actual impact, but you'll see the vehicles just

19  before and the truck just after the impact.

20      I'm going to go ahead and hit the play button.  It's a

21  couple of minutes before you see a whole lot of action.

22      You can see the headlights of the 18-wheeler as it

23  approaches behind the trees.  Right here he comes to a stop.

24  You're going to see a white SUV come in here from this side, and

25  then behind that will be Mr. Bradley's -- you'll see the lights

 1    of his vehicle.

 2              Now will be the other camera angle, Plaintiff's 17.

 3              That's the 18-wheeler lights you can see approaching

 4    from the back, but you won't be able to see it at the stop sign.

 5    And you'll see the white SUV and then Mr. Bradley's vehicle.

 6    That's the 18-wheeler.

 7              That's the video.

 8              You can take it off, Paula.  Thank you so much.

 9              Now the plaintiffs call Trooper Michael Davis.

10              Can I go in the hall, Your Honor?

11              THE COURT:  You may.

12                     (Pause in Proceedings)

13              THE COURT:  Please approach and be sworn.

14              THE COURTROOM DEPUTY:  Please raise your right hand.

15              Do you solemnly swear that the testimony you are about

16    to give in this case will be the truth, the whole truth, and

17    nothing but the truth, so help you God?

18              THE WITNESS:  Yes, ma'am.

19              THE COURTROOM DEPUTY:  Thank you.

20              You may be seated right here.

21    Whereupon,

22                     MICHAEL DAVIS

23    was called as a witness; after having been first duly sworn, was

24    examined and testified as follows:

25                     DIRECT EXAMINATION

1   BY MR. DAVID:

2   Q    Can you state your full name for the record.

3   A    Senior Trooper Michael Davis.

4   Q    Thank you, Senior Trooper.  I appreciate that.

5        We're here to talk to you about a February 14th,

6   2018, automobile accident that I believe you investigated,

7   correct?

8   A    If it's the one that's in front of me, yes.

9   Q    February 14th, 2018.  It says about 5:10, but I think your

10  other notes you say the ambulance was called at 4:55.  So

11  sometime right before 5:00 a.m. the accident happened?

12  A    Approximately that time, yeah.

13  Q    That's right?  We have to make sure the record is clear.

14  A    I understand.

15  Q    So correct?  Sometime before 5:00 a.m. the accident

16  happened?

17  A    Approximately, yes.

18  Q    Okay.  Thank you so much.

19       Tell me about your history working for the state police

20  and how you got to be a senior trooper at the state police.

21  A    In 2008 I applied at the state police and was hired and went

22  to the academy.

23  Q    Okay.  And tell me kind of what your role has been with the

24  state police the entirety of the time you've been working.

25  A    I've had multiple roles.  I've had patrol.  From 2008 to

1    roughly 2019 I was patrol.  From 2019 to current I am now on the

2    weight enforcement section of the state police.

3    Q    Well, thank you so much for being here, Trooper Davis.

4         So at the time of this accident you were still on

5    patrol, correct?

6    A    That is correct.

7    Q    And tell me, based on your training at the academy and

8    training at the state police, what being a patrol officer for the

9    state police generally does when it comes to crash

10   investigations.

11   A    Traffic enforcement and crash investigation.

12   Q    Okay.  And when you're alerted to a crash, kind of what's

13   the next step?  What do you do?

14   A    I log myself en route and head to the crash.

15   Q    Okay.  And what time did you arrive for this accident?

16   A    According to my report, at 5032 hours.

17   Q    So at 5:30 in the morning?

18   A    5:32.

19   Q    Thank you.

20        And what was the road surface like when you arrived?

21   A    According to my report, it was dry.

22   Q    And what was the -- let me back up a little bit.

23        What was the weather like?

24   A    The weather conditions is reported as foggy.

25   Q    And what was the lighting like based on your report?

1   A    Dark, no streetlights.

2   Q    And if you can remember -- and the jury has heard this in

3   opening, but I want to hear it from you.

4          How was the traffic control at the intersection of

5   LA 26 and US 190 where this accident happened?

6   A    Can you rephrase because I'm not quite understanding what

7   you're asking?

