UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION


WILFRED BRADLEY,                    :        Docket No. 19-00056
                                    :
                  Plaintiff,        :
vs.                                 :        August 2, 2022
                                    :
MOUNTAIN LAKE RISK, ET AL.,         :
                                    :
                  Defendants.       :        Lafayette, Louisiana
_____


REPORTER'S OFFICIAL TRANSCRIPT OF THE JURY TRIAL

BEFORE THE HONORABLE ROBERT R. SUMMERHAYS

UNITED STATES DISTRICT JUDGE

VOLUME II OF V

PAGES 107 THROUGH ^


REPORTED BY:        LARAE E. BOURQUE, RMR, CRR
                    Federal Official Court Reporter
                    800 Lafayette Street, Ste. 3103
                    Lafayette, LA  70501

A P P E A R A N C E S

FOR THE PLAINTIFF:          BLAKE ROSSI DAVID
                            Broussard & David
                            P.O. Box 3524
                            Lafayette, LA  70502-3524

                            REED KREGER ELLIS
                            Broussard & David
                            P.O. Box 3524
                            Lafayette, LA  70502-3524

FOR THE DEFENDANTS:         JAMES M. DILL
                            Dill Law Firm
                            825 Lafayette Street
                            Lafayette, LA  70501

                            MICHAEL C. WYNNE
                            Dill Law Firm
                            825 Lafayette Street
                            Lafayette, LA  70501

I N D E X

PROCEEDINGS:                                                    PAGE:

WITNESSES:

GEORGE ROBERT FIORUCCI
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Wynne.............
     Redirect Examination by Mr. David...........

MICHAEL S. GILLEN
     Voir Dire Examination by Mr. David..........
     Voir Dire Examination by Mr. Dill..........
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Dill...............
     Redirect Examination by Mr. David...........

DR. DAVID MULDOWNEY
     Voir Dire Examination by Mr. David..........
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Dill...............
     Redirect Examination by Mr. David...........

```
 1                    P R O C E E D I N G S

 2                              (Call to order of the court.)

 3          THE COURT:  Please be seated.

 4          Good morning.  I'm glad we're in here and not out

 5   there.  We've got a storm moving in.  Hopefully we don't lose

 6   power, which has happened before.

 7             Any issues before we bring the jury in?

 8          MR. DAVID:  I don't believe so, Your Honor.

 9          MR. DILL:  None from the defense.

10          THE COURT:  One minute late.  We'll bring them in.

11                 (Jury Entered the Courtroom)

12          THE COURT:  Everyone may be seated.

13          I want to thank the jury again for being here and thank

14   you for your service.

15          We are still proceeding with the plaintiff's case.  So,

16   Mr. David, call your next witness.

17          MR. DAVID:  The plaintiffs call the defendant,

18   Mr. George Fiorucci, to the stand.

19          THE COURT:  Okay.  The defendant will approach and be

20   sworn in.

21          THE COURTROOM DEPUTY:  Please raise your right hand.

22          Do you solemnly swear that the testimony you are about

23   to give in this case will be the truth, the whole truth, and

24   nothing but the truth, so help you God?

25          THE WITNESS:  I do.
```

```
 1                    THE COURTROOM DEPUTY:  Thank you.

 2                    THE WITNESS:  Mr. David, can I get my water before just

 3      in case?  Sorry about that.  Thank you.

 4                    Should I address you by sir or Mr. David?

 5                    MR. DAVID:  You call me whatever you want.  Hey, you,

 6      stinking plaintiff lawyer.  All apply.

 7                    THE COURT:  All right.  I don't want to proceed until

 8      we have working equipment.

 9                    THE COURTROOM DEPUTY:  Cory is coming up now.

10                    THE COURT:  All right.  I don't want us just sitting

11      around.  Let's go ahead and release the jury and have them go

12      back to the jury room where they can enjoy drinks and snacks and

13      coffee and we'll get this situated.  I'm sorry.

14                         (Jury Exited the Courtroom)

15                    THE COURT:  My apologies.  We have very good technology

16      here, but sometimes that's the problem.  It goes out.

17                    No other issues that we need to deal with while we

18      wait?

19                    MR. DAVID:  I don't think so, Your Honor.

20                    THE COURT:  Well, good.  I appreciate y'all working

21      together and making this go smoothly.

22                         (Pause in Proceedings)

23                    THE COURT:  Let's go ahead.

24                    All right.  We'll keep our fingers crossed.

25                         (Jury Entered the Courtroom)
```

```
 1              THE COURT:  Okay.  Everybody may be seated.  I think
 2   we're working now.
 3              So, Ms. Derouen, if you want to try that on.  Can you
 4   hear?
 5              THE JUROR:  Yes.  Thank you.
 6              THE COURT:  It's probably too loud.
 7              THE JUROR:  No.  It's good.  Thank you.
 8              THE COURT:  Mr. David, you may proceed when ready.
 9   Whereupon,
10                     GEORGE ROBERT FIORUCCI
11   was called as a witness; after having been first duly sworn, was
12   examined and testified as follows:
13                        DIRECT EXAMINATION
14   BY MR. DAVID:
15   Q    Mr. Fiorucci, can you state your full name and current
16   address for the record.
17   A    George Robert Fiorucci, rhymes with Gucci.  Mr. David said
18   it correctly and Jim's got it right, but I'd rather be named
19   Smith sometimes because every time I've got to spell it out, but,
20   yeah, it's Fiorucci.
21   Q    Well, I'm a David.  My parents are -- my dad's Cajun, but my
22   middle name is Rossi, R-O-S-S-I.  My mom's got a lot of Italian
23   in here.
24              Can you state your address for the record, too.
25   A    5006 Bowman Court, Spring, Texas, 73888.
```

1    Q    And you know why we're here.  We're here to talk about that

2    Valentine's Day accident four and a half years ago,

3    February 14th, 2018.

4              At that time you were working for U.S. Xpress?

5    A    Yes.

6    Q    You were a truck driver?

7    A    Yes, sir.

8    Q    You had a Texas CDL at that time?

9    A    Yes.

10   Q    And on the morning in question, February 18th -- I mean,

11   February 14th, 2018, you were heading from the Houston area to

12   making your Walmart run in Louisiana, correct?

13   A    Yes, sir.

14   Q    And as you were coming down I-10 heading towards Jennings

15   and past Lake Charles, you saw some fog starting to set in,

16   correct?

17   A    Well, actually I heard you tell the story.  I go through

18   Cleveland on 105 towards Beaumont and then work my way back to

19   10.  That was the way I always went, but, yeah, once I got across

20   to Sulphur, what have you, you started seeing a little bit, yes.

21   Q    Okay.  Gotcha.  And you stopped in Jennings to make your

22   first drop?

23   A    Yes.

24   Q    And you headed from Jennings to Oakdale, correct?

25   A    That's correct.

1   Q    And you had some fog there, too, going from Jennings to
2   Oakdale, correct?
3   A    Yes.
4   Q    And your visibility on the way to Oakdale you said was about
5   one-eighth to one-quarter mile?
6   A    I don't believe I ever said that in the deposition.  It was
7   just still kind of the same.  It was just barely out there, but
8   you might have some later in the day.  So it was there, but it
9   wasn't like it was.  Once you came out of Oakdale is when it
10  really started coming in.
11  Q    Do you remember giving your deposition on May 18th, 2020?
12  A    Yes, sir.
13            MR. DAVID:  Jim, it's page 65 of his deposition.
14            Let me see real quick.
15            Actually page 64 is where the question starts.
16            THE WITNESS:  I don't have a copy.
17            MR. DAVID:  May I approach, Your Honor?
18            THE COURT:  You may.
19            MR. DAVID:  Thank you, Your Honor.
20  BY MR. DAVID:
21  Q    The question was:  From the time you got on the road early
22  the night before this morning, was there fog even back in Texas?
23            And what was your answer?
24  A    No.
25  Q    Keep saying it.

1   A    No.  The fog pretty much set in kind of as I was headed, you

2   know, from Lake Charles going to Jennings, but really, you know

3   -- it was starting to come in, but really, you know, it hadn't

4   really started settling until kind of after I left Oakdale.

5           That's what I just said.

6   Q    Just read the whole thing.

7   A    Okay.  After I left Oakdale or was out of Oakdale headed --

8   well, see, I said after I left Oakdale.

9   Q    Look.  I really -- I'm going to let you explain your answer

10  all you want.  What I need right now for impeachment purposes is

11  for you to read the exact answer that you gave and then we'll

12  talk about it.  There's room for explanation.

13  A    I'm going to start over.

14          It started back in Texas.

15          Can you hear me okay?

16          I said, no, the fog pretty much set in kind of as I was

17  headed, you know, from Lake Charles going to Jennings.  It was

18  starting to come in, but really, you know, it hadn't started

19  settling in until I kind of -- after I left Oakdale, after I left

20  Oakdale or was at Oakdale, headed to Oakdale, getting up in that

21  area because I know when I was going up 26, yeah, it was starting

22  to settle in a little.

23  Q    How bad was the fog just before this accident?

24  A    I mean, I figure it was a quarter mile visibility, maybe to

25  an eighth.  So between an eighth and a quarter.

```
 1              I mean, an eighth is very -- that was your question.
 2   Q    Okay.  Thank you so much.
 3              So before the accident you said there was an eighth to
 4   a quarter mile of visibility, correct?
 5   A    Yes.
 6   Q    And I think you said moderate fog; is that right?
 7   A    Yes.
 8   Q    At that time making this route, were you familiar with this
 9   route, this Walmart route where you'd hit these towns?
10   A    Yes.
11   Q    You had done it quite a few times, correct?
12   A    Yes.
13   Q    And you are familiar with this intersection at LA 26 and
14   190, correct?
15   A    That morning previously or --
16   Q    All of the above.
17   A    Yes.
18   Q    And so familiar with the route, you weren't even using GPS
19   for the route, correct?
20   A    Correct.
21   Q    And you remember that they have flashing red lights and a
22   stop sign on 26 going northbound and southbound to cross 190,
23   correct?
24   A    Yes.
25   Q    And, in fact, you had crossed north up 26 through 190 that
```

1    morning heading to Oakdale before you came back down when the

2    accident happened, correct?

3    A    Yes, I did.

4    Q    And before you left Oakdale, you knew it was foggy, correct?

5    A    Yes.

6    Q    As you're coming down towards 26 towards 190 just before

7    this accident, you stop at the stop sign?

8    A    In Elton?

9    Q    Yes, sir.

10   A    Yes.

11   Q    LA 26 at US 190 right where the accident happened?

12   A    Yes.

13   Q    And you saw the two stop signs on each side?

14   A    Yes.

15   Q    You saw the --

16   A    Well, north and south.

17   Q    Well, I meant heading southbound on 26, you saw the two stop

18   signs on either side of the road facing your direction?

19   A    Yes.

20   Q    You saw the two red lights flashing?

21   A    Yes.

22   Q    When you came to a stop at the stop sign looking out your

23   driver's side window down US 190 towards that westbound traffic,

24   you could see an eighth to a quarter mile?

25   A    Yes.

1   Q     And you noticed that white SUV, the Yukon XL, coming down

2   the westbound lane before the accident, correct?

3   A     Yes, I did.

4   Q     And you saw him put on his blinker before he made the turn?

5   A     Right before he turned.

6   Q     And you waited for the SUV to make the turn into the Chevron

7   parking lot, correct?

8   A     Yes.

9   Q     And then you immediately began your left turn onto US 190,

10  correct?

11  A     Yes.

12  Q     The first time you ever noticed Wilfred Bradley's vehicle

13  was actually not through your driver's side window, but through

14  your windshield, correct?

15  A     Yes, once I was in the lane with my tractor on 190 eastbound

16  lane.

17  Q     And just to clarify.  You never saw Mr. Wilfred Bradley's

18  vehicle out of your driver's side window?

19  A     I mean, I'm looking in -- once you -- can I explain a little

20  or no?

21  Q     Answer the question and explain.

22  A     So you're looking back and forth, right?  So you're clear

23  here, and, of course, when this truck is doing its turn, I'm

24  looking where the truck is.  Then as you start to proceed, you're

25  basically crossing the drive lane -- or the westbound lane.  So

1   I'm looking again to the right because if there's a vehicle

2   there, I actually could turn to avoid if something like this was

3   happening from the right.

4          So the last thing you do is looking out your passenger

5   side to see because you're already in the drive lane over here.

6   So there's nothing you can really do at that point.  Hopefully

7   they're doing what they need to do.

8          So then I made the turn, and then once I'm in the lane

9   with my tractor -- and the trailer follows the tractor around.

10  It's hooked to it.  So it basically pivots right around with your

11  tractor.  So I'm looking straight ahead and that's when I saw

12  him.

13  Q   And at least on May 18th, 2020, when we last spoke, you

14  couldn't remember whether or not Mr. Bradley even had his

15  headlights on, correct?

16  A   Yeah.  I still can't see it necessarily.  I saw the shadow.

17  You know, everything happened so quick, but to me there was

18  nothing bright.  If they did, they weren't bright or it wasn't --

19  like some headlights can be annoying or brighter than normal.  I

20  didn't notice that, but, I mean, everything was happening to

21  quick, so I didn't, you know...

22  Q   But you don't remember bright or dark headlights, correct?

23  A   I don't remember it at all.  I remember seeing more of the

24  shadow.  Even though it was a dark car, I guess it was coming

25  into the light of the gas station more.

1   Q    And the first time you saw Wilfred's vehicle is when it was

2   60 to 90 feet from impact, correct?

3   A    I think that's what I stated.

4   Q    Is that a correct statement?

5   A    That's an estimate, yes.

6   Q    That's what you testified to earlier, correct?

7   A    You mean on the deposition?

8   Q    Yes.

9   A    That's what I said, yeah.  I was estimating two years from

10  the incident, but 90 feet is 90 feet.  So, you know, I couldn't

11  say more or less, but I guess that's what I said, yeah.

12  Q    Okay.  We've established you said 60 to 90 feet.  Sitting

13  here today do you remember it differently?

14  A    That's exactly what I said.

15  Q    And you feel the same way today?

16  A    I'm not going to change my statement, but basically, you

17  know, when I thought about it or when we were talking, he's there

18  and I'm seeing him coming.  So 60 becomes 30 or whatever it might

19  be or 120 becomes 90 becomes 30.  So if you're moving at whatever

20  rate of speed, it's changing.  So I threw 90 to whatever, 60, out

21  there.

22  Q    Did you feel the impact of the Volkswagen?

23  A    Yes.  I felt the thud when it hit the tire and then the

24  tractor.  It bounced off the tire and then, you know, hit the

25  trailer itself.

1   Q    And then you continued going forward and parked kind of just

2   past the Chevron gas station on the right, correct?

3   A    Yes.  I pulled over to the first safe area to totally get

4   off the road there.

5         MR. DAVID:  And can you pull up Plaintiff's Exhibit

6   Number 1, which is the state police photos, the ones of his

7   tractor.  Thank you so much.

8   BY MR. DAVID:

9   Q    We saw this picture with the trooper yesterday.  These are

10  pictures he took at the scene?

11  A    I believe.  I don't know.  That's me right there.  I have my

12  back turned, but I guess so.

13  Q    That was my question.  And I'm looking at this picture.

14        MR. DAVID:  Can we dim the lights a little bit?  Thank

15  you so much, Ms. Paula.  I appreciate it.

16  BY MR. DAVID:

17  Q    So this is you right here in this photo from Exhibit 1 that

18  shows a person in front of the tractor trailer, correct?

19  A    Yes.

20  Q    And when we say "tractor," this red part is the tractor,

21  correct?

22  A    Yes.

23  Q    And the white part is the trailer?

24  A    Yes, sir.

25  Q    And we can see on the video that you have some running

1    lights and a blinker.  Explain to us what lights you have on this

2    trailer right here or this tractor and trailer.  I'm sorry.

3    A    I have marker lights, clearance --

4    Q    About right here?

5    A    Oh, that's reflectors.

6    Q    Do the reflectors go all the way back to the end the

7    trailer?

8    A    Yeah.  You've got to make sure those are complete.  On your

9    pre-trip, you check and make sure they aren't cut or removed.

10   So, yes, it was complete.

11   Q    You just can't see the end of them in this picture?

12   A    Right.  You have a photo, another one from yesterday, on

13   your exhibit that showed all the reflectors.

14   Q    Okay.  I have one more photo.  I just want to make sure.

15            So for the lights --

16   A    Those are called clearance lights up top, you know, for a

17   bridge or whatever, you know, so you can see.

18   Q    Is there a light on the back top corner, too?

19   A    No.

20   Q    Just this one at the bottom that we see?

21   A    The one at the bottom, the one at the top, the one in the

22   front of the trailer, which can be seen from sort of in front,

23   but also from the side.  More from the side.  It's kind of like

24   right on the corner.  And then in the back you have clearance

25   lights, red clearance lights, at the very top of the trailer on

1    the back where the doors are.

2    Q    And this is the same morning right after the accident when

3    the officer showed up 30 or 40 minutes after the crash.  These

4    were the conditions?  It was dark that morning?

5    A    Yes.

6              MR. DAVID:  Can you go to the next picture, Ms. Reed?

7              Thank you.

8    BY MR. DAVID:

9    Q    Is this the one you were talking about that had the other

10   profile shot of the trailer?

11   A    Yes.

12   Q    I can't quite tell.  Is the tractor up here?

13   A    Yeah.  I see that now.  I thought there was one yesterday

14   where you had the tractor on this side.  I'm not sure if that's

15   the one that we had.  The tractor is on the right in that picture

16   there.

17   Q    So your tractor is --

18   A    That's the opposite side of where the accident occurred, I

19   believe.

20             THE COURT:  Let me stop you.  Y'all are engaging in a

21   conversation and it has to be questions and answers.  Otherwise,

22   we can't have a record.

23             So I caution the witness.  If you could just wait for a

24   question and don't try to talk over each other.

25             THE WITNESS:  Yes, sir.

```
 1              THE COURT:  Thank you.

 2   BY MR. DAVID:

 3   Q    So just to clarify for the jury, on the right side of this

 4   image, Exhibit 1, is the actual tractor?

 5   A    Yes.

 6   Q    I guess you can see the reflectors on the back of the

 7   tractor right here?

 8   A    Well, yes.  Those are the brake lights and the running

 9   lights.

10   Q    Okay.  Thank you.

11              After the crash you called your dispatcher first before

12   calling the police?

13   A    I never called the police.

14   Q    So you just called the dispatcher first?

15   A    Well, actually I secured the scene -- you know, we'll

16   probably get into that more in a minute, but the scene from --

17   you know, so Mr. Bradley didn't get struck again by another

18   vehicle.  At that point people were everywhere around the scene

19   there.  So then I went back to stay with my truck and I called my

20   dispatch at that time.  So within two minutes Elton Police were

21   there.

22   Q    I want to ask about that.  Your first call after the crash

23   was to dispatch, correct?

24   A    Yes.

25   Q    And you never called the police, correct?
```

1   A    That's correct.

2   Q    You just said you secured the scene.  Tell me what you did

3   to secure the scene.

4   A    Well, we have cones or triangles.  I had triangles.  You

5   know, if you have a flat tire or what have you, you place them,

6   you know, a certain number of feet behind your vehicle, of your

7   vehicle, but I didn't need those.  I pulled all the way off the

8   highway.

9        So I went and placed one on the other side or kind of

10  in the intersection, you know, where the flashing yellow was and

11  then one, you know, 50 feet or more from the eastbound side of

12  Mr. Bradley's car so that hopefully somebody would see him.  The

13  nose of his car was a little bit in the -- well, I guess it was

14  in -- well, he was near the double yellow.  So he was all the way

15  across the eastbound -- the turn lane on the eastbound side and

16  then his nose was in the westbound lane a little bit.

17  Q    On your driver's logs, you didn't even note the accident on

18  your logs, correct?

19  A    I didn't do that, no, sir.

20  Q    And you never checked on Wilfred after the crash?

21  A    No, sir.  I stayed at my vehicle.  At that point everybody

22  was there.  Can I elaborate on that one, on why I didn't check?

23  Q    Sure.

24  A    So once you see the accident -- we all saw the pictures.

25  You know, for me looking at it, too, it was -- you know, my

```
 1    lawyer said horrifying.  Yeah, it was.  So I got a little PTSD
 2    instantly.  When you see something like that, you don't know what
 3    is going on, and then basically there were so many people around,
 4    it was a nervous situation.  So, you know, I'm always told even
 5    if you're in a vehicle, your car, your personal vehicle, stay
 6    with your vehicle, so...
 7    Q    But there were other people?
 8    A    Yeah.  There was probably ten people around there.
 9    Q    And you could see in the video people in that white Yukon
10    actually went to go help out, correct?
11    A    I guess, yes, sir.  I didn't know that at the time.  I wish
12    they had actually spoken to somebody and said they might have
13    witnessed because it looked like when we watched the video that
14    they witnessed something.  So they would have known if
15    Mr. Bradley was behind him or if his lights were way back.
16    Q    Did you continue driving for U.S. Xpress after the crash?
17    A    Yes, I did.
18    Q    In your experience cars rarely slow down for flashing yellow
19    signals, correct?
20    A    They should, but, no, they don't.
21    Q    And 55 miles per hour is the speed limit on this road,
22    correct?
23    A    Well, I'm glad you brought that up.  I'd like to correct
24    that right now, sir, and for everybody.  This is very important.
25    The speed limit is 55 on 190.  When you get a sixteenth of a mile
```

1    from that light on both sides, it goes down to 50.

2            And actually you have Elton on the eastbound side of

3    where the accident occurred.  So you're doing 55 on the

4    eastbound, you slow down to 50 for the flashing yellow, and then

5    you proceed through the light.  And I'm not positive, but the

6    speed starts slowing down as you get to Elton.  Just to make that

7    clear, it's 50.  There's a posted sign showing the intersection

8    and 50 miles an hour right before you get to the intersection

9    from the eastbound side.

10   Q    That's not what you said in your deposition.  You said it

11   was 55 miles an hour, correct?

12   A    There was a part in there where I said that it dropped to

13   50.  If I didn't, then -- because I know I've said it the whole

14   time.  So I don't remember that.

15   Q    I think that's the first time I've ever heard that from

16   anybody in this case.

17   A    Okay.  Well, I've definitely said it to my lawyers ever

18   since, you know, it happened.

19   Q    If U.S. Xpress's own expert says it was a 55-mile per hour

20   roadway, would you dispute that?

21   A    We actually have a picture that shows that sign that wasn't

22   entered into the exhibits, but we made note of it and found that

23   picture yesterday.

24           THE COURT:  Okay.  I'm going to stop you again.  I

25   don't want you to engage in a conversation.  Only answer the

```
 1    question that's asked.
 2                THE WITNESS:  Okay.
 3                THE COURT:  And Mr. David will allow you to explain if
 4    you wish, but we have to have a question and answer because we're
 5    having problems with the record.
 6                MR. DAVID:  Thank you.  And I have to explore this,
 7    Your Honor.  It's never come up.  This is kind of -- no one's
 8    ever said this in the case.
 9                MR. DILL:  Your Honor, I'm going to --
10                THE COURT:  If you want to discuss this, we need to
11    come to the bench.
12                MR. DAVID:  I'm going to ask him one more question if I
13    can, Your Honor.
14                THE COURT:  All right.  Proceed.
15    BY MR. DAVID:
16    Q    You mentioned you first saw this picture yesterday?
17    A    I don't know if I've ever seen it when we talked before, but
18    I've definitely – and they can confirm or deny that I've been
19    saying this the whole time.  Whether I said it in the deposition,
20    I don't remember, and I've even looked at it, you know, the
21    deposition, reading it over to see what I did say, but that's
22    been my story the whole time.  I mean, I told that to my wife
23    that night that that's the situation.  And I'm sorry that, you
24    know, it wasn't in there.  I didn't know.
25                THE COURT:  You're --
```

1          THE WITNESS:  I'm sorry.

2          THE COURT:  I mean, you can't just sit there and talk.

3    Okay?  You've got to answer questions.  That's why we have this

4    process, question and answer.

5    BY MR. DAVID:

6    Q    On your deposition of May 18th, 2020, page 91, I ask you

7    about speeding and you answered -- it's line 10 through 15.  What

8    do you say here at the answer?

9          THE COURT:  Just read.

10   BY MR. DAVID:

11   Q    Just read it exactly as it says right here.

12   A    (As Read:)  And 50 was the speed limit.  So I thought he

13   would have been going 40 to 45 max.

14          I said that because of the fog situation.

15   Q    But the only testimony in your deposition was 55 miles per

16   hour was the speed limit, correct?

17   A    Yeah.  I forgot to say that sign was there.  So I did forget

18   that in my deposition.

19   Q    And you're saying that you saw a sign with your own eyes the

20   day of the accident or sometime before the accident?

21   A    Well, as we've said, I've traveled that route many times and

22   every time I saw it, once or twice a month at least, probably

23   four times a months because I would go to Eunice.  Even if I

24   didn't go to Oakdale, I would be traveling down 190 from 65, and

25   I'd travel from Elton through that intersection or vice versa and

1    I would see that slow speed to 50 at that intersection.  Even I

2    would -- even I would say to myself, man, why do we got to slow

3    down, but it's there.

4    Q    And you heard the trooper yesterday testify it was a 55 mile

5    per hour speed limit, correct?

6    A    Yes, sir.

7    Q    And.  When you testified that you saw Mr. Bradley's vehicle

8    60 to 90 feet before impact, you actually saw his vehicle before

9    the crash?  Is that what you're testifying to?

10   A    Yes.

11   Q    By the time your tractor and trailer were well into the

12   right lane of US 190, the crash had already happened, correct?

13   A    Right lane meaning the eastbound lane?

14   Q    That's what I'm talking about.

15          By the time the entire tractor and the entire trailer

16   were established in that right eastbound lane of US 190, the

17   crash had already happened, correct?

18   A    I don't know how to answer that question.

19          THE COURT:  You've got to answer the question.

20   A    Possibly.  I don't remember what I said on there.  I mean,

21   the trailer was following my tractor around.  So momentum-wise

22   it's going to keep going into the lane.  My tractor was in the --

23   75 percent of the trailer was already around the corner before

24   Mr. Bradley struck the vehicle.  So three-quarters of the way.  I

25   was around the corner before the accident.  So I imagine once he

1    hit -- because I didn't have to do much straightening out to get

2    pulled over to the road.  So, yeah, once the accident occurred, I

3    was in the eastbound lane.

4    BY MR. DAVID:

5    Q    I'm talking about at the point of impact when Mr. Bradley

6    hit your vehicle, was your 18-wheeler, the tractor and the

7    trailer, fully in that right eastbound lane of US 190?

8    A    No.  I believe it was partially in the turn lane going south

9    on 26.

10   Q    Plaintiff's Exhibit 18, already in evidence, are the January

11   29th, 2020, answers to interrogatories from you.  And I'll show

12   this again.  This is Plaintiff's Exhibit 18 already in evidence.

13   The first page shows that this is the interrogatories from you,

14   George Fiorucci, responding to plaintiff's interrogatories.

15          If I skip down to question number 16 -- let me zoom

16   this out a little bit -- we ask:  Please state, according to your

17   best information, knowledge, and belief, the cause of the crash

18   which is the subject of this litigation.  There were some

19   objections, but at the end you talk about the narrative of what

20   happened.

21          These are your answers from January of 2020, correct,

22   Plaintiff's Exhibit 18, certified answers to discovery?  Is that

23   a correct statement?  Would you like to look at it?

24   A    I'm reading it right now, sir.

25   Q    Okay.

1    A    Yes.

2    Q    And on that day -- in these certified answers, you answered

3    in this case four months before your deposition, you said:

4    Defendant did not see any other headlights or vehicles and so he

5    entered the intersection and turned left.  Defendant's truck and

6    trailer were well into the right lane of US 190 when he first saw

7    the shadow of plaintiff's vehicle.

8    A    That's correct.

9    Q    So did you see the shadow of plaintiff's vehicle before or

10   after the crash because this says you don't see him until you're

11   fully in that lane?

12   A    Well, somewhere in whatever statement where I said that I

13   saw him out the windshield.  So that's what I said.  I don't know

14   if it was in this one.  Where was the statement where I said

15   that, where I saw him out of the windshield?

16   Q    Mr. Fiorucci, you only answer the questions I ask you.  We

17   don't care about all the statements.  We care about the truth of

18   what happened.

19              THE COURT:  All right.  You're arguing.  Don't argue.

20   A    Well, that statement is mine, yes.

21              THE COURT:  All right.  We're not going to get into a

22   conversation or an argument.  He asks the questions.  You answer

23   them.

24              Ask your question, please, Mr. David.

25   BY MR. DAVID:

1    Q    This was the first official answer in this lawsuit from you

2    about what happened in the crash and it says that you didn't see

3    the shadow of plaintiff's vehicle until your entire tractor and

4    trailer were well into that right eastbound lane of 190.  Did you

5    not see Mr. Bradley's vehicle until after the accident or was it

6    before?

7    A    It was before.

8              MR. DAVID:  Thank you, Your Honor.

9              No further questions.

10             THE COURT:  Counsel.

11                    CROSS-EXAMINATION

12   BY MR. WYNNE:

13   Q    Good morning, Mr. Fiorucci.

14   A    Good morning.

15   Q    Mr. Fiorucci, please limit yourself to answering our

16   questions here today.  We're going to try to make a clean record

17   here.  Okay?

18   A    Yes.

19   Q    Mr. Fiorucci, where are you from originally?

20   A    Arlington, Virginia.

21   Q    What's your family like?

22   A    It's a small family, close-knit.  We kind of stay to

23   ourselves, but, you know, it's just my wife and a son.

24   Q    And what do you do for a living?

25   A    Drive a truck.

1    Q    How long have you driven a truck?

2    A    On and off since I was like 18, but probably big trucks ten

3    years, the ones that, you know, were involved in the accident

4    here.

5    Q    And what's your truck call sign?

6    A    Chief Running Mouth.

7    Q    On the day of the accident, what kind of goods were you

8    hauling to the Walmart?

9    A    Meat and produce.

10   Q    What kind of route was it?

11   A    It was a dedicated route.

12   Q    So you did that route often?

13   A    Yes.

14   Q    You're familiar with the intersection on that route?

15   A    Yes, I am.

16   Q    Were you in a hurry that day?

17   A    No.

18   Q    You testified earlier you came to a stop at the intersection

19   of Highway 26 and 190, right?

20   A    That's correct.

21   Q    How long was that stop?

22   A    I mean, the time I waited there?  I waited quite a long time

23   for the white SUV to clear or finally make its decision.  So it

24   could have been, you know, eight or ten seconds.  I don't know.