8   Q    Stop signs and red flashing lights versus amber flashing

9   lights.  Do you remember how the intersection of LA 26 and US 190

10  was controlled at the time of the accident?

11  A    East and west is controlled by a yellow flashing light.

12  North and sound is controlled with red flashing and stop signs.

13  Q    So the 18-wheeler driver number one in your report had stop

14  signs and red flashing lights, and driver number two, Mr. Bradley

15  in the Volkswagen, had yellow flashing lights, correct?

16  A    Yes.

17  Q    Thank you so much.

18          I'd like to pull up -- you took some photos of the

19  scene while you were there as well?

20  A    Yes.

21  Q    That's Plaintiff's Exhibit P, I believe, or Plaintiff's

22  Exhibit 1 I should say.  I want to go through some of these

23  photos and just have you identify that these are the photos that

24  you took at the scene.

25  A    It's possible.  It's been a very long time.  If they're

1    attached to the report, then it is.

2    Q    I can tell you that the parties have stipulated that we got

3    these photos from the state police.  If anyone from the state

4    police took the photos, it would have been you?

5    A    That is correct.

6    Q    And I see the top of your report you note that you took some

7    photos at the scene?

8    A    That is correct.

9    Q    And the photos right here of vehicle two are Mr. Wilfred

10   Bradley's vehicle?

11   A    I would say that would be correct.

12         MR. DAVID:  Go to the next photo, please.  Thank you.

13   BY MR. DAVID:

14   Q    This one as well, vehicle number two?

15   A    That would be from the right side, yes, passenger side.

16   Q    Thank you so much.

17         And this is the front of the vehicle number two?

18   A    Right.

19   Q    Mr. Bradley's vehicle?

20   A    Yes.

21   Q    And this would be vehicle one, the 18-wheeler?

22   A    Yes.

23   Q    The U.S. Xpress 18-wheeler.

24         And this is a profile shot, I guess, of the 18-wheeler,

25   an angle shot of the 18-wheeler.  Do you know if that's the

1    driver?

2    A    I don't remember.

3    Q    The rear of the 18-wheeler, correct?

4    A    Yes.

5    Q    Okay.  And, again, another profile shot of the other side of

6    the 18-wheeler, correct?

7    A    Correct.

8    Q    And this is the US DOT number, the name U.S. Xpress, and

9    Chattanooga, Tennessee, where they're based out of?

10   A    That's correct.

11   Q    Okay.  Thank you so much.

12        Tell me, based on your investigation, who driver number

13   one was.

14   A    According to the report that I prepared -- forgive me for

15   the last name.  It's Mr. George.  I'm not sure even how to start

16   pronouncing his last name.

17   Q    I think it's Fiorucci.

18        MR. DAVID:  Did I say that right?  I'm Italian.

19   BY MR. DAVID:

20   Q    Okay.  What was he operating?  What kind of vehicle?

21   A    He was operating a 2016 Peterbilt.

22   Q    And he had the same trailer we just saw on your photos?

23   A    A 2012 Great Dane van cargo trailer.

24   Q    And who owned that vehicle?

25   A    U.S. Xpress Leasing.

1    Q    And based on your investigation, were there any vision

2    obscurements for Mr. Fiorucci operating his vehicle?

3    A    According to the report, there were no vision obscurements.

4    Q    No vision obscurements?

5    A    No vision obscurements.

6    Q    No vision obscurements, right?

7    A    Right.

8    Q    Now, tell me about vehicle two, the Volkswagen.  Who was

9    operating that vehicle?

10   A    Vehicle two is operated by Mr. Wilfred Bradley.

11   Q    Okay.  And what kind of vehicle was that?

12   A    A 1999 Volkswagen Passat.

13   Q    And he was injured and transported to Lafayette General

14   Medical Center by Acadian Ambulance?

15   A    According to the report, yes.

16   Q    Based on your observation, did he have any vision

17   obscurements?

18   A    None that I could tell according to the report.

19   Q    What was his condition based on your investigation?

20   A    Injuries are reported as mild or moderate.  I'm sorry.  It's

21   non-incapacitating, moderate.