25   Q    And when you say for the white SUV to make a decision, why

```
 1   did you think it was making a decision?
 2   A    Well, he was probably traveling about 35.  You know, even
 3   though it was foggy, he was even going slower than you need to go
 4   in fog.  So I'm trying to read his mind thinking, well, he must
 5   be turning, and then just before he turned, he put on a signal.
 6   Q    When did you first see the white SUV?
 7   A    I mean, I probably saw his lights whatever that distance
 8   might be, an eighth of a mile or so in the distance down 190.
 9   Q    Was the white SUV in front of the Chevron or beyond the
10   Chevron when you first saw it?
11   A    Beyond the Chevron.  I couldn't see the color of the car
12   until obviously it got a little closer.  Of course, it's dark and
13   a little bit of fog, but it was pretty visible.
14   Q    When you first saw the white SUV beyond the Chevron, what
15   portion of the vehicle did you see?  Obviously not the color.
16   A    I saw the hood.
17   Q    What part of the hood?
18   A    I mean, the headlights, the hood, you know, the roof of the
19   car.  Then as it got closer, I saw the side of it.
20   Q    What was your speed like when you were traveling down
21   Highway 26?
22   A    It's a pretty curvy road.  So I always did a little bit less
23   than -- the posted speed is 55, but I was doing probably 50 or
24   less with the fog, and corners, you know, you slow down a little
25   bit more.  So it was pretty windy.
```

1    Q    And your next turn on that route, was that US 190 heading

2    eastbound?

3    A    Yes.

4    Q    You're familiar with that intersection?

5    A    Yes.

6    Q    And you're familiar with the signage across US 190?

7    A    Yes, I am.

8    Q    And as you traveled eastbound on US 190, what signals are

9    there?

10    A    Well, right now there's -- it's a four-way stop sign now.  A

11    month after the fact, I was notified --

12            MR. DAVID:  Objection.

13            MR. WYNNE:  Your Honor, may we approach?

14            THE COURT:  Yes.

15        (Whereupon, a sidebar conference was had as follows:)

16            MR. DAVID:  They're intentionally bringing issues in

17    front of the jury about changes to the intersection.  How in the

18    world is that relevant in this case?

19            MR. WYNNE:  I've instructed him to answer my question,

20    and my question was simply what signage was there.

21            THE COURT:  In the past tense.  Okay?  Ask the question

22    again.  I mean, I'll sustain the objection as to, you know,

23    remediations that were made after the fact.

24            MR. DAVID:  Thank you, Your Honor.

25        (Whereupon, the sidebar conference was concluded.)

```
1              THE COURT:  Again, I want to tell the witness you need
2    to answer the question that's asked of you.  You need to listen
3    to it and only answer the question that is asked.
4              You may proceed, counsel, subject to the Court's
5    rulings.
6    BY THE COURT:
7    Q    Mr. Fiorucci, on February 14th, 2018, were you familiar
8    with the present signage on US 190?
9    A    Yes.  It was flashing yellow traveling on 190 east and west,
10   and it was a flashing stop sign for 26 north and south.
11   Q    And on the date of the accident as you head eastbound on
12   US 190, is there additional signage?
13   A    You mean speed signs?
14   Q    Any other signage.
15   A    When you make a left, yeah, the speed goes from 50 to 55 to
16   65 headed towards Eunice.
17   Q    So it's your testimony today that there is a caution signal
18   that changes the speed limit on the day of the accident on US 190
19   heading eastbound?
20   A    Yes.
21   Q    What did you do when you reached the intersection of
22   Highway 26 and US 190 on the day of the incident?
23   A    Stopped.  Came to a complete stop there at the stop sign.
24   Q    Was it a single stop or two stops?
25   A    Well, it's a single stop, and then stop signs are back away
```

1    from intersections.  So I nosed forward a bit so I could see

2    better around the corners.

3    Q    From your vantage point on the date of the accident, as you

4    looked east and westbound on US 190, is the roadway flat?

5    A    Yes.  It's pretty flat and straight both directions.

6    Q    What did you do after you came to that second stop at the

7    stop sign on the date of the accident?

8    A    Waited for the -- well, obviously looked both ways multiple

9    times, but sat there probably longer than you would normally sit

10   if there was no traffic.  You know, I stopped long enough, but

11   there was a vehicle coming undecided what he was going to do.  So

12   I waited probably a little longer than normal.

13   Q    But eventually you entered the intersection to make a left

14   turn, correct?

15   A    Yes.

16   Q    Where was your tractor located when you first saw the black

17   sedan on the day of the accident?

18   A    It was in the travel lane eastbound on 90.

19   Q    And on the date of the accident, your tractor was in the

20   westbound lane of US 190 when you first saw the sedan?

21   A    One more time, please.

22   Q    When you first saw the black sedan, where was your trailer

23   located?

24   A    My trailer was following me around the corner, and like I

25   said previously, it was probably what I thought was in the turn

1    lane.  There's a drive lane and turn lane.  It came around the

2    corner.  So a part of it was probably across the turn lane a

3    little bit.

4    Q     What happens after you see the sedan?

5    A     I mean, I saw it through my windshield, and I said, you

6    know, there's a car there, and, you know, I thought, well, he'll

7    be fine if he's going the speed, and then he went by.  So I just

8    kept on going.  I didn't think anything would happen, you know.

9    I didn't think that -- either he would go around if he had to,

10   but he was probably already slowing.  I thought he might have saw

11   the truck, but it just happened.

12   Q     Eventually there's a collision between your trailer and the

13   sedan, correct?

14   A     Yes.

15   Q     Where did the sedan hit?

16   A     The rear third of the tractor trailer combination, the front

17   tandem of the tires, front tires of the rear tandem.

18   Q     And after the impact, what did you do?

19   A     Proceeded to pull over as soon as I can there and apply the

20   brakes and what have you, stopped.

21   Q     And how long did it take you -- you had testified that you

22   had taken out cones?

23   A     Reflector triangles.

24   Q     How long did it take you to bring those triangles out?

25   A     It didn't take long, but first I jumped out to go back to

1  the scene, and then I saw kind of the positioning of it, and then

2  -- so I basically went to the back of the trailer.  Then I went

3  back to my cab to get the cones or triangles which are inside the

4  cab and then, you know, proceed to place them at the scene.

5          There was multiple motorists that had pulled over.  I

6  guess Mr. David had said the guys from the gas station came out.

7  So there was people gathering there.  So I placed the cones or

8  triangles and then that was it.  I went back to my vehicle.

9  Q    Your tractor that day had a manual or automatic

10  transmission?

11  A    Automatic.

12  Q    Can you describe for me the reflectors on the trailer?

13  A    Well, they're about -- they're right along the edge of the

14  trailers.  You know, it's a reflective white and red tape as

15  we've seen in the picture.  And generally a trailer is four feet

16  or three and a half feet or so.  So it's generally at eye level

17  for vehicles to see, cars, people and cars.  That's the main

18  reason it's there, so people can see the side of the trailers.

19  Q    And in addition to the reflective tape, what other sign or

20  markers do you have on that truck that light up?

21  A    We have the clearance lights above, and then the marker

22  lights, which, you know, run the sides of the truck.

23  Q    How many marker lights run up the sides of the truck?

24  A    Well, you know, markers, you have three.  There's two yellow

25  and one red at the rear.  So you have the yellow flashing light

1    in the middle of the trailer, which is also a marker.  So when it

2    flashes, it flashes.  When it doesn't flash, it's a marker, just

3    a lit-up light.  And then you have one on the front corner, which

4    is right on the corner so you can see it from the front if you're

5    driving this way or you can see it from the side as well.

6    Q    And those three marker lights you just described, they're on

7    both sides of the truck?

8    A    Yes.

9    Q    And when we're talking about the truck, the three markers --

10   it's actually the trailer itself, correct?

11   A    Yes.  Sometimes they hang below the trailer.  They're on the

12   trailer.  Some are built into the trailer.  Some are installed

13   underneath.

14               MR. WYNNE:  No further questions, Your Honor.

15               THE COURT:  Mr. David, any redirect?

16               MR. DAVID:  Just briefly.

17                         REDIRECT EXAMINATION

18   BY MR. DAVID:

19   Q    How long were you stopped at that stop sign before you

20   decided to go?

21   A    I mean, I never really thought about it, but probably eight

22   seconds or more.

23   Q    And how fast did you accelerate from stop to going?

24   A    I pushed it as hard as it would go and it started down to

25   second gear.  So whatever speed you get up to shift.  You know, I

1   just went at that point.  So just estimating the speed.

2              MR. DAVID:  Thank you so much.

3              THE COURT:  You may step down.

4              MR. DAVID:  Your Honor, can I have a brief break?

5              THE COURT:  Yes.  We'll take a brief recess while we

6   get the next witness situated.

7                   (Jury Exited the Courtroom)

8              THE COURT:  Please be seated.  So we're going to get

9   your next witness.

10             MR. DAVID:  Yes, sir.  Mr. Gillen.  I need to talk to

11  him real quick.

12             THE COURT:  We'll keep this short, but long enough for

13  the jury to walk around.  Let's take a brief recess.

14                        (Recess)

15             THE COURT:  Please be seated.

16             MR. DAVID:  Your Honor, we have a major issue to

17  discuss.

18             The first time in the history of this case that's been

19  mentioned ever that there was a 50-mile per hour caution sign

20  before the intersection is Mr. Fiorucci on the stand.

21             THE COURT:  Okay.

22             MR. DAVID:  I've never seen a picture of the 50-mile

23  per hour caution.  We just pulled up the initial discovery.  I

24  didn't see it there.  There's no picture of this 50-mile caution

25  sign in any of the exhibits filed by defendants or plaintiffs in

1   this case, and for the first time that my eyes have seen it,

2   Mr. Dill just showed me that their native adjuster files has this

3   picture and he didn't have it in his discovery.

4          I think any questions about that should be off limits.

5   Whether it's innocent or not, it's absolutely, by effect, trial

6   by ambush here.  We had a pretrial conference -- a pretrial order

7   a few weeks ago where they quote their expert as saying it's a

8   55-mile per hour roadway and there's no mention of this anywhere.

9          We just pulled up the initial discovery and it's not in

10  those photos that he got initially.  I don't know if it's

11  somewhere buried in some other discovery.  I've never seen it.

12  It's not an exhibit at trial.

13         I'm about to put my expert on and they're going to

14  start questioning him and cross-examining him with a picture

15  that's not evidence, that's never been produced as far as I can

16  tell right now, and it's -- it shouldn't be allowed.  We

17  shouldn't have to go fight this fight.  It's one thing for

18  Mr. Fiorucci to say something that was prompted by a picture

19  being shown to him last night, which I think should be stricken

20  as well, but it's another thing to have a trial by ambush on an

21  expert up here when their expert has never disclosed there was a

22  50 mile per hour caution.  He's had multiple reports.  We've had

23  pretrial conferences, pretrial orders, discovery responses,

24  everything else, the trooper.  Everyone says it's 55 miles an

25  hour.  No one has ever mentioned --

1          THE COURT:  Slow down.

2          MR. DAVID:  Sorry.

3          -- the 50-mile per hour advisory, and I don't think it

4  should be part of the evidence in this trial because it's too

5  late for that.  It's hard to unring the bell when they start

6  doing this and then they're issuing new reports and have new

7  opinions about what that advisory would mean if it's authentic

8  and real and we don't even know that.

9          So that's the long and short.  All I did was look at

10  their initial discovery where they had some of their adjuster

11  photos and it wasn't in there.  I know it's not in their bench

12  book.  It's not in our bench book.  It's never been identified or

13  marked for trial.  When they took Mr. Gillen's deposition they

14  never brought it up in that deposition.  It was never cited by

15  any of their experts.  And, again, every pleading they've filed

16  with the court, they represent -- and their experts as well -- it

17  was a 55-mile per hour zone.

18          THE COURT:  So what you're asking is you want to

19  preclude them from asking an expert or cross-examining an expert

20  on that 50-mile an hour because it was not produced.

21          MR. DAVID:  Exactly.  And using any picture now that

22  we've never seen before, that was not included in our exhibits.

23  If this was a relevant exhibit, they should have produced it.

24  They should have had it in their exhibit book and they should

25  have -- I don't want them using it --

```
1                   THE COURT REPORTER:  Mr. David.
2                   MR. DAVID:  I'm sorry, ma'am.
3                   I don't want them using it as some kind of rebuttal
4         either because that's not what it is.
5                   THE COURT:  All right.  Just to clarify because there's
6         a difference.  There's what he testified to, which is subject to
7         cross-examination and impeachment, and there's a question of
8         having an actual document that is put in front of a witness.
9                   Are you talking about the document?  Because it seems
10        to me the witness can testify to his belief subject to
11        cross-examination, and, you know, an expert can -- that can be
12        brought up with an expert, did you hear this testimony, et
13        cetera, versus showing an expert a document that has not been
14        produced in discovery.  Those are two distinct issues and you're
15        saying the document.
16                  MR. DAVID:  Yes, sir.  Well, first the document.  Two,
17        I don't think we should have the discussion.  It's an issue
18        that's never been raised before throughout this entire case and
19        no one's even mentioned this 50-mile per hour caution sign or
20        whatever it might be.  And I can't authenticate it.  We don't
21        have time to go have our expert authenticate it and find out what
22        it means and where exactly it is and how far it may be from the
23        intersection and which direction and everything else.  That's
24        why, one, the document should be out, and it doesn't open the
25        door for Mr. Burson to come in a couple of days and say, oh,
```

1   here's -- no.  They have to produce that timely and they have to

2   list it in their exhibits.  We have all the Custard photos.  They

3   have them in their exhibit, the Custard photos, and that one is

4   not included.

5            MR. DILL:  May I respond, Judge?

6            THE COURT:  Yes, Mr. Dill.

7            MR. DILL:  The issue is that I did not include -- we

8   had a set of Adobe photographs -- and I have a pet peeve that I

9   don't use Adobe photographs because they don't come up well.  So

10  we get native files.

11           The adjuster -- the independent adjuster did not

12  transmit to me the photo he is talking about.  So when we

13  produced photos for exhibits for the trial, it was left out.  It

14  is not in my exhibit book, and I'll tell the Court, it's not --

15  that's why you didn't see it with Mr. Fiorucci because we

16  couldn't.  It was not in the exhibits.

17           In his deposition -- and counsel crossed him with the

18  deposition.  At the very next paragraph, Mr. Fiorucci did say

19  it's 50 miles an hour.  It's a yellow speed advisory sign.  It's

20  not a speed limit sign.  It's a speed advisory showing a cross on

21  a yellow triangle, and underneath it, 50 miles per hour.

22           THE COURT:  And that was discussed during his

23  deposition?

24           MR. DILL:  It was not discussed during -- the sign

25  itself was not, but Mr. Fiorucci made the comment, the next

1  statement --

2           THE COURT:  In the deposition?

3           MR. DILL:  In the deposition, page 91.

4           (As read:)  I thought he should have been going 40 to

5  45, 45 max, because he should slow, at least, five for the

6  weather conditions and 50 was the speed limit.  So I thought he

7  should have been going 45 to 45 max.

8           That's what he said in the deposition.  He didn't talk

9  about the sign, but he talked about the speed.  I get the issue

10 with the exhibit.  At this point I don't know that there's any

11 way I could get the exhibit into evidence, but being able to

12 cross somebody on what the truth of the matter is at that

13 intersection is a wholly different matter.  We're here to find

14 the truth.  There's a caution light, and I believe highway design

15 does require that there be a speed advisory sign in addition to

16 that caution light.

17          MR. DAVID:  That picture is not in evidence.  What he

18 said in his deposition --

19          THE COURT:  Let me stop you.  We're talking about two

20 different things.  We're talking about a picture and we're

21 talking about testimony about it being 50 miles an hour.

22          I agree with the picture.  If it was not properly

23 marked as an exhibit and disclosed, you know, we're not going to

24 use it, but what you're asking for is to completely eliminate any

25 mention of 50 miles an hour.  I mean, he testified on the stand

1   here.

2          My understanding is that he mentioned the speed limit

3   as 50 miles an hour in his deposition, and if you have a dispute

4   with that, the proper way to handle it is cross-examination

5   during the deposition or to address it with another witness or to

6   impeach him.  I don't see a basis for wholly excluding his

7   testimony or any question of the 50 miles an hour.

8          MR. DAVID:  Thank you, Your Honor.

9          And, again, in his testimony, he said, one, it was a

10  55-mile per hour speed limit.  Later it was a 50-mile per hour

11  speed limit.  And Mr. Dill's not saying it was a 50-mile per hour

12  speed limit.  You're saying there's like one of these curve signs

13  or intersection signs saying there's a caution.  We can't

14  authenticate that.  We have never seen that.  So I can't really

15  comment on that right now.

16         THE COURT:  Isn't that part of discovery?  Can't you

17  investigate that?  Can't you ask for it in discovery, and if they

18  deny it or don't specifically disclose a question about the speed

19  limit, can't that be adequately addressed?

20         I have a real problem with saying that they cannot

21  raise what, you know, the speed limit is or what the signage was

22  at that intersection.  I have a problem with that.

23         MR. DAVID:  And I guess -- thank you, Your Honor.

24         My concern is that after they ask Mr. Gillen and he

25  says he sees no evidence of that, then they're going to have

1   their expert come and say, here, I've got the picture or

2   whatever.  I don't know.  I haven't been able to authenticate or

3   see it yet.  That's why I'm saying, no, it's off limits.  It's

4   too late for that picture to come in and whatever that additional

5   proof is.

6              THE COURT:  Mr. Dill, you're not going to try to get in

7   that picture through an expert, are you?

8              MR. DILL:  I am not, Judge.

9              MR. DAVID:  And he's issued two reports.  I didn't

10  depose him.  He's limited to the four corners of his reports and

11  he cannot start talking about caution signs that he didn't

12  mention in his report.

13             THE COURT:  Mr. Dill?

14             MR. DILL:  Judge, I'm in the what's good for the goose

15  is good for the gander on this thing, and my experts will stay

16  within their bounds as long as his experts stay within their

17  bounds as well.  I think it's a little rich that we're having

18  that kind of a discussion after all we've done in the last two

19  weeks.

20             THE COURT:  I agree.  You know, both sides play by the

21  rules.  If that was not disclosed, you don't use it, and the same

22  with the plaintiff's experts.  We'll say that outside the hearing

23  of the jury, but I expect y'all to adhere to that.

24             And, again, I'm not beating up on you, Mr. David, but

25  you do have to slow down.

```
1              MR. DAVID:  I know.  I'm sorry.

2              THE COURT:  All right.  Just because we're having --

3    you know, we want to make sure we've got a record.

4              Any other issues?  We're clear?

5              MR. DAVID:  Yes, sir.

6              THE COURT:  Okay.  Let's go ahead and bring the jury

7    in.

8                   (Jury Entered the Courtroom)

9              THE COURT:  Please be seated.

10             Mr. David, you may proceed.

11             MR. DAVID:  Thank you, Your Honor.

12             At this time the plaintiff calls Michael Gillen to the

13   stand.

14             THE COURTROOM DEPUTY:  Please raise your right hand.

15             Do you solemnly swear that the testimony you are about

16   to give in this case will be the truth, the whole truth, and

17   nothing but the truth, so help you God?

18             THE WITNESS:  I do.

19             THE COURTROOM DEPUTY:  Thank you.

20             THE WITNESS:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MR. DAVID:  Thank you, Mr. Gillen.

23   Whereupon,

24                   MICHAEL S. GILLEN

25   was called as a witness; after having been first duly sworn, was
```

1    examined and testified as follows:

2                        VOIR DIRE EXAMINATION

3    BY MR. DAVID:

4    Q    Can you state your full name and address for the record.

5    A    Michael S. Gillen, 6515 Greenwell Springs Road, Baton Rouge,

6    Louisiana.

7    Q    Thank you so much, Mr. Gillen.

8            Why don't you tell the jury about your education and

9    your background and your experience in the field of accident

10   reconstruction and rules of the road.

11   A    Sure.

12           I'm a traffic accident reconstructionist -- that's what

13   I do for a living -- which is investigate and reconstruct traffic

14   accidents.  I started off doing this in 1977 as a police officer

15   in Baton Rouge.  I worked in the traffic division.  I spent a

16   20-year career there investigating accidents.  As a police

17   officer, I investigated over 2,000 accidents.  Written a bunch of

18   tickets, about 25,000 tickets as a police officer.  I was a

19   traffic cop, but my training was specialized in technical

20   investigation and reconstruction.  Those courses came from the

21   Northwestern Traffic Institute, Northwestern University in

22   Evanston, Illinois; Texas A & M; Arkansas State University; IPTM

23   in Jacksonville, Florida; and all of about 1,300 hours of formal

24   tested courses to investigate and reconstruct traffic accidents.

25           Some of those courses were specific to commercial

1  vehicles.  They're a different animal.  They're bigger.  They're

2  slower.  They handle differently from a passenger vehicle.  So we

3  were taught acceleration rates, braking capabilities, et cetera,

4  relating to commercial trucks.

5          I retired from the police department in '96.  In '93 I

6  had started my business in the private sector.  So I had a

7  three-year overlap, but since I retired, I've been doing accident

8  reconstruction full time in the private sector, sometimes for the

9  plaintiff.  That's the party filing the suit.  Sometimes it's the

10  defense.  That's the party that's being sued.  Along with a

11  little bit of criminal mix in there, sometimes for the

12  prosecution, sometimes for the defense, but all we do -- and

13  "we," I'm speaking collectively for my business.  I have eight

14  employees and we only do traffic accident investigation and

15  reconstruction.

16  Q    Did you talk about the Baton Rouge investigation unit, the

17  homicide unit?

18  A    I did not.

19  Q    The traffic fatality unit.  I'm sorry.

20  A    Yeah.  Part of what I did with the city police department

21  prior to my retirement, I started a specialized division within

22  the traffic division.  There was a traffic homicide unit, and as

23  the name implies, we investigated fatalities.

24          If there was a traffic fatality or a critical injury

25  accident, my team -- I had seven people under my direction -- we

1   would respond and we were the traffic detectives.  We would

2   photograph the scene.  We would impound the vehicles, conduct

3   mechanical inspections on the vehicles, attend the autopsy when

4   that occurred, make the notifications, and after collecting all

5   of the physical evidence associated with the collision, we would

6   prepare a case for criminal prosecution where that was

7   applicable.

8           I did the same thing in the hit-and-run division for

9   seven years before I started the traffic homicide unit

10  investigating hit-and-run accidents, comparing damages to the

11  vehicles, taking statements, preparing cases for criminal

12  prosecution and testifying on those cases in court.

13          MR. DAVID:  Thank you, Mr. Gillen.

14          At this time the plaintiff would tender Mr. Gillen as

15  an expert in crash reconstruction and rules of the road.

16          THE COURT:  Any objection?

17          MR. DILL:  Your Honor, brief cross, and I do have an

18  objection.

19                    VOIR DIRE EXAMINATION

20  BY MR. DILL:

21  Q    Good morning, Mr. Gillen.

22  A    Good morning, Mr. Dill.  How are you?

23  Q    Doing fine.  Yourself?

24  A    I'm good.  Thank you.

25  Q    Mr. Gillen, do you have an engineering degree?

1   A    No, sir.  I'm not an engineer.  I'm an accident

2   reconstructionist.

3   Q    Do you have a degree of any sort?

4   A    No, sir.  I went to LSU long enough to decide not to,

5   dropped out, went back into the law enforcement training program,

6   graduated from that and started with the city police department.

7   Q    You told us a few minutes ago you opened your business in

8   1993, correct?

9   A    Yes, sir.

10  Q    And that business is solely for litigation, correct?

11  A    Well, either for litigation or in anticipation of

12  litigation.  It's not uncommon for a trucking company to call us

13  out in the event of a major collision long before a lawsuit is

14  ever filed.  We go out.  We take photographs.  We don't take

15  statements.  We're collecting physical evidence.  So in the event

16  of a lawsuit, we have something to reconstruct the collision

17  from.

18  Q    All of your work is for litigation purposes, either

19  preparation for or in work with actual litigation?

20  A    With the exception of the criminal work -- I guess if you

21  call criminal work litigation, yes, sir.

22  Q    You've never held a commercial driver's license, have you?

23  A    No, sir, I have not.

24  Q    You've never worked for a trucking company, have you?

25  A    No, sir.

```
 1   Q    You've never held a safety position at a trucking company?

 2   A    No, sir.  I've never worked for a trucking company.  I've

 3   participated in safety programs with the LMTA, which is the

 4   Louisiana Motor Transport Association.  Several years ago I

 5   worked with their safety department in developing safety programs

 6   for the trucking companies trying to reduce trucking-related

 7   accidents.

 8   Q    You've never held a certificate in truck safety, have you?

 9   A    No, sir.

10   Q    And you've never driven a tractor trailer, have you?

11   A    No, sir.  The only time I've ever driven a tractor trailer

12   was in a training course in a parking lot, but I've never done

13   that for a living.

14             MR. DILL:  Very good.  Thank you.

15             Your Honor, I have no further cross.

16             Sidebar for the objection.

17        (Whereupon, a sidebar conference was had as follows:)

18             MR. DILL:  Judge, he was disclosed as an accident

19   reconstruction expert.  He just tendered him for rules of the

20   road.  I'm not sure exactly what that means, but it sounds like

21   law.

22             MR. DAVID:  I'll retract that.

23             THE COURT:  Purely limited to accident reconstruction,

24   not getting into rules of the road or the types of testimony that

25   is more appropriate for somebody who has that experience in
```

1    driving.  He does not.

2              MR. DAVID:  Well, but he --

3              THE COURT:  That's my ruling.

4              MR. DAVID:  Thank you, Your Honor.

5         (Whereupon, the sidebar conference was concluded.)

6              MR. DAVID:  We'd tender Mr. Gillen as an expert in

7    accident reconstruction.

8              THE COURT:  Mr. Dill?

9              MR. DILL:  No objection, Your Honor.

10             THE COURT:  You may proceed subject to the Court's

11   rulings.

12             MR. DAVID:  Thank you, Your Honor.

13                     DIRECT EXAMINATION

14   BY MR. DAVID:

15   Q    Mr. Gillen, what did you do in investigating this case?

16   What documents did you review?

17   A    A lot.  I have three binders of material.

18             We started off with a police report and photographs

19   that were taken at the accident scene.  There were follow-up

20   photographs taken during daylight of the 18-wheeler.  We wound up

21   with the deposition testimony, vehicle research on both of the

22   vehicles.  We looked at satellite views of the accident site as

23   well as Google street views of the accident site.

24             Give me just a moment and I'll find you a complete list

25   here.

1          We did weather research, the traffic count for the

2  accident location, vehicle research on the 2016 Peterbilt driven

3  by Mr. Fiorucci.  We looked at his driver logs.  Did vehicle

4  research on the Volkswagen Passat.

5          I looked at the Louisiana revised statutes, the

6  Commercial Driver's License Guide, the Code of Federal

7  Regulations.

8          We studied the turning pattern for an 18-wheeler based

9  on AASHTO design standards.  AASHTO is an acronym for the

10  American Association of State Highway and Transportation

11  Officials.  It's the green book that traffic engineers use to

12  design intersections, and within that book, it has turning

13  patterns for different size vehicles.  So they're making certain

14  when they build that intersection, it can accommodate vehicles

15  that would be using that highway.  We studied the turning

16  patterns from that.

17          We looked at Delmar's Tractor-Trailer Truck Driver

18  Training Manual for the safety guidelines for a truck driver.

19  The Northwestern Traffic Institute Accident Reconstructing

20  Manual.  We conducted calculations.  We produced CAD diagrams.

21          And we produced three reports in this.  Our initial

22  report was before we received the video.  This is somewhat of a

23  unique case in that we have a video.

24          MR. DILL:  Your Honor, can I enter an objection to the

25  narrative at this point?

1           THE COURT:  Sustained.  Question and answer.

2   BY MR. DAVID:

3   Q     And thanks for listing all the documents you reviewed,

4   Mr. Gillen.

5           You were just about to talk about the video.  What

6   makes this unique about this case and having a video?

7   A     We have the seconds leading up to the collision and after

8   the collision captured on a security video from a gas station

9   located at the intersection.

10  Q     Is this a difficult case to figure out?

11  A     No, sir, it is not.

12  Q     Sometimes I feel like I get too much in the weeds of stuff.

13          This is pretty simple, right?

14  A     This is a very straightforward case with an intersection

15  governed by a flashing red light for the 18-wheeler and the

16  favored roadway, the main highway, Highway 190, the favored

17  roadway having the right-of-way at the intersection.

18          MR. DILL:  Your Honor, I'm going to enter an objection

19  at this point to -- sidebar.

20          (Whereupon, a sidebar conference was had as follows:)

21          MR. DILL:  He's getting into the favored roadway and

22  talking about who had the right of way.  He's walking over into

23  the legal part.  Your Honor is going to have to decide what the

24  law is on that and that's my objection.

25          THE COURT:  He needs to stay away from the

1    right-of-way.

2              MR. DAVID:  I need to have minute with this.

3              THE COURT:  You need to have --

4              MR. DAVID:  He has three different reports where he

5    lays out all of this.  As an accident reconstructionist, he's

6    done this many times.  Every accident reconstructionist does this

7    all the time where they talk about the rules and what the

8    violations are and what's going on.  He lays them out.

9              Nothing he's saying wasn't in his three reports.  They

10   didn't file a Daubert.  They didn't file any challenges.  How in

11   the world are we saying this expert can't talk about things

12   within the bounds of his report?  They didn't file a Daubert

13   motion.

14             MR. DILL:  It's outside the scope of what his expertise

15   is and it's the Court's duty to instruct the jury on what the law

16   is.  Just because he puts it in a report doesn't mean it has to

17   come into evidence.

18             MR. DAVID:  That's exactly why we have Daubert

19   challenges so we can say, no, this is beyond his expertise.  They

20   didn't do it.

21             And, by the way, we could spend more time talking about

22   all his expertise in these areas and what he's done.  He's

23   testified about this many times in cases where Mr. Dill and me

24   are involved.

25             THE COURT:  There are disputes, though, over the

1    right-of-way and the proper instructions.  I'm not going to allow

2    you to get in the plaintiff's version of that law through an

3    expert until it is hammered out in the jury instructions.  He

4    cannot testify as to the law.  He's not an expert in the law.

5           MR. DAVID:  Your Honor, I respect what you're saying,

6    but I want you to understand, yesterday when the trooper -- you

7    said, no, he has to be an expert.  This is the guy who says this,

8    that this is what happens.