22   Q    And based on your investigation, who had the right-of-way at

23   this intersection?

24            MR. WYNNE:  Your Honor, may we have a sidebar?

25            THE COURT:  Yes.

1       (Whereupon, a sidebar conference was had as follows:)

2           MR. WYNNE:  Your Honor, respectfully we'd like to

3  object.

4           THE COURT:  You can talk a little louder.

5           MR. WYNNE:  Judge, it's a legal conclusion.  He hasn't

6  been tendered as an expert.

7           MR. DAVID:  It's just right-of-way on the highway.  I'm

8  not saying who violated anything.

9           THE COURT:  That's a legal conclusion.  It's a legal

10  concept.  If he was an expert, he could probably opine on it, but

11  even then I'd have an issue because we're going to have a debate

12  over jury instructions on right-of-way.  So let's keep away from

13  that.  That's sustained.

14           MR. WYNNE:  Your Honor, while we're here and not to

15  waste time while we're at sidebar, I just want to make sure that

16  we're not going to go into anything about the ticket given the no

17  contest plea.

18           THE COURT:  The what?

19           MR. WYNNE:  The ticket.

20           THE COURT:  I excluded that.  We're not going to talk

21  about that.

22       (Whereupon, the sidebar conference was concluded.)

23           THE COURT:  The objection is sustained.

24           Mr. David, you may proceed subject to the Court's

25  ruling.

1          MR. DAVID:  Thank you so much, Your Honor.

2     BY MR. DAVID:

3     Q    By the time you got to the scene, the 18-wheeler had been

4     moved from the site of the accident?

5     A    According to my report, yes.

6     Q    And what about Mr. Bradley's vehicle?  Do you know where it

7     was when you arrived at the scene?

8     A    It was at the point of rest.

9     Q    In the middle of the intersection?

10    A    Correct.

11         MR. DAVID:  Those are all the questions I have.

12         Thank you, Your Honor.  Thank you, Trooper.

13         THE COURT:  Counsel, you may proceed with your cross

14    when ready.

15                    CROSS-EXAMINATION

16    BY MR. WYNNE:

17    Q    Officer -- Trooper.  I apologize.  Good afternoon.  It's

18    been a long day.  I just want to talk to you very briefly about

19    two issues I believe we've addressed.

20         When you arrived at the scene, what were the atmosphere

21    conditions like?

22    A    Can you please explain what you're asking for?

23    Q    Sure.  Did you see any fog?

24    A    I don't recall.

25    Q    Okay.

1    A    It is noted either fog or smoke in the report.

2    Q    And when you complete a report, you do it to the best of

3    your ability, correct?

4    A    That's correct.

5    Q    And you noted the condition of the roadway in your report,

6    correct?

7    A    Correct.

8    Q    And what was the condition of the roadway?

9    A    No abnormalities.

10   Q    When you arrived at the scene, do you remember or recall the

11   route you took to get there?

12   A    I do not.

13   Q    Okay.  And we talked earlier about some photographs you said

14   you had taken.  I would like to direct you to 3483, Defendant

15   3483.  Is this an accurate representation of the trailer that you

16   observed on the day of the accident?

17   A    The tractor, not the trailer.

18   Q    The tractor.  And I'd like to also pull 3482 and now we're

19   going to talk about the trailer.  Is this an accurate

20   representation of the trailer you saw on the date of the

21   accident?

22   A    That would be correct.

23   Q    And what is the refracting material at the bottom of that

24   trailer?