9           If you look at the Code of Evidence, experts can talk

10   about their findings, but they can dispute it.  Their expert will

11   say, no, he's wrong, and he lists all of the laws that they like.

12   They have it their pretrial order as well that their expert is

13   going to say --

14          THE COURT REPORTER:  Mr. David.

15          MR. DAVID:  I'm sorry.  I'll slow down.

16          Their expert is going to say that we violated these

17   laws and we violated these.  That's what they do in maritime

18   cases, in trucking cases.  Every time -- and I've been doing this

19   for a long time.  This is what -- if not, what is he saying?

20   He's here to talk about what's going on, what the factors were,

21   what the stop signs --

22          THE COURT:  He can testify to that, but what you're --

23   what the dispute is over is what the law is about right-of-way.

24          MR. DAVID:  Yes.  And he can say, well, a stop sign --

25   what the rule is for a stop sign, what you're supposed to do.

1          THE COURT:  I'm instructing the jury on that.  He can

2     testify as -- I mean, he's an expert in the mechanics of that

3     accident, not an expert in the legal obligations governing the

4     plaintiff and the defendant.

5          MR. DAVID:  He has findings about who did what wrong.

6     Theirs has findings about --

7          MR. DILL:  That's the jury's job.

8          MR. DAVID:  Wait.  Their entire expert report says

9     Mr. Bradley was speeding beyond the speed limit, all these

10    things, but didn't observe the caution light because you're

11    supposed to -- they said it in opening and everything else.

12    That's what's this about is.

13          We talk about our interpretations of the laws, what

14    people's duties are to the road.  If you can't talk about the

15    duties, we don't need these experts.  This is what they do.  And,

16    again, the form to dispute this is in a Daubert motion, which

17    they would have lost because I would have briefed it.

18          THE COURT REPORTER:  Mr. David.

19          MR. DAVID:  Still too fast?  I'm sorry.  I was trying

20    to go slow.

21          THE COURT:  All right.  This is going to take a little

22    bit more time.  I'm going to let the jury go.

23       (Whereupon, the sidebar conference was concluded.)

24          THE COURT:  All right.  We're going to take a brief

25    recess and I'll let you go back to the jury room.

1          (Jury Exited the Courtroom)

2          THE COURT:  All right.  This is a closer question and

3   that's why I wanted to let the jury go so we can make sure that

4   we clarify this.

5          There are disputes between the parties over the law

6   that goes to the right-of-way.  My inclination is to not allow

7   testimony that addresses legal issues that are still in dispute

8   by the parties until we can -- until the Court makes a ruling on

9   which law and the proper phrasing of that law is appropriate.

10         Now, Mr. Dill, accident reconstruction experts

11  sometimes venture into parties' duties and who has the

12  right-of-way.  So I want to get some rules -- pardon the pun --

13  rules of the road for this.

14         What is it that you're objecting to?  Are you objecting

15  to any mention of parties' duties and right-of-way or just to

16  those matters that are still subject to dispute by the parties as

17  far as the law?

18         MR. DILL:  It's those matters that are subject to

19  dispute, Your Honor.

20         THE COURT:  Can we define those?

21         MR. DILL:  It's the duty of a motorist under the

22  circumstances that we have because what I anticipate he's going

23  to try to say is that he's going to try to explain in the

24  plaintiff's terms that Mr. Fiorucci had to stay at that stop sign

25  for all time until whatever.

1          So he's trying to establish a duty that is within the
2    province of the Court to establish and venturing out of accident
3    reconstruction, which is the movement of the vehicles through,
4    not the obligations of the motorist.  He's not a driver.  He's
5    never driven.  So he's now venturing into saying what a truck
6    driver should or should not do at that intersection.
7          So it's leaving his expertise as an accident
8    reconstructionist who can calculate and recreate what happened in
9    a crash.  It took this many seconds and this many feet.  They
10   came together this way.  The damage pattern showed this.  All of
11   that is the mechanics of an accident and how they came together,
12   but the decisions of the drivers leaves accident reconstruction
13   and goes into a completely different field and actually invades
14   the province of the Court and the province of the jury to
15   determine whether or not there was a violation of the duty.
16         MR. DAVID:  Your Honor, I can't believe what my ears
17   are hearing.
18         THE COURT:  Oh, come on.  Let's not -- stop.  Okay?
19   You don't have a jury here.  It's just me.
20         MR. DAVID:  But we've done this so many times.
21         His expert lists all the laws that they think are
22   favorable to them, lists all the rules for trucking that they
23   think are favorable to them.  These are all the rules that they
24   think are unfavorable to Mr. Bradley.
25         THE COURT:  It's in the providence of the Court to

1    instruct the jury, to review the parties' proposed instructions

2    on what the law is, and to come to an conclusion as to which I'm

3    going to instruct the jury on and to provide that.  It's not

4    appropriate for the witness -- for an expert witness to opine on

5    what I'm going to instruct the jury on.

6              Now, let's go to the second level.

7              I'm not going to allow him to opine on the legal

8    questions that the parties are addressing and that we have to

9    determine in a charge conference and how those are going to be

10   instructed to the jury.  They're disputed and it's not for an

11   expert witness to address that with the jury.  That's my clear

12   ruling on that.

13             Now, getting into the duty, that's a little bit --

14   that's more of a fluid issue because it is a question for the

15   jury as to whether or not one party or the other violated a duty

16   of care.  That's an ultimate question that the jury has to

17   decide.  There's case law that allows an expert to address the

18   ultimate duty under some circumstances, Mr. Dill.

19             MR. DILL:  And there are, Your Honor, but I'm not sure

20   that this expert crosses that line when he just testified he has

21   no experience in driving an 18-wheeler.  How does he get there as

22   an accident reconstructionist?

23             MR. DAVID:  And, Your Honor, in response to that,

24   first, this is a stop sign case.  The objection was raised when

25   Mr. Dill talked about the favored roadway.  There's no dispute in

1    this case as to what the favored roadway is.  None.  There's
2    vehicles with stop signs.  There's roads with stop signs, LA 26,
3    and there's a road without a stop sign.  That's the favored
4    roadway.  That's not in dispute.

5          I'm not even quite sure what the legal dispute is.  Is
6    he talking about the presumption of a left-turning motorist?  I'm
7    not bringing that up with this witness.  But he was talking about
8    the duty of a motorist at a stop sign, to not just stop and look,
9    but to yield the right-of-way.  That's what he's testified to
10   thousands of times.

11         And Mr. Dill's expert talks about those duties in his
12   reports.  He's done it many, many times.  That's what experts do.
13   They take the rules and they apply them to the facts to give
14   their opinions.  They're going to butt heads and sometimes their
15   opinions don't carry the day, but he's not going -- I guess we
16   need to figure out what's really in dispute.  He's not going to
17   talk about --

18         THE COURT:  I don't think there's a whole lot of
19   dispute as to what experts do.  The question is, is the expert
20   doing that on a subject matter that they're qualified to do.

21         MR. DAVID:  And, Your Honor, in fairness to Mr. Gillen
22   and me and my client, the time for bringing up a -- first of all,
23   he is qualified to testify as to everything in here.  If he
24   wasn't, you would have seen a Daubert motion for the three
25   reports he issued.

1           If I thought their expert wasn't qualified who gave

2   very similar opinions, I would have filed a Daubert motion, but

3   no one did that in this case.  So it's inappropriate to raise

4   that right now.

5           Second, I think we need to narrow down what issues of

6   law are in dispute so we can avoid them and so we don't foreclose

7   this entire testimony because there's not a whole lot in dispute.

8           THE COURT:  How about not having an expert testify as

9   to what the law is?  I mean, that's my concern here is that we

10  have experts crossing over that boundary.  We're the ones --

11  y'all propose instructions to me and I make a decision as to what

12  instructions are going to be given to the jury.  That's not the

13  role of an expert to duplicate that or to at least suggest to the

14  jury what the law is.

15          Now, the question I have -- let me go to Mr. Dill.

16          Your expert.  The expert reports, expert depositions,

17  did they discuss the right-of-way?

18          MR. DILL:  He was not deposed, Your Honor.  He

19  discusses all kinds of things in his report and I think he

20  discusses right-of-way.  It's not a question I will ask him.  I'm

21  of the belief that an expert has to stay within the bounds of his

22  expertise and expressing who in the ultimate issue did something.

23          THE COURT:  Was your expert a driver?

24          MR. DILL:  He was not.  He was a Louisiana state

25  trooper before he was a reconstructionist.

1          MR. DAVID:  They're similarly situated.

2          THE COURT:  All right.  I'm going to allow Mr. David to

3     get into that and I'll allow your expert to get into it.

4          MR. DAVID:  Thank you, Your Honor.

5          THE COURT:  But the question is -- I want to clarify

6     this.  I don't want him venturing into what the law is,

7     especially if it's an area of dispute because there are two --

8     there are multiple versions of the right-of-way, the law on

9     right-of-way in the parties' proposed instructions, and those

10    have not been resolved.

11         MR. DAVID:  If I can to clarify because I don't want to

12    run afoul of your order, Your Honor, and I'll try to speak

13    slowly.

14         So he can talk about the rules for obeying a stop sign

15    and red flashing lights and amber flashing lights, right?  And

16    that's all in the report.  It's in their report as well.  This is

17    what these folks testify to in every case for a long, long time,

18    and I don't think there's any dispute about what LA 32 or RS 32,

19    whatever colon it is, it is the law, but the dispute in our

20    instruction isn't going to be the duty to yield at a stop sign.

21    It may be preemption.  It may be the presumption of a

22    left-turning motorist.

23         THE COURT:  That's what's at dispute.

24         MR. DAVID:  Are there any other ones where we have a

25    dispute because we're not going to talk about those two, but

1    favored roadway, stop sign, duty to look out and see what you
2    should see like they talked about in their opening.
3             THE COURT:  The favored roadway, I believe there may be
4    -- is there a dispute over that?
5             MR. DILL:  There's not a dispute that it was a favored
6    roadway, but it was controlled by a caution sign, and there's a
7    duty of a motorist who approaches a caution light, what we've
8    submitted a requested charge on, to slow the vehicle and proceed
9    with caution.  That's where the dispute comes in and how that
10   interacts with the favored roadway.
11            MR. DAVID:  There's no dispute on the law, Your Honor.
12   I think our yellow or amber light instruction was the law.  It's
13   LARS 32 something.  So no one is saying you don't have to use
14   caution when you approach the yellow flashing light.  That's the
15   law.
16            THE COURT:  Yeah.  What I want to get away from is
17   where there is a dispute and there is a dispute over certain
18   instructions relating to right-of-way, including instructions
19   that were put up on a screen to the jury, which I'm not happy
20   about.  That should never happen.  You should not put those
21   instructions up until there has been a resolution by the Court of
22   what the law is that will be instructed to the jury.  That should
23   not have happened in opening statements.
24            And I want to make sure that we're not doing the same
25   thing with an expert witness, but what I will allow -- the other

1    issues, Mr. Dill, I think can be adequately addressed on

2    cross-examination of the witness as well as presenting your

3    expert's testimony.  Your expert -- you know, if Mr. David can

4    get into those questions as far as duty and stopping at a stop

5    sign, the matters that are not in dispute, you can do the same

6    with your expert.

7               MR. DAVID:  Mr. Dill, other than preemption and other

8    than the left-turning motorist, what other legal disputes do we

9    have?

10              MR. DILL:  I think that's it.  It's the yellow caution,

11   the duty of a left-turning motorist and --

12              MR. DAVID:  What's sort of dispute on a yellow caution?

13              MR. DILL:  The obligation of a driver.

14              MR. DAVID:  But the law is you have to use caution.

15   Your expert may say use caution means A, B, C, D, E, F, and mine

16   might say it's G, H, or whatever else, but the law is the law.

17   It's actually a revised statute.  I think we used the exact text

18   from the law.  I don't think we dispute the law.  I guess we're

19   talking about what we think the duties of the driver are with

20   respect to the law.

21              MR. DILL:  I think there's some case law under

22   Louisiana law that dictates what that means, which is --

23              THE COURT:  Until we decide it, an expert is not going

24   to cover it.  Okay?

25              MR. DAVID:  I don't want to be so argumentative,

1    Your Honor, but in opening statement, Mr. Dill says a yellow

2    caution light means you have to use caution and Mr. Bradley

3    didn't do that, and we have an expert who's opined on that in his

4    report that there's no duty to reduce his speed under the law.

5    It might be a good idea sometimes, but there is none.

6          Again, the law is so clear because it's the law.

7    There's a revised statute that says what the duty is for a yellow

8    flashing light, but the interpretation of what that means for a

9    duty to a driver to reduce speed by five or ten or is it okay

10   just to look out and be vigilant about where you're going.

11         THE COURT:  I'm not following you.

12         My ruling was if there is a dispute, two different

13   versions of the jury instruction, I'm not going to allow an

14   expert to testify as to one party's version of that jury

15   instruction.  Okay?

16         MR. DAVID:  Certainly, Your Honor, and I wouldn't do

17   that, but I think we could all agree that a yellow flashing light

18   means caution.

19         MR. DILL:  Judge, what he just told the Court, that

20   he's going to testify that there is no duty to slow down for a

21   caution light under the law, is exactly one of my objections.

22   He's now telling the jury what the law is on a yellow caution

23   light.  That's where the problem comes up.  That's exactly one of

24   the scenarios that I'm concerned about.

25         THE COURT:  I'm not sure why you need expert testimony

1   on that.  You can propose an instruction that defines that and

2   the jury can be instructed on it if the Court agrees that that's

3   a proper statement of the law.

4           MR. DAVID:  It's not about the law, Your Honor, because

5   we really -- he may have some cases, but we're not disputing what

6   the law is, but it's what the duty of a motorist is under the

7   law, and that's what his expertise is in.  He said it in his

8   deposition.  He said it in this.  There's no requirement under

9   the law -- and in his reports -- that the motorist reduce his

10  speed for a flashing yellow light.  You don't get a speeding

11  ticket for going 55 through a flashing yellow light.

12          THE COURT:  All right.  We're going to take a brief

13  recess.  We'll do ten minutes and we'll come back and bring the

14  jury in and the Court will rule.

15          MR. DAVID:  Thank you, Your Honor.

16          Do you want the reports?

17          THE COURT:  Yes.  If you could give those to Heather,

18  that would be great.

19                      (Recess)

20          THE COURT:  Please be seated.  I apologize for the

21  delay, but it takes a while when the Court is required to dig

22  through these documents.

23          Again, you know, counsel needs to assist the Court by

24  pointing to specific places in the reports that you're using to

25  support your positions.  I understand this was -- that this was

1    last minute, but it's going to take a lot of time out of this

2    trial if we keep doing this.

3            Okay.  Sidebar because this is going to be easier this

4    way.

5        (Whereupon, a sidebar conference was had as follows:)

6            THE COURT:  I have the witnesses.  This is from the

7    original report.  This is from the supplemental report, but the

8    supplemental report I do not believe added an additional opinion

9    to it.  It was addressing another expert, correct?  I did not see

10   a list of conclusions in that.

11           MR. DAVID:  A list of conclusions?  I don't know.

12   There's definitely some opinions in there, but I can't tell you.

13           THE COURT:  Okay.  That's all accident reconstruction.

14   I mean, that's permissible.

15           MR. DAVID:  And, Your Honor, Mr. Gillen pointed out to

16   me that with accident reconstruction -- what were the three

17   things you said, Mr. Gillen, about accident reconstruction?

18           THE WITNESS:  (Unintelligible) and driver strategy.

19           THE COURT:  Driver strategy.  That's not law.

20           MR. DAVID:  Yes, sir.

21           THE COURT:  Let's keep going.  U.S. Highway 190 is the

22   favored roadway at the intersection.  That includes some law in

23   there.

24           Now, that's part of the reason why this is not

25   clear-cut because courts will allow some discussion of the law if

1   it's built in, baked in to their opinions.  That seems to be --

2   you know, there's really no dispute as to what is the favored

3   highway at this point, is there?

4            MR. DILL:  There is none, Judge.

5            THE COURT:  I will allow that.

6            From his stopped position, Mr. Fiorucci should have

7   been able to see Mr. Bradley approaching.  That can go in

8   accident reconstruction because they can talk about, you know,

9   what a -- you know, what -- you know, under the circumstances

10  given the weather, given the circumstances, given the positions

11  of the vehicle, what one of the participants should have been

12  able to see.  I'll allow that.

13           Mr. Fiorucci failed to yield to Mr. Bradley who was

14  approaching the favored highway.  There's no dispute over favored

15  highway.  Yield, that is something that is within the knowledge

16  and province of the jury.  A lot of courts will say if it's

17  something that is common to a jury's understanding, you don't

18  need an expert, it's not appropriate for the expert, but the case

19  law also states that sometimes that type of testimony can assist

20  the trier of fact and courts will often allow it.  I'm going to

21  allow that.

22           Mr. Fiorucci created a hazard by turning left in front

23  of Mr. Bradley.  That's not law.  That's his opinion.  Whether or

24  not it's a hazard, you can cross-examine him.  You can bring in

25  an expert to address that.

1          Two things that I have an issue with, Mr. Fiorucci

2    failed to follow the advice of the Texas Commercial Driver's

3    License Guide and Mr. Fiorucci violated two Louisiana statutes.

4    Now, that's an opinion, but as far as the Louisiana statutes,

5    he's going to testify to what happened, in his opinion what

6    happened.  I'm going to instruct the jury on the law and the jury

7    is going to match those two and come to a conclusion.  I'm not

8    satisfied that he is in the best position to opine on whether or

9    not they violated the statute if he can testify to all of these

10   other aspects.

11          MR. DAVID:  And, Your Honor, if we can just say that

12   you have a duty to yield at a stop sign and he failed in his duty

13   to yield.  I'm not going to go in saying LA R.S. 12:234.  I'm not

14   going to do that at all.

15          MR. DILL:  And the driver manual is another issue,

16   Judge.  He's espousing that that is the law and it's not.

17          THE COURT:  Yeah.  I did not admit him as a trucking

18   industry practices expert.  I admitted him as an accident

19   reconstruction specialist.

20          MR. DAVID:  And, Your Honor, we'll do whatever the

21   Court wants.

22          I will say for strategy, in every trucking case I've

23   had, Mr. Gillen several times and other experts, they talk about

24   what the rules are for commercial drivers.

25          THE COURT:  Well, sometimes they overlap.  Sometimes

1  they have expertise, but Mr. Dill objected to him testifying as

2  to, quote, the rules of the road and to limit that to accident

3  reconstruction.  The question is can you qualify this witness as

4  an expert in the Texas Commercial Driver's License Guide and

5  practices for tractor trailer truck driving.

6      MR. DAVID:  I can absolutely qualify him as an expert

7  in, one, the rules of the road, and, two, in driver strategy,

8  professional driver strategy versus regular driver strategy,

9  which he's testified to hundreds of times in federal and state

10  courts.  And to be honest, I'm not going to lie, but I think that

11  statute just says -- doesn't it say something about fog and

12  you're supposed to slow down in fog?

13      MR. DILL:  It's not a statute.

14      MR. DAVID:  I mean that Texas professional driver

15  regulation.

16      MR. DILL:  It's not a regulation.  What it is is it's a

17  study guide given to truck drivers and on the inside cover it

18  says it's not published by any governmental agency.  It

19  discredits itself.  It is simply a study guide for truck drivers

20  to use to study for their CDL exam.  It is not the law.

21      THE COURT:  We've got two things there that sounds

22  highly relevant to me.  I mean, if this is what truck drivers, in

23  the defendants' position, receive and are instructed in, it's not

24  a legal conclusion because it's not the law, where does that come

25  in?

1          MR. DILL:  I don't think it comes in, Judge.  I don't

2    think it has any bearing on what the law in this case is.  It's a

3    defensive driving --

4          MR. DAVID:  And my only response to that, Your Honor,

5    is since it's not the law, this is the exact thing that Daubert

6    would be used for to challenge the reliability of -- he cited

7    this specifically in his report and they never challenged that.

8          So I would think study guides and instruction manuals

9    and things like that are things that we always talk about in

10   driver strategy.  And there's some instructions on fog.  There's

11   instructions on not blocking traffic and things like that.  Those

12   are all things that are in his report.  He's not going to talk

13   about certainly -- it's going to be -- and, again, this is a stop

14   sign case.  It's so basic.

15         I'm going to try to talk slower and be nicer, Your

16   Honor, but I don't see how they can say something that's not the

17   law he can't talk about because it's not reliable when they never

18   filed a motion saying that he was using poor methodology and not

19   using, you know, reliable --

20         THE COURT:  Well, there's a lot of content in reports

21   that don't end up being actually presented in testimony.

22         MR. DAVID:  Yes, sir.  Absolutely.

23         THE COURT:  I'm sure their reports as well list

24   statutes and list law.  The question is that doesn't mean because

25   you have these lengthy compendiums, that if somebody has a timely

1    objection at trial -- and with courts, generally the case law is

2    when we're dealing with this kind of parsing of expert testimony,

3    it's best to do it at trial subject to live objections because,

4    for example, failure to yield in some circumstances may be not

5    subject for expert testimony because an ordinary juror could

6    understand the failure to yield, but in other cases, given the

7    context, failure to yield, it could be helpful to have an expert

8    testify to that.  So that's why the fact that there was no motion

9    in limine is irrelevant here.  I don't want to hear any more

10   arguments.  There's no motion in limine.

11             MR. DAVID:  I have no plans to ask any questions about

12   that Texas regulation or whatever it is.

13             THE COURT:  The Texas commercial and Delmar

14   tractor-trailer truck driver training.

15             MR. DAVID:  I'm not going to ask about that.

16             THE COURT:  All right.  We're not going to allow that

17   unless you can find some other way to bring it in.

18             MR. DAVID:  What I'd like to do is just instruct the

19   Court that I'm not going to -- I don't want to go brief that.  I

20   don't want to delay us any longer.  I'm not going to bring up --

21             THE COURT:  Those two points.

22             MR. DAVID:  That way there's no adverse opinion against

23   Mr. Gillen and we'll just move on from it if that's okay with

24   Your Honor.

25             THE COURT:  Are you satisfied?

1          MR. DILL:  I'm satisfied, Your Honor.

2          THE COURT:  And if we stray beyond that, object, and

3    we'll do sidebar.

4          MR. DAVID:  Thank you, Your Honor.

5          MR. DILL:  Thank you, Your Honor.

6          THE COURT:  Let's bring in the jury.

7          It's 11:30.  I'll go a little bit later -- since

8    they've had an extended break -- closer to 12:30 and we'll give

9    them an hour and 15 minutes.

10         Do you think you can finish this witness in an hour?

11         MR. DAVID:  I know I will.  I don't know about

12   Mr. Dill.

13         THE COURT:  How much more time do you think you've got?

14         MR. DAVID:  About 45 minutes.

15              (Jury Entered the Courtroom)

16         THE COURT:  All right.  Everyone may be seated.

17         Again, I apologize for keeping the jury waiting.  What

18   we have been doing is discussing the law and procedure to

19   hopefully prevent having to have a lot of objections which will

20   slow down the proceeding even more.

21         So you may proceed subject to the Court's ruling,

22   Mr. David.

23         MR. DAVID:  Thank you so much, Your Honor.  I

24   appreciate it.  And, Mr. Gillen -- and I thank everyone for the

25   delay, for suffering through the delay at least.

1    BY MR. DAVID:

2    Q    Mr. Gillen, again, we were talking about how simple this

3    particular case is.  It's a stop sign case.  I think you

4    mentioned that Mr. Bradley was on the favored roadway and the

5    18-wheeler had the stop sign, correct?

6    A    That's correct.  Yes, sir.

7    Q    And sometimes I get too much in the weeds and make things

8    that are really simple complicated.  That's what I want to talk

9    to you about.

10             THE COURT:  Let's stick to questions, Mr. David,

11   please.

12             MR. DAVID:  Yes, sir.  I'm sorry, Your Honor.

13   BY MR. DAVID:

14   Q    In this stop sign case, what duty did Mr. Fiorucci have to

15   look down at traffic and see who's coming?

16   A    It's his responsibility at a stop sign.  He has to bring his

17   vehicle to a stop and check for traffic coming both directions

18   and yield to that traffic before pulling out from a stopped

19   position.

20   Q    And I know you just heard the testimony of Mr. Fiorucci,

21   correct?

22   A    Yes, sir.

23   Q    And you've seen the video.  We're going to see the video

24   again in a second, but you've seen the video in this case,

25   correct?

```
1    A    I have, yes.

2    Q    And the evidence in the video, the clear evidence, is that

3    Mr. Bradley's headlights were on, correct?

4    A    Yes.

5    Q    And we know, based on the video and what we can see, that

6    you could see his headlights from at least 350 feet away where

7    the video starts?

8    A    Yes, when his vehicle comes into view.

9    Q    So that doesn't mean you could only see him 350 feet away.

10   It's just that's where the edge of the camera was and you could

11   see the profile of his headlights as it comes at 350 feet from

12   the impact, correct?

13   A    That's correct.

14   Q    And you can also see in the video -- we talked about the

15   18-wheeler's headlights.  How far away were those headlights when

16   they first come into view?

17   A    Over 700 feet.  We measured 770 feet of view of

18   Mr. Fiorucci's headlights as he's traveling south on LA 26

19   approaching the intersection.

20            The security camera -- one of the two security cameras

21   on the face of this Chevron gas station on the corner was pointed

22   north in the direction of the intersection and you can see

23   Mr. Fiorucci's headlights as he's approaching the stop sign.

24   Q    So objectively from the video, you know you could see low

25   beam headlights from at least 770 feet away, correct?
```

1    A    Yes.

2    Q    And based on your expertise, it's actually further than

3    that.  Those headlights come from behind a tree.  It's not like

4    they came in the distance and that's when you can first see them,

5    correct?

6    A    That's correct.

7         We used a landmark.  There was a vending machine under

8    a canopy on the northeast corner of that intersection.  So

9    looking at the satellite views, we knew where that building was

10   and we knew where the camera was and we simply drew a line from

11   those two points intercepted with Highway 26 and then measured

12   that distance.  The headlights actually came into view farther

13   north as he's traveling south, but we used that known landmark as

14   a measuring point.

15   Q    So even objectively on the video, it was further than

16   770 feet that you could see the low beam headlights?

17   A    Yes, sir.

18        MR. DAVID:  Ms. Paula, can we have the projector.

19   Thank you so much.

20   BY MR. DAVID:

21   Q    I'm going to put up your demonstrative aid that's been

22   shared with the defense.  There's a lot going on right here, but

23   I think what you just testified to, if I could show the jury, was

24   how far away the truck was based on the measurements you made

25   from the video, correct?

1   A    Yes, sir.

2   Q    And that's this green line, the 770 feet?

3   A    Yes, sir.  That represents the distance from the face of the

4   station, the gas station down at the bottom of that photograph,

5   up to the position of the truck at the top of the photograph

6   coming south on Highway 26.

7   Q    So we know the point of the impact is right in the middle of

8   the intersection, and we have some other distances that we know

9   based on the testimony, like Mr. Fiorucci saying he could see

10  somewhere between an eighth of a mile or a quarter of a mile down

11  this road when he got to the stop sign and looked left, correct?

12  A    Yes, sir.

13        MR. DAVID:  And so if you could zoom on that a little

14  bit, Ms. Reed.

15  BY MR. DAVID:

16  Q    So based on his own testimony, he should be able to see low

17  beam headlights coming in his direction somewhere between an

18  eighth and a quarter mile away?

19  A    Yes, sir.

20  Q    Based on what we can see in the video, the 18-wheeler lights

21  when they come 770 feet away -- oh, sorry.  Did I hit the button

22  or did you hit it?  That the headlights on the 18-wheeler, we

23  know we could see those low beam headlights from 770 feet away at

24  least, that he should be able to see the vehicle from this far

25  away from the intersection?

```
 1    A    That's correct.

 2              MR. DAVID:  And scroll over to the left some more.

 3    BY MR. DAVID:

 4    Q    This is what we talked about, this camera angle.  It only

 5    goes to right here.  A bit further, you could probably see it

 6    further, but you can see the profile, a side shot, of

 7    Mr. Bradley's headlights at 350 feet away?

 8    A    Yes, sir.

 9    Q    And Mr. Fiorucci's testimony today is that he didn't see

10    Mr. Bradley's vehicle until he saw it out of his front windshield

11    at 60 to 90 feet away, correct?

12    A    Yes, sir.

13    Q    If you have a duty to yield the right-of-way at a stop sign,

14    can you just say, well, I didn't see them?

15    A    No, sir.

16    Q    You have to see what you can see, right?

17    A    Mr. Bradley's vehicle was there to be seen.  His headlights

18    were on and they show up in the video.

19              MR. DAVID:  I do want to go through the video,

20    Ms. Reed.  I want the jury to see it for the second time.  They

21    saw the video yesterday one time.  Thank you, Ms. Reed.

22    BY MR. DAVID:

23    Q    And so it's cued up and playing right now, and if you want

24    to, you can just tell us what you're seeing and anything you're

25    noting.  If you want the pointer, you can.
```

1  A    Well, this is one of the two -- thank you.  This is one of

2  the two video cameras on the face of the Chevron station.

3           Can we stop it right there?  Back up just a little bit,

4  please, and if you'll be prepared to stop it as you see the

5  lights come in past the vending machine.  There you go.  The

6  lights that are coming into view -- this is just a pointer to use

7  at the big screen?

8  Q    It is.  Sorry.

9           MR. DAVID:  May I approach, Your Honor?

10          THE COURT:  You may.

11          MR. DAVID:  You press this little -- yeah.  If you

12  press this little red button right here, it will give you a red

13  point that maybe will help you articulate.

14  A    If you see the lights coming into view there, once those

15  lights came into alignment with the side of that vending machine

16  location, whatever you want to call that, measuring from the face

17  of the Chevron station to that right side of the building and

18  extending that line out gave us 770 feet away from the Chevron

19  station.  So we know from that.  You can see headlights.  There's

20  been a discussion about fog, but you can see the approaching

21  headlights 770 feet away from the front of Mr. Fiorucci's truck.

22          Can you start the video again, please?

23          MR. DAVID:  Pause it one more time, Ms. Reed.

24  BY MR. DAVID:

25  Q    I do want to ask you, it's been brought up already that

1     there's some commercial lighting for the signage for the Chevron

2     building and I guess for the gas tanks and then across the street

3     this Coke vending machine little station they have.  That ground

4     level commercial signage and lighting, does that help make the

5     18-wheeler more visible for Mr. Bradley coming that direction?