25   A    Retro reflective material.

```
1    Q     Do you travel US 190 often?

2    A     At the time I lived there.  So, yes.

3    Q     On your way to the site if you're on 190, it's a straight

4    and flat road?

5    A     For the most part, yes.

6    Q     What's the speed limit right in front of that convenience

7    store?

8    A     They're both 55 miles her hour.

9              MR. WYNNE:  I have no further questions.

10             Thank you.

11             THE COURT:  Any redirect?

12             MR. DAVID:  No redirect, Your Honor.  Thank you.

13             THE COURT:  Senior Trooper, you may step down.  Thank

14   you for taking the time to testify here today.

15             MR. DAVID:  I know the next witness is close, Your

16   Honor, because Ms. Reed just told me he asked if it's the

17   building with the half heads in front of it.

18             THE COURT:  Okay.

19             MR. DAVID:  The EMT is coming.  He'll be quick.  I

20   think Mr. Fiorucci will go long.  So it would be probably better

21   to wait two or three minutes for him to get through security and

22   get up here.

23             THE COURT:  Well, why don't we do that.  We'll take a

24   quick break.  We'll do that witness.  Then I'm assuming that will

25   wrap us up for today.
```

1          MR. DAVID:  He's on his way up right now, Your Honor.

2          THE COURT:  Okay.  We can wait a couple of minutes

3     then.  Maybe get the jury out a little bit early depending on how

4     much time we've got.

5                         (Pause in Proceedings)

6          THE COURT:  Mr. David, you may call your next witness.

7          MR. DAVID:  The plaintiffs call emergency technician

8     Mr. Dustin Soileau to the stand.

9          THE COURTROOM DEPUTY:  Please raise your right hand.

10          Do you solemnly swear that the testimony you are about

11     to give in this case will be the truth, the whole truth, and

12     nothing but the truth, so help you God?

13          THE WITNESS:  I do.

14     Whereupon,

15                       DUSTIN KEITH SOILEAU

16     was called as a witness; after having been first duly sworn, was

17     examined and testified as follows:

18                        DIRECT EXAMINATION

19     BY MR. DAVID:

20     Q    Mr. Soileau, would you like the benefit of your Acadian

21     Ambulance records?

22     A    Yes, sir, please.

23          MR. DAVID:  May I approach, Your Honor?

24          THE COURT:  Yes.

25          MR. DAVID:  And it's already an exhibit.

```
 1    BY MR. DAVID:

 2    Q    Mr. Soileau, can you state your full name for the record.

 3    A    My name is Dustin Keith Soileau.

 4    Q    I just want the record to reflect I asked you when you came

 5    in, you're from Ville Platte, right?

 6    A    Yes, sir.

 7    Q    Mr. Fontenot, the other EMT with you, is he from Ville

 8    Platte?

 9    A    Yes, sir.

10          THE COURT:  Mr. David, do you think we can twist that

11    around a bit?  I think it's sideways.

12          MR. DAVID:  Oh, these are not ours.  We don't need any

13    exhibits for this one.  Oh, we do.  Sorry about that, Your Honor.

14    I didn't realize we were on the screen yet.

15          THE COURT:  I just noticed the jurors' heads were

16    sideways and it's too early to have a neck problem.

17    BY MR. DAVID:

18    Q    Mr. Soileau, can you state your full name and current

19    address for the record.

20    A    Dustin Keith Soileau.  Address is 203 Lucien Road, Ville

21    Platte, Louisiana, 70586.

22    Q    And I'm going to ask you some questions, but before I do,

23    we're here about a February 14$^{th}$, 2018, accident in Elton in

24    between -- just past Basile and Eunice on US 190 with its

25    intersection to LA 26.  Do you have any independent recollection
```

1    of this particular crash?

2    A    I do remember going to the crash.  I don't remember the

3    exact details of it, though.

4    Q    Okay.  And if you can, if there's anything you remember as

5    we're going through this report beyond what's in your report,

6    we'd love to hear about that as well.

7            Why don't you tell me about your history working for

8    Acadian Ambulance and being a paramedic.

9    A    I've been a paramedic with Acadian since 2010.  Before that

10   I was an EMT.  I started with Acadian in 2008.  So this year I'll

11   make 14 years with Acadian Ambulance.  I'm also a critical care

12   paramedic which back then, that was the same as an air med medic.

13   I also have a degree in general science.

14   Q    Where did you go to school?

15   A    SLCC.

16   Q    Okay.  Great.

17           So explain to the jury briefly, not too much, the

18   difference between an EMT and a paramedic and then this critical

19   care.

20   A    The EMTs on the ambulance, they can do life-saving maneuvers

21   without medications, without EKGs or IVs or anything like that.