6     A     No, sir.  As the police report noted, the lighting was

7     indicated as dark, no streetlights.  I would consider this visual

8     clutter.  You have lights from the vending machine on the right.

9     You have lights from the gas station on the left.  There's no

10    direct illumination from streetlights with the intention of

11    lighting up this intersection for a motorist.

12    Q     And when you say visual clutter, are you saying Mr. Bradley

13    coming down US 190 doesn't just see darkness and maybe lights of

14    other cars.  There's lights on both sides that are bright for him

15    to see that can distract from anything else that's coming?

16    A     Yes, sir.

17    Q     And those lights are brighter than the running lights of the

18    18-wheeler, correct?

19    A     They are.  The side marker lights on a truck or even on your

20    car are little, bitty, tiny bulbs about the size of your thumb,

21    the end of your thumb, in comparison to a headlight which is a

22    much larger, brighter light.

23    Q     Thank you so much.  I'm going to let you --

24          MR. DAVID:  Reed, why don't you hit play again.

25    BY MR. DAVID:

1  Q    And just tell us what you're seeing here, Mr. Gillen.

2  A    You can see the 18-wheeler heading past the vending machine

3  and is coming to the intersection and it will stop at the

4  intersection.

5           Okay.  Can we hold that for just a moment?

6           I understood the testimony from Mr. Fiorucci that he

7  stopped twice.  I could not discern that in the video.  I can see

8  where the 18-wheeler does come to a stop and he holds that

9  stopped position for roughly 11 seconds.  We can determine his

10  position there.  If you see the large rectangular sign in the

11  background, that's the service station sign.  You know, it will

12  typically have the price of the gas and so forth on it.

13          We know the location of that sign again based on the

14  Google satellite views and street views that you can pull up from

15  Google Earth, and we know the location of the camera because the

16  camera's in direct alignment with the two poles that are

17  supporting the canopy at the gas pump island.

18          So by connecting those two poles theoretically and

19  extending that line back to the face of the service station, we

20  know where the camera is, and now from the camera to the right

21  edge of that sign, we know where the 18-wheeler is in its stopped

22  position at the intersection.

23  Q    And when he came to a stop, was he stopped with his bumper

24  right at the edge of the roadway?

25  A    No, sir.  Based on what we were able to glean from this

```
 1    still shot, Mr. Fiorucci is stopped about ten feet back from the
 2    fog line, which is the painted line or the start of the
 3    intersection.  He's ten feet back from the intersection.
 4  Q    So he's got some distance to go before he even enters the
 5    intersection as he starts going forward?
 6  A    Yes, sir.
 7  Q    Thank you.
 8          Anything else on this particular frame or do you want
 9    to go forward?
10  A    Let's go forward, please.
11          Okay.  Can we stop there?  You're going to need to back
12    that up a little bit, please.  Stop it right there.  Stop,
13    please.
14          The white SUV that Mr. Fiorucci observed turns left
15    into the Chevron station and at that point Mr. Fiorucci is
16    starting his forward movement.
17  Q    And we have two different camera views of this.  We'll show
18    the next one next.
19          How far behind the white SUV, the Yukon XL right there,
20    is Mr. Bradley's vehicle as they're coming down US 190?
21  A    The time difference between the white SUV coming in to the
22    right camera view and Mr. Bradley's headlights coming in to that
23    camera view, about six seconds apart.  So Mr. Bradley is
24    following about six seconds behind the white SUV when they come
25    into view from the other camera.
```

1           Did you want to continue this to impact?

2    Q    Yes.

3    A    And be prepared to stop it.

4           Well, we missed it.  Stop it right there.  We'll talk

5    about that while we have that shot.

6           The lights that you see now at the back of the

7    18-wheeler trailer facing the cameras at the service station,

8    that's Mr. Bradley's vehicle after the impact, and Mr. Bradley's

9    vehicle is being rotated by the 18-wheeler.  After Mr. Bradley's

10   contact into the side of the trailer -- and the contact is about

11   midpoint on the trailer -- the left rear wheels, the tires on the

12   18-wheeler, catch the right front corner of Mr. Bradley's car and

13   shove it around.  It shoves it around such that the headlights

14   come into view.

15   Q    So based on the physical evidence -- and we'll see the

16   picture in a second -- Mr. Bradley's vehicle impacted around the

17   midpoint of the trailer and then was run over or hit by the

18   tandem wheels in the back.  Is that a fair statement?

19   A    Yes, sir.

20          If we could back this up, I'd like the jury to see from

21   the starting point of the 18-wheeler to the impact and then try

22   to capture the Bradley vehicle coming in as well.

23          Mr. Fiorucci is now stopped.  He stopped for 11

24   seconds.  And when he starts moving forward, he will have moved

25   forward seven and a half seconds to impact.

1      Stop.

2          Okay.  It's difficult to discern in this image, but

3  what you're seeing right there are the taillights and the

4  headlights on Mr. Bradley's vehicle passing in front of the

5  vending station that's bright.  And you can see the position of

6  the 18-wheeler at that point.  While the tractor is out on the

7  east side of the highway -- and it's not fully turned yet.  It's

8  in the process of turning.  The trailer is still positioned off

9  to the side, on the side road, the majority of the trailer at

10  that point.

11          Is there any way of backing that up just a little bit?

12  What I'd like to do is just stop it -- that's good right there.

13          That's Mr. Bradley's vehicle coming into this camera

14  view.  And, again, we can see the glow of lights on the front.

15  We can't see the back because it's obscured by that sign.

16  Mr. Fiorucci is in motion pulling into the intersection while the

17  Bradley vehicle is clearly in view.  Its lights are in view.

18  Q    And you got to slow this down at view it at your office

19  slide by slide, slice by slice, and you could see Mr. Bradley's

20  taillights illuminate just before impact?

21  A    We can see that.  We can see the glow of the headlights.

22          If we can go to the other video.

23          MR. DAVID:  Thank you, Ms. Reed.

24  A    Okay.  Can we stop it right there for just a moment?

25          This is the second camera on the face of the Chevron

1    station, and, again, we were able to position this camera because

2    we know these two support poles supporting the overhead canopy at

3    pump island number three -- there are four pump islands in front

4    of this service station.  These two poles supporting the canopy

5    at pump island number three are in direct alignment from this

6    camera view.  So by connecting those dots, we're able to position

7    the camera on the face of the building.

8              If you look to the right, you're able to see the

9    approach path of the white SUV as well as Mr. Bradley's vehicle.

10   They'll come into view.  Of course, you lose them in this view,

11   but you pick them up on the other camera.

12   BY MR. DAVID:

13   Q    And Mr. Fiorucci testified that he saw the white SUV's

14   headlights approaching.  He just never saw Mr. Bradley's

15   headlights, correct?

16   A    Yes, sir.

17             If we could run this forward and be prepared to stop it

18   when the first set of headlights come in, please.

19             Okay.  That's the white SUV coming into camera view.

20             If you'll go ahead and run that forward and be prepared

21   to stop.

22             Mr. Bradley's vehicle from the time -- it's about a

23   six-second gap between the vehicles.  You can see the headlights.

24   Those are the headlights of Mr. Bradley's Volkswagen.

25   Q    How long does it take this 18-wheeler to safely come from

1    where he was stopped to fully in the eastbound lane, tractor and

2    trailer, on US 190?

3    A    Based on the acceleration rate that he was using in the

4    video, he would have needed 11 seconds to complete the turn.  He

5    starts the turn seven and a half seconds before the impact

6    happens.  So while he needed 11, he's starting at seven and a

7    half -- Mr. Bradley's vehicle is only seven and a half seconds

8    away.  You can see Mr. Bradley's headlights right here.

9              Can we continue this forward for a little bit?

10             Stop it.

11             So we're losing the frontal view of the headlights,

12   which you can see the side marker lights and the backlights on

13   Mr. Bradley's vehicle, but clearly his headlights were visible as

14   he was approaching the intersection and it came into camera view.

15             After the -- can we run forward on this view after the

16   impact and show Mr. Fiorucci's 18-wheeler stopped in the parking

17   lot?

18   Q    Yes, sir.

19   A    That's Mr. Fiorucci's 18-wheeler coming into view.  The

20   impact has already occurred.  You'll see people from the service

21   station running in that direction of the intersection after the

22   collision.

23             Was that the end of it?

24   Q    That clip ends right here.  In evidence we have the entire

25   -- it goes on for a long time after that.

1    A    Okay.  What I wanted to demonstrate -- and perhaps you can

2    find it, but what the video demonstrates is that after

3    Mr. Fiorucci has stopped and after the collision has occurred,

4    the next vehicle that appears coming westbound on Highway 190 is

5    90 something seconds later.  So there was no vehicle immediately

6    behind Mr. Bradley.

7                   The next vehicle coming --

8                   MR. DILL:  If I could object to the narrative.

9                   THE COURT:  The objection is sustained.  Let's lead him

10   through this with questions.

11                  MR. DAVID:  Thank you, Your Honor.

12                  Thank you, Mr. Dill.

13   BY MR. DAVID:

14   Q    What we're getting at is so there was a six-second gap when

15   they come into the picture here between the white SUV and

16   Mr. Bradley, correct?

17   A    Yes, sir.

18   Q    Between Mr. Bradley coming and the next vehicle, it's 90

19   seconds, a minute and a half?

20   A    Yes, sir.

21   Q    That's enough time to safely make the maneuver from

22   Highway 26 to US 190, at least in one direction?

23   A    Nine times more than he needed, yes, sir.

24   Q    But six seconds is not enough?

25   A    No.  Seven and a half.  He was in motion for seven and a

1    half seconds, and that's simply -- Mr. Fiorucci again was trying

2    to make a maneuver that was going to take 11 seconds and he

3    started doing that when the approaching Bradley vehicle was only

4    seven and a half seconds away with his headlights on.

5    Q    And I have to always say when we get into the weeds, this is

6    a simple case.  We're going to get in the weeds and talk about

7    these distances and times --

8             THE COURT:  Mr. David, don't argue.

9             And I'll caution the jury, a lawyer's characterization

10   of the evidence is not evidence.  You shouldn't rely on that.

11   You only rely on the answers of the witness to the lawyer's

12   questions.

13            You may proceed subject to the Court's ruling.

14            MR. DAVID:  Thank you, Your Honor.

15   BY MR. DAVID:

16   Q    It's still a pretty basic case, correct?

17   A    Yes, sir.

18   Q    We're going to talk about perception-reaction time in a

19   second.  We're talking about these sight lines, but this is

20   pretty simple.  There's a stop sign and a duty to see who's

21   coming and yield to them, correct?

22   A    That's correct, yes.

23   Q    And Mr. Fiorucci failed to do that?

24   A    Yes, sir.

25   Q    Okay.  I do want to ask you questions about what you saw on

1    the video, particularly the other video, as it pertains to how

2    long it took the 18-wheeler to get from the stop position to even

3    the road and how that's important.

4    A    The first part of Mr. Fiorucci's movement has to take up to

5    ten feet set back as he is in the edge of the roadway.  He's

6    driving an 18-wheeler.  It accelerates slower than a car and is a

7    longer vehicle than a car, but in order to take up that first ten

8    feet of space to even get to the edge of the roadway, he's

9    burning up 2.6 seconds in the math.

10         Let's keep this real world because none of us in this

11   room can count tenths of a second.  I know I can't, but

12   mathematically it took 2.6 seconds.  Real world, about three

13   seconds, a little more than two, not quite three.

14         So now Mr. Fiorucci in reaching the end of the --

15   excuse me, edge of the roadway has burned up 2.6 seconds of the

16   total 7.5.  So as his tractor -- the nose of his tractor is

17   encroaching into the roadway on Highway 190, he's 4.9 seconds

18   away from impact, and he's continuing forward in a turn pulling a

19   trailer behind him that's now, during the course of that turn,

20   going to be blocking Highway 190.

21         As the impact is occurring, as you heard Mr. Fiorucci's

22   testimony, Mr. Fiorucci's first observation of the headlights

23   that we can see on the video is through the windshield of his

24   truck.  I'm taking that he's looking forward as his tractor is

25   straightened out.  For whatever reason, he did not see from his

1    side window what was there to be seen, which were the approaching

2    headlights of Mr. Bradley's vehicle.

3    Q    Thank you, Mr. Gillen.

4              And I want to talk about Mr. Bradley and what he's

5    doing and what he can see based on the science and your findings

6    in this case, and part of that is his perception-reaction time,

7    but I want you to talk about that 2.6 seconds, two and a half to

8    three seconds that it took Mr. Fiorucci and the U.S. Xpress

9    18-wheeler to even get to the roadway.

10             Does Mr. Bradley, if he could even see that far and see

11   with all the lights and the Chevron and everything else, if he

12   could even see the 18-wheeler, does he have any reason to expect

13   the 18-wheeler to come into his roadway until it's actually

14   coming into the roadway?

15   A    No, sir.  We're talking about driver perception-reaction and

16   it's really a four-stage process.  Perception is nothing more

17   than seeing it.  You may see something, but then you have to

18   identify it.  First you have to be able to identify the

19   18-wheeler side marker lights amongst all the other lights.  Then

20   you have to identify that the 18-wheeler is moving, his initial

21   movement covering those ten feet.

22             And I'm looking for the math associated with this.

23   Excuse me just a minute.

24             His speed is very slow because, again, it's a truck

25   that accelerates slowly.

```
1              I promise I have it.

2    Q     Thank you, Mr. Gillen.

3    A     When Mr. Fiorucci has reached the fog line -- and the fog

4    line is just the painted edge line designating the right side of

5    your travel lane called the fog line.

6              After Mr. Fiorucci has moved forward reaching that

7    point, he has only gotten up to five miles per hour.  So you have

8    a very slow moving side marker light amongst all the other

9    clutter to identify -- it's only moving five.  At the point --

10   and that's at the point the front bumper is coming into

11   Mr. Bradley's travel lane.  Mr. Bradley at that same point is now

12   only 395 feet away.

13             To put that in perspective, a city block is about

14   300 feet, a football field, 300 feet, but you have a highway, a

15   highway speed, wet pavement, with a vehicle that's only 395 feet

16   away, less than five seconds from impact, and at that point

17   Mr. Fiorucci was moving his truck into the travel lane into the

18   path of Mr. Bradley.

19   Q     And Mr. Fiorucci's headlights are not facing Mr. Bradley.

20   They're facing south down Highway 26 when he starts his turn,

21   correct?

22   A     That's correct.  It's not until Mr. Fiorucci's in the course

23   of his turn, in his left turn, do his headlights become visible

24   to Mr. Bradley, and that's happening late in this -- we're

25   dealing with a five-second window of opportunity from the time
```

1    that the 18-wheeler comes into the travel lane, starts coming

2    into the travel lane, to the point of impact.  Five seconds and

3    this whole thing is over.  Five seconds.

4            And at that five-second mark, Mr. Fiorucci's headlights

5    of the 18-wheeler, they're not pointed at Mr. Bradley.  They're

6    pointed straight down the highway, and as he turns farther to the

7    left, then they get in the lane that Mr. Fiorucci is trying to

8    turn into and at that point they're pointed at Mr. Bradley.

9    Q    The opportunity as well.  You talked about this time it took

10   Mr. Fiorucci and the U.S. Xpress 18-wheeler to move from his

11   point of rest to the road to just barely in the road.  You talked

12   about how Mr. Bradley only has the side lights to look at and

13   notice with all the other clutter, but what about Mr. Fiorucci?

14   Aside from before he starts to turn, does he have other

15   opportunities to look and see Mr. Bradley and stop his

16   18-wheeler?

17   A    Sure, he did.  He was already in a stopped position.

18   Mr. Fiorucci did not begin moving into the intersection or

19   leaving his stopped position until the white SUV is turning into

20   the service station, and there's nothing preventing Mr. Fiorucci

21   looking to his left to see the approaching headlights that are

22   there to be seen that we can see in the video to see

23   Mr. Bradley's approaching vehicle.

24           Mr. Fiorucci, because even though it's an 18-wheeler,

25   even had he started moving, he only gets up to five miles per

1    hour.  He has the greater ability to stop and avoid this versus a

2    vehicle traveling highway speed.  Mr. Fiorucci can stop and hold

3    his position.  Even if he made a mistake and didn't initially see

4    the Bradley vehicle, he can still avoid it by putting his foot on

5    the brake and stopping his forward motion.

6    Q    And just to sum up, when he stopped at the stop sign, if he

7    looks left down through his driver's side door, there's nothing

8    to keep him from seeing Mr. Bradley's headlights?  We've

9    established that by how far he could see and how far

10   Mr. Bradley's headlights were away, correct?

11   A    Correct.

12   Q    And then as he starts going forward in that 2.6 seconds

13   between stop and even hitting the fog line, that's 2.6 seconds

14   that he could have checked that time to the left and seen

15   Mr. Bradley and stopped his vehicle?

16   A    That's correct.

17   Q    And he's going very slow at that point because he's just

18   getting started?

19   A    That's correct.

20   Q    And even as he starts to get into the roadway, the

21   U.S. Xpress 18-wheeler, and he's still moving under five miles an

22   hour, if he just looks left, he can stop and maybe leave enough

23   room for Mr. Bradley to escape and steer away from his entrance

24   into the roadway, correct?

25   A    Yes, sir.

1   Q    Additionally, when the 18-wheeler first starts in the

2   roadway, it's kind of a dark red cab, correct?

3   A    It is.

4   Q    And it has some reflectors on it.  Talk about when the

5   trailer first comes in the roadway.  When does the trailer first

6   come into the roadway?  How long before the impact?

7   A    It's between the 4.9 second and the 3.4 second mark.  The

8   tractor is entering the roadway, or the front bumper of the

9   tractor, at 4.9 seconds.  The trailer, of course, is behind the

10  tractor.  So the front of the trailer is coming in after that.

11          When the tractor is reaching the turning lane --

12  there's a dedicated left turn lane for westbound Highway 190.

13  That's the direction Mr. Bradley was traveling, westbound.

14  There's a dedicated left turn lane there after the front of the

15  tractor has crossed the through travel lane occupied by

16  Mr. Bradley and the front bumper is now reaching the turning

17  lane.  That's 3.4 seconds from impact.  The trailer, of course,

18  is still behind the tractor.

19          Somewhere in that time frame -- it's going to be around

20  three seconds -- the front of the trailer starts to come into the

21  travel lane.  The 18-wheeler, the front of it, would have reached

22  the eastbound lane.  That's the direction --

23          MR. DILL:  I'm going to enter an objection as

24  nonresponsive.

25          THE COURT:  I'm going to sustain the objection.  I want

1    you to lead this witness with questions and answers.

2              MR. DAVID:  Yes, sir.  Will do.  I'm sorry, Your Honor.

3    BY MR. DAVID:

4    Q    And, again, I just want to go to the progression if we can

5    quickly, Mr. Gillen, just about the times of where he was as he's

6    pulling out just in sequence.

7    A    Sure.  This all relates to the front of Mr. Fiorucci's

8    18-wheeler.

9    Q    Yes, sir.

10   A    7.5 seconds he starts his movement from a stopped position

11   that he's been in for 11 seconds.  4.9 seconds, the front of his

12   rig is at the fog line, the right edge of the westbound lane.

13   3.4 seconds, the front of the 18-wheeler has reached the turn

14   lane, dedicated turn lane westbound on 190.  At 2.4 seconds, the

15   front of the 18-wheeler is reaching the eastbound lane, and then

16   zero seconds we have impact.

17   Q    About Mr. Bradley, Wilfred Bradley, and his vehicle, you

18   talked about his perception-reaction time.  On a dark -- tell me

19   about the science behind that.  What's the appropriate

20   perception-reaction time for a regular driver who's alert in

21   broad daylight?

22   A    The typical value is one and a half seconds.  And you'll see

23   it in your driver's license manual.  You'll see it in studies.

24              The perception-reaction is a combination of four mental

25   processes that take place:  Perception, identification, emotion,

1   which is simply making a decision, and, finally, carrying that

2   out.  PIEV, volition.  We call it PRT.  Daytime normal event,

3   typical value, second and a half.

4            During that mental process, your vehicle is still doing

5   whatever it was doing at that start of that second half.  The

6   vehicle hasn't started slowing down yet because you have not put

7   that action into place.

8            Nighttime, that value goes up because you've lost a lot

9   of contrast values and it's more difficult to identify things.

10  It's more difficult to see things.  Again, a typical value,

11  nighttime, two seconds.  Sometimes it's more.  Sometimes a driver

12  doesn't perceive and react at all because they never perceived or

13  never identified what it was they saw.

14  Q    And so if it's two seconds or so for nighttime, does it

15  increase -- does your perception-reaction time increase or

16  decrease with things like fog or light clutter that's in the

17  area?

18  A    It would increase because fog makes it more difficult to

19  see.  The same thing with rain.  It's more difficult to see.

20  Visual clutter, more difficult to see.  The more difficult it is

21  to perceive it, the more time you're burning up before you're

22  able to take an avoidance maneuver.

23  Q    What about a driver like Mr. Bradley driving down a highway?

24  Can he assume that the roadway is going to be free of defects or

25  people pulling out in front of him?

1          MR. DILL:  Objection, Your Honor.

2          THE COURT:  What's the basis?

3          MR. DILL:  Beyond.  It's the conversation we had on the

4    record outside the presence.

5          THE COURT:  Approach.

6       (Whereupon, a sidebar conference was had as follows:)

7          MR. DILL:  You're asking him to opine on law.  He asked

8    him does a driver have the right to assume that the road ahead of

9    him is clear.  That gets into a matter of law.

10         MR. DAVID:  That's driver strategy I would say, Your

11   Honor.

12         THE COURT:  (As read:)  What about a driver like

13   Mr. Bradley driving down a highway?  Can he assume that the

14   roadway is going to be free of defects or people pulling out in

15   front of him?

16         I don't think that's a legal question.  As long as we

17   stay away from what the law imposes on him, it gets close to a

18   common sense, ordinary issue that the jury can decide without

19   expert testimony, but I'm going to allow it in this context given

20   his other testimony.

21         MR. DAVID:  Thank you, Your Honor.

22         THE COURT:  The objection is overruled.

23      (Whereupon, the sidebar conference was concluded.)

24   BY MR. DAVID:

25   Q    Mr. Gillen, do you remember the question?

1    A     I'm sorry?

2    Q     Do you remember the question?

3    A     I do not.

4    Q     I'll try my best to rephrase it the same way.

5          MR. DAVID:  Would you mind?

6          (Whereupon, the question was read back to the witness by the

7    court reporter.)

8    A     The answer to that is, yes, I think you can say what is a

9    reasonable expectation that a vehicle is not going to pull out in

10   front of you, particularly when it's governed by a regulatory

11   traffic control device.

12         THE COURT:  Let me stop you there.  I just want to

13   caution the jury, again, of my standard instruction that any

14   discussion of the law, the Court will be providing the relevant

15   law for you to apply.  Thank you.

16         MR. DAVID:  Thank you, Mr. Gillen.

17         Thank you, Judge.

18         We'll go to the next exhibit if we can, Ms. Reed.

19   BY MR. DAVID:

20   Q     This shows the actual property damage on the vehicle.  Tell

21   us what we're looking at here with these four pictures of the

22   damage on the vehicles, Mr. Gillen.

23   A     These are just a select few of the photographs that were

24   made available of the two vehicles, but the two at the top are

25   Mr. Bradley's Volkswagen that were taken there at the accident

1    scene.  You can see the crush damage on the front.  The right
2    front corner has more severe damage.  You see the bumper is
3    pushed in.  The fender.  The headlight housing is pushed in.
4    That's due to the contact with the wheel on the 18-wheeler as the
5    18-wheeler continues forward in its turn.  And we saw in the
6    video how the 18-wheeler rotated Mr. Bradley's car.  That's the
7    contact point there.

8            The roof damage that we see in the other photograph to
9    the right of that, this is basically an underride collision where
10    the Volkswagen runs under the side of the trailer near the
11    midpoint of the trailer.  So there's heavy crush.

12           The two white little fluffy things that you see in the
13    photographs, those are airbags that have deployed as a result of
14    the collision.  Mr. Bradley had to be extricated from the vehicle
15    due to the severity of the crush.  That's noted in the police
16    report.  And typically what happens in an extrication, they use a
17    hurst tool, a giant pair of scissors, hydraulic scissors.  They
18    cut away metal components so that the rescue people can gain
19    access to the occupant in the vehicle because they're not able to
20    get them out otherwise.

21           The bottom panel shows two photographs of the
22    18-wheeler trailer.  In the panel on the left, you can see the
23    crumpling of the lower frame line of the trailer, and that
24    hanging light fixture is a side marker light.  That's near the
25    midpoint of the trailer.  And then the panel to the right of

1   that, we're looking from the front of the trailer toward the

2   back.

3           And another photograph that we haven't shown here, you

4   can actually see the frame members of the axle support for the

5   axle that you're looking at there.  Those frame axle support

6   brackets were bent from driver side to the passenger side as well

7   as front to back.

8           So we're having contact with the -- that would be axle

9   number four.  There are five axles on an 18-wheeler counting from

10  the front.  You have contact with axle number four into the right

11  front corner of Mr. Bradley's vehicle and contact with the lower

12  edge of the trailer into the roof line and A-pillars.  A-pillars

13  are the support columns for the windshield and the roof at the

14  front of your vehicle.

15  Q    Thank you, Mr. Gillen.

16          I do want to talk about speed some.  What was the speed

17  limit on US 190 at this intersection?

18  A    55 miles per hour.

19  Q    And that's what the trooper put in his crash report and what

20  he testified yesterday, correct?

21  A    Yes, sir.

22  Q    In fact, that's what Mr. Burson, U.S. Xpress's expert, has

23  said the speed limit was on this particular roadway, correct?

24  A    Yes, sir.

25  Q    How did you determine, based on the video, how fast

1    Mr. Bradley's vehicle was going?  I want to be as brief as

2    possible if we can.  Just the simple math that you did as quickly

3    as you can.

4    A    The same thing we did with the video cameras to see how this

5    accident unfolded on video.  We used known landmarks that we were

6    able to identify in the video and measured the distance along the

7    road.  After that, it's a simple calculation.  If you know the

8    distance a vehicle is traveling and how much time it took them to

9    travel, that known distance, you can calculate the speed.  We did

10   that for Mr. Bradley's vehicle and his speed was 55 miles per

11   hour.

12   Q    And Mr. Burson is going to testify for U.S. Xpress in this

13   case.  He did speed calculations as well, correct?

14          MR. DILL:  Objection, Your Honor.  Attacking a witness

15   before he comes to the stand.

16          THE COURT:  Mr. David?

17          MR. DAVID:  Well, Your Honor, I'll have to call him on

18   rebuttal.  He's issued reports specifically -- I'm not attacking

19   anyone -- questioning the methodologies and numbers used by

20   Mr. Burson.  I think he can do that on the stand.

21          THE COURT:  I'm going to overrule the objection just to

22   save time on presentation.  You can address that on cross and you

23   can address it with your expert.  I'm going to overrule the

24   objection.

25          MR. DAVID:  Thank you, Your Honor.

```
 1                 THE COURT:  Mr. David, how much more time do you have?
 2     I want to make sure we break for lunch.
 3                 MR. DAVID:  I would hope I'm done in the next five
 4     minutes.
 5                 THE COURT:  All right.  Very good.
 6                 MR. DAVID:  I'm sorry I've been so long.
 7     BY MR. DAVID:
 8     Q     Mr. Gillen, as quickly as you can, just tell me the issues
 9     you had with Mr. Burson's calculations of speed.  Just tell us
10     the defects you noticed in the way he calculated it.
11     A     Mr. Burson also did a time-distance analysis based on the
12     video, but he mistakenly identified landmarks in the video.  It
13     gave him a bad distance, an incorrect distance.
14     Q     And I guess my point was if you have the wrong data for
15     distance, you can't do the calculation to get the right speed?
16     You have to have the right distance data, the right linear data,
17     correct?
18     A     That's correct.
19     Q     So if you have the wrong point, you can't get to a proper
20     speed that's reliable?
21     A     That's correct.
22     Q     And you covered that in your reports.
23                 Mr. Burson has also reported that Mr. Bradley's
24     operating his vehicle was unreasonable in not stopping before the
25     accident.  What are your opinions about that?
```

1    A    Well, I disagree with that.  Again, Mr. Bradley is on a

2    favored roadway, but he's not going to have the time nor distance

3    available to stop depending -- due to the encroachment of

4    Mr. Fiorucci's 18-wheeler and how close Mr. Bradley was to the

5    intersection when Mr. Fiorucci pulled out.  It simply does not

6    provide enough time for Mr. Fiorucci to complete the maneuver and

7    it does not provide enough time for Mr. Bradley to avoid the

8    collision.

9    Q    So, first, the truck driver, Mr. Fiorucci, should have seen

10   Mr. Bradley coming and he didn't, correct?

11   A    Yes.

12   Q    Second, are truck drivers allowed at a stop sign or anyone

13   at a stop sign allowed to pull out in front of somebody and just

14   assume that they're going to stop?

15   A    No, no.  In fact, the CDL manual, the truck driving manual,

16   specifically --

17            MR. DILL:  Your Honor, objection.

18            THE COURT:  Sustained.

19            MR. DAVID:  Can we approach for one second?

20            THE COURT:  Yes.

21        (Whereupon, a sidebar conference was had as follows:)

22            MR. DAVID:  I'm not sure exactly what he's going to

23   say, but if it's the Louisiana CDL, it's probably that thing

24   where you can't obstruct traffic.

25            THE COURT:  He can't testify to that.  I've already

1    ruled.  Let's not retread that ground.

2        (Whereupon, the sidebar conference was concluded.)

3    BY MR. DAVID:

4    Q    And I want to get away from just professional truck drivers,

5    but anyone at a stop sign can't make a decision that I think they

6    can stop in time, I'm just going to go?

7    A    No, sir.  You can't do that.

8    Q    And that didn't happen in this case because Mr. Fiorucci

9    never saw him when he started blocking the roadway?

10   A    My understanding of Mr. Fiorucci's testimony is that he did

11   not see Mr. Bradley until Mr. Fiorucci saw through his own

12   windshield Mr. Bradley's approaching vehicle.

13   Q    And, again, this is just a simple stop sign case.  You have

14   to yield the right-of-way and Mr. Fiorucci didn't do it?

15   A    That's correct.

16        MR. DAVID:  Thank you.

17        No further questions, Your Honor.

18        THE COURT:  Okay.  Mr. Dill, what I'd like to do is

19   take lunch at this time and we can begin your cross-examination

20   after lunch if there's no objection.

21        MR. DILL:  No objection, Your Honor.

22        THE COURT:  All right.  I'm going to release you for

23   lunch.  It is 12:25.  So I will give you until 1:45 and we will

24   start up at that time.  So thank you again.