22   They can do CPR, stop bleeding, bandaging, splinting, stuff like

23   that.

24           When you move up to the next level, it's more

25   education.  It's roughly around two years of education and you

1    get a technical study certificate for it and you become a

2    paramedic which can do IVs.  You can do EKGs.  You can intubate.

3    We do a lot more advanced stuff in the field that EMTs couldn't

4    do.  It's a lot more of hospital setting stuff that they can do

5    in the hospital, like with a cardiac arrest, we could actually do

6    everything that you would do in the hospital on the back of the

7    ambulance.

8              The next level would be critical care paramedics.

9    They're mostly on air med or we have certain units devoted to

10   those medics.  They do the interfacility transfers from say all

11   the ICU patients that are on vents.  Not every ambulance is

12   equipped with a vent.  During COVID it was very -- you know,

13   something we really needed was a lot of vent patients and stuff.

14   So the critical care paramedics actually can transfer those on a

15   vent so they never interrupt care or anything like that.  We can

16   actually transfer patients with blood and other medications that

17   are not normally transported by ambulance.

18   Q    Thank you so much.  I appreciate it.

19             And what time did you guys -- were y'all first notified

20   of the crash in this case?

21   A    On my record, it says 4:55 a.m.

22   Q    Sometime right before 4:55 a.m. the crash occurred and

23   someone called 911 and they called y'all?

24   A    Correct.

25   Q    When did y'all arrive on the scene?

1   A    5:14 we arrived on scene.

2   Q    A little less than 20 minutes after you were called, 20

3   minutes or so after the crash?

4   A    Yeah.  A good bit of time, but, yes, sir.

5   Q    And tell me when you arrived on the scene what you saw when

6   you arrived.

7   A    I don't really remember exactly.  I just remember the fire

8   department was there and they were trying to get the patient out

9   or maybe had just got the patient out or something like that, and

10  whenever we first get there, we start assessing the patient

11  instantly and try to figure out any life-threatening injuries we

12  have.

13         On my paperwork it says the patient was sitting in the

14  car alert and oriented as the firemen were cutting his car to get

15  him out.  So when we arrived there, that must have been what we

16  had seen was the firemen trying to get him out of the vehicle.

17  Q    Do you remember independently him being worried about the

18  blood and things like that while you were there?

19         MR. DILL:  Objection, Your Honor.  Calls for the

20  knowledge of another person.

21         MR. DAVID:  I'm just asking about his observations,

22  Your Honor.

23         THE COURT:  The question is a little bit confusing.

24  You can rephrase.

25  BY MR. DAVID:

1    Q    In your observations, do you remember seeing blood or seeing

2    Mr. Bradley bleeding at the scene?

3    A    I'm sure he was bleeding because of all the injuries that

4    I'm reading on the report.  So I'm sure there was plenty of blood

5    on the scene.

6    Q    Okay.  Fair enough.  I'm looking at your report.

7         Did it take about 20 minutes after you arrived to get

8    him out of the vehicle?

9    A    It looks like from patient contact to the left scene was

10   5:15 to 5:43.  So it was probably, you know, in that time frame,

11   getting him packaged up, putting him on everything to try to get

12   him transported to the hospital.  So they probably were still

13   trying to get him out of the vehicle during that time.

14   Q    Do you remember the jaws of life being used by the fire

15   department and things like that?

16   A    I don't remember right offhand, sir.

17   Q    Do you have documentation in your file about him being

18   extracted by the fire department?

19   A    Under the narrative history text:  Sitting upright in the

20   car alert and oriented as firemen cutting his car to get him out.

21   Q    And about the back seat of his car having to be removed to

22   get him out of the vehicle?

23   A    It says:  We stood back and waited for him to be extricated.

24   Patient was then released to us by fire department, but he was

25   still in the car and unable to get him out without moving the

1   seat back and taking car pieces out of the way.