25        All rise for the jury.

```
 1                    (Jury Exited the Courtroom)
 2             THE COURT:  Please be seated.
 3             Any issues before we take our lunch break?
 4             MR. DAVID:  I don't think so, Your Honor.
 5             THE COURT:  I'm trying not to express my frustration,
 6     but I feel that on multiple times we've replowed ground that I've
 7     already ruled on.  Okay?  So let's try to move this forward.
 8             All right.  We're in recess until 1:45.
 9                         (Recess)
10             THE COURT:  Please be seated.
11             I think we have a juror that was a little bit late and
12     she has arrived.  So we're ready to go.
13             Any issues before we bring them in?
14             MR. DAVID:  No, sir.
15             MR. DILL:  No, sir, Your Honor.
16             THE COURT:  And, Mr. Dill, you're going to begin your
17     cross of the witness.  I'll bring them in -- why don't we have
18     the witness come and sit in the box and then we'll bring them in.
19     While he's doing that, we'll bring in the jury.
20                    (Jury Entered the Courtroom)
21             THE COURT:  Everybody may be seated.
22             Mr. Dill, you may begin your cross-examination when you
23     are ready.
24             MR. DILL:  Thank you, Your Honor.
25                         CROSS-EXAMINATION
```

1    BY MR. DILL:

2    Q     Good afternoon, Mr. Gillen.

3    A     Good afternoon, Mr. Dill.

4    Q     You testified earlier that in this matter you prepared three

5    separate reports; is that correct?

6    A     Yes, sir.

7    Q     The first report that you prepared was dated February 26th,

8    2020; is that right?

9    A     Give me just a moment to catch up with you, but that sounds

10   right.

11   Q     Do you have that report in front of you?

12   A     I don't, but I will in just a moment.

13         Yes, sir.  February the 26th of 2020.

14   Q     And if you could turn to page 7, sir.

15         I heard you testify earlier that Mr. Bradley's vehicle

16   struck the center of the trailer, underrode, and then a second

17   impact occurred when the tires of the trailer hit it from the

18   right side.  Did I understand your testimony correctly?

19   A     Yes, sir.  There was contact on the right front of

20   Mr. Bradley's bumper, bumper area.  That would have come from the

21   tires of the 18-wheeler.  Whether or not it's two independent

22   impacts, it's practically simultaneous.  It's during the course

23   of the turn of the 18-wheeler.  We know we have contact damage

24   near the midpoint of the trailer where the damaged light is, and

25   then we know we have crush to the bumper and the headlight area

1    of Mr. Bradley's Volkswagen.  That portion of his vehicle is
2    lower than the frame rail side of the trailer.
3    Q    If you'd go to page 7 of the report that you prepared under
4    the section marked "Scene Photos."  It is the fifth line down.
5          You talk about -- in the fourth you said there's more
6    damage to the front right side of the Volkswagen -- I'm sorry,
7    the front right side of the bumper of Mr. Bradley's Volkswagen
8    than the left side.
9          Isn't it true that in your report you say this is
10   consistent with the front right side of the Volkswagen striking
11   the front tire wheel assembly, axle four, of the trailer?
12   A    Yes, sir.  That's what it says.
13   Q    If he had struck that trailer mid-trailer without touching
14   those tires with that front right side, he wouldn't have
15   underridden, correct?
16   A    Probably so.  Yes, sir.
17   Q    The first report that you created did not include an
18   analysis of the video that we have from the convenience store,
19   correct?
20   A    That's correct.  We did not have the video at the time the
21   first report was requested.
22   Q    You had a lot of other information, though?
23   A    Yes, sir.
24   Q    All right.  And you performed a traffic accident
25   reconstruction and expressed opinions about this case that you

1    believe were accurate in that report, didn't you?

2    A    Based on the information we had at that time, yes, sir.  We

3    had the crash report, photographs.  There were several legal

4    documents back and forth.  We had the medical records, which we

5    did not rely on, a property damage estimate for the Volkswagen,

6    the driver's logs for Mr. Fiorucci.  Again, the revised statutes,

7    CFR regulations, technical papers from SAE, the AASHTO turn

8    pattern, the Texas Commercial Driver's License Guide, the Delmar

9    guide, the Northwestern Traffic Crash Reconstruction Manual, site

10   research, Google aerial and street views, vehicle research, NHTSA

11   vehicle database just checking for recalls.

12   Q    And I appreciate that, Mr. Gillen, but I didn't ask you to

13   recite what was in your report, what you used to formulate your

14   report.  I just wanted to make sure that we understood you had

15   information to create an accident reconstruction, correct?

16   A    Yes, sir.  I was trying to outline the information we had.

17   We did not have the video at the time the first report was

18   requested.

19   Q    One of the opinions that you set forth in the report was

20   that Mr. Fiorucci's movement lasted 11.8 seconds from the time he

21   began moving until impact.  Wasn't that one of your opinions in

22   that first report?

23   A    Yes, sir.  We later learned, once we received the video,

24   that that was not correct.  That calculation was based on a

25   normal acceleration rate for an 18-wheeler based on table value.

1   Once we received the video, we found that Mr. Fiorucci was

2   accelerating at faster than a normal rate.  So it did not take

3   him 11 seconds.  It only took him seven and a half seconds to

4   impact.

5   Q    But if you did not get the videotape from the convenience

6   store, you would have taken the stand, raised your hand, and

7   swore to this jury he was moving and it took 11.8 seconds to get

8   to this point of impact?

9   A    I would have testified that based on a normal acceleration

10  rate for an 18-wheeler in a turning pattern, this is the time

11  that it would take.  Now that we have the video, we generated a

12  second report.  In fact, a third report as we were receiving

13  additional information.

14  Q    Another opinion that you set forth was Mr. Fiorucci attained

15  the speed of 11 miles per hour through the movement in your first

16  report, correct?

17  A    Yes, sir.

18  Q    And after you got the video, you determined that he was

19  moving at 16 miles per hour at the end of the turn, correct?

20  A    Yes, sir.

21  Q    Neither you nor anyone from your company ever traveled out

22  to the scene and actually did a survey of that scene, did they?

23  A    No, sir, we did not.  We had the Google satellite views, we

24  had the street views, and we had the police report to work from

25  and photographs.

1    Q     Neither yourself or anyone from your company ever inspected

2    either of the two vehicles?

3    A     No, sir, we did not.  Let's see.  We were hired December of

4    '19.  The accident happened February of '18.

5    Q     The reports that were prepared in this case were initially

6    prepared by someone other than you, correct?

7    A     They were assisted in preparation by technicians.  Every

8    work that we do in my office is a team effort.  A technician is

9    assigned to a file.  A technician works that file in conjunction

10   with me.  We meet on it throughout the course of that work

11   preparation.

12            In fact, I think on these, at the time I had a

13   technician cosigning the report.  Yes.  This was cosigned by

14   Michael Raymond who was a mechanical engineering graduate who had

15   been through the five courses from Northwestern in anticipation

16   of Michael Raymond being able at some point to testify.  He

17   decided he did not want to sit here in the hot seat and he's no

18   longer with my firm.

19   Q     That was my next question.  He's no longer with you, is he?

20   A     He is not.  No, sir.

21   Q     Same question with regard to the video analysis.  You did

22   not perform the video analysis yourself, did you?

23   A     Well, I guess that depends on the definition of a video

24   analysis.  I have looked at the video several times and gleaned

25   the information from the video.  As far as breaking it down going

1   through frame by frame, I did not do that.  A technician in my

2   office did that.

3   Q    Let's talk about the accident scene at the intersection of

4   Highway 190 and Highway 26 in Elton.  You would agree that 190 in

5   the area is flat and level for at least a half mile east of this

6   intersection?

7   A    Yes, sir, at least.

8   Q    You reviewed the deposition of Mr. Bradley, didn't you?

9   A    I did.  Yes, sir.

10  Q    Did you see where he indicated he thought that there was a

11  hill you had to cross before you could see the intersection as

12  you approached from the east?

13  A    I'm not -- I don't recall that testimony, but I'm certainly

14  not aware of a hill.  It appears to be a flat level approach.

15           MR. DILL:  May I approach the witness, Your Honor?

16           THE COURT:  You may approach.

17           MR. DAVID:  Page?

18           MR. DILL:  Forty-five.

19  BY MR. DILL:

20  Q    On page 45 at line 3, Mr. Bradley was asked a question by

21  myself:  On a normal morning when there's no fog, how far back

22  can you see that intersection?

23           And can you read his answer at line 5?

24  A    (As read:)  Basically when you're coming up, there's a hill.

25  So you can't see until you come up like a little -- a little

1    hill.  Then you can see, but you can see it from -- I mean, you

2    can see it.  I can't tell you the distance, but you can see it,

3    but you can only see it when you come up to that hill, the slight

4    hill.

5    Q    In your analysis of the roadway in that area, did you find

6    any hill or vision obscurement as described in his deposition?

7    A    No, sir, not within the distance, the time frame of the

8    movement of the 18-wheeler.  I did not see any hill that would

9    create any type of sightline restriction.

10   Q    In fact, outside of the fog that's been described in various

11   testimony so far, there are no vision obscurements at all at this

12   intersection, are there?

13   A    No, sir.  It's flat open for both drivers to see each other

14   at that intersection.  The problem we have is what are the

15   drivers looking for, what is there for them to see.

16   Q    And in that first report I believe you indicated that when

17   Mr. Fiorucci began his turn, you had put Mr. Bradley 952 feet

18   from the intersection; is that correct?

19   A    Yes, sir.

20        Just a moment, Mr. Dill.  That's based on the 11-second

21   calculated travel time for Mr. Fiorucci which we found was not

22   correct once we received the video.  So that 900 feet goes away.

23   Nine hundred was simply a calculated value based on a travel time

24   for Mr. Fiorucci which turned out not to be an accurate time.

25   Q    Well, if you would let me complete my question, please, sir.

1          In your report you concluded that there were no vision

2     obscurements from that 952 mark to the intersection; is that

3     correct?

4     A    I think so.  Yes, sir.

5     Q    And I think you said earlier you read the deposition of

6     Mr. Fiorucci where he said that he estimated visibility between

7     one-eighth and one-quarter mile that morning?

8     A    Yes, sir.

9     Q    How many feet are in a quarter of a mile?

10    A    Oh, there would be 1,320.

11    Q    And how many feet are in an eighth of a mile?

12    A    It would be half of that.  That would be 660.

13    Q    So when you calculated the visibility at 770 feet away that

14    you testified earlier, that would be between one-eighth and

15    one-quarter mile, correct?

16    A    Yes, sir.

17    Q    Now, when you made that calculation, you determined that

18    Mr. Fiorucci's 18-wheeler headlights could be seen 770 feet away;

19    is that correct?

20    A    Yes, sir.

21          As he was traveling down Highway 26, that 770 were of

22    his headlight.  The visibility of his headlights only refers to

23    the camera view of Mr. Fiorucci's approach as he's coming down

24    that side road, Highway 26, approaching the intersection.  That's

25    770 feet from the face of the Chevron store to where we can

1    determine where Mr. Fiorucci was on Highway 26.

2    Q    And you assumed that the fog density was uniform along

3    Highway 190 to that which was on Highway 26 to reach your

4    conclusions about visibility, correct?

5    A    The only conclusion that I reached from that is that

6    Mr. Fiorucci's headlights were visible.  So therefore presumably

7    headlights on the main highway would also have been visible for

8    at least 770 feet.

9    Q    So you dismiss the potential for patchy dense fog in South

10   Louisiana on a rural country highway in the early morning hours

11   in February?

12   A    Oh, I don't think I dismissed it any more than Mr. Fiorucci

13   who's testified that he encountered occasional fog, but continued

14   to drive in it.  I don't know what the conditions were outside of

15   the realm of the camera view.

16   Q    We agree on something.

17          Your visibility analysis also assumes that the light

18   throw of Mr. Fiorucci's tractor and that of Mr. Bradley's

19   Volkswagen are the same?

20   A    Well, when you say light throw, to me we're talking about

21   the distance of the beam.  I'm considering the intensity of the

22   light level.  The intensity of headlights is obviously greater

23   than side marker lights, and the intensity of lights in general

24   are set forth in SAE standards.  Those standards say that on low

25   beam, a light will illuminate at ground level 260 to 290 feet in

1    front of the vehicle, but that doesn't mean that you can't see

2    the glow of the light at a greater distance.  Obviously we can

3    see Mr. Fiorucci's headlights traveling down Highway 26 at least

4    770 feet away from the camera.

5    Q    Isn't it true that the headlights on Mr. Fiorucci's tractor

6    were substantially larger than the headlights on the Volkswagen

7    Passat driven by Mr. Bradley?

8    A    You know, I don't know that for a fact.  The housing itself

9    might be larger, but as far as the bulb itself, I don't really

10   know.  We didn't pull the bulbs from the vehicles.

11   Q    Are the headlamps on Mr. Fiorucci's tractor mounted higher

12   off the ground than those of the Volkswagen Passat?

13   A    Yes, sir, but they still have to meet the same standard for

14   low beam illumination.  The purpose of that standard is that so

15   even on low beam, your truck headlights -- and as you drove a

16   truck, Mr. Dill, I'm sure you can relate to this.  Your low beam

17   lighting by design is down and to the right so that you do not

18   blind oncoming drivers.  That's applicable to whether it's a

19   passenger car or an 18-wheeler.

20   Q    And you haven't done any analysis in any of your reports to

21   determine whether or not the light intensity thrown by the

22   headlights of each vehicle was the same pattern?

23   A    No, sir, I have not.

24   Q    Let's talk about the video now.

25            MR. DILL:  Mr. Don, if we could begin the clip at

```
 1   4:52:30 on number 12.  I'm sorry.  It's going to be 16 at
 2   4:52:30.
 3   BY MR. DILL:
 4   Q    So we see Mr. Fiorucci approaching here, correct?
 5   A    Yes, sir.
 6           MR. DILL:  Can we stop it at 4:52:39, please.
 7   BY MR. DILL:
 8   Q    And as we see him sitting here, we can see the lights that
 9   are displayed on his truck, correct?
10   A    Yes, sir.  I can see the glow of the headlights.  I can see
11   the cluster of illumination from the cab marker lights, the
12   roof-mounted lights on the tractor.  I can see what may be a side
13   marker light on the tractor kind of behind the headlight area.  I
14   see the top corner marker light on the trailer.  There's a
15   midpoint light that we later see hanging down dangling in a
16   photograph, and then what appears to be the rear most side marker
17   light.
18           MR. DILL:  Mr. Don, could I have photograph number
19   3480, please.
20   BY MR. DILL:
21   Q    All right.  And this is a picture of the truck we saw
22   earlier.  We see the little side marker light right here that you
23   were speaking of, correct?
24   A    I'm not sure if it was that light, Mr. Dill, or the one
25   that's on the lower edge of the door, but there is a side marker
```

```
 1   light that I think I'm seeing in that previous still image of the
 2   video.
 3   Q    And here are the amber lights at the top of the cab?
 4   A    Those are cab marker lights.
 5   Q    Up here at the top of the trailer?
 6   A    That's a clearance light on the top left corner.
 7   Q    All right.  And on this picture, we don't see the center
 8   marker light any longer because this is post-accident, correct?
 9   A    That's correct.
10   Q    And the red and white stripes that go down the side of the
11   trailer are called reflective tape or conspicuity tape, correct?
12   A    That's correct.
13   Q    And those are lit up when a light shines upon them, correct?
14   A    Yes, sir.  Those are just -- it is a reflective tape, and
15   you're optimal reflectivity is when the light source is at a
16   right angle to that.  As that trailer turns and gets at an angle
17   less than 90, the reflectivity, which is just the light being
18   transmitted to the viewer from the light source, that
19   reflectivity diminishes the greater the angle.
20        MR. DILL:  Could I have 3481, please, Mr. Don.
21   BY MR. DILL:
22   Q    This would be the rear of the trailer, correct?
23   A    Yes, sir.  If you were following that, that would be what
24   you would see.
25   Q    And apparently the officer who took the photograph used the
```

1   flash and that caused the retroreflective tape to light up,

2   correct?

3   A    Yes, sir.  And he was obviously close to the trailer as

4   well.

5          MR. DILL:  Mr. Don, could I please have 3482, the next

6   one in sequence.

7   BY MR. DILL:

8   Q    And in this photograph we see the passenger side of the

9   trailer, correct?

10  A    Yes, sir.  This was a photograph that was discussed earlier.

11  Where you have the arrow pointed right now is -- or where you had

12  it was at the rear of the tractor.  You see two low strips of

13  reflective tape and two taillights.  That's the back end of the

14  tractor.  Forward of that, farther to the right, is the beginning

15  of the trailer.

16          We're looking at the right side of the trailer not

17  quite all the way to the back end of it, but of significance in

18  this, you can see the center marker light on the side, this side

19  of the trailer, that's not damaged.  It's near the midpoint, but

20  you can also see that the rear axles are staged not at the rear

21  of the trailer, but they're farther forward.

22          Many of these trailers -- and apparently this one --

23  has an adjustable dolly, and they do that to accommodate load and

24  turning radius for the 18-wheeler.  This dolly, which consists of

25  axles four and five, is staged not at the rear of the trailer,

1   but farther forward which accounts for the damage we see on the

2   car on the other -- from the other side of the trailer.

3                  MR. DILL:  Mr. Don, 1704, please.

4   BY MR. DILL:

5   Q    And this is a post-accident photograph taken by one of the

6   adjusters and it shows that the red and white tape comes actually

7   all the way back to the end of the trailer, correct?

8   A    Yes, sir, I think so.  And you're referring to the tape on

9   the side.

10                 MR. DILL:  All right.  If we could go back to camera 16

11  at 4:52:39.

12                 Can you advance me to 39 seconds, please.

13  BY MR. DILL:

14  Q    Now, as he gets to this --

15                 MR. DILL:  And you can let it roll, Mr. Don.

16  BY MR. DILL:

17  Q    As he sits here, we can see that the center marker light on

18  that trailer is actually flashing, correct?

19  A    Yes, sir.  It appears to be.

20  Q    And you can see that the light from the red flashing light

21  is flashing down on top of the trailer, correct?

22  A    Yes, sir.

23                 MR. DILL:  And if you'd stop it here, sir.

24  BY MR. DILL:

25  Q    He sat in that position for 11 seconds you said earlier?

1    A    Yes, sir, I think so.

2         MR. DILL:  If you could back me up to 39 seconds and

3    give me angle 12, please.  4:52:39.

4    BY MR. DILL:

5    Q    So when he arrives at this stop bar, it's at 39 seconds,

6    correct?

7    A    Yes, sir, based on camera 16.

8    Q    And he begins movement between 51 and 52, correct?

9    A    Yes, sir.

10   Q    All right.  So when he comes to the stop bar, there's

11   nothing in view at present, correct?

12   A    When you say there's nothing in view, there's nothing

13   captured in the camera view.  That does not mean that there's --

14   Q    And that's my point.  There's nothing on the camera view.

15        MR. DILL:  And if you'd let it roll forward, Mr. Don.

16   BY MR. DILL:

17   Q    And at 43 seconds the white SUV enters into the frame,

18   correct?

19   A    Yes, sir.

20        MR. DILL:  If you'll let it roll forward, please,

21   Mr. Don.  Actually I'm going to need camera 16 at 52 seconds.

22   A    What we're looking at there is the SUV coming in.

23   BY MR. DILL:

24   Q    And you said that is the point when the truck begins to

25   turn, correct?

1    A    Yes, sir.  That's close to that.  If you could back it up

2    just a moment.

3    Q    You read Mr. Fiorucci's deposition that he saw the SUV at a

4    distance and he estimated it to be an eighth and a quarter of a

5    mile, correct?

6    A    I understood his testimony to be that he had an opportunity

7    of visibility an eighth to a quarter mile.  I don't recall that

8    he said that he observed the SUV at that point.  I thought he was

9    describing how far he could actually see based on the conditions

10   that he was describing.

11   Q    You didn't understand that to be the distance he saw the SUV

12   coming in to the gas station?

13   A    No, sir.  I don't recall that.  I thought that he was

14   describing the distance he was able to see.

15   Q    The time it took for that SUV to come into view and go

16   through the area would corroborate that it was about that

17   distance, wouldn't it?

18   A    It's going to depend on the speed of that vehicle.

19   Q    Did you ever calculate the distance at which the lights

20   become visible in the extreme right side of camera 12?

21   A    And we're talking about the light from what?

22   Q    From the cars.

23   A    No, sir, from the SUV nor from Mr. Bradley's vehicle.

24   Q    You didn't calculate the speed of the SUV at all, did you?

25   A    No, sir, I did not.  I know that he's slowing to make a

1   turn.  A typical turning speed is around 10 to 15 miles an hour.

2            MR. DILL:  Please go back to camera angle 12 at 52:52.

3   BY MR. DILL:

4   Q    Mr. Bradley's vehicle entered the frame between 51 and 52

5   seconds, correct?

6   A    Yes, sir, I think so.

7   Q    And how many seconds before impact is this when he enters

8   the frame?

9   A    I need to find a document with the frame time stamp on it,

10  Mr. Dill.  Give me just a moment.

11           The impact happened at time stamp 4:52:58.  We did find

12  there was about a second difference in the two clocks between the

13  cameras, but they're running close together.  4:52:58 is

14  camera 16 picking up the impact.  I think we just said that the

15  Bradley vehicle is entering between 51 and 52.  We're talking

16  about seconds, seconds on the clock display.

17           So between Bradley entering and the impact at 58 on the

18  time stamp of the video, you're looking at six to seven seconds.

19  The time that we gleaned from the video for the movement of

20  Mr. Fiorucci's 18-wheeler was seven and a half seconds from the

21  time that we could discern he was first moving, when the

22  headlight position started to change, to the point of impact.

23           MR. DILL:  If we could go back to camera 16 and go back

24  to 39 seconds.

25           That's good.  Thank you.  And if you could pause it

1   there.

2   BY MR. DILL:

3   Q    The distance from the front of the store where this camera

4   is located to where this truck is sitting is 300 feet; is that

5   correct?

6   A    Approximately.  Yes, sir.

7   Q    Mr. Bradley testified in his deposition that he was first

8   able to see the 18-wheeler through the fog when he was in front

9   of the gas station and the tractor trailer was across both lanes,

10  didn't he?

11  A    Yes, sir.  We're using the gas station as a reference, but

12  what wasn't specified, or at least it wasn't clear to me, is

13  where along the gas station.  The gas station covers a distance

14  along the roadway.

15  Q    Isn't it true that in your deposition you told me it was

16  about 130 feet from impact?

17  A    Well, it's going to depend on what point he is in the gas

18  station.

19  Q    Did you read that Mr. Bradley testified he didn't see any

20  other traffic in the mile before he got to the gas station?

21  A    Yes, sir.  As I recall, he did not recall the SUV that we

22  know was traveling in front of him and then turned into the gas

23  station that's depicted on the video.

24  Q    When he becomes visible on camera angle 12, I think you just

25  told me he's six or six and a half seconds from impact, correct?

```
 1   A    You're talking about Mr. Bradley?

 2   Q    Mr. Bradley.

 3   A    Yes, sir.

 4   Q    Would you agree with me that there's nothing visible in the

 5   video, including fog, that would prevent a motorist who's paying

 6   attention from seeing the intersection and Mr. Fiorucci's truck?

 7   A    Yes, sir.  I think that applies to both of them.  There's

 8   nothing preventing Mr. Fiorucci from seeing the approaching

 9   headlights and there's nothing preventing Mr. Bradley from seeing

10   an 18-wheeler which at that point has not even gotten into the

11   highway.

12   Q    Mr. Bradley's direction of travel had a caution light that

13   was flashing and operable on the morning of the accident, didn't

14   it?

15   A    Yes, sir.

16   Q    The purpose of the caution light --

17        MR. DAVID:  Objection, Your Honor.  Can we approach?

18   (Whereupon, a sidebar conference was had as follows:)

19        MR. DAVID:  I wanted to say it before you got the

20   question out, but you told us not to ask about what the caution

21   light says and what the law is on that.

22        MR. DILL:  I'm not asking what the purpose was.

23        MR. DAVID:  You said the purpose.

24        THE COURT:  You can't ask questions about the law

25   governing caution, but the fact of the placement of signs,
```

```
 1   whether they're operative, where they're located, line of sight,
 2   absolutely.
 3              MR. DAVID:  The purpose, though?
 4              THE COURT:  Well, I mean, you talked about the stop
 5   sign and he was supposed to stop at the stop sign.  You asked
 6   that question.
 7              MR. DAVID:  You specifically told us -- I tried to do
 8   the yellow flashing and you said, no, we haven't decided what
 9   that means.
10              MR. DILL:  I'm not asking him what the law is on a
11   yellow flashing sign.  I'm not going there.
12              MR. DAVID:  Because I wanted to say he didn't have to
13   slow down and y'all said I couldn't.
14              MR. DILL:  That's not where I'm going with it, Judge.
15              MR. DAVID:  It's the purpose of.  It's where it is and
16   what it's doing.
17              THE COURT:  I'll let you ask that on redirect.
18              MR. DAVID:  Thank you, Your Honor.
19              I don't want to run afoul of your order.  I can ask the
20   question does the law require or are you required.
21              THE COURT:  No.
22              MR. DAVID:  Is a driver required to reduce his speed at
23   a yellow light?  I can ask that question?
24              THE COURT:  Let's hear what his question is and what
25   the response is and I'll allow you the equivalent ability to ask
```

1    the equivalent question.  How's that?

2             MR. DAVID:  Perfect.  Thank you.

3         (Whereupon, the sidebar conference was concluded.)

4             THE COURT:  Mr. Dill, you may proceed subject to the

5    Court's ruling.

6    BY MR. DILL:

7    Q    Mr. Gillen, the purpose of a caution light is to alert

8    motorists along the roadway of a dangerous intersection?

9    A    Well, I wouldn't categorize it as a dangerous intersection.

10   Most major intersections along a major highway would have a

11   caution light, if not a full traffic signal.  In this case

12   there's a yellow caution for Highway 190 and a red stoplight

13   flashing red light for LA 26.

14   Q    Is the idea that a caution light is there to help reduce

15   perception-reaction time for a motorist to direct their attention

16   that they're approaching an intersection?

17   A    Well, it's certainly to put them on notice if they are

18   approaching an intersection.  I don't know that that would reduce

19   perception-reaction time of a vehicle that you're not expecting

20   to do something such as pull out in front of you.

21   Q    Well, perception-reaction time is elongated by complexivity

22   (sic) -- complexity and surprise, correct?

23             It's getting late in the afternoon.

24   A    The more complex it is, the longer it takes to process.

25   Just like at night and dark, it takes longer.  Any number of

1    factors can elongate, as you've put it, a perception-reaction

2    time.

3    Q    And that light is out there to help eliminate surprise?

4    A    It's to put you on notice that you're approaching an

5    intersection.

6    Q    You've done hundreds of caution light cases?

7    A    Probably.

8    Q    Before you get to a caution light, are there almost always

9    cautionary signs, speed advisory signs?

10   A    Not necessarily.  There are almost always -- on a major

11   highway, there would be an advance symbol sign letting you know

12   that you are approaching an intersection.  There's not

13   necessarily a speed warning sign associated with that.

14   Q    And that sign is a yellow square turned on its side so it's

15   a --

16   A    Call it a yellow diamond.

17   Q    Yellow diamond?

18   A    Yes, sir.

19   Q    And it's got a cross in it?

20   A    Yes, sir, depending on the shape of the intersection.  The

21   symbol on the sign resembles the shape of the intersection.  If

22   it's a T intersection, there will be a T on it.  If it's a

23   four-way intersection like this, there would be a four-way cross.

24   Q    And the parlance in accident reconstruction is that's an

25   advisory sign, correct?

1   A    The parlance in the MUTCD which is the Manual of Uniform

2   Traffice Control Devices.  That's the federal highway guideline

3   that establishes signage throughout every state of this nation.

4   They call it a warning sign, not a regulatory sign.

5   Q    Now, at 55 miles per hour, Mr. Bradley would have been

6   traveling at 81 feet per second, correct?

7   A    Yes, sir.

8   Q    So at six seconds when he appears in camera 12, he's about

9   486 feet from the point of impact, correct?

10  A    You said six seconds out?

11  Q    Yes, sir.  I thought that's what you told me you figured on

12  the video.

13  A    Well, you're asking me for a distance.  I'm just -- unless

14  you want me to take you for your word on your math, Mr. Dill.

15  Q    I'm a lawyer.  Please do not.

16  A    Yes, sir.  That's 486 feet.  Fifty-five miles per how is

17  81 feet per second.  Multiply that by six seconds, that's

18  486 feet away.

19  Q    So when he entered view on camera 12 at six seconds, if he

20  had perceived the truck at that point and reacted, if you give

21  him two seconds for perception-reaction, he would have traveled

22  162 feet at that point, correct?

23  A    That's correct.

24  Q    That would put him 324 feet away from the point of impact,

25  right?

1   A    Yes, sir.

2   Q    Now, one of the things that you guys do as

3   reconstructionists is you calculate braking distance and stopping

4   distances of vehicles, correct?

5   A    Yes, sir.

6   Q    And those are different things, aren't they?

7   A    Sure.  The stopping distance includes perception-reaction

8   time.  That's included in the mental process.  Braking is just

9   the mechanical action of the vehicle after you put your foot on

10  the brake depending on the degree of braking that you're applying

11  as to the distance it requires to stop.

12  Q    And if Mr. Bradley made a full application of the brakes on

13  that Volkswagen Passat, what did you calculate braking distance

14  to be?

15  A    Under a full application of brakes on wet pavement as they

16  had that morning, sliding with emergency braking, it would

17  require 201 feet to slide to a stop from 55 miles per hour.

18  Q    All right.  You weren't present for the trooper's testimony

19  yesterday, were you?

20  A    No, sir.

21  Q    He testified that the pavement was dry.  Could you tell us

22  what the stopping distance would be if the pavement was dry?  I'm

23  sorry.  The braking distance, not the stopping distance.

24  A    We'd have to assume a table value for -- it's called the

25  coefficient of friction.  It's how sticky a surface is.  And

1    they're given numerical values which is a percentage of the

2    g-force.  Wet pavement gave us .5 g's.  Clean, dry pavement in

3    good condition, normally about a .7 g.  A full lockup skidding to

4    a stop on clean, dry pavement, assuming a value of .7, would

5    require 144 feet, but we know in this case we don't have dry

6    pavement.  The photographs depict wet pavement even in the

7    parking lot of the service station.  So if that's what the

8    trooper testified to, I think he's mistaken.  That's not what

9    he's reported in his accident report form.