2   Q    Tell me what you did when you were able to finally attend to

3   Mr. Wilfred.

4   A    We did a spinal motion restriction it looks like.  So what

5   that is is putting a C-collar in place to make sure his head and

6   everything stays in line.  So if he did have a neck or back

7   injury, we would actually prevent it from getting worse during

8   the transport.  We did an EKG four lead.  We also controlled the

9   bleeding.  I remember there was a lot of -- I remember there was,

10   I think, some hand deformity or something like that on the

11   patient.  So we had bandaged it up and that's how you control the

12   bleeding on him.

13         Also contact LERN.  LERN Is a state program that we

14   have in Louisiana where you call them.  You tell them exactly

15   about your patient, all the details of your patient, and they

16   determine what's the best hospital for them, like that multiple

17   patients in that critical condition wouldn't be at the same

18   hospital so the doctors can actually kind of shuffle patients

19   around.  That's where we got the determination for which hospital

20   to go to.

21   Q    And what was your -- I guess what did you assess at the

22   scene?  What different injuries did you assess on Mr. Bradley

23   while you were there?

24   A    Whenever we assess every patient, we do the airway, the

25   breathing, and the circulation.  Circulation involves all the

1   bleeding, which control the bleeding was one of the treatments on

2   the patient, but we would assess every injury, all the bleeding,

3   bandage every spot that was bleeding, stuff like that.

4   Q    And you documented he had at the scene neck, back, and chest

5   injuries aside from the cuts and mangled finger?

6   A    It says:  Bleeding to the back of the head, large laceration

7   to the back of the head, right pinky finger hanging on barely to

8   the hand, bruising to the right hand.  No other deformities.

9   Minor abrasions to the body.  Neck, back, and chest pain.

10  Supportive care and bandage was the treatments.

11  Q    And I know -- thank you for taking care of Mr. Bradley --

12  you did what's called a Glasgow Coma Scale.  What is that?

13  A    A Glasgow Coma Scale is what we consider -- we call it the

14  GCS scale.  So at that time and moment, what we do is we

15  determine -- it's kind of like their neurological, but it only

16  uses three points, like their eye-opening, if they actually are

17  alert and oriented, and then their muscle movement.

18         So it's a small portion of a neuro exam that just tells

19  you kind of like the bare essentials of the neuro exam at that

20  moment.  Now, those things are very suggestive and you can say I

21  did a GCS on someone who just woke up.  Theirs might be 14 versus

22  somebody who's been awake and alert all day, they'd be a 15.  If

23  you have some slight confusion, it could alter the GCS to like a

24  14 versus a 15.

25  Q    Is the alternative true, too?  Can somebody who had a

1    smaller GCS, like if they had been passed out before -- if

2    someone is passed out cold, what's their GCS?

3    A    If they're passed out cold and not moving or anything, it

4    would be a three.  We see this a lot in like diabetic patients

5    and stuff.  They'll be unresponsive.  Family can't wake them or

6    anything like that.  Then as soon as you give them sugar, you get

7    their sugar levels back up, they're 15 in a matter of minutes.

8         Another example would be like a football player who

9    gets hit on a football team.  He'll be passed out on the field

10   and, you know, everybody runs to wake him up, and then by the

11   time they get there, he's up and walks off the field.  So at that

12   time he could have been a three, the football player, and then he

13   moves to a 15 when he gets to the ambulance.

14   Q    So in your experience as a paramedic and as a critical care

15   paramedic, having a 15 on a Glasgow when you got there 20 minutes

16   or so post-accident has nothing to do with whether he had a

17   concussion or not?

18        MR. DILL:  Objection, Your Honor.

19        (Whereupon, a sidebar conference was had as follows:)

20        MR. DILL:  Judge, he's trying to backdoor a medical

21   opinion on whether or not he could have had a concussion in this

22   accident from an EMT or a paramedic.

23        MR. DAVID:  Not at all that he had one.  Just the fact

24   that he has a Glasgow 15 doesn't mean he was passed out.

25        MR. DILL:  It calls for an expert opinion.

1          MR. DAVID:  Not at all.  He experiences it every day.

2          THE COURT:  All right.  Let's not argue about that.

3    It's a medical opinion.  He's not -- he hasn't been disclosed

4    as -- I mean, when he opines to what his diagnosis is, why isn't

5    that opinion?