10   Q    But either wet or dry, if he perceived and reacted when he

11   entered the view of camera 12, he could have brought his vehicle

12   to a full stop far before getting to the point of impact,

13   correct?

14   A    Yes, sir, but let's discuss what's triggering that

15   perception-reaction.

16           MR. DILL:  Objection, Your Honor.

17           THE COURT:  The witness will only answer the question

18   asked.  Counsel for the plaintiff will have an opportunity for

19   redirect.

20           You may proceed, Mr. Dill.

21           MR. DILL:  Thank you.

22   BY MR. DILL:

23   Q    Mr. Gillen, he did not have to bring his vehicle to a stop

24   to avoid impact, did he?

25   A    No, sir.  He has to brake enough to reduce his speed such

1  that he's going to build in the additional four seconds for the

2  18-wheeler to complete his turn or an additional one and a half

3  -- I think it came out to 1.7 seconds for the back of the

4  18-wheeler to just clear Mr. Bradley's travel lane.

5        Again, Mr. Fiorucci's trying to make a maneuver where

6  he simply doesn't have enough time to do that.  He's making an

7  11-second maneuver when traffic is only seven and a half seconds

8  away.  So the approaching vehicle is going to have to either come

9  to a stop or apply enough braking to build in more time for the

10 18-wheeler to complete that maneuver.

11 Q    Now, let me back up and make sure I understand what you just

12 said.  You said he needed 1.7 seconds more to complete clearance

13 of that lane, correct?

14 A    I think so.  I think 1.7 -- we discussed that at the

15 deposition, as I recall, and I think the 1.7 would build in

16 enough time for the 18-wheeler to clear the lane that

17 Mr. Bradley's in.  Mr. Fiorucci won't complete his maneuver.  He

18 won't be straightened out on the highway.  He'll still be

19 blocking the left turn lane.  The trailer is still hanging out

20 there where it's not supposed to be.

21 Q    But all Mr. Bradley had to do was apply modest braking to

22 slow his vehicle slightly in that last six seconds and that

23 trailer would have cleared, correct?

24 A    Perhaps.  It depends on at what point Bradley applies

25 brakes, but it goes back to what is the visual cue that Bradley

1   is responding to, and at the six-second mark, Mr. Fiorucci --

2   we're talking about six seconds before impact.  The visual cue,

3   the trigger for Mr. Bradley, is an 18-wheeler that's still off on

4   the side and has not even reached the edge of the roadway

5   occupied by Mr. Bradley.

6   Q    If Mr. Bradley had slowed his vehicle to 45 in the last

7   605 feet of his travel, he would have cleared Mr. Fiorucci's

8   vehicle, correct, without having to slow down any further?

9   A    If he was rolling at a constant 45 miles per hour during the

10  course of 605 feet, I would tend to agree with that.  It's kind

11  of like if Mr. Bradley had left the house seven seconds later, we

12  wouldn't be here either.  Mr. Bradley, based on the video, was

13  traveling 55 miles per hour on the highway approaching an

14  intersection where the cross traffic was governed by a red

15  flashing light.

16  Q    In all of the video that we've looked at, it's your opinion

17  that the speed of Mr. Bradley's vehicle never changes until

18  impact; is that correct?

19  A    Yes, sir.  I don't see any indication of any appreciable

20  braking.  It seems that the brake lights come on at the last

21  moment, right at impact practically.

22  Q    And isn't it true that the impact itself from inertia on the

23  brake pedal could actually cause that light to come on?

24  A    It could.

25  Q    So in everything you've looked at for the entire period,

1   from the time he comes in on camera angle 12 until he makes

2   contact, the speed of that vehicle is a constant 55 miles per

3   hour?

4   A    It appears to be, but to the question regarding inertia,

5   this vehicle did not have a black box to download to give us the

6   brake pedal application, trigger, whether or not the brake pedal

7   was ever applied, but I have yet to come across a download --

8   it's called a CDR, crash data recorder -- that shows a brake

9   pedal application resulting from an impact.  I guess it's

10  possible.  I just haven't seen that in any of the downloads I've

11  ever done.

12          MR. DILL:  I don't have any further questions, Your

13  Honor.

14          Thank you, Mr. Gillen.

15          MR. DAVID:  Very brief redirect.

16          THE COURT:  You may proceed when ready.

17                  REDIRECT EXAMINATION

18  BY MR. DAVID:

19  Q    And you kind of hit upon it, Mr. Gillen, but if Mr. Bradley

20  had been able to apply his brakes sooner or if he had been able

21  to see the tractor trailer from much further away, like you said,

22  those if's can go on -- that could be in any case forever,

23  correct?

24  A    Yes, sir.

25  Q    Every accident you could say, well, if you'd seen him way

1  further back, there wouldn't be an accident, correct?

2  A    Yes, sir.

3  Q    Every accident, if they were going way slower, maybe they

4  wouldn't have gotten there and there wouldn't be an accident,

5  correct?

6  A    Yes, sir.

7  Q    He asked about the dry pavement.  Did you use the uniform

8  crash report from the state police in formulating your opinions

9  in this case?

10  A    I used that.  I used the police photographs.  I used the

11  video, all of which -- the police report says wet pavement.  The

12  photographs show wet pavement.  The video shows wet pavement.  So

13  we used a sticky value under full lockup for wet pavement.

14  Q    Can you pull out the crash report?  Do you have it handy

15  with you -- if not, we can get it for you -- that you used to

16  formulate your opinions in this case?

17  A    Okay, sir.

18  Q    And the jury heard Trooper Michael testify yesterday and I

19  believe he may have misread that report.  This is a report he

20  filled out, the crash report?

21  A    Yes, sir.

22  Q    There's only one crash report in this case, right?

23  A    Uniform Crash Report signed by Trooper Michael Davis.

24  Q    And for pavement, does he mark wet or dry?

25  A    It's identified as road surface.  It's marked wet blacktop.

1          MR. DAVID:  Your Honor, I'd like to offer, file, and

2    introduce that portion of the crash report.

3          MR. DILL:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5          MR. DAVID:  Thank you, Your Honor.

6    BY MR. DAVID:

7    Q    And we went through -- Mr. Dill went through a bunch of if

8    scenarios about what Mr. Bradley maybe could have done if he had

9    been slower or had the ability to see from much further away.

10   You were just shown the video.  If Mr. Fiorucci just looks out

11   his driver's side window, he sees those headlights and doesn't go

12   and there's no accident, correct?

13   A    Correct.  If he holds his position for seven and a half more

14   seconds after he's been sitting there for eleven, then none of us

15   are sitting here today.  The accident does not happen.

16   Q    All this visibility we talked about, a quarter to an eighth

17   of a mile, Mr. Fiorucci's own words for his visibility at the

18   scene right at the stop sign looking where he looked out his

19   driver's side window, he absolutely should have been able to see

20   Wilfred Bradley's headlights and not go, correct?

21   A    Yes, sir.

22   Q    And as he started going in those two and a half seconds plus

23   before he got to the fog line, he should have looked then and

24   stopped, correct?

25   A    He had the opportunity to, yes, sir.

```
1    Q    Much more so than Mr. Bradley who only had the benefit of

2    the sidelights while Mr. Mr. Fiorucci has the benefit of

3    Mr. Bradley's headlights, correct?

4    A    Yes.

5              MR. DAVID:  No further questions.

6              Thank you, Your Honor.

7              THE WITNESS:  Your Honor, it's going to take a second

8    for me to pack up here.

9              THE COURT:  I understand.

10             MR. DAVID:  Your Honor, if I could walk in the hall and

11   see if I have my next witness.  Is that okay?

12             THE COURT:  That's good.  I'd like to go at least

13   another 15 minutes before we take another break.

14             MR. DAVID:  Perfect.  Thank you, Your Honor.

15                  (Pause in Proceedings)

16             MR. DAVID:  The witness is gathering up.

17             THE COURT:  And I think he's walking through the door.

18             So, Mr. David, you may call your next witness.

19             MR. DAVID:  Thank you, Your Honor.

20             At this time the plaintiffs call Dr. David Muldowney to

21   the stand.

22             THE COURT:  Dr. Muldowney will approach and be sworn

23   in.

24             THE COURTROOM DEPUTY:  Please raise your right hand.

25             Do you solemnly swear that the testimony you are about
```

1    to give in this case will be the truth, the whole truth, and

2    nothing but the truth, so help you God?

3              THE WITNESS:  I do.

4              THE COURTROOM DEPUTY:  Thank you.

5    Whereupon,

6                   DR. DAVID SCOTT MULDOWNEY

7    was called as a witness; after having been first duly sworn, was

8    examined and testified as follows:

9                   VOIR DIRE EXAMINATION

10   BY MR. DAVID:

11   Q    Doctor, are you logged in for your medical records?

12   A    In two seconds.

13        Okay.

14   Q    Thank you, Doctor.

15        Can you state your full name and current business

16   address for the record.

17   A    Yes.  David Scott Muldowney, 1103 Kaliste Saloom Road,

18   Suite 102, Lafayette, Louisiana.

19   Q    Dr. Muldowney, can you tell the jury about your experience

20   as an orthopedic spine surgeon, maybe what you did school-wise to

21   get to that position.

22   A    I went to college at the University of Tennessee in

23   Knoxville.  Then completed four years of medical school at Baylor

24   College of Medicine in Houston.  Then a five-year orthopedic

25   surgery residency at Tulane in New Orleans.  Then a one-year

```
 1   spine fellowship, six months of which was at Tulane and six
 2   months was in Louisville, Kentucky.  I completed that in 1997 --
 3   I'm sorry, in 1995, and I was in practice for a year in New
 4   Orleans before relocating to Lafayette in 1996.  I've been in
 5   private practice in orthopedic surgery with an emphasis on spine
 6   surgery since then.
 7   Q    So that's 26 or 27 years or so?
 8   A    Yes.
 9   Q    Practicing right here in Lafayette at the Lafayette Bone and
10   Joint Clinic?
11   A    Yes.
12   Q    And tell me what your practice involves on a day-to-day
13   basis.  What are you doing as an orthopedic spine surgeon?
14   A    Well, I do some general orthopedics as well.  So basically
15   orthopedic surgeons take care of diseases and injuries of the
16   musculoskeletal system.  I have a particular emphasis on spine
17   surgery.  So the majority of the surgeries I do are either on the
18   neck or the back, but we also take care of knees and hips and
19   other things as well.
20   Q    And are you board certified in orthopedic spine surgery?
21   A    Yes.
22   Q    And when was that board certification?
23   A    I'm sorry.  I'm board certified in orthopedic surgery.
24   Q    And when was that certification?
25   A    The initial one was 1997, and I've recertified every ten
```

1    years since then.

2              MR. DAVID:  Thank you, Doctor.

3              At this time I would tender Dr. Muldowney as an expert

4    in orthopedic spine surgery.

5              MR. DILL:  No traversal, Your Honor.  We accept.

6              THE COURT:  You may proceed.

7                        DIRECT EXAMINATION

8    BY MR. DAVID:

9    Q    Dr. Muldowney, you've been treating Mr. Bradley for about

10   four and a half years now?

11   A    Yes.

12   Q    Ever since his February 14th, 2018, incident?

13   A    Yes.

14   Q    Tell me, have you gotten to know Mr. Bradley pretty well?

15   It's been a long time.

16   A    I know him fairly well.  I mean, there's only a limited

17   amount of time I spend with each patient, but certainly some I

18   know better than others based on the amount of time that I've

19   seen them.

20   Q    Is Mr. Bradley one of those guys who complains a bunch or is

21   he pretty stoic and quiet?

22   A    No.  He doesn't complain.  He doesn't complain much, no.

23   Q    Tell me how he came to see you and what his condition was

24   when he first came to see you.

25   A    He saw me about two weeks, thirteen days, following the

1    accident on February 27th, 2018.  He gave me the history of

2    what happened and we instituted treatment at that point.  I don't

3    recall -- I don't specifically know how he came to see me,

4    whether his attorney referred him or whether he picked my name

5    out of a hat.  I don't know.

6    Q    Thank you so much.

7              And you've had a chance to review the ambulance and ER

8    records in this matter as well?

9    A    Yes.

10   Q    Okay.  And so you know that at the ambulance scene he had

11   complaints of neck and low back problems?

12   A    Yes.

13   Q    And at the hospital they actually did CTs of his neck and

14   his low back as well?

15   A    Yes.

16   Q    Okay.  And for the last four and a half years you've been

17   treating him primarily for his neck and his back and his

18   headaches?

19   A    Yes.

20   Q    And I guess you have upper and middle back as well that you

21   treat him for, correct?

22   A    Yes.

23   Q    I don't want to go through every single report you have, but

24   let's talk about his course of treatment, conservative care until

25   the point he needed surgery.  What was your first order of

1  treatment for Mr. Bradley when he came in?

2  A    Well, typically in his case, just like most every case that

3  we do, the first thing we recommend is a course of physical

4  therapy.  We can do medications as well, typically an

5  anti-inflammatory and a muscle relaxer would be appropriate, but

6  the main thing initially is physical therapy.  So I recommended

7  physical therapy.

8  Q    And you saw him a few weeks after the incident, correct, on

9  February 27th, 2018, about 13 days later?

10  A    Yes.

11  Q    And what kind of problems did he have?  Did he have leg

12  problems as well at that point?

13  A    Yes.  He was having low back -- I'm sorry, neck pain,

14  midback pain, and left leg pain.

15  Q    And chest pain as well?  It was very painful?

16  A    Yes.  Chest pain as well.

17  Q    And over time the problems with his leg and his chest got

18  better and you're no longer treating him for that anymore?

19  A    Correct.

20  Q    Let's talk about his neck.  Tell me about the symptoms he

21  had in his neck when he presented and throughout the course of

22  the therapy and other treatment you recommended.

23  A    He was complaining primarily of posterior neck pain that

24  radiated into the shoulders and midback area that he described as

25  an aching and constant.  Those symptoms remained relatively

1    consistent throughout our treatment.  So that was his primary

2    complaints with his neck.

3    Q    And you're familiar that Wilfred was a heavy duty

4    scaffolding worker before this accident, correct?

5    A    Yes.

6    Q    And actually worked out with some high intensity workouts;

7    is that correct?

8    A    Yes.

9    Q    And he had no history of neck problems or neck complaints

10   before this accident, correct?

11   A    Correct.

12   Q    And he has an immediate onset of neck pain after the

13   accident?

14   A    Yes.

15   Q    So after therapy, what else did you consider to help treat

16   his neck condition?

17   A    Well, the next option would be an injection in his neck.  So

18   we did that eventually as well.

19   Q    And that was a cervical epidural steroid injection?

20   A    Yes.

21   Q    Tell the jury what that is.  What does that involve to have

22   one of those CESIs or cervical epidural steroid injections?

23   A    What we do is we use a special needle and we place it in the

24   back of the neck.  The patient is laying on the table on their

25   stomach.  Usually anesthesia is there to provide some sedation so

1    the patient doesn't move or doesn't really feel anything.  And

2    using the x-ray, the realtime x-ray machine, the fluoroscopy

3    machine, we visualize the spine.

4              We scrub up the neck, put some local anesthesiology in

5    the skin over where we want the needle to go under the x-ray, and

6    then using a special needle and a special syringe called a

7    loss-of-resistance syringe, we slowly advance the needle until

8    it's in the epidural space, which is the space in the spinal

9    canal, but not in the spinal cord, not in the sac that the fluid

10   and the spinal cord stays in.  That's the dura is what that

11   structure is and that's sort of the dividing line between what we

12   want to see and what we don't want to see basically when we're

13   doing this kind of stuff.  So it's in the epidural space, not the

14   subdural space.

15             Once the needle is positioned where we think it needs

16   to be, we inject a little bit of dye and we watch how it flows

17   under the x-ray, and then once we confirm that everything is

18   where we want it, we inject usually a small amount of lidocaine,

19   which is an anesthetic, and Cortisone.

20             What it does is it helps to -- it helps to stabilize

21   the nerves and soothe the nerves, and it's really -- it just

22   helps the pain.  It doesn't always work, but it's something that

23   we can try that may help.

24   Q    Is it kind of a dual function of a cervical epidural steroid

25   injection?  One is to treat the patient and hope he gets better

1    at least temporarily, and, two, diagnostic as well?

2    A    I think there probably is some diagnostic value to it.  It's

3    mainly a therapeutic thing.  If it works, great.  If it doesn't,

4    then we sort of scratch it off our list and move on to the next

5    thing.  I don't think it -- if it doesn't work, it doesn't mean

6    that's not where the problem is necessarily.  It just means that

7    it's not going to work.  If it does work and it's temporary, I

8    think it does help provide some evidence that the problem is

9    where we think it is, yes.

10   Q    And for Mr. Bradley it worked, right?

11   A    Yes.

12   Q    And he got temporary relief in his neck from the cervical

13   epidural steroid injection?

14   A    Yes.

15   Q    And, in fact, that got repeated not once, but two more

16   times?  He had three of those total surgeries and under

17   anesthesiology -- not surgeries, injections and put under

18   anesthesiology like you just described?

19   A    That's correct.

20   Q    And is there a correlation of Wilfred's injuries and what's

21   going on in his neck and the symptoms he's having and the imaging

22   that was reviewed in this case?

23   A    Well, what his MRI showed was a disc abnormality at C3, C4,

24   where there was a broad-based disc bulge.  It looked a little bit

25   more to the left which may cause some narrowing of the

1   neuroforamen.  So these are fairly non-specific in terms of what

2   pain they produce, but certainly his symptoms would be consistent

3   with that MRI.

4   Q    And this is a slice of his neck MRI right here.  Can you

5   circle where the herniated disc is.

6   A    Just on the screen?

7   Q    Yes, sir.

8   A    Do I use this little pen or my finger?

9   Q    Just your finger will do.

10  A    So, yes, it's right here.

11         THE COURTROOM DEPUTY:  It's not working.

12         THE WITNESS:  That's okay.  Can I use the laser pen to

13  point?

14  A    So this is the C3, C4 disc right here.  It's named that

15  because that's C3, the third cervical vertebra, and that's the

16  fourth cervical vertebra.  So we name the discs by the bone above

17  and below.  And it's got this relatively small bulge protrusion

18  here that we can see on this side-view that we really don't see

19  at the rest of the levels.

20         MR. DAVID:  Fair enough.

21         Cue up the next slide.

22  BY MR. DAVID:

23  Q    And this one is harder for people to understand what this

24  is.  Can you tell us what this MRI slice is showing us?

25  A    Yes.  This is a cross section through the spine at the C3,

1   C4 level.  So this is the disc.  This is the spinal cord.  This

2   is the foramen that the nerve root goes out on each side, and

3   this is the joint, the facet joint on each side, and this is the

4   back of the neck.  You can't really see it very well on this

5   particular image, but the little bony prominence that comes out

6   right here is the spinous process and that's what you feel in the

7   back of your neck.  When you're pushing the little ridges back

8   there is this right here.

9            So what we're seeing is that the disc is bulging out

10  there a little bit more to the left.  The space for the right

11  side nerve is a little bit more than the space for the left

12  there.  So that's what that shows us.

13  Q    And when it comes to MRIs, unless someone had a prior

14  condition of neck problems and had an MRI right before the

15  accident and right after, it's always hard to date what is new

16  injury and what is degenerative process, correct?

17  A    Correct.

18  Q    So what doctors do -- and it's accepted everywhere.  All

19  your patients and everyone else's patients they see, they look at

20  how is a person doing before trauma and after to see if it's

21  related to the trauma, correct?

22  A    Yes.

23  Q    And here we know Mr. Bradley was not having neck pain, has a

24  very traumatic event, and has neck symptoms soon thereafter?

25  A    Yes.

1 Q So that's how you relate his neck condition and whatever is

2 giving him problems at C3-4 in his neck to this accident,

3 correct?

4 A Yes.

5 Q What's the next step?

6  So you see this imagining.  You've seen that's he's had

7 temporary relief from the three separate cervical epidural

8 steroid injections.  What's the next process in the treatment for

9 Mr. Bradley?

10 A Well, normally what I would recommend to anybody would be to

11 live with their symptoms and hope that they will eventually get

12 better.  If the patient says I can't do that, I'm hurting too

13 much, it's too bad for me to do that any longer, then we consider

14 surgery.  In his case he has an abnormality at the C3, C4 disc.

15 So we discussed surgery at that level with him.

16 Q What surgical options did he have when you discussed

17 surgery?

18 A So generally there's a bunch of them, but there's really two

19 that I considered with him.

20  First was an anterior cervical discectomy and fusion

21 where we make an incision on the front of the neck, remove the

22 disc, and then put a piece of bone in place of the disc and then

23 a plate on top of that.  So that effectively eliminates that disc

24 and converts that movable segment into a stiff fused segment.  So

25 he loses the motion at that level.

1          The other option would be a disc replacement where we
2   do the same thing basically, but instead of putting a piece of
3   bone and a plate to lock it in position, we put a mechanical
4   device that replaces the disc so his neck continues to move and
5   function more normally.  That was the option that we decided to
6   use in his case.
7   Q    And to illustrate this for the jury so they can see what the
8   surgical process looked like, some professionals put together
9   some illustrations and you approved this was the kind of surgery
10  that you did.  It was on August 15th, 2019.  So a year and a half
11  after the incident.  It was a C3-4 total disc arthroplasty,
12  correct?
13  A    Yes.
14          MR. DAVID:  All right.  Go ahead.  Next clip.
15  BY MR. DAVID:
16  Q    And this is as he's prepped and his throat is opened up, the
17  surgical exposure of the vertebrae?
18  A    Yes.
19  Q    Why don't you explain to the jury what's going on here.
20  A    So two pins have been inserted, one into C3 and one into C4.
21  You can't see them because this device is over the pins, and what
22  that does, that allows us to distract those two bones.  So we
23  incise the disc with a little knife and then we use various
24  instruments.  This is a pituitary rongeur.  We use other
25  different instruments, curettes and so forth, where we scrape the

```
 1   disc and basically remove the entire disc back to the spinal cord
 2   basically using these instruments.  That's what this is
 3   demonstrating here, the removal of the disc with the special
 4   instruments there.
 5   Q    Thank you, Doctor.
 6           MR. DAVID:  Next, please.
 7   BY MR. DAVID:
 8   Q    And this is again one of those cross sectional views, almost
 9   like a bird's-eye view if you cut the neck in half, correct?
10   A    Correct.
11   Q    Why don't you explain what this shows.
12   A    So this -- the annulus, the anterior annulus, has been
13   incised here and removed and the disc material is partially
14   removed.  This is all disc material here.  This is the spinal
15   cord.  So this would be removed all the way back to this level
16   here and up along the sides as much as we safely can.  The
17   vertebral artery is in there somewhere.  So we don't want to get
18   too crazy with what we do.  So that's what's going on with that.
19   Q    You talked about preparing the disc space?
20   A    Yes.
21   Q    Okay.  And this is the actual device that's inserted into
22   the disc?
23   A    Yes.
24   Q    Okay.  Does that device ever come out or that's in there
25   permanently?
```

1    A    It's in there permanently.

2    Q    And this is an actual x-ray of Mr. Bradley's spine with the

3    actual device in it, correct?

4    A    Yes.

5    Q    And you relate the need for that surgery and all of his neck

6    treatment that you administered to this accident, correct?

7    A    Yes.

8    Q    I do want to talk about his upper and midback.

9         You were treating him consistently for a long time for

10   his upper and midback complaints as well, correct?

11   A    Yes.

12   Q    Are those conditions surgical?

13   A    No.

14   Q    What do you think the process is for what injuries he has

15   there that are still going on and he still has problems with from

16   time to time?

17   A    Well, he has degenerative discs at those levels.  It's a lot

18   more difficult to treat the thoracic spine than it is the

19   cervical and the lumbar spine for a variety of reasons, but

20   mainly the ribs are there.  So you can't get to it from the front

21   very easily.  And the spinal cord is there, if you're making an

22   incision in the back.  It's generally an area that doesn't

23   require surgical treatment because the ribs provide some natural

24   stability to that area and it's rarely enough of an issue that we

25   end up doing surgery there.  So it's just something we manage

1   non-operatively.

2   Q    Okay.  I do want to talk about his low back now.

3          Was it the same treatment?  He presented and you

4   treated him for his low back problems.  I know his neck was the

5   focus early on, correct?

6   A    Yes.

7   Q    His neck and hand and other parts.  So even though there's

8   documentation of his back pain and injury, the real treatment for

9   his back, when it comes to surgery, wasn't until three plus years

10  after the crash?

11  A    That's correct.

12  Q    Let's go to the MRI image further back.  If you can, Doc,

13  why don't you talk about that L4-5 disc.

14  A    That's it right there.  This is the L5.  The nomenclature is

15  the same as in the cervical spine.  It's named by the bone above

16  and below.  This is the L4 vertebra.  This is the L5 vertebra.

17  This is the sacrum down here.  So this is the L4-5 disc.  That's

18  L5, S1.

19          So you can look at these discs and say, well, that one

20  looks a little different than the others.  It's darker.  It's

21  probably a little bit narrower than the others.  It also has sort

22  of a bulge back here, and there's some other stuff going on up in

23  the front here that's just not present at the other discs.

24  Q    And even though this was a condition that Mr. Bradley

25  treated for later, you noted that he had numbness in his leg as

1   well as back pain?

2   A    Yeah.  I'm sure we did at some point.  I can't recall

3   specifically which office visit it was, but, yeah.

4   Q    And then you ended up performing surgery on his back as

5   well.  What was the reasoning for that?

6   A    Well, similar to the reasoning for his neck, that he had

7   this disc.  It was the only abnormality on his MRI.  And he

8   reported to me that the pain was not one that he wanted to

9   continue to live with, and actually part of the rationale for

10  proceeding with surgery is he had done really good with his neck

11  surgery.  His pain was basically gone after that.  So one of the

12  best predictors that we have of how someone does from a second

13  spine surgery is how they did from their first spine surgery.

14         So when we see people, you know, fairly routinely who

15  have had previous surgery in their back or in their neck or

16  whatever and they have problems, so I'm trying to decide is

17  another operation going to help them.  If they've had five

18  operations and none of them have worked, then the sixth is

19  probably is not going to work either.

20         So even if we saw something that we thought could be

21  made better, I would tend not to want to do it because the

22  likelihood of the sixth one working when the others didn't is

23  pretty low, but in his instance he got great results with the

24  cervical surgery.  So that certainly is an indicator that, you

25  know, there's no psychological or other reasons that he might not

1    get better with additional surgery.

2            So with the one-level disease with the symptoms that he

3    had, we tried an epidural injection.  It didn't work.  He was

4    just ready to proceed with surgery and so we did.

5    Q    And I think you testified he had a central disc herniation

6    at L4-5 with compression of the L5 nerve root.  What does that

7    mean?

8    A    So the central disc herniation or bulge protrusion, whatever

9    you want to call it, is this part here where the disc sticks out

10   into the space occupied by the nerves.

11           So there's no spinal cord down here.  This is just

12   nerve roots.  The spinal cord ends -- you can't really see it,

13   but it ends probably right above where the MRI is.  All of these

14   lines coming down are nerve roots and a nerve root goes out at

15   each level.  So in his particular instance, it was causing some

16   narrowing of the hole that the nerve root goes out.

17   Q    And, again, before this accident, he's working.  He's

18   healthy.  He's able to what he want to do.  You'll see pictures

19   of the working out he was doing.  And then after this trauma, he

20   has an immediate onset of back pain that continues until he has

21   surgery, correct?

22   A    Yes.

23   Q    And do you relate the need for the back treatment and the

24   surgery to this accident as well?

25   A    Yes.

1   Q    And the neck I know was successful.  He still has residual

2   symptoms in his neck, but it's much better since he had the

3   surgery, correct?

4   A    Yes.

5   Q    And the same with the back?

6   A    Yes.

7   Q    And what kind of surgery did you do on the back?

8        We'll pull up the medivisual for that one, too.  I

9   think his is just one image for this one, Doctor.

10  A    So this is, in essence, what we could have done in his neck

11  with the fusion, but in the back, the disc replacement just

12  doesn't work as well.  So I typically still do a lumbar fusion

13  for this particular problem rather than a disc replacement.

14       So I have a vascular surgeon, usually Dr. Luke, make

15  the incision.  He moves the internal organs to the side.  The

16  main thing is the iliac artery and the iliac vein are right

17  there.  The aorta and vena cava are right above where we're

18  working.  So those are the main structures that are at risk when

19  we do the surgery.

20       So I like to have a vascular surgeon there in case

21  something happens, but he's responsible for providing the

22  exposure.  Then we incise the disc using the same type of

23  instruments that we used on the neck surgery, just bigger because

24  it's a bigger disc and bigger space, and we do the same thing.

25  Then we put this device in here.  Instead of an artificial disc,

 1   we put the fusion device in with fixation, these screws, and that

 2   locks everything into place and keeps it from moving and it will

 3   heal as one solid bone over time.

 4   Q    And when you have a fusion surgery like this in the low

 5   back, is there a risk to having adjacent segment problems above

 6   or below that area as well?

 7             MR. DILL:  Your Honor, I'm going to renew my objection

 8   that was made previously just to preserve the record.

 9   Q    Yes?

10   A    Yes.

11             THE COURT:  Sustained.

12             MR. DAVID:  I'm sorry, Your Honor.

13        (Whereupon, a sidebar conference was had as follows:)

14             THE COURT:  We had an objection on the adjacent segment

15   level.

16             MR. DAVID:  You've already ruled on this in chambers.

17   You say he could testify to that.  That's why he renewed his

18   objection, just to preserve the record.

19             MR. DILL:  I'm just preserving the record, Judge.

20             THE COURT:  All right.  The objection is overruled.

21   We'll proceed.  I apologize.  I did not catch that question.

22        (Whereupon, the sidebar conference was concluded.)

23             THE COURT:  You may proceed subject to my ruling.

24             MR. DAVID:  Thank you, Your Honor.

25   BY MR. DAVID:

1   Q    And, again, we want to talk about the risk of adjacent level

2   surgery in his low back after having the fusion.  Explain to the

3   jury what that is and what that means.

4   A    Well, when we do a fusion at a segment of the spine, any

5   place really, but particularly the lumbar spine as well, we

6   change the mechanics of it.  So motion that was going through

7   this disc can no longer go through that disc.  So the stress gets

8   transmitted to the disc above and to the disc below and it tends

9   to cause those to wear out prematurely.