6          MR. DAVID:  No.  It's not about diagnosis.  It's about

7    in his experience as a paramedic, does he attend to somebody

8    who's passed out, they wake up and they're a Glasgow 15.  They've

9    had trauma.  They're knocked out.  They come to and they're a

10   Glasgow 15.  I'm not saying Mr. Bradley or anything else, just

11   that in his experience, people with a Glasgow of 15 after being

12   traumatically knocked unconscious.  Just his experience, not that

13   Mr. Bradley had a concussion or didn't.

14         THE COURT:  The question is, is this based on

15   scientific, technical, or other specialized knowledge within the

16   scope of Rule 702?

17         MR. DAVID:  No, sir.  It's his experience as a

18   paramedic.  That's it.

19         THE COURT:  Isn't that specialized or technical

20   knowledge?

21         MR. DAVID:  No.  The Glasgow -- he's already said --

22         THE COURT:  He can testify as to what he observed.  He

23   cannot testify as to his opinions as to what he concluded similar

24   to the way a doctor diagnoses a patient.  You can navigate around

25   that.  That's the parameter.

1          MR. DAVID:  Okay.  I just don't want to be right up

2     here again because that's what I want to ask him.  In your

3     experience you've had people who are passed out.  They were a

4     three and then a minute or two later they're a fifteen.

5          MR. DILL:  It goes to his technical knowledge, Judge.

6          MR. DAVID:  It's his experience.  Anyone can talk about

7     this.  A lawyer can talk about, yeah, I filed a motion and I

8     filed another motion.

9          THE COURT:  I mean, he's trained and certified as a

10    paramedic.

11         MR. DAVID:  This isn't about did Mr. Bradley have a

12    concussion or was there something in his eyes that made you think

13    he had a concussion before.  This is in your experience, doing

14    this every day for 15 years, do you see people who you do your

15    Glasgow Coma test, they're a three and --

16         THE COURT:  That's technical specialized knowledge.  I

17    mean, you can ask him what he observed, you can ask him what he

18    did, but you cannot get backdoor opinion testimony that is based

19    on scientific, technical, or other specialized knowledge.

20    They're highly specialized knowledge.

21        (Whereupon, the sidebar conference was concluded.)

22         THE COURT:  Mr. David, you may proceed subject to the

23    Court's ruling.

24         MR. DAVID:  Thank you, Your Honor.

25    BY MR. DAVID:

1    Q    Do you know when you administered the Glasgow Coma Scale

2    test on Mr. Bradley?

3    A    It says at 1515 we did a GCS on him.

4    Q    And explain to me what you would have done in observing

5    Mr. Bradley about 20 minutes or so post-collision for your GCS,

6    for your Glasgow Coma Scale.

7    A    I would have spoke to him.  If his eyes were open, he would

8    get a four.  I would have talked to him, asked him a couple of

9    questions.  If he knew who he was, where he was, he would get a

10   five on the next number.  Then if he could move his hands and

11   arms around, then he would get a six.  So it would total up a

12   total of 15 with that.

13   Q    It doesn't take much to get a 15 on a GCS?

14   A    No, sir, not at all.

15   Q    And there's nothing you did in your GCS of Mr. Bradley 20

16   minutes post-collision that retroactively found out what he would

17   have been in the 20 minutes before you got there?

18   A    No, sir.  With a 20-minute window, anything could happen.

19   Q    Okay.  Thank you so much.

20        If Mr. Bradley testifies that he blacked out after this

21   crash, is anything about your observations inconsistent with

22   that?

23        MR. DILL:  Objection, Your Honor.  Calls for

24   speculation.

25        MR. DAVID:  I tried to phrase it very clearly, were his

 1  observations inconsistent with that.

 2          THE COURT:  I'm going to overrule the objection.

 3          You may answer if you understand the question.

 4  A    Yes, sir.

 5          If Mr. Bradley says he was unconscious or passed out

 6  before we arrived, I mean, that could have possibly happened.  We

 7  have no idea what happened 20 minutes after a bad accident like

 8  that.  Sometimes people pass out and wake back up and then

 9  they're back normal.