10       So there's a lot of different studies that look -- they

11  all come up with different things, but what I've come to

12  establish is the risk, based on the literature, is about a three

13  percent chance per year that he would develop clinically

14  significant adjacent segment disease, and in my experience, that

15  is very rarely successfully treated non-surgically.  It just

16  seems to be more recalcitrant to the typical things that we do

17  and most of those people go on to have more surgery on their

18  back.  So three percent a year.  You do the math.  In seventeen

19  years it becomes a 51 percent chance that he would probably

20  require another operation, and he was 53, I believe, when surgery

21  was performed.  So he would still be young enough that we would

22  consider doing something like that on someone his age.

23  Q    And in this world we live in probabilities, more likely than

24  not, the preponderance of the evidence.  More likely than not

25  Wilfred Bradley is going to have another spine fusion in his

1    future?

2    A    Yes.

3    Q    I do want to talk about specifically the instances of back

4    complaints and back documentation for his low back and his back.

5    From the time of the accident until the time he had his surgery

6    -- and I'm going to mark -- these are all defense exhibits.  So

7    I'll give you the numbers so you can have him.

8           Defense Exhibit A1, pages 3 through 7, is the Acadian

9    Ambulance record, and at the scene, neck, back, and chest pain.

10   Patient assisted out of the car and complained of back pain and

11   chest pain.

12          That's at the ambulance at the scene, correct?

13   A    Yes.

14   Q    Next at LGMC.  Same day.  Defense Exhibit A5.  Diagnosis,

15   back pain due to injury.

16          The next visit -- again, this is the same day.  LGMC.

17   It's Defense A5 again.  Unspecified injury of lower back, initial

18   encounter.

19          Again at LGMC that same day they order a CT of the

20   lumbar without contrast, and the reason they're doing it is

21   because they suspect fractured lumbar vertebrae and there is no

22   evidence of fracture.  And they have some spondylosis --

23          THE COURT:  Mr. David, I think it's better to have the

24   witness --

25          MR. DAVID:  You're right.  I just thought about that as

```
 1    I was saying it, Your Honor.
 2              THE COURT:  You can't testify.
 3              MR. DAVID:  I'd love to, but you're absolutely right.
 4    I'm sorry, Your Honor.
 5              THE COURT:  And I would remind the jury that statements
 6    of counsel are not evidence.
 7              MR. DAVID:  But I will say this.  What I'm putting up
 8    here is evidence, Your Honor.
 9              THE COURT:  You can direct him to the evidence, but
10    it's best to have the witness testify.
11              MR. DAVID:  I agree.  Thank you, Your Honor.  Thanks
12    for reminding me of that.
13    BY MR. DAVID:
14    Q    And, again, we're showing you these images on your screen,
15    Dr. Muldowney.
16              Did he go to the LGMC and have a CT of his lumbar
17    spine?
18    A    Yes.
19    Q    And what was the reason for that based on the report you see
20    right here, Defense Exhibit A5?
21    A    It indicates suspicion of a fractured lumbar vertebra.
22    Q    Fair enough.
23              And then I'd like to skip forward to your visit of
24    February 27th, 2018, Defense Exhibit A7, and his list of injuries
25    are chest, back, neck, and shoulders, correct?
```

1    A    Yes.

2    Q    Okay.  Fast-forward two months.  April 24th, 2018.  He

3    comes back to see you, correct?

4    A    Yes.

5    Q    And on that visit you do an examination of the lumbar spine.

6    Explain to the jury what that means.

7    A    Well, an examination is when we palpate or, you know, look

8    at the area of the body that is in question.  So in this

9    particular instance an examination of the lumbar spine would

10   involve a variety of potential things, but me looking at it, me

11   pushing on it, sometimes me having them bend different ways or

12   bending them different ways, and then examining the strength of

13   the lower extremities to ensure that the muscle strength is

14   normal in the leg.

15   Q    And, Doc, I'm trying to keep a running count just to make

16   sure I have these.  I counted all of those Lafayette General

17   visits as one, that Acadian Ambulance visit is another, and that

18   first visit to you -- that first April 24th, 2008, visit to you

19   when you did that exam of his lumbar spine as another.  So on

20   that date two months after the accident, what did the exam reveal

21   of his lumbar spine.

22   A    It revealed mild tenderness over the lower lumbar area with

23   limited motion secondary to pain.

24   Q    And just to make sure I'm clear.  Lumbar is low back?

25   A    Yes.

1    Q    What does it mean when you feel tenderness in his low back

2    on exam?

3    A    Well, it would indicate that he had some sort of process

4    going on, some sort of injury going on that would make the

5    muscles tender.

6    Q    It produces pain?

7    A    Yes.

8    Q    And limited range of motion sounds pretty generic, but tell

9    the jury what that means, limited range of motion secondary to

10   pain.

11   A    So range of motion is how much someone can move a particular

12   body part that we're looking at.  So there's two reasons why

13   someone could have limited range of motion.  It could simply be

14   that it doesn't go there anymore, but it doesn't hurt.  It just

15   won't move.  So it's fused or it's stiff or whatever.  And then

16   there's range of motion that provokes pain and therefore doesn't

17   go through the full extent that we would expect it to.

18        So in his particular instance when I asked him to bend

19   and do various things with his back, he complained of pain when

20   doing it.  So it decreased how much he could do.

21   Q    I promise I'm going to speed it up right here, but that's a

22   check.  He had positive back pain on that day, correct?

23   A    Yes.

24   Q    The next day he goes to his family doctor, Dr. Segar, and

25   with Dr. Segar he complains of neck and back pain, correct?

1    A    Yes.

2    Q    The next day, November 28th, 2018 -- and that last one was

3    Exhibit A3, but A7 he comes back to you again, Dr. Muldowney, and

4    you do an exam the same year as the accident, November 28th,

5    2018, and what does that exam reveal for the lumbar spine?

6    A    He continues to have mild tenderness over the lumbar area

7    with limited range of motion.

8    Q    Again, indications of pain and injury ongoing?

9    A    Yes.

10   Q    That's a check, correct?

11   A    Yes.

12   Q    Next, fast-forward to September 11th, 2019, the next year,

13   Dr. Muldowney.  He comes back to see you, still A7, and what is

14   his lumbar exam at that time?

15   A    I'm sorry.  What was the date again?

16   Q    It's on the screen.  September 11th, 2019.

17   A    Yes.  He was complaining of mild tenderness over the lower

18   lumbar area with limited range of motion.

19   Q    So that's a check of ongoing back process and back pain,

20   correct?

21   A    Yes.

22   Q    Next, a month later, October 15th, 2019, still Defendants'

23   A7, he comes back to see Dr. Muldowney.  What's the review of

24   symptoms then?

25   A    He complained of back pain.

1    Q    That's a check, correct?

2    A    Yes.

3    Q    Next, he goes back to see you again a month later,

4    November 12th, 2019, still A7.  Explain what the findings were on

5    exam for that visit.

6    A    The exam findings were mild tenderness over the lower lumbar

7    area with limited range of motion.

8    Q    That's a check for ongoing injury and back pain, correct?

9    A    Yes.

10   Q    The next visit is, I guess, four months later on March 11th,

11   2020.  He comes to see you.  Still Defendants' A7.  And what is

12   the exam and review of symptoms that day of the lumbar spine?

13   A    The review of symptoms indicates back pain.

14   Q    And that's a check as well, correct?

15   A    Yes.

16   Q    One month later or less than a month, April 8th, 2020, he

17   comes back to see you again, Defendants' A7, and he again

18   complains of joint stiffness, muscle pain, and back pain,

19   correct?

20   A    Yes.

21   Q    Another check, correct?

22   A    Yes.

23   Q    Then on June 10th, 2020, two months later, back to see you

24   again.  Defendants' A7.  And tell me about the review of symptoms

25   and the exam on that date.

```
1    A    The review of symptoms indicate that he complains of joint
2    stiffness and back pain.  The physical exam showed mild
3    tenderness over the lower lumbar area and limited range of motion
4    secondary to pain.
5    Q    And I know there's to be some discussion about his midback
6    versus his upper back versus his low back.  Every one of these
7    exams where you talk about lumbar, that's only the low back,
8    right?
9    A    Correct.
10            THE COURT:  Mr. David, are you at a good stopping
11   point?  We've been going over an hour and a half.
12            MR. DAVID:  Yes, sir.  Sorry about that.  Thank you.
13            THE COURT:  Well, I'm trying to find a right time to do
14   it, and I don't want to interrupt at the wrong time.
15            Why don't we go ahead and give the jury about ten
16   minutes to stretch their legs and rest and we'll deal with any
17   matters we need to do out of their presence.
18            MR. DAVID:  Thank you, Your Honor.
19            THE COURT:  All rise for the jury.
20                   (Jury Exited the Courtroom)
21            THE COURT:  Let me see counsel up here.
22                   (Off the Record)
23            THE COURT:  We'll take a brief recess.
24                   (Recess)
25            THE COURT:  Please be seated.
```

1          THE COURT:  Ready to call the jury in and proceed?

2          MR. DAVID:  Yes, sir, Your Honor.

3          THE COURT:  All right.  Let's go ahead and bring them

4     in.

5               (Jury Entered the Courtroom)

6          THE COURT:  Okay.  Everybody may be seated.

7          Mr. David.

8          MR. DAVID:  Thank you, Your Honor.  I'm going to try to

9     speed it up a little bit faster.  I have my trusty partner, Reed,

10    going to be checking the boxes for us so we can make sure we have

11    that down.

12    BY MR. DAVID:

13    Q    Dr. Muldowney, we were talking about June 10th, 2020, about

14    two years after the accident.  Defense Exhibit A7.  And on that

15    day you did an exam of Mr. Bradley's lumbar spine and it was

16    positive as well, correct?

17    A    Yes.

18    Q    And limited range of motion as well?

19    A    Yes.

20    Q    Ongoing back pain and process of injury even two years and

21    two months post-accident, correct?

22    A    Yes.

23    Q    The next day is September 8th, 2020.  He comes back to see

24    you -- Defendants' A7 -- and he complains of back pain, correct?

25    A    Yes.

1   Q    Then December 8th, 2020, he comes back to see you.  Same

2   exhibit.  Again, tenderness over the lower lumbar area, limited

3   range of motion, and then again there's actually two different

4   notes of lumbar exam for the low back.  We talked about the

5   continuing injury process, correct?

6   A    Yes.

7   Q    Then the next year, January 13th, 2021 -- and this is a

8   little bit of a shift because he comes in with a chief complaint

9   of low back pain on that date, correct?

10  A    Yes.

11  Q    And really from this point forward, the back pain becomes

12  the focus and the neck treatment you have kind of becomes

13  secondary.  Is that a fair assessment?

14  A    Yes.

15  Q    Same with the upper and midback?

16  A    Yes.

17  Q    And, in fact, he comes to see you one month later again

18  talking about his low back pain.  It's seven out of ten.  Again,

19  he has joint stiffness and the neck -- that's February 24th,

20  2021.  He goes to see Dr. Weir and talks about his persistent

21  back pain as well.  That's Defendants' A8C and a plaintiff's

22  exhibit as well.

23         MR. DILL:  Judge, he's just reading.

24         MR. DAVID:  I was trying to go faster.

25         THE COURT:  You can refer to the document, and if you

1   need it in the record, you can have him read it.

2           MR. DAVID:  Okay.  Thank you.

3   BY MR. DAVID:

4   Q    Based on the record before you with Dr. Weir, he complains

5   of neck and back pain as well, correct?

6   A    Yes.

7   Q    And the lumbar spine is mildly tender, correct?

8   A    Yes.

9   Q    And then the next visit that you'll see on the screen, which

10  is Defense Exhibit B1, is Dr. Bertuccini's record, correct?

11  A    Yes.

12  Q    When he sees Dr. Bertuccini, the defendant's doctor, he

13  talks about his low back pain in the bilateral buttocks and seven

14  out of ten pain, correct?

15  A    Yes.

16  Q    And the same going forward.  From May 21st, 2021, with you,

17  more back complaints, correct?

18  A    Yes.

19  Q    And that same day he goes to physical therapy for his back,

20  correct, Defense Exhibit A16?

21  A    Yes.

22  Q    Follows up again with Weir, which is A8C, for his persistent

23  back pain and tenderness?

24  A    Yes.

25  Q    Back to see you in July and September of 2021, A7.  Positive

```
 1    findings on exam.  And I think we're getting around the time --

 2    well, before this he actually had a lumbar epidural steroid

 3    injection as well, correct?

 4    A    Yes.

 5    Q    Kind of like the cervical epidural steroid injections, but

 6    in the lumbar?

 7    A    Yes.

 8    Q    And then again on October 4th, 2021, he sees Dr. Weir.

 9    The record in front of you is Plaintiff's Exhibit 7, correct?

10    A    Yes.

11    Q    And then October 19th, back to you again for low back

12    pain, Defense Exhibit A7.  Do you see that in front of you?

13    A    Yes.

14    Q    The next page actually has the exam as well, the positive

15    findings on exam.  And at this point this is -- you had

16    recommended surgery in the summer of 2021, but it got postponed.

17    Why was that?

18    A    He had some medical issues that needed to be clarified

19    before he could undergo surgery.

20    Q    Some kidney problems?

21    A    I believe so, yes.

22    Q    He went to see a nephrologist and someone else about those

23    issues?

24    A    He went to whoever he needed to go to.  I don't recall the

25    details of it.
```

```
1    Q    Fair enough.
2              Moving forward.  On October 28th, 2021, he goes to
3    Acadiana Vascular and complains of back pain, Defense A20,
4    correct?
5    A    What's the date?
6    Q    This is October 28th, 2021.  The top left corner is where it
7    has the date.  Exhibit A20.
8              This is not you.  I'm sorry.  This is Acadiana
9    Vascular.  The screen in front of you is the exhibit.
10   A    Okay.  It was the date that was confusing me.
11             I see.  Okay.  October 28, 2021.  Yes.
12   Q    And I know that was long and laborious, but it was important
13   because I wanted to make sure that you relayed -- you confirmed
14   that the injury process in his low back started the day of the
15   accident and continued all the way through his surgery and to
16   today, correct?
17   A    Yes.
18   Q    And that's why it's a pretty easy feat to relate his low
19   back symptoms to this accident, correct?
20   A    Yes.
21   Q    And the surgeries you performed and the surgeries he's going
22   to need in the future?
23   A    Yes.
24   Q    And I know at some point when you -- the shift focused in
25   January of 2021 to active treatment of his low back to figure out
```

1    how you could solve that problem.  You and I met sometime, I

2    think, around March or so of '21, and I brought all of these

3    exact same records to you just to show you the history, the

4    ambulance, the hospital and some of the doctors that you weren't

5    familiar with, correct?

6    A    Yes.

7    Q    You also treated Wilfred Bradley for his headaches from

8    early on after the accident until you referred him to Dr. Weir,

9    correct?

10   A    Correct.

11   Q    And we have another headache log, and I don't want to spend

12   too much time, but the first one is Defense Exhibit A5 at the

13   hospital the day of the accident, patient reports headaches?

14   A    Yes.

15   Q    And then do you see your visit of October 2nd, 2018, defense

16   exhibit A7, he complained that his neck symptoms exacerbated by

17   his moderate headaches; is that correct?

18   A    Yes.

19   Q    And again I'm going to quickly say these.  In November of

20   2019 -- go ahead.  Wait.  This is Bertuccini.  I'm sorry.

21   Bertuccini sees the doctor for the defense and on May 22nd, 2019,

22   Defense Exhibit B1, he experiences approximately two headaches by

23   varying intensity weekly documented there, correct?

24   A    Yes.

25   Q    And then with you in September of '19, November of '19, and

1    June of '20, 87, we just -- we're quickly going through those.

2    You document the patient is complaining of headaches, correct?

3    A    Yes.

4    Q    And then at that point you referred him to Dr. Weir, a board

5    certified neurologist here in town, to take care of his

6    headaches?

7    A    Correct.

8    Q    Why did you refer him to Dr. Weir for headaches?

9    A    Well, my initial thought was that these were probably

10   cervicogenic headaches, but then I began to suspect they may have

11   been more post-traumatic in nature and they hadn't resolved.  So

12   at that point I felt it was appropriate to refer him to a

13   neurologist.

14   Q    And at the time you referred him, it was over two years

15   post-accident, correct?

16   A    Yes.

17   Q    By that point that headache condition is chronic?

18   A    Yes.

19   Q    You treat cervicogenic and post-traumatic headaches all the

20   time in your practice as an orthopedic doctor, correct?

21   A    Yes.

22   Q    And headaches that have gone on for that long, are they more

23   likely than not to continue going?

24   A    I would think so, yes.

25   Q    And they're going to need active treatment going forward,

1   correct?

2   A    Yes.

3   Q    And he sees Dr. Weir going forward.  I don't want to belabor

4   the point, but from that point forward through today he's been

5   treating with you and Dr. Weir and even Dr. Savant documenting

6   his continued headache problems?

7         MR. DILL:  Your Honor, I'm going to make an objection.

8   Sidebar, please?

9         THE COURT:  Yes.

10   (Whereupon, a sidebar conference was had as follows:)

11         MR. DILL:  He's trying to get in future medical care

12   for a headache that he doesn't have in his records or Dr. Weir's

13   records that you excluded Dr. Weir from testifying under the

14   Rule 26 stuff.  I'm going to object, Your Honor.  He's trying to

15   pull it in that way.

16         MR. DAVID:  Well, first of all, he said that Dr. Weir

17   could testify as to what's in his reports.  He can testify as to

18   what's in his records and in his deposition.  Second, he's been

19   treating him for his headaches for four and a half years.

20         MR. DILL:  He doesn't say anything about future medical

21   care of a headache in his reports.

22         THE COURT:  Dr. Muldowney.

23         MR. DILL:  Dr. Muldowney.

24         MR. DAVID:  But he's reviewed the entire life care

25   plan.  He's already referred to Dr. Weir.  He's the one who's

1    still documenting headaches.

2            THE COURT:  Point to me to where this has been

3    disclosed before.

4            MR. DAVID:  It's disclosed in Stokes' report, future

5    headache treatment, but that's (unintelligible) Dr. Weir and that

6    was all done timely.

7            MR. DILL:  He's trying to bootstrap Dr. Muldowney's

8    testimony to Dr. Stokes' report about Dr. Weir.

9            MR. DAVID:  Your Honor, I'm trying to make sure I can

10   connect the dots for the life care plan in this case which this

11   guy needs.

12           THE COURT:  The objection is sustained.

13        (Whereupon, the sidebar conference was concluded.)

14           THE COURT:  You may proceed subject to the Court's

15   rulings.

16           MR. DAVID:  Thank you, Your Honor.

17   BY MR. DAVID:

18   Q    I do want to talk some about Wilfred Bradley's current

19   condition and how he's doing.  What limitations does he have

20   going forward based on the two surgeries you've had and your

21   treatment of his head, neck, midback, low back, and upper back?

22   A    I would expect him to be limited to light duty type

23   activities that don't involve lifting more than 10, frequently 10

24   to 20 pounds occasionally.  No bending, stooping, crawling,

25   climbing.  So pretty much common sense kind of things after

1    someone's had back and neck surgery.

2    Q    You didn't tell him don't ever bend back in the end of 2018

3    or early 2019, did you?  There would have been no reason to tell

4    him that back then?

5    A    No.

6    Q    And you met with Dr. -- or Mr. Stokes, Mr. Larry Stokes, a

7    vocational counselor and a life care planner, to talk about

8    Mr. Bradley's limitations physically for work and also about his

9    future treatment, correct?

10   A    Yes.

11   Q    And you reviewed Dr. Stokes' report in this matter?

12   A    Yes.

13   Q    And all the recommendations you have for Dr. Stokes,

14   including adjacent level surgery, including labs, x-rays, lumbar

15   spine and cervical spine MRIs, physical therapy, anything that

16   you told Dr. Stokes in your reports with him you find medically

17   reasonable and likely to occur in the future, correct?

18   A    Yes.

19   Q    And all of that is related to this accident, correct?

20   A    Yes.

21   Q    And did you review the entirety of Mr. Stokes' report?

22   A    Very briefly.  I was not sent that until recently.

23   Typically what they do is he sends me a concise summary of the

24   things that I've told him and I sign off on that and then he

25   prepares the formal report which includes a lot of other stuff

```
 1   besides what I say.  So, yes, I have reviewed it, but not
 2   in-depth.
 3   Q    And everything that you sign on the document with Larry
 4   Stokes are things you recommended and he incorporated into that
 5   report, correct?
 6   A    Correct.
 7   Q    And I don't want to belabor the point, but I want to make
 8   sure we have our bases covered with Mr. Stokes.
 9        You gave Mr. Stokes lots of recommendations on therapy,
10   on all the pre- and post-surgical treatment from general
11   practitioner to help in his home, recovering from surgery in the
12   future, things like that, household help.  All of those items you
13   said are reasonably necessary and more likely than not to occur
14   in the future, correct?
15   A    Yes.
16   Q    Anything other than what you've told Mr. Stokes and he
17   included in your report that you reviewed, anything else that you
18   think he needs in the future going forward?
19        MR. DILL:  Objection, Your Honor.  It's beyond the
20   report.
21        MR. DAVID:  I'll withdraw the question.  I'll withdraw
22   the question, Your Honor.
23        THE COURT:  All right.  Subject to you withdrawing the
24   question, the Court will overrule the objection.
25   BY MR. DAVID:
```

```
 1   Q    During the course of your treatment with Mr. Bradley, was he
 2   ever restricted from driving in 2018 or 2019 or going to the
 3   store?
 4   A    No.
 5           MR. DAVID:  Your Honor, I think that's all the
 6   questions I have.
 7           THE COURT:  Very good.
 8           Mr. Dill, you may conduct cross when ready.
 9           MR. DILL:  Thank you.
10                        CROSS-EXAMINATION
11   BY MR. DILL:
12   Q    Dr. Muldowney, if you could look at February 27th in your
13   records.
14           MR. DILL:  And, Mr. Don, if you could pull up 0755.
15   BY MR. DILL:
16   Q    Doctor, in the center of that page, you can see it on the
17   screen, Mr. Bradley was referred to you by Mr. Simien, an
18   attorney here in town?
19   A    Yes.
20   Q    Thank you.  I'm going to go ahead and go through these
21   quickly.
22           MR. DILL:  Mr. Don, 0442.
23   BY MR. DILL:
24   Q    February 27th, 2018, was your first visit with
25   Mr. Bradley, correct?
```

1   A    Yes.

2          MR. DILL:  And at the bottom of the page, Mr. Don, if

3   you could blow up the last paragraph.

4   BY MR. DILL:

5   Q   He continued to complain of significant neck pain, midback

6   pain, and left leg pain, correct?

7   A    Yes.

8   Q   You did not mention lumbar pain in that paragraph, did you?

9   A    No.

10  Q   In fact, in that report you didn't diagnose him with any

11  lumbar pain, did you?

12  A    No.

13         MR. DILL:  If you could go to the next page, 0443,

14  please, Mr. Don.  0443.  And if you could blow up on neurologic,

15  this area right here.

16  BY MR. DILL:

17  Q   Did he complain of any headaches on that date?

18  A   I'm not sure from what you're showing me.

19         MR. DILL:  I'm sorry, Mr. Don.

20  A   He denied dizziness and headaches.

21  BY MR. DILL:

22  Q   All right.  So you asked him if he had any dizziness and

23  headaches and he denied that, correct?

24  A    Well, it's not quite that simple because it's something that

25  he checks off on a form, and if he doesn't check it off, then

1    it's assumed it was negative.  I don't think he was affirmatively

2    asked whether he had headaches or not and answered no.  It's sort

3    of a lack of a yes answer and indicates a denied response in this

4    particular section of the report.

5    Q    All right.  And he also did not check that he had any

6    anxiety or depression, correct?

7    A    Correct.

8         MR. DILL:  If you could blow up the bottom of the page

9    here, Mr. Don.

10   BY MR. DILL:

11   Q    You actually did an examination of his lumbar spine on that

12   day?

13   A    Yes.

14   Q    And you found there was no significant tenderness to

15   palpation, his range of motion, no significant limitation of

16   forward flexion, correct?

17   A    Correct.

18   Q    In fact, it was a normal exam, correct?

19   A    Yes.

20        MR. DILL:  And if we could go to 0444.

21   BY MR. DILL:

22   Q    On that exam, Doctor, on that date you diagnosed him with a

23   sprain of the neck, cervical spine, correct, sprain of the

24   thoracic spine?

25   A    Yes.

1    Q    And a contusion of the left lower leg, correct?

2    A    Yes.

3    Q    You didn't do any x-rays of his lumbar spine, did you?

4    A    I did not.

5    Q    If he had made any complaint whatsoever of his lumbar spine,

6    you would have run an x-ray on him, wouldn't you?

7    A    More than likely, but if he had a previous CT scan, which

8    turns out he did, I probably wouldn't have, but it wasn't an

9    issue that came up.

10           MR. DILL:  Mr. Don, if I could have number 3340 from

11   Dr. Henderson's records.

12   BY MR. DILL:

13   Q    You knew he saw Dr. Henderson.  Did you get a copy of the

14   diagram that he had done for Dr. Henderson on February 28th of

15   2018?

16   A    No.

17   Q    And on that diagram you would agree he didn't indicate that

18   he had any complaints in his lumbar spine, correct?

19   A    Correct.

20           MR. DILL:  Mr. Don, if I could have 0730 from

21   Performance Physical Therapy on March 1st, 2018, and if you

22   could blow up the paragraph under subjective findings.

23   BY MR. DILL:

24   Q    And, Doctor, here we see his present chief complaint is pain

25   in the chest, front of neck, behind his neck, upper back, and a

```
1    contusion to the left shin and left lower leg area, correct?
2    A    Yes.
3              MR. DILL:  0735, please, Mr. Don.
4    BY MR. DILL:
5    Q    And in that same report in the middle of the page here, he
6    indicates that the lumbar AROM -- would that be active range of
7    motion, Doctor?
8    A    Yes.
9    Q    And what does he indicate at Performance Physical Therapy in
10   March of 2018?
11   A    That it is normal and pain free.
12   Q    Doctor, when a patient comes to you and complains of pain,
13   how is it that you go about causally relating something to an
14   event?
15   A    It generally requires some temporal relationship between the
16   event and the onset of the symptoms.  It's not necessarily
17   immediate because things change and it sometimes takes a little
18   bit of time for symptoms to develop, but ultimately you have to
19   trace it back to something that happened shortly after the
20   accident to really consider that it came from the accident.
21   Q    So there's a period of time that will pass and at some point
22   you're going to say, okay, I really can't relate it, right?
23   A    Correct.
24   Q    What's the magic number?
25   A    Well, I don't really know the answer to that.  I think
```

1   within a few weeks would be probably the most that I would say

2   that if someone is not having symptoms, then it would probably

3   not be related -- unless something happens.  I mean, I've had

4   instances where someone has gone to therapy for a particular

5   problem, and then they say when I was in therapy, I had this

6   happen and then something else.  So there can be secondary events

7   that are the direct result of the initial event, but not the

8   event itself that can lead to additional problems, but I think I

9   would say within a month that the symptoms, if they're directly

10  to the accident, should be present.

11  Q    You see patients with herniated discs in their lumbar spine

12  and their cervical spine for that matter that haven't been in car

13  wrecks, right?

14  A    Yes.

15  Q    Is that pretty common?

16  A    Yeah.  I think it is fairly common.  Not everybody is in a

17  car accident and they have neck and back problems for sure.

18  Q    Are there studies out there that have studied the

19  asymptomatic population and done MRI scans on their spines to see

20  what the incidence of disc pathology, positive disc pathology,

21  would be in a normal asymptomatic population?

22  A    Yes.

23  Q    Mr. Bradley was 49 at the time of this accident.  What

24  percentage of the population who's asymptomatic would have in

25  their lumbar spine some kind of finding on an MRI a bulge or a

1    herniation?

2    A    I'm not sure what the exact statistic would be for a

3    49-year-old, but anybody over age 30 would have a fairly large

4    chance of having something on their MRI that we would consider

5    potentially significant.

6    Q    And by fairly large, more than 50 percent, right?

7    A    I don't know if it would be more than 50 percent, but it's

8    more as we get older for sure.  So, you know, for example, it

9    would be very rare to have a 70-year-old to not have some

10   abnormality on their MRI.  It would be very rare for a

11   ten-year-old to have an abnormality.  So there's a spectrum.  And

12   at 30 -- I can't recall exactly what the percentage was at age

13   30.  I think it was like 30 percent of people at age 30, and then

14   it would progressively increase as you get older.

15   Q    And heavy manual labor, it tends to be more aggressive in

16   the lumbar spine in causing problems, correct, or degeneration?

17   A    Well, I don't know that we can really say that.  There was a

18   twins study that was done in -- a multi-center, multi-year study

19   that looked at identical twins and followed them for 50 years.

20   It was started, I think, in the '50s maybe.  It's been a long,

21   long study.

22          So one of the things they looked at was degeneration in

23   the spine, and the theory being, okay, we have these identical

24   twins and one of them did one thing and the other one did

25   something else, had different life experiences.  We would expect

```
 1    to see a difference in the degeneration or these types of
 2    findings in their spine, and what they found is that they were
 3    remarkably similar no matter what they had done or what had
 4    happened to them.
 5              So they concluded that 60 percent of these types of
 6    findings are genetic in nature and the other 40 percent may be --
 7    so, yes, there could be some accident or trauma or repetitive
 8    kind of thing that could contribute to it, but it's probably not
 9    the driving factor in whether these things are there or not.
10              MR. DILL:  Mr. Don, could I have 0109, please,
11    Lafayette General Medical Center, and in the center of the page
12    under History of Present Illness, if you could blow that whole
13    paragraph up.
14    BY MR. DILL:
15    Q    Actually, Doctor, this is the ER doctor's notes here.  Could
16    you tell us -- here in the middle it says:  Patient reports
17    headache, neck pain, right hand pain, and upper back pain.  Did
18    you see that in the ER records?
19    A    I don't recall specifically seeing that line.
20    Q    There's a difference between the midback and the lower back,
21    right?  They teach you guys that in med school pretty early on
22    I'm guessing, right?
23    A    Yes.
24    Q    So where the back pain is is very significant when we're
25    looking at these records, right?
```

1    A    Yes.

2            MR. DILL:  Mr. Don, could I have 0391, and if you could

3    blow up the center right where your -- right there.

4    BY MR. DILL:

5    Q    He went to the ER at Mercy.  These are from Mercy Hospital

6    in Eunice and this one is dated 2/24/2018, Doctor.  On this do

7    you see that there's any complaint of back pain at the ER at

8    Mercy?

9    A    No.

10   Q    I'm sorry.  I didn't hear your response, Doctor.

11   A    I'm sorry.  No.

12   Q    Thank you.

13           I ask you these questions, Doctor.  On December 11th of

14   2020, you wrote a little note about speaking with Mr. Bradley --

15   and I apologize.