10          MR. DAVID:  Thank you so much.  I appreciate your time.

11          THE COURT:  Mr. Dill, you may cross when ready.

12          MR. DILL:  Thank you, Your Honor.

13                          CROSS-EXAMINATION

14  BY MR. DILL:

15  Q    Mr. Soileau, my name is Jim Dill.  Good afternoon.

16          You didn't report any alteration of consciousness in

17  your report, did you?

18  A    Not that I see, sir.

19  Q    If you had gotten a report that he had lost consciousness or

20  had an alternation in consciousness, you would have documented

21  that, wouldn't you?

22  A    I may have.  With an accident, sometimes you get tunnel

23  vision, and, you know, we were more worried about his hand, the

24  loss of extremities and stuff like that.  If he would have said

25  that maybe he lost consciousness or something, I may have

1    documented it.  I don't see where it is or isn't documented.

2    Q    You've read that report?

3    A    Parts of it so far.

4    Q    Did you do anything in preparation for your testimony today?

5    A    I haven't met with anyone, no, sir.

6    Q    Did you speak to anybody?

7    A    I did talk to the attorney that called me to tell me to come

8    today.

9    Q    Where would you document if there was a loss of

10   consciousness at the scene?

11   A    You would probably put it in the narrative.

12   Q    That's an important piece of information that you give to

13   the hospital when you transmit the patient, isn't it?

14   A    It could be, yes, sir.

15   Q    And you talked about the Glasgow Coma score that you gave.

16   Fifteen is actually the highest score you can give to a patient,

17   correct?

18   A    Yes, sir.  Someone who is like me and you.

19   Q    And I'm seeing you perusing your report there.  Have you

20   seen -- because I couldn't find it in your report where you noted

21   any loss of consciousness.

22   A    I'm still reading it, sir.

23          The unknown of what happened, but patient says he was

24   driving.  I mean, he doesn't remember what happened.  I mean,

25   that could be somewhat, but I did not write that he lost

1    consciousness.

2              MR. DILL:  Thank you.

3              No further questions, Your Honor.

4              THE COURT:  Any redirect?

5              MR. DAVID:  No redirect, Your Honor.

6              THE COURT:  All right.  You may stand down.  The Court

7    does appreciate you taking the time to testify here today.  Thank

8    you.

9              We will call the next witness tomorrow morning.

10             MR. DAVID:  Yes, sir.

11             THE COURT:  All right.  We are done for today.  I would

12   ask that you be back no later than 8:15 tomorrow morning.  We're

13   going to try to start at 8:30.  I'm going to meet with counsel at

14   8:30.  There may be a few evidentiary matters, getting some

15   exhibits that may take a couple of minutes, but my goal is to try

16   to get us started as quickly as possible so that we can wrap this

17   up as swiftly as possible.

18             I'm sending you home.  Remember, don't talk to anybody

19   about this case.  Don't do any research on this case.  Don't try

20   to look up any of the -- don't try to look up the intersection

21   that has been discussed in the case.  Don't try to investigate it

22   if any of you are close to the road in question.  And, again,

23   don't talk to anybody about the facts of this case.  You can talk

24   to them that you are on a jury and you have jury duty, but not

25   the facts of the case.

```
 1                   All right.  Thank you.

 2                   All rise.

 3                        (Jury Exited the Courtroom)

 4             THE COURT:  Okay.  You can be seated.

 5             As I said, we're going to try to get started at

 6   8:30 tomorrow morning, but my experience has been we always say

 7   we're going to start examination at 8:30 and it's usually about

 8   8:45 because we've got some documents to go over, some exhibits,

 9   but I'd like to try to get that going as quickly as possible.

10             Any issues before we leave today?

11             MR. DAVID:  Nothing, Your Honor.

12             MR. DILL:  No, Your Honor.

13             THE COURT:  All right.  Very good.

14             I know there have been some disputes here, but I

15   appreciate the professionalism of counsel on both sides.  We're

16   adjourned.

17

18

19

20

21

22

23

24

25
```