16           MR. DILL:  Could I have the ELMO, please.

17   BY MR. DILL:

18   Q    This is a note you prepared, correct?

19   A    Yes.

20   Q    And on December 11th of 2020, you wrote:  He never

21   addressed it with reference to low back pain with you, he thought

22   it was coming from his midback, correct?

23   A    Yes.

24   Q    And so he recently began to feel pain extending from the

25   midback to his low back.  That's in December of 2020 when the low

```
 1    back issue develops, correct?
 2              MR. DAVID:  Object to form.  I'm sorry.  I withdraw the
 3    objection, Your Honor.  I'm sorry.
 4              THE COURT:  You may proceed.
 5              THE WITNESS:  Could you repeat the question, please?
 6    BY MR. DILL:
 7    Q    Yes, sir.
 8              When you wrote this note, this is when the low back
 9    pain began to develop?
10    A    Well, it's hard to say for sure.  It's when he began
11    describing it as coming from his low back.  So the implication
12    from this is that it was hurting there, but he was describing it
13    as midback pain, but it was really more low back pain.
14    Q    That's what you're saying in this note?
15    A    That's what he told me, yes.
16    Q    Was that a meeting with him or with his lawyer?
17    A    I spoke with the patient.  So it was -- I don't know if it
18    was a meeting or whether we spoke on the phone, but it was with
19    the patient.
20    Q    But none of your reports prior to that indicated he was
21    having low back pain that you recorded, correct?
22    A    Other than the physical examinations and the review of
23    systems sections where he indicated back pain, that's correct.
24    It was not vocalized as a primary complaint earlier on.
25              MR. DILL:  All right.  Could I have 0446, please,
```

1    Mr. Don.

2    BY MR. DILL:

3    Q    He comes to you on March 27th of 2018 and on that date up

4    at the top what did he present with complaints of pain about?

5    A    With neck pain.

6    Q    No mention of lumbar pain?

7    A    No.

8    Q    He rated the pain as a three of ten?

9    A    Yes.

10   Q    How does that go about?  How do you do that?  How do you

11   decide what number to ascribe?

12   A    The patient gives it to us.

13   Q    Is it on a chart with a body or is it just they fill out a

14   number?

15   A    Normally my nurse asks them on a scale of one to ten what

16   would their pain be with zero being no pain and ten being severe

17   pain and they provide a number and my nurse records it.

18   Q    On this particular visit, what did he indicate his midback

19   pain was?

20   A    It was a zero out of ten.

21   Q    Which means no pain, correct?

22   A    Correct.

23   Q    And he also indicated that the left leg pain had gotten to a

24   zero of ten, correct?

25   A    Yes.

1   Q    At the bottom of the page you indicate overall his mood and

2   affect were normal?

3   A    Yes.

4         MR. DILL:  0447, please, Mr. Don.

5   BY MR. DILL:

6   Q    All right.  And up on the left side in the Review Of

7   Systems, again there was no indication of any headache, correct,

8   Doctor?

9   A    Correct.

10  Q    And there was no indication of any anxiety or depression?

11  A    Correct.

12        MR. DILL:  Mr. Don, if I could have 0449, please.

13  BY MR. DILL:

14  Q    Chief complaint up at the top, first paragraph, please.

15  A    Neck pain, midback pain.

16  Q    And he rated his neck pain as a four of ten?

17  A    Yes.

18  Q    And he told you he was not working at the time due to the

19  injury?

20  A    Yes.

21  Q    He indicated the pain occurred in the morning?

22  A    He indicated it was exacerbated by morning stiffness and

23  driving -- and I'm sorry.  The pain occurs in the morning.  I see

24  that now.

25  Q    And what did he indicate alleviated the pain?

1    A    Exercise.

2    Q    Do you know what kind of home exercises he was doing at that

3    time?

4    A    What date is this again?

5    Q    April 24th of 2018.

6    A    I sent him to physical therapy.  So I assume it's exercises

7    from the physical therapist that they taught him.  I don't know

8    that for a fact, though.  I'd have to look to see if he had seen

9    a therapist by then.

10   Q    You've gotten to know him over the last four years and know

11   that he was a guy who did high intensity workouts at some point

12   in his life?

13   A    Yes.

14   Q    Do you know if he had gotten back to that at this point?

15   A    I don't know.

16        MR. DILL:  All right.  0450, please, Mr. Don.

17   BY MR. DILL:

18   Q    Again, on that April 24th visit on the left side, Review

19   of Symptoms, he didn't report any headaches, dizziness, or any

20   anxiety or depression, correct?

21   A    Correct.

22        MR. DILL:  0451, please, Mr. Don.  And if you could

23   blow up Plan.

24   BY MR. DILL:

25   Q    Doctor, can you tell me what he told you on that day about

1    his maintaining an activity?

2    A    That as long as he maintains some sort of activity level --

3    and I think that should say on a daily basis -- as well as his

4    activities of daily living, the pain seems to be somewhat

5    tolerable.  It never goes away, but seldom becomes severe.  The

6    home exercises and formal physical therapy have been ineffective

7    in eliminating his symptoms.

8    Q    Thank you.

9         MR. DILL:  0452, please, Mr. Don.

10   BY MR. DILL:

11   Q    On May 2nd, 2018, he again comes back and he was

12   continuing to complain of pain, correct, in his neck?

13   A    Yes.

14   Q    It did not radiate into his arms, correct?

15   A    Correct.

16   Q    And up to this point he had no radiating pain into his arms,

17   correct?

18   A    Correct.

19        MR. DILL:  0453, please, Mr. Don.

20   BY MR. DILL:

21   Q    And on the Review of Systems, again, Doctor, did he complain

22   of headaches on that date?

23   A    He did not.

24   Q    All right.  Did he complain of anxiety, depression, or

25   memory loss on that date?

```
 1   A    No.
 2   Q    Did you give him -- I'm sorry.
 3            MR. DILL:  Can you cancel out of that, please, Mr. Don.
 4   BY MR. DILL:
 5   Q    And if you could tell me, did you give him any prescriptions
 6   at that time?
 7   A    No.
 8   Q    Had you been giving him prescriptions all through here,
 9   Doctor?
10   A    I'd have to look three each one to see.  I know he did not
11   take much in the way of prescriptions throughout my entire
12   treatment.  So if I did, it wasn't much.
13   Q    Doctor, if I continue on with these, that pretty much stays
14   the same for over a year, correct, that he didn't indicate any
15   headaches?
16   A    I'd have to look at each one, but I accept your word for it.
17            MR. DILL:  0456, please, Mr. Don.
18   BY MR. DILL:
19   Q    On June 26, 2018, you saw him.
20            MR. DILL:  And can you blow up the chief complaint
21   history.
22   BY MR. DILL:
23   Q    On that date he rated his pain as a one, didn't he, Doctor?
24   A    Yes.
25   Q    Did he complain of any back pain?
```

```
1    A    No.

2    Q    So he had a zero of ten on the back pain on that day,

3    correct?

4    A    Well, its' not mentioned.  So I don't -- yeah.  There it is.

5    Zero out of ten.

6              MR. DILL:  0457, please, Mr. Don.

7    BY MR. DILL:

8    Q    Review of Systems, top left.  And again on this date,

9    Doctor, he denied dizziness and headache and anxiety and

10   depression, right?

11   A    Yes.

12   Q    Doctor, in your visits with him, your physical examination

13   of him was normal, correct?  He had complaints of pain, but you

14   didn't find any sensation issues, any reflex issues, any of that

15   when you examined his neck?

16   A    Correct.

17             MR. DILL:  All right.  Mr. Don, 0459, please.  Chief

18   complaint.

19   BY MR. DILL:

20   Q    This is July 25th, 2018, Doctor.  Can you tell us what his

21   complaints were that day?

22   A    Neck pain radiating into the top of his shoulders.  Neck

23   pain is rated a five out of ten.  Posterior cervical.

24   Q    This is a post-injection visit, correct, Doctor?

25   A    Yes.
```

296

```
 1    Q    So on this visit he was -- it was how long post-injection?
 2    A    About a month or a little bit over a month.
 3    Q    And what did he tell you about the effect of the injection
 4   that he had gotten?
 5    A    It lasted about a month and that now he's kind of back to
 6   the way he was before the injection.
 7    Q    So for that month he was pain free from the neck, correct?
 8    A    I don't think he was pain free, but he was much reduced in
 9   pain.
10         MR. DILL:  0460, Mr. Don.  Review of Symptoms on the
11   left side.
12   BY MR. DILL:
13    Q    He denied numbness, tingling, burning, tremors, dizziness,
14   and headaches on that day, Doctor?
15    A    Yes.
16    Q    And he denied anxiety and depression and memory loss, right?
17    A    Yes.
18    Q    So, Doctor, at this point we're eight months -- or six
19   months past the accident, right?  So the temporal relation for
20   headaches is gone, right?
21    A    Not necessarily because he has neck issues and headaches can
22   come from cervical issues.  It's not necessarily something that
23   would be present right away.
24         MR. DILL:  All right.  0463, please, Mr. Don.  And if
25   you could give me the second paragraph.
```

1    BY MR. DILL:

2    Q    He had another injection, correct?

3    A    Yes.

4    Q    And on that date what were his complaints?

5    A    He had neck pain.  He rated it a two to three out of ten

6    which he described as constant stiffness and it was exacerbated

7    by turning his head from left to right.

8              MR. DILL:  0464, please, Mr. Don.  Review of Systems.

9    BY MR. DILL:

10   Q    On that date, Doctor, did he indicate if he had any

11   headaches?

12   A    No.

13   Q    And again no anxiety or depression?

14   A    Correct.

15             MR. DILL:  0466, please, Mr. Don.  Chief complaint,

16   please.

17   BY MR. DILL:

18   Q    On that date he was a four or five out of ten on his neck?

19   A    Yes.

20   Q    And he indicated it was now worsened, correct?

21   A    Yes.

22   Q    At this time, Doctor, around this visit and the last visit,

23   do you know whether or not he was having any range of motion

24   issues with his neck?

25   A    Other than some discomfort when he turns his head from side

1    to side.  I don't know that he was having any specific limitation

2    as a result of it.

3              MR. DILL:  0467, please.  Review of Systems.

4    BY MR. DILL:

5    Q    Again he denied headaches and anxiety and depression?

6    A    Yes.

7    Q    And that was October 2nd, 2018, Doctor?

8    A    Yes.

9              MR. DILL:  And let's just go to 0655.

10   BY MR. DILL:

11   Q    And this is on October 31st, 2018, correct, Doctor?  And

12   on the Review of Systems, again he denies headache and dizziness,

13   anxiety and depression, correct?

14   A    Yes.

15   Q    I'm going to go ahead and skip forward.  I think we've

16   covered those enough.

17              In January of 2019 you saw him on the 29th.

18              MR. DILL:  0476.  At the top, MRI.

19   BY MR. DILL:

20   Q    Doctor, he had an MRI of his cervical spine and you put it

21   up earlier and showed everyone.  The bulge that he had was small,

22   wasn't it?

23   A    Yes.

24   Q    But it didn't impinge into the foramina, correct?

25   A    I thought it did a little bit on the left, but it was

1  probably still patent enough that I wouldn't call it stenotic.

2  Q    Let's break that down a little bit so that we're all on the

3  same page.  Through the foramina the nerve roots exit in the

4  cervical spine, correct?

5  A    Yes.

6  Q    And what we're talking about is if the disc pushes on that

7  nerve root, it can cause pain somewhere else, correct?

8  A    Usually down the distribution of that nerve, yes.

9  Q    And at the level that we're talking about, where would that

10 pain go?

11 A    Into the shoulder or upper arm area, the C-4 nerve root.

12 Q    And when you said that the level was patent, what does that

13 mean?

14 A    Probably not narrowed enough that it was causing pressure on

15 the nerve.

16 Q    And you weren't seeing what you considered to be radicular

17 complaints on him at that time, were you?

18 A    No.

19 Q    So when you made the decision to go forward with the

20 surgery, it was essentially for pain, correct?

21 A    Yes.

22 Q    And pain is subjective, correct?

23 A    Yes.

24 Q    So you did the surgery on his neck and how did he do

25 post-surgery?

```
 1   A    Ultimately he did very well.  He had a substantial reduction

 2   in his symptoms.

 3   Q    Did those symptoms return, Doctor, later on in his

 4   treatment?

 5   A    I don't recall them returning to the extent that they were

 6   there before.  He may have developed some additional symptoms.

 7   Q    Now, I do want to get -- and I don't want to go too much

 8   longer.

 9            Eventually you ended up doing a lumbar surgery on him

10   as well and something caught my eye because you -- I need to get

11   to January of 2021, I believe, Doctor.  Do you have that?  When

12   did you perform the surgery?

13   A    On November 1$^{st}$, 2021.

14   Q    All right.  He returned after the surgery.

15            MR. DILL:  And if we could get to 5153, please,

16   Mr. Don, and under Plan.

17   BY MR. DILL:

18   Q    After that surgery, Doctor, he came to you and he indicated

19   he was doing well, correct?

20   A    Yes.

21   Q    He was walking two and a half miles every day, correct?

22   A    Yes.

23   Q    And he asked you if he could run, didn't he?

24   A    Yes.

25   Q    That's a no-no after a back surgery, isn't it?
```

1    A    It's certainly not something that I'm typically asked this

2    time after surgery to be honest.  It's not something I would

3    recommend after back surgery at this stage.

4    Q    Is running one of those activities that we do that's tough

5    on the spine because of the pounding?

6    A    I think it probably is although I'm not aware of any

7    particular research that indicates that it causes a problem, but

8    it sort of kind of makes sense to me that it would be difficult

9    for some people to do that.

10   Q    Do you know when he got back to doing his sprints that he

11   was doing or did you even know he was doing sprints?

12   A    I don't recall when that resumed.

13   Q    Mr. Bradley is not a small guy.  He's over two hundred

14   pounds and he's a big guy, right?

15   A    Yes.

16   Q    Very, very muscular?

17   A    Yes.

18   Q    After the surgery he came to you on January 11th of 2022.

19           MR. DILL:  Then if you could go to 5156, please,

20   Mr. Don, and under Plan, if you could pull that up.

21   BY MR. DILL:

22   Q    This is two months post back surgery, right, Doctor?

23   A    Yes.

24   Q    And he indicated he had resumed his activities of daily

25   living and was performing a fairly active weightlifting program,

1    right?

2    A    Yes.

3    Q    And you indicated we will increase his lifting to a 50-pound

4    maximum; is that right?

5    A    Yes.

6    Q    I've been doing it 34 years, Doctor.  I've never had a

7    patient released to lift 50 pounds two months after back surgery?

8    A    Well, it would probably be with a bench, a bench press or

9    something like that.  It doesn't specifically say that, but I

10   would not want him doing squats or whatever the ones are where

11   you bend over and lift stuff up.  So he could do bench press,

12   50 pounds, incline press, 50 pounds, but I wouldn't want him

13   doing anything that loaded his spine like that and repetitive

14   bending.

15   Q    But that's too close in time to put that kind of load on a

16   fresh surgery, right?

17   A    Yes.

18   Q    That spine needs how long to heal following a fusion surgery

19   like the one you performed?

20   A    It takes about a year, nine months to fifteen months, for

21   the bone to heal completely.

22   Q    All right.  Now, you testified a little while ago with

23   Mr. David that you've restricted him from a work standpoint to

24   light duty which is like 10 or 20 pounds, right?

25   A    Correct.

1   Q    Well, why is he light duty in work if he can go and lift

2   weights and lift 50 pounds?

3   A    Well, it's a difference in how the weight is lifted and what

4   muscles you're using to do it.  So doing a bench press puts

5   essentially no axial load on the spine.  So it would be perfectly

6   safe for him to do a bench press with however much weight.  He's

7   a big guy.  So he could do a bench press with however much weight

8   he could do.

9        A military press would be similar.  It's a little bit

10  more of an axial load.  So probably not quite as much.  It's

11  completely different for him to be lifting and bending and

12  stooping and picking things up.  It's just a different activity

13  on the back compared to a controlled weightlifting exercise.

14  Q    Doctor, it's been four years since this accident.  Was he

15  capable of working during those four years at light and sedentary

16  work?

17  A    Potentially depending on how much pain he's in.

18       MR. DILL:  Let's go to 5302, please, Mr. Don, under

19  Plan.

20  BY MR. DILL:

21  Q    And this is the last note I have from you, Doctor.

22       At that point you recommended in May of 2022 that he

23  continue self-directed exercises?

24  A    Yes.

25  Q    And you discussed with him at this point what activities he

1    could do and talked about returning to work, right?

2    A    Yes.

3    Q    And you told him he couldn't go back to his previous job as

4    a scaffold builder; right?

5    A    Correct.

6    Q    And I think Dr. Henderson told -- we're going to hear from

7    him -- that because he lost the pinky finger, that climbing was

8    going to be out of the question.  So that was never an issue,

9    correct?

10   A    Yes.

11            MR. DILL:  All right.  You can take that down, please,

12   Mr. Don.

13   BY MR. DILL:

14   Q    Doctor, you raised on direct examination adjacent segment

15   surgery.  What facts do you rely upon to say that he's going to

16   need an adjacent segment surgery in the future?

17   A    Well, the research that has been done that estimates various

18   percentages for the risk of developing these problems as time

19   goes by.  So it's really an amalgamation of all of that.  I've

20   derived three percent per year which is sort of the median of

21   those studies.

22   Q    So three percent of your patients come back a year.  Is it

23   from your own practice that you determined these statistics or is

24   this just from a study?

25   A    No.  It's not my own practice.  It's research that's done by

1   people.

2   Q    Can you name an article for me?

3   A    Not off the top of my head.  I've got a stack in my office.

4   Q    In your deposition you were unable to give us the names of

5   any articles that said that, correct?

6   A    I don't recall, but I'm not one of these people that quotes

7   -- I'm not an academician.  I don't memorize literature and quote

8   the sources like academic people do.  It's just not who I am.

9   Q    You indicate it's three percent per year.  Can you tell me

10  what the longest period studied in any of those articles was?

11  A    Ten years.

12  Q    Ten years.  So would you admit, Doctor, that none of the

13  articles that you have have studied patients for 17 years to see

14  if actually 50 percent or 50.1 percent of people get an adjacent

15  segment surgery?

16  A    That is correct.

17  Q    So you're doing the math and extrapolating it out and making

18  the assumption that it will continue on at that pace for the next

19  seven years?

20  A    That's correct.

21         MR. DILL:  Thank you.

22         No further questions, Your Honor.

23         Thank you, Doctor.

24         THE COURT:  Mr. David, you may proceed with redirect

25  when ready.

1                         REDIRECT EXAMINATION

2       BY MR. DAVID:

3       Q    And he was just talking about those studies.  I'll pick that

4       up.  The studies themselves make the assumption.  Even though the

5       study was only ten years, they talk about that three percent a

6       year going forward, correct?

7       A    Correct.

8       Q    You didn't make that up yourself?

9       A    No.

10      Q    I do want to talk about a few things taking it a step back

11      and then getting to some of the reports that were discussed.

12                   Typically with neck and back patients, do those

13      symptoms wax and wane, good days and bad days?

14      A    They can for sure.

15      Q    And that's what you experienced with Mr. Bradley, correct?

16      A    Yes.

17      Q    Certainly some days he came in and he was feeling pretty

18      good.  You just saw some of those.  And some days he came in

19      feeling pretty lousy.  You saw some of those as well, correct?

20      A    Yes.

21      Q    His pain was significant enough to where you recommended,

22      based on his findings, the physical exam, the pain he was in, the

23      MRIs you saw, surgery and those surgeries were successful,

24      correct?

25      A    Yes.

1    Q    Mr. Dill brought up this, I guess, conflation, the

2    combination of the midback and low back.  Nothing in what you

3    said in late 2020 or early 2021 says that the low back pain

4    originated then.  That's just the report where you said you're

5    thinking that some of the midback pain he was talking about may

6    have actually been low back pain, correct?

7    A    Correct.

8    Q    And none of the reports we just went over when I was talking

9    to you were those midback complaints.  They were all back and

10   lumbar, correct?

11   A    Yes.

12   Q    I'm talk about all the reports, all the checked boxes we

13   talked about.  Lumbar exam.  That's not midback.  That's low

14   back, correct?

15   A    Correct.

16   Q    I think a couple of the records -- the first one, two,

17   three, four, I think five or six records Mr. Dill brought up

18   about no low back pain, a few were from the date of the accident,

19   February 14th, 2018.  I don't think I have to bring it up

20   again.  You remember the ER record we just talked about in your

21   direct testimony at Lafayette General where he complained of back

22   pain.  They thought he might have a broken back and they did a CT

23   scan that same day, correct?

24   A    Yes.

25   Q    So the fact that some ER doctor who reattached his finger

1    didn't mention his back pain wouldn't negate the fact that the

2    ambulance, paramedic, and the ER doctors documented his low back

3    pain that day?

4    A    It would not.

5    Q    Mr. Dill talked about --

6         MR. DAVID:  Can I get the ELMO?  Thank you so much.

7    BY MR. DAVID:

8    Q    He talked about the first visit in February of 2018, just 13

9    days post-accident, where low back pain was not mentioned, but

10   the next visit, April 24th, 2018, which was shown to you in

11   direct testimony just a few minutes ago, again you do the exam

12   and he's got pain in his back and limited range of motion?

13   A    Yes.

14   Q    Two months post-injury where he complains of significant

15   pain the day of the accident and he's back to see you.  And I

16   think you'll see the records we just talked about.  He sees his

17   family doctor for pain in the back the next day, correct?

18   A    Yes.

19   Q    One thing I want to mention because many of the records

20   Mr. Dill just went to, he kept saying, look, no headaches, and

21   they would point to Review of Systems.  It starts on the first

22   page.  I heard you say something that I haven't heard you say

23   before when you were testifying with Mr. Dill that, look, this

24   left column stuff is a form, and if you check yes, it's positive,

25   but if you don't check anything or you're not asked about it, it

```
1    defaults to denied, correct?

2    A    Correct.

3    Q    And he showed you this part of this record of October 2nd,

4    2018, about seven months post-accident, and he showed you that

5    part, the default, but didn't show you the first paragraph or

6    didn't reference it -- he might have showed you about the back --

7    didn't reference in the first paragraph where he talked about --

8    the same record, he's talking about moderate headaches.  Is that

9    a fair statement?

10   A    Yes.

11   Q    And that kind of proves the point that all of these left

12   column records he just showed you don't actually tell the tale.

13   That's some of the electronic medical record stuff that happens,

14   but the narrative does, correct?

15            THE COURT:  Mr. David, you're arguing again.  Just ask

16   the question.

17            MR. DAVID:  Yes, sir.

18   BY MR. DAVID:

19   Q    I guess that's my point.  The left column, it seems like

20   it's not as reliable as the actual narrative part in the exam.

21   Is that a fair statement?

22   A    Yes.  The left column is a check box form that the patient

23   fills out.  It's run through a scanner and it gets dumped into

24   the report.  Honestly I rarely, if ever, even look at it.  It's

25   just something that gets in there because it's electronic health
```

```
1    records and they're the greatest and that's what needs to be in
2    there.  So that's what's in there.
3    Q    Thank you so much.
4              In talking about the back pain and the delay where you
5    got actively treating and did the surgery, what is masking in the
6    medical community when it comes to injury?
7              MR. DILL:  Objection, Your Honor.  Beyond the scope.
8              MR. DAVID:  Everything was about medical causation of
9    the neck and back, Your Honor —— or the back.  I'm sorry.
10             THE COURT:  Approach.
11        (Whereupon, a sidebar conference was had as follows:)
12             THE COURT:  You're objecting to the question about
13   masking?
14             MR. DILL:  It's beyond the scope of cross-examination.
15             THE COURT:  What are you getting at with masking?
16             MR. DAVID:  It's a medical term that when you're
17   concentrating on the neck, you're not thinking about your back as
18   much.  His whole cross was about back causation and him not
19   reporting symptoms and this is an explanation for why.  You don't
20   concentrate on stuff when you're thinking about your neck or your
21   finger or things like that.  He's talked about this in his
22   deposition.  This is directly in response to cross-examination
23   testimony.
24             THE COURT:  I think it's fair.  I'm going to overrule
25   the objection.
```

```
1              (Whereupon, the sidebar conference was concluded.)
2              THE COURT:  Mr. David, you may proceed given the
3    Court's ruling.
4              MR. DAVID:  Thank you, Your Honor.
5    BY MR. DAVID:
6    Q    So, Doctor, what does it mean in the medical community if
7    somebody has significant pain and it's masking other pain?  What
8    does that mean as a physician?
9    A    Well, it's a situation where someone has an injury to one
10   particular area of the body that is significantly worse than,
11   say, another area, and so they tend to, I guess, ignore -- I
12   don't want to say ignore, but not focus on the area that's not as
13   significantly injured and focus on the area that is worse.
14   Q    Fair enough.
15             So part of Mr. Bradley's condition could have been
16   masking some of the back pain early on while he's dealing with
17   neck surgery and neck treatment and hand surgery and hand
18   treatment and things like that, correct?
19   A    Yes.
20   Q    Mr. Dill brought up the fact that pain is subjective.  Well,
21   one, you're a trained physician.  So when you do examinations and
22   feel tenderness and feel range of motion, you're judging not only
23   what they're telling you, but what you're feeling, correct?
24   A    Correct.
25   Q    In four and a half years, has Wilfred Bradley given you any
```

1    reason to disbelieve him?

2    A    No.

3    Q    In fact, he's the kind of guy who wants to do more.  He

4    wants to get better, correct?

5    A    Yes.

6    Q    And that's why he wants to go do weights and he wants to get

7    stronger?

8    A    Right.

9    Q    No reason ever to suspect he was faking or malingering or

10   anything like that?

11   A    No.

12   Q    In fact, they asked about prescription medication.  He's

13   often refused narcotic pain medication except recovering from

14   surgery.  Is that a fair statement?

15   A    Yeah.  I believe he's had very limited prescriptions, three

16   or four times during the course of the several years I've treated

17   him.  It's always for a very small number of pain pills.  You

18   know, 15 pills, that's not much and they would last him for four

19   months.

20   Q    And he would much rather rely on NSAIDS and AAll eve and

21   Advil than take any kind of narcotics, correct?

22   A    Yes.

23   Q    And I want to make sure this is clear to the jury as well.

24        Your examination findings for Mr. Bradley were

25   consistent with the MRI findings.  The problems he had at C3-4 in

1   his neck were consistent with the examination findings in his

2   complaints and that's why it was easy to relay his problems to

3   fix it with surgery, correct?

4   A    Yes.

5   Q    And that's why the surgery worked is because it helped some

6   of the problems that he was having.  Fair enough?

7   A    Yes.

8   Q    And also with a disease process like we saw on the MRIs

9   before, is it often that that progresses, like maybe there's

10  initial pain and then it gets worse and worse and worse or waxes

11  and wanes and then progresses and gets worse over time?

12  A    It can in just about any possible scenario you can envision

13  or things that we see in terms of getting better, getting worse.

14  Some people never get any better and it's miserable the entire

15  time.  Some people get better and then they get worse.  Some have

16  waxing and waning.  So, yeah, all of those can occur.

17  Q    And for Mr. Bradley, his neck and back conditions progressed

18  to the point where he needed surgery and they were repaired by

19  surgery, correct?

20  A    Yeah.  Sometimes it's not that the symptoms progress.  It's

21  just they don't ever get better and people get tired of living

22  with it and want to try something different.

23  Q    And he still had residual neck problems and back problems,

24  pain, correct?

25  A    Some, yes.

1  Q    Not as bad as it was before the surgery?

2  A    Correct.

3  Q    And the restrictions you have on him are permanent, correct?

4  A    Yes.

5  Q    And nothing in the cross-examination questions by Mr. Dill

6  have changed your position that all the neck and back treatment

7  you prescribed, past and future, are related to this accident,

8  correct?

9  A    Correct.

10         MR. DAVID:  No further questions, Your Honor.

11         THE COURT:  Okay.  We're at 5:00 o'clock.  You know, I

12  know that you have Dr. Henderson.  Unless we can do that in 20

13  minutes or 30 minutes, I don't want to keep the jury here.

14         MR. DAVID:  I think he went home, Your Honor.

15         THE COURT:  What's that?

16         MR. DAVID:  When you told me the last time, I told him

17  he could go home.

18         THE COURT:  We were holding it open just to see how

19  long this took, but I think I'm going to go ahead and let the

20  jury go.  We'll get started in the morning at 8:30 and proceed

21  from there.

22         Again, I'm going to release you for the evening.  Just

23  to inform you that you're not to discuss this case as I've

24  instructed before with anybody.  Don't do any independent

25  research.  You've seen some diagrams of accident scenes.  Don't

```
 1    try to Google those or do your own investigation.
 2              Again, I appreciate your service here today.  I'd like
 3    you back at 8:15 tomorrow morning and we'll try to get started at
 4    8:30.
 5              All rise.
 6                    (Jury Exited the Courtroom)
 7              THE COURT:  All right.  Please be seated.
 8              If there are no housekeeping matters, I want you back
 9    early tomorrow morning so we can start at 8:30.
10              MR. DILL:  One quick request, Judge.  If you could
11    tomorrow in your comments tell the jury if they see us in the
12    hallways coming in, because we come through the same security,
13    we're not ignoring them or being rude.  You know, it's that
14    awkward we can't say hello kind of thing.
15              THE COURT:  Yeah.  I'll make sure.  That's not in our
16    --
17              THE CLERK:  It's in the preliminary.
18              THE COURT:  We have it in the preliminary, but I'll
19    read it again.  I take it that you've had some experience.
20              MR. DILL:  It's just you walk into them and they light
21    up like I'm going to say hi and I can't say anything.
22              THE COURT:  Yeah.  We'll make sure --
23              MR. DILL:  Thank you, Your Honor.
24              THE COURT:  -- that they don't think y'all are being
25    rude to them.
```

1          MR. DILL:  I appreciate it.

2                                    (Proceedings Adjourned.)

3                         _   _   _

```
 1                          Certificate
 2   I hereby certify this ^ day of September, 2022, that the
 3   foregoing is, to the best of my ability and understanding, a true
 4   and correct transcript from the record of proceedings in the
 5   above-entitled matter.
 6
 7                              /s/ LaRae E. Bourque
 8                              Federal Official Court Reporter
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```