UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION


WILFRED BRADLEY,                    :      Docket No. 19-00056
                                    :
              Plaintiff,            :
vs.                                 :      August 3, 2022
                                    :
MOUNTAIN LAKE RISK, ET AL.,         :
                                    :
              Defendants.           :      Lafayette, Louisiana
_____


REPORTER'S OFFICIAL TRANSCRIPT OF THE JURY TRIAL

BEFORE THE HONORABLE ROBERT R. SUMMERHAYS

UNITED STATES DISTRICT JUDGE

VOLUME III OF V

PAGES 318 THROUGH 561


REPORTED BY:        LARAE E. BOURQUE, RMR, CRR
                    Federal Official Court Reporter
                    800 Lafayette Street, Ste. 3103
                       Lafayette, LA  70501

A P P E A R A N C E S

FOR THE PLAINTIFF:              BLAKE ROSSI DAVID
                               Broussard & David
                               P.O. Box 3524
                               Lafayette, LA  70502-3524

                               REED KREGER ELLIS
                               Broussard & David
                               P.O. Box 3524
                               Lafayette, LA  70502-3524

FOR THE DEFENDANTS:            JAMES M. DILL
                               Dill Law Firm
                               825 Lafayette Street
                               Lafayette, LA  70501

                               MICHAEL C. WYNNE
                               Dill Law Firm
                               825 Lafayette Street
                               Lafayette, LA  70501

I N D E X

PROCEEDINGS:                                                    PAGE:

WITNESSES:

DARRELL LANE HENDERSON
     Voir Dire Examination by Mr. David..........
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Wynne..............
     Redirect Examination by Mr. David...........

DR. DAVID LOUIS WEIR
     Voir Dire Examination by Mr. David..........
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Dill...............
     Redirect Examination by Mr. David...........

JENSEN JOHN BERGERON
     Voir Dire Examination by Mr. David..........
     Voir Dire Examination by Mr. Dill...........
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Dill...............
     Redirect Examination by Mr. David...........

LARRY STOKES
     Voir Dire Examination by Mr. David..........
     Voir Dire Examination by Mr. Dill...........
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Dill...............
     Redirect Examination by Mr. David...........

JOHN W. THERIOT
     Voir Dire Examination by Mr. David..........
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Dill...............

WILFRED BRADLEY
     Direct Examination by Mr. David.............
     Cross Examination by Mr. Dill...............
     Redirect Examination by Mr. David...........

RULE 50 MOTION..................................

```
 1                    P R O C E E D I N G S

 2                          (Call to order of the court.)

 3          THE COURT:  Please be seated.

 4          Okay.  I'm going to read the instruction that counsel

 5    had requested and remind the jurors that y'all are not able to

 6    talk to them, and because of that, you're not being rude to them

 7    just to be clear and just so that they know that.

 8          MR. DAVID:  Thank you, Your Honor.  It was actually

 9    awkward this morning because we were all in line right next to a

10    juror.  Please be sure to include the parties, too, their parties

11    and Mr. Bradley, in the instruction, please, Your Honor.

12          THE COURT:  Absolutely.

13          MR. DILL:  Can we take up a quick issue?  Actually,

14    two.

15          THE COURT:  Sure.

16          MR. DILL:  Since 2:30 this morning I've been mulling

17    yesterday over and going through the day and I have some

18    concerns.  I've worn the carpet out between my table and the

19    sidebar with objections and I hate doing that because I know it

20    alienates the jury and they think I'm obstructing justice, and as

21    I went through the course of what happened during the day, it

22    started registering that maybe I've got a pattern here that I

23    need to be concerned about.  I'm not making any accusations, but

24    I'm trying a case against a 15 plus year lawyer who rightfully

25    touts a multitude of million and multi-million dollar verdicts in
```

1    his repertoire, and having to object for reading records,

2    narratives, and things like that that I have to do to protect the

3    record concern me greatly when we have all the fights that we

4    have on the real issues that we have.  It gets to a point where I

5    know I've got jurors rolling their eyes when we make an

6    objection.  So I've got some concerns.

7          And I know it's a tactic that is taught in the

8    plaintiff's circle.  We've heard about it, make the defendant

9    object enough to where the jury hates him, and I have some grave

10   concerns because that is not in accordance with the decorum

11   required in federal court and practicing before this bar.

12         The other thing -- and yesterday we had an impeachment.

13   I put the pieces together last night, and it was called up and it

14   was scrolled very slowly past the objections in the beginning,

15   and counsel made a comment about it, and I just see a theme

16   developing, and I want the Court to be aware of my concerns at

17   this point that if it continues, I'm going to have to make a

18   motion on this and either have the Court admonish the jury and

19   explain -- because my concern is the admonishment that's given in

20   the general charge is just not enough to compensate for what's

21   occurring if it is in fact a strategy.

22         The other issue that I need to take up is counsel

23   advised me this morning he's not calling Dr. Savant and

24   Dr. Blalock and he plans to put in their records before the jury

25   and that they were already introduced into evidence, and to the

1    extent that they've been introduced into evidence without

2    excision of that which was excluded by the Court's ruling on

3    Rule 26, the defendant objects.

4            The Court made a ruling that the opinion testimony of

5    those physicians was not coming in and it cannot be published to

6    the jury.  Otherwise, it's violating what the Court has already

7    ruled.

8            So my concern, Judge, is I'm walking a minefield today.

9    I know we have Dr. Weir coming up this morning and he's got some

10   limitations, and Mr. Bergeron is coming up and he's got some

11   limitations, and I don't want to have to end up alienating this

12   jury because I'm protecting the interests of my clients in

13   accordance with the orders issued by this Court.

14           Thank you.

15           THE COURT:  Mr. David?

16           MR. DAVID:  Thank you, Your Honor.

17           I'm a bit blindsided by that.

18           First, I do apologize.  We were slow getting started

19   yesterday and I was trying to rush through some of the doctors

20   and the Court rightfully told me to ask more questions.  I'm

21   pretty sure every document I put up here I identified by exhibit.

22   The defense didn't do any of that.  Every time they used a code

23   number, I had no idea what it was, but I didn't complain because

24   we're all working well here together.

25           I can promise you this, Judge.  I've never heard in my

1    life of the strategy of trying to get the defense to object.  I

2    can promise you this.  I've never thought during this trial, oh,

3    good, another objection.  I don't want to be objected to.  I

4    definitely don't like being sustained when they object.  I think

5    it makes me look bad every time.  It hurts me and my case to hear

6    that.

7              So I can tell you I will do my best, but I think I have

8    been doing my best, and the Court rightly a couple of times

9    yesterday stopped me because my witnesses were just kind of

10   carrying on and sometimes I was talking more about the reports

11   and I probably should have just let them talk.  The reports were

12   on the screen.  I was reading the reports, I understand that, but

13   I just don't want the Court to think -- I know I am certainly not

14   perfect, but I'm not diabolical.  I don't have some plan here.

15   I'm trying to get the truth to the jury the best I can.

16             So for that issue, if you have any questions, I'm

17   happy.  I don't think anybody is doing anything horrible in this

18   case in how they're conducting it.

19             THE COURT:  Just two comments, and there's two issues

20   here.  One is just general presentation of evidence and one is

21   very specific to what's about to happen today as far as the

22   witnesses and the evidence.

23             How to put this.  I made several comments, and I will

24   tell you my philosophy is I like to inject myself as little as

25   possible into the proceedings because those jurors -- I picked

1   those jurors.  I talked to those jurors at the beginning of this

2   case.  They will put whatever I say significant weight, and when

3   I admonish a lawyer, they're going to put some weight on that,

4   and I find that I've had to do that.  I know your response is you

5   were trying to work through a significant number of doctors and

6   testimony, but the long compound questions -- you know, I know

7   that's -- you know, your argument is you're trying to speed this

8   along, but all of those questions are subject to -- were subject

9   -- many were subject to objections, if not compound, leading,

10  and, you know, it would do a great disservice to the parties for

11  me to continually jump in there and admonish you on that given my

12  status with the jury.

13          You know, I'm not going to ascribe any diabolical

14  intent to either side, but the defendants -- and you're under the

15  same -- you have the same issue when the defendants present their

16  case.  Jumping in with continual objections can turn off the

17  jury.  So I'm going to admonish you to ask questions.  Don't

18  insert argument.  You know, even though you want to try to speed

19  this along, don't make commentary, preface a question with

20  commentary.  You know, I think that's part of the issue here.

21  I'm not being critical because I know what you're trying -- I

22  know that you're trying to speed this along.  And I hope it's not

23  a strategy to elicit objections and I'm not going to ascribe that

24  to anybody because there's no evidence of that, but I want to

25  make sure that we have a clean record.

1          The other thing is it's creating some issues on the

2     record and we're making it very difficult for LaRae to do her job

3     as well.  It makes for a very long day for the people who are

4     trying to move this proceeding along.  I'm not trying to be

5     critical because I know you've practiced a very long time.

6     You've got a significant amount of experience.  The only thing

7     I'm going to ascribe to it is you want to move this along and

8     unfortunately we may have to invest the time to do it.

9          MR. DAVID:  Thank you, Your Honor.  I think we'll

10    finish the plaintiff's case today.  And I just want to say the

11    Court's not saying I can't ask a leading question to a doctor.

12    Just be careful with compound and commentary.  Is that --

13         THE COURT:  Yes.  The leading questions, I mean, you

14    can do that with an expert, but it goes overboard sometimes, and,

15    you know, sometimes I'm hearing you testify and commenting on the

16    evidence as opposed to hearing the doctors actually testify and,

17    you know, there's a fine line there, which you obviously -- I

18    mean, you know that, but I ascribe that to you wanting to push

19    this along, but we need to be mindful of that because I will step

20    in if I think that I'm hearing essentially argument or commentary

21    on the evidence like I did yesterday.  I don't want to do that

22    and I'd like to stay away from that, but, you know, I think it's

23    going to be necessary to ensure that we have a clean record.

24         As far as putting in --

25         MR. DAVID:  I didn't get to talk about that issue.

1    Before you rule, I'd love to say a few things about it if I

2    could, Your Honor.

3                    THE COURT:  About the evidence?

4                    MR. DAVID:  Yes, sir, the evidence.

5                    THE COURT:  All right.  You may proceed.

6                    MR. DAVID:  The records I think that Mr. Dill are

7    referring to were about Dr. Savant; is that correct?

8                    MR. DILL:  Savant and Blalock.

9                    MR. DAVID:  Savant and Blalock were subject to a

10   Rule 26 motion.  I told them they're not going to testify today

11   because I was worried about putting them up as lay witnesses and

12   getting sideways with the Court on where they go or where they

13   might go even if I try to tell them to not testify as treating

14   doctors.

15                   Their records were in our bench books.  Their records

16   were admitted at trial without objection, without any redactions,

17   without anything.  Their records are in evidence.  There's no --

18   there's no takebacks on the defense side.

19                   Now, I think the one concern that's been voiced to me

20   this morning for the first time was, well, she said he had

21   cognitive issues.  You're not going to hear us talk about that in

22   this case.  It's in evidence, but Dr. Blalock's kidney records

23   are what they are and her two psychiatric treatments where she

24   bolsters Mr. Bergeron's PTSD diagnosis I think are important for

25   the jury to know that it wasn't just one doctor saying he had

1    PTSD.  It's two.

2              MR. DILL:  I missed that last part.  On who?  Savant?

3              MR. DAVID:  Savant.

4              MR. DILL:  That's an opinion, Judge.  That's exactly

5    what we did in chambers.

6              MR. DAVID:  It's a medical record.  In many, many cases

7    you don't call doctors to the stand, but you rely on the medical

8    records that are stipulated as authentic and are in evidence in

9    this case, Your Honor.  So we're not going to come in and have

10   her testify that this is what happens with PTSD patients and

11   everything else because I didn't think she could do that, but her

12   medical records are in evidence.

13             THE COURT:  The medical records can have opinions in

14   them.  I mean, when we talk about diagnoses, that's opinion.

15             MR. DAVID:  But it's not expert testimony.  It's a

16   medical record, which certified medical records come in in every

17   case we have without doctors coming and testifying, and I realize

18   that if 90 days ago we had listed her as a treating doctor, she

19   could have, but that doesn't stop the evidence.  They've never

20   objected to these records.

21             THE COURT:  Mr. Dill objected to the records.

22             MR. DILL:  We did.  It's in the pretrial.

23             THE COURT:  What's that?

24             MR. DILL:  We objected in the pretrial and filed a

25   motion in limine on it.

1          THE COURT:  And I granted it.

2          MR. DAVID:  Your Honor, that was all about her

3   testifying, and then when I read each one of them as we put them

4   in the record on the first day of trial, there was no objection.

5          THE COURT:  You're arguing with me.

6          MR. DAVID:  I'm sorry, Your Honor.

7          THE COURT:  I've ruled on the motion in limine.  As a

8   matter of fact, probably to Mr. Dill's chagrin, I carved back

9   that ruling.  We're not going to reargue that.  We're not going

10  to reargue that.

11         I mean, what I would suggest is that you get with

12  Mr. Dill and see if you can come to an agreement on what of those

13  records satisfies or is compliant with the Court's ruling.

14         MR. DAVID:  Yes, sir.

15         THE COURT:  And I'm not trying to -- I'm not trying to

16  lose my temper or be cross with you, you know, but when lawyers

17  start arguing with me on a point where I've decided an issue

18  pursuant to a motion for reconsideration, as all courts are

19  required to do and as Judge Brown has done, reconsider and make

20  some alterations to their ruling and then now I'm getting

21  argument again and again about the same issue, it's decided.

22  Okay?  It's decided.  I'm not going to revisit that.

23         MR. DAVID:  I just want to note my objection for the

24  record to any redactions to the evidence.

25         THE COURT:  It's in there.

1          And what I would suggest is that you confer with

2     Mr. Dill and see if you can come to an agreement on what parts of

3     those records can come in subject to the ruling on the motion in

4     limine, and if there's a dispute, we'll go back in chambers and

5     we'll mediate it.  Okay?

6                    MR. DAVID:  Thank you so much, Your Honor.

7                    THE COURT:  All right.

8                    MR. DILL:  Judge, finally, just so the Court knows,

9     Mr. David has indicated he will turn the case to me at the end of

10    the day today.  I'll have three witnesses in the morning.  We're

11    going to scuttle down and we should be finished and ready to go

12    to the jury at lunch tomorrow or even before.  We have three

13    short witnesses in the morning.  It will be Dr. Bertuccini -- or

14    potentially four if I have to call Dr. Grief depending on the day

15    today, but it will be Bertuccini, Segar, and Frenzel, and we

16    anticipate all three of those being relatively short.

17                    THE COURT:  Very good.

18          And as far as the doctors that are coming up, again,

19    you know, I know that counsel does not like to do sidebars

20    because it obviously interrupts the flow of the proceeding and

21    the jury, but some of these doctors, we may have to deal with it

22    on sidebar because there has been -- the Court, in reconsidering

23    a ruling on the motion in limine, put some parameters on the

24    doctors that are coming up and I want to make sure that we hue to

25    those parameters.

```
 1              MR. DAVID:  Yes, sir.  I have Dr. Weir's deposition
 2   right here and the ruling as well.  Thank you.
 3              THE COURT:  Very good.
 4                      (Conferring)
 5              THE COURT:  Okay.  Heather has a good point.  We're
 6   pretty close on the jury instructions.  Given the timing
 7   tomorrow, do you want to start late tomorrow, have the jury come
 8   in late and have y'all come in for a charge conference in the
 9   morning?
10              MR. DAVID:  That's fine with me.
11              MR. DILL:  That's fine, Your Honor.
12              THE COURT:  I can have the jury come in at 9:15 and we
13   can start at 9:30 and that will give us -- I don't think y'all
14   are too far apart on some of these.  There's going to be
15   disputes, for example, on Housley probably, but I don't think the
16   parties are very far apart on this.  Okay?
17              MR. DAVID:  Thank you, Your Honor.
18              THE COURT:  I'm going to have the jury here at 9:15.  I
19   want counsel here when you usually arrive.  We'll start at
20   8:30 and that way we have an hour to work on the charges.
21              MR. DILL:  Here in the courtroom, Your Honor?
22              THE COURT:  Yes.  Well, let's meet in the courtroom.
23   You can come in the courtroom.  I may bring you back because
24   sometimes it's easier, when we have jury instructions, to pass it
25   around the table.  So it's easier to do it in a conference room.
```

1    So you can set up in here and we'll come and get you when we're

2    ready.

3              All right.  Let's go ahead and call the jury in.

4                   (Jury Entered the Courtroom)

5              THE COURT:  All right.  Everyone may be seated.

6              Again, I want to thank the jury for your service.  I

7    like to do that every morning.

8              Just a couple of points.  Tomorrow morning we're going

9    to start later.  I'm going to have you come in at 9:15 instead of

10   8:15 and we're going to get started at 9:30.  That's because we

11   have some business to do as far as the law and the procedure.  It

12   appears that there is a good chance that you could get the case

13   by the end of the day tomorrow or Friday morning at the latest.

14   So we are on track for a five-day trial.  Counsel has done a very

15   good job at pushing this forward on both sides.

16             One thing I want to do.  I want to just clarify.  I had

17   given y'all an instruction when we first started that the

18   parties, the witnesses, the attorneys, and everyone here that's

19   associated with the case, not court personnel, but everybody out

20   at the bar here, are prohibited from talking to you.  That's just

21   to ensure that it's fair.

22             So if you see them in the hallways, which sometimes you

23   come in the same entrance, and they don't speak to you or don't

24   acknowledge you, it's not because they are trying to be rude or

25   ignore you.  They're following my instruction -- and it's a very

1    strict instruction -- that they're not to speak to you.  So I

2    just wanted to clarify that.  So if you see them, that's why they

3    don't acknowledge you.

4            So with that, we are still in the plaintiff's case.

5            Mr. David, you now have the floor.  You can call your

6    next witness.

7            MR. DAVID:  Thank you, Your Honor.  We call Dr. Darrell

8    Henderson.

9            THE COURT:  Dr. Henderson will approach and be sworn

10   in.

11           THE COURTROOM DEPUTY:  Please raise your right hand.

12           Do you solemnly swear that the testimony you are about

13   to give in this case will be the truth, the whole truth, and

14   nothing but the truth, so help you God?

15           THE WITNESS:  I do.

16           THE COURTROOM DEPUTY:  Thank you.  You may be seated

17   right here.

18   Whereupon,

19                   DR. DARRELL LANE HENDERSON

20   was called as a witness; after having been first duly sworn, was

21   examined and testified as follows:

22                   VOIR DIRE EXAMINATION

23   BY MR. DAVID:

24   Q    Good morning, Dr. Henderson.

25   A    Good morning.

1    Q    Can you state your full name and current business dress for

2    the record.

3    A    Yes.  Darrell Lane Henderson and I'm in town at 323 key --

4    I'm sorry, that's my office.  It's 413 --

5    Q    South College?

6    A    413 North College.  I moved there about three years ago.

7    Q    You were about to give us your home address.  We're all

8    going to a barbecue after the trial.

9    A    That's right.

10   Q    I want you to tell the jury what kind of doctor you are.

11   A    I'm a plastic and reconstructive surgeon specializing in

12   surgery of the hand.

13   Q    Are you board certified?

14   A    Yes.

15   Q    And what's your board certification?

16   A    I was board certified by the American Board of Plastic and

17   Reconstructive Surgery and I passed that board on the first

18   occasion.

19   Q    Can you tell the jury about your education and residency and

20   becoming an expert doctor?

21   A    Sure.

22        Plastic surgery is kind of a long specialty.  I went to

23   medical school.  I finished medical school at the University of

24   the Tennessee in 1954.  I then did a one-year rotated internship

25   at Baylor University Medical Center in Dallas, Texas, and an

1    internship is where the young doctor studies different parts of
2    medicine such as orthopedics, general surgery.  I was fortunate.
3    I was with a plastic surgeon, internal medicine, things like
4    that.  So you get a general understanding of all medicine, and I
5    decided at that time I wanted to be a plastic surgeon.
6            So then the next thing I did is I worked -- I applied
7    to Mayo Clinic in Rochester, Minnesota.  It's one of the premiere
8    training centers.  And I was able to get a six-year residency.
9    The first half was in general surgery.  The last half was in
10   plastic and reconstructive surgery.
11           I wasn't particularly interested in hand, but they said
12   I had to go to Milwaukee, Wisconsin, for a year, studied with a
13   very famous hand surgeon.  So I did that and I turned out to be
14   lucky because that's what I've continued to work on is the hand
15   surgery.
16           After I finished the Mayo Clinic after the six years, I
17   went in the United States Navy in Portsmouth, Virginia, and I
18   went in as a plastic surgeon.  The first year I made it to heart
19   surgery because I had a lot of training at the Mayo Clinic in
20   open heart surgery.  I did orthopedics, I did general surgery,
21   and I did some plastic surgery as well.
22           I had a lot of hands blown off.  This was during the
23   Vietnam War.  So I got a lot of experience firsthand.  It's one
24   of the first wars that we've had in the history of our country
25   where somebody mutilated their leg or mutilated their hand and

1   their arm and the Navy decided to try to save it.  In previous

2   wars it was just an automatic amputation.  So we would get these

3   mutilated legs, feet, hands, arms, abdomens come in by plane.

4   Some weeks we'd get 130 patients, new patients coming in.

5           After that, I took my board certification.  That's an

6   examination you have to take by the plastic surgery organization.

7   Mine was a written exam.  I had to list cases and show the

8   results I had gotten.  Then finally had to take an oral

9   examination with the American Board of Plastic Surgery to prove

10  that I was a plastic surgeon.

11          I then moved to Lafayette where we are now.  I was the

12  second -- let's see.  It was 1969 I think when I came here.  I

13  was the second hand surgeon in the whole state at that time.

14  There was one very famous hand surgeon in New Orleans, but

15  elsewhere in the state there weren't any hand surgeons.  Most of

16  the general surgeons and orthopedic surgeons weren't adequately

17  trained in that.  So I was immediately extremely, extremely busy.

18          So my practice has continued with that.  I had three

19  partners that worked for me a number of years until they got old

20  and then I'm still practicing.  I'm actually busier now doing

21  hand surgery than any time in my life.

22  Q    Thank you, Doctor.

23          And those 45 years of practice have been here in

24  Lafayette?

25  A    Yes, sir.

```
 1    Q    In private practice.
 2              MR. DAVID:  Your Honor, at this time I would tender Dr.
 3    Henderson as an expert in plastic reconstructive surgery and hand
 4    surgery.
 5              MR. WYNNE:  No objection, Your Honor.  We waive the
 6    traversal.
 7              THE COURT:  You may proceed.
 8              MR. DAVID:  Thank you, Your Honor.
 9              The tender was accepted, correct, Your Honor?
10              THE COURT:  Yes.
11              MR. DAVID:  Thank you so much.
12                        DIRECT EXAMINATION
13    BY MR. DAVID:
14    Q    Doctor, when was the first time you saw Mr. Wilfred Bradley?
15    A    The first time I saw him was February 28th, 2018, in my
16    office.
17    Q    So that's 14 days after his crash?
18    A    That's correct.
19    Q    And I think we already have some pictures up.  You took some
20    pictures of his hand when he presented to you, correct?
21    A    Yes, I did.
22    Q    There was already a partial amputation of his finger and
23    stitches in his fingers and hand?
24    A    That's right.  That bottom picture -- well, both of those
25    pictures show what it looked like.  His finger had been
```

```
1   amputated.  He had a tiny, maybe a half inch, segment of bone
2   that was left.  He still had that joint.  Of course, the tendons
3   didn't attach to that small remnant of the little finger, but
4   that's the way it looked and he wanted to know could anything be
5   done to help make his function better.
6   Q    And I think we have some more pictures, too.
7           MR. DAVID:  I'm sorry, Ms. Paula.  This is Plaintiff's
8   Exhibit 7I, page 58.
9   BY MR. DAVID:
10  Q    And then this was how it was the first time you saw him.
11  And the next page will be 61.
12  A    That's correct.  It had stitches, scabs, and it kind of
13  looked ugly then.
14  Q    And on the thumb portion of his right hand, he had a burn
15  from the crash as well, correct?
16  A    That's correct.
17  Q    Did you get a history of the accident and crash from Wilfred
18  when he came to see you?
19  A    Yes, I did.
20  Q    Was he wearing his seat belt?
21  A    Yes.  He had seat belts on.
22  Q    He also had an L-shaped gash on his head that had been
23  stitched up when he came to see you?
24  A    Yes, he did.
25  Q    Plaintiff's 7I, page 57.  These are the pictures in your
```

1   office when Mr. Wilfred came to see you, correct?

2   A    Yes.  That's the way he looked when he came in.  That bottom

3   picture, it's kind of difficult to see the stitches, but if you

4   see them, they're running up.  It's stitched very nice together.

5   Q    And I think the ER said it was a ten centimeter gash and

6   your records say it's nine centimeters.  Why is that?

7   A    Well, the scar can contract a little bit and nine and ten

8   are almost the same.

9   Q    I guess when they sew it up, it shortens it up, too?

10  A    It would shorten up.  It would contract a little bit.

11  Q    And are you familiar with Dr. Bennett Fontenot, the ER

12  surgeon who amputated the rest of his finger?

13  A    Yes, I am.

14  Q    Good doctor?

15  A    Very good doctor.

16  Q    And he did a good job with the amputation?

17  A    Yes.  He did the proper procedure and amputated it at that

18  level.

19  Q    He had cleaned the wounds and debrided and things like that?

20  A    That's correct.

21  Q    Did you have to do any of that when Mr. Wilfred came to see

22  you that day?

23  A    Did I what?

24  Q    Clean the wound or anything like that.

25  A    Well, when he came in, I removed the stitches from his

1    scalp, and I think he had some stitches on his hand, too.  I went

2    ahead and removed that.  There's usually a little bit of dead

3    tissue there, but not much.  We cleaned it up and I talked to him

4    about the future.

5    Q    What did Wilfred tell you about the car crash when he came

6    to see you that first time?

7    A    Well, he said that he was driving westbound on Highway 90

8    near Elton, Louisiana, in a car and an 18-wheeler truck came

9    across his lane and turned left.  Mr. Bradley said he didn't have

10   time to stop and he was afraid that he would be in a crash and

11   he'd cut his head off.  He used the word "decapitation."

12         So when he saw that he couldn't avoid the truck, he

13   dove into the passenger seat.  This is the way he got bruises on

14   his arm, his abdomen, and chest and probably hurt his back in the

15   diving, but he didn't get his head cut off.  That's what

16   happened.

17   Q    Did he report to you on that first visit instances of

18   blacking out at the scene of the crash right after the accident?

19   A    Yes.  He said he had several episodes of blacking out,

20   fainting.

21   Q    That's just two weeks after the accident he's reporting that

22   to you?

23   A    That's correct.  That's from his head injury.

24   Q    Did Mr. Wilfred tell you on that first visit about some

25   phantom pain in his finger or the absent finger I should say?

1    A    Yes.  He had what we call phantom pain.  Like I have five

2    fingers and I can feel all five fingers, but these five fingers

3    are embedded in my brain.  So just because he lost the little

4    finger, he didn't lose that embedded portion of where the finger

5    is in his brain.  So patients tend to keep feeling like they have

6    the finger because the finger itches, but there's no finger to

7    scratch, and it goes on sometimes up to a year.

8    Q    And let's see.  Again on his head, I think we've got a

9    couple of more pictures of his head we can show.  That was

10   Plaintiff's Exhibit 57 -- or 7I.

11           MR. DAVID:  And the medivisual, Reed, do you have that

12   or is that further down?

13   BY MR. DAVID:

14   Q    This is an image, a demonstrative image, of the cut as it

15   was before it was --

16   A    That's right.  It's kind of an L-shape cut and then it

17   opened up.  It was deep and it went all the way down to the

18   scalp.

19   Q    Thank you so much.

20           Tell me about your exam of Wilfred on that first visit.

21   A    Well, the wound on the scalp was healed and so I went ahead

22   in my office and took out the stitches.  We also took out the

23   stitches on his hand.  It looked like the amputation had done

24   well.  I took x-rays.

25           There was -- at the base of the little finger there was

1    about maybe one-half or one-third of an inch of bone that was

2    left, and when bone is left, particularly at a part of the bone

3    in the finger that's nearest to the body, we call that the

4    proximal area, there's no tendons that attach to it.  So that

5    bone is unstable meaning it's going to move around.

6           At that time I saw him, I told him that he was going to

7    need to have some type of revisional amputation at some point in

8    time in the future.  We could either go ahead and remove that

9    small piece of bone that he had left in the finger or I told him

10   I thought a better option that he ought to think about is what we

11   call a re-amputation.  What we do in order to prevent a stump --

12   it kind of looks like that in his hand -- many times we'll go

13   ahead and remove the bone up at the body of the hand, and at kind

14   of a bleak angle, it removes these muscles, which we call the

15   hypothenar muscles, and move them over to the ring finger.  It

16   kind of gives this sideways motion to the ring finger that we

17   have in our little finger and I told him to think about that.

18   Q    Thank you, Doctor.

19          And on exam he had spasm in his neck and upper back?

20   A    Yes.  He had periodic spasms and pain.

21   Q    And you, Doctor, even took pick pictures of a really large

22   contusion on his left leg, correct?

23   A    Yes.  That's probably from where he dove over.

24   Q    And I think we have a few more images of his head just a few

25   days before.  And this is the car crash that he was in.  I know

1    you have some of these pictures even in your records.  Here's

2    other pictures.  This is the same -- different views of the same

3    sutured head.  You can see it on the screen right there, Doctor?

4    A    Yes, sir.

5    Q    And show some of those pictures that are in Dr. -- also in

6    7I and Dr. Henderson's records, Reed.

7    A    And I routinely ask for pictures of the accident scene, the

8    vehicle that they're in, on every patient that I see, and it

9    helps me better understand how they got hurt and I think I can

10   give them better care because of that.

11   BY MR. DAVID:

12   Q    And looking at these pictures, it shows where he would have

13   injured his head when the vehicle --

14   A    That's correct, if he had been sitting up straight.

15              MR. WYNNE:  Sidebar, Your Honor.

16              THE COURT:  Yes.

17        (Whereupon, a sidebar conference was had as follows:)

18              MR. WYNNE:  He's been accepted as a witness.

19              THE COURT:  I can't hear you.  You need to talk louder.

20   We've got a static so they can't hear us.

21              MR. WYNNE:  Respectfully, Your Honor, he's been

22   accepted as an expert as a hand surgeon.  He's now opining about

23   a head injury.  There's a laceration no doubt, but that is not

24   within the providence of a head injury.  A head injury implies

25   that it is a TBI.  And it's not in his report.  There's only talk

1    of the laceration in his report.

2              MR. DAVID:  I'm not asking anything about cognitive

3    issues or any TBI.  I'm only talking about the injury to his head

4    and the car that cut his head open.  He's a plastic surgeon.

5              MR. DILL:  He's now taken him to somewhere that's not

6    in his report.

7              THE COURT:  Stick to the laceration.

8              MR. DAVID:  Oh, a hundred percent.

9              THE COURT:  That's what he did.  That visual depiction

10   that's not a photograph, is that in evidence?

11             MR. DAVID:  It's a demonstrative aid.

12             THE COURT:  They've seen it?

13             MR. DAVID:  Yes, sir.

14             MR. DILL:  Judge, while we're up here, they're

15   scrolling through a whole bunch of exhibits as they look for

16   something when it's public to the jury.

17             THE COURT:  Can't we just do it one at a time because

18   I'm having a hard time following.

19             MR. DAVID:  I apologize.  I thought they were all in

20   order, but, yes, sir.

21             THE COURT:  And it's confusing the jury, too.

22             MR. DAVID:  I agree.

23             THE COURT:  So can we get some parameters?  Only

24   pictures of the head injuries.  I don't want testimony on

25   mechanics of the crash and how that impacted the head.

1          MR. DAVID:  Yes, sir.

2          THE COURT:  Okay.  And I'm not sure why pictures of the

3    car crash is –– he didn't see the car crash.  I mean, he can talk

4    about, you know, what was presented to him as part of his

5    diagnosis, but when we show pictures of the car crash, he didn't

6    have that when he diagnosed and treated him for the laceration.

7          MR. DAVID:  And, Your Honor, I'm fine with everything

8    you just said.  It's not that important.  I was just noting that

9    this is the crash and they are in his records and that's where he

10   hurt his head.  That's all he's going to say.

11         THE COURT:  If you can show –– you can show the

12   pictures that are in his records that he were provided to him in

13   diagnosing this patient, you can show that, but as far as the

14   mechanics of the crash and going beyond the laceration and repair

15   of the laceration .

16         MR. DAVID:  Oh, I'm not going there.

17         THE COURT:  Fair?

18         MR. DILL:  Yes.

19         MR. DAVID:  Absolutely, Your Honor.  I have no problem

20   with that at all.

21         THE COURT:  And let's not flip through slides.

22         MR. DAVID:  Yes, sir.

23         THE COURT:  All right.  Thank you.

24      (Whereupon, the sidebar conference was concluded.)

25         THE COURT:  Okay.  Mr. David, you may proceed according

1    to the Court's rulings.

2              MR. DAVID:  Thank you, Your Honor.  I was talking to

3    her about flipping through those pictures.  I think Ms. Reed has

4    fixed my errors.

5              THE COURT:  Very good.  Thank you.

6    BY MR. DAVID:

7    Q    And just to make sure I wrap this up, Doctor, based on your

8    history and what you reviewed, the ten-centimeter or

9    nine-centimeter laceration on Mr. Bradley's head was caused by

10   the crash, correct?

11   A    Yes, it was.

12   Q    As was the amputation?

13   A    The amputation and the crushing of the whole right hand.

14   Q    And I want you to tell the jury about that, too, because it

15   wasn't just a finger injury.  It was the whole right hand,

16   correct?

17   A    That's correct.

18   Q    In fact, when he went to see you that first visit, how much

19   strength did he have in his right hand versus his left?

20   A    Yeah.  We routinely check the hand for the strength and

21   compare it to the other hand and check the pinch of the fingers,

22   and the hand, the dominant hand, which is his -- he was

23   right-hand dominant, is usually stronger.

24             Now, the grasp test, when he would try to get something

25   to squeeze like that on the machine, he had one hundred eighteen

1    of grasp on the left hand versus only five on the right hand.

2            The pinch of each finger, the index finger against the

3    thumb, he had twelve on the left, six pounds on the right.  So

4    half of that strength on the long finger, which is now closer to

5    the little finger, he had fifteen pounds on the left and only

6    three pounds on the right.  And then the ring finger, which is

7    right next to the little finger, that had more damage to it.  He

8    had twelve on the left.  So the left is pretty much the same,

9    twelve, fifteen, and twelve, but on the right he had only half a

10   pound of pinch there, and of course the little finger was gone.

11   Q    And, Doctor, you mentioned about future surgery, but you

12   treated Mr. Bradley for quite a while until his surgery in

13   December of 2019?

14   A    Yes, I did.

15   Q    And you worked hard to get his grip strength stronger in his

16   right hand versus his left?

17   A    That's correct.

18   Q    Let's talk about the surgery.  What type of surgery did you

19   perform on Mr. Bradley?

20   A    What I performed was the operation that I talked to him

21   about the first day I saw him.  When you lose a finger at the

22   knuckle here, it sticks in the way.  You go to put your hand in

23   your pocket, it catches the pocket.  If you go to shake hands,

24   it's awkward there.

25            So what we do is what's called a re-amputation and we

1    can do that really nicely of the little finger or the index

2    finger.  We just basically remove the finger way down in the body

3    of the hand, take all the bone and the tendons out, and then move

4    these muscles that I've said are call the hypothenar muscles back

5    and attach them to the ring finger.  So we give the ring finger

6    somewhat a function of the little finger.

7              Now we have -- I'm sure you'll see the pictures in a

8    minute.  We have a smooth hand that won't catch in your pocket,

9    that's not noticeable at first.  I saw Mr. Bradley when I got in

10   the courtroom.  It's kind of hard to tell that he's had anything

11   done.  He just has one less finger on his hand than mine, but he

12   doesn't have an ugly stump that catches and hits up with things.

13   Q    Thank you, Doctor.  7A, pages 26 through 29 of the

14   plaintiff's exhibits, I think are some x-rays before the surgery.

15             MR. DAVID:  We're going to show the demonstrative aid

16   first, Your Honor, that will help kind of walk through the

17   surgery you went through, I believe.

18             THE COURT:  And all of this has been --

19             MR. DAVID:  All of this has been disclosed to the

20   defense, Your Honor.

21             THE COURT:  Gotcha.

22   BY MR. DAVID:

23   Q    And that is what his hand looked like before the surgery,

24   correct?

25   A    Yes.  That's the way the hand looked before and he basically

1    has all the little finger missing.  He has a tiny, tiny little

2    piece of bone right here.

3    Q     And why a zigzag incision?

4    A     The zigzag incision —— the body heals better if we don't

5    have straight incisions.  So in plastic surgery, we very seldom

6    make any straight incisions.  The incisions are zigzag or lazy

7    curves or something because the scar —— you know, we talked about

8    the laceration was ten centimeters at the time, but when I saw

9    him, it had shrunk down to nine centimeters.

10            Well, if this happens on the hand, if you make a

11   straight incision on the hand, then a year later that incision

12   would have shrunk and now it's going to cause a contracture.  So

13   if we make these zigzag incisions, it's kind of like an

14   accordion.  An accordion has zigzag sides so you can play an

15   accordion.  If an accordion had straight sides, then it would be

16   stiff and non-yielding and you couldn't play it.

17            THE COURT:  Let me stop you there.

18            Paula, our juror does not have her hearing aid.

19            THE JUROR:  It just stopped.

20            THE COURT:  It just stopped.  Okay.  I saw you weren't

21   wearing it.  I wanted to make sure that we —— you're good?

22            THE JUROR:  Yes.  I'm sorry.  It just stopped.

23            THE COURT:  And all of y'all, if there is something

24   where you can't hear or you're having some issue, for example, if

25   your display isn't working, raise your hand and we'll take care

```
 1    of you.
 2              All right.  Mr. David, you may proceed.
 3              MR. DAVID:  Thank you, Your Honor.
 4    BY MR. DAVID:
 5    Q    And so you just talked about the incision you made and then
 6    what happens when you open up the hand.
 7    A    We're now to the bone of the little finger.  So this shows
 8    the bone, shows the tendons on top.  The tendons are underneath
 9    and all the soft tissue.  So we save the soft tissue and then we
10    make an angled cut across the base of what's called the
11    metacarpal, that little finger bone.  That way we take the whole
12    finger off and save enough skin so now we can sew it up and
13    hopefully it won't look like his finger is missing.
14    Q    And the tendons are put back over the bone?
15    A    Sir?
16    Q    How do you seal -- how do you keep the bone and the nerves
17    --
18    A    We cover it with the muscle that used to be going to the
19    little finger.
20    Q    And I think we have some before and after x-rays.
21              MR. DAVID:  Paula, can you turn it off while she works
22    through that.
23    A    They're at the bottom of that slide if you can move that
24    slide up.
25              MR. DAVID:  Yes.  I think we're trying to line it up.
```

1    We have it right there.

2    BY MR. DAVID:

3    Q    While she works on that, Doctor, I'll just ask some

4    additional questions.

5    A    Sure.

6    Q    There's some comparison x-rays we'll talk about in a few

7    minutes and some comparison pictures you took, but let's talk

8    about post-surgery.  What happens post-surgery to Wilfred going

9    forward?  What are his limitations in that right hand going

10   forward?

11   A    Well, the big limitation is that the body has a tendency to

12   try to regrow fingers once you remove them and we call that a

13   spur of the bone.  Like when we take the finger off, many times

14   that bone that we grind off and we make smooth and it's nice and

15   short, six months later there would be a spur maybe an inch long

16   on that.  So periodically I have to go back in the amputation and

17   remove some of the spurs.

18            The nerves that used to go to the little finger, they

19   don't go to the little finger anymore because it's gone.  So what

20   we do, we cut those nerves off at the base and they can form

21   what's called a neuroma.  Usually the neuroma, if it's going to

22   form, forms early.  Like the spur, usually it forms early, but

23   I've seen neuromas occur several years later and I've seen spurs

24   occur several years later.

25            So typically when the patient comes in, I examine their

1    hands for neuromas.  That's very tender ends of the nerve

2    endings.  Then I always take x-rays to see how much of the bone

3    has grown back and has it grown back enough that we have to go in

4    and do a surgical revision of the bone.

5    Q    And did you follow up with Mr. Bradley even after the

6    surgery?

7    A    Yes, I did.

8    Q    Are you still following up or is it on an as-needed basis

9    right now?

10   A    No.  I probably still see him once a year.

11   Q    And I was asking more about the limitations, the physical

12   limitations of that right hand going forward.  What's the

13   disability of that hand?

14   A    Well, the right hand is going to be about 25 percent weaker

15   at least.  Like he was very, very weak right after surgery.  He

16   got a lot of his strength back, but he has 25 percent of the hand

17   now gone because of the injury.  So his strength would go down by

18   that, too.

19   Q    And tell me about his limitations in terms of how that

20   practically turns into what he can do with that right hand.  You

21   know, he used to be a scaffold builder and climb things.

22   A    I told him I didn't think it would be wise to go back and be

23   a scaffold builder because he had to climb and he had to use his

24   hands.  This hand is going to always be weaker.  If I'm holding

25   this light like that, I have a lot more leverage on it because I

1    have four fingers on it.  If you only have three fingers, you

2    just can't hold it as tight.  The hand is narrower.  You don't

3    have the strength in the hand like you would before.  For normal

4    light activities, he'll probably be fine, but as far as scaffold

5    building and doing that work, I told him he's not going to be

6    able to do that.

7    Q    And this is the x-ray we were trying to get up, Doctor.  Why

8    don't you explain to the jury what this is.  This is all part of

9    your exhibits.

10   A    Yes.  It shows the stump of bone left that's there.  This is

11   called a metacarpal, this bone that used to go to the little

12   finger.  So that's there, but it abruptly ends.  So what I did, I

13   cut it across the base like where this light is and you'll see it

14   there.  It ends.  I cut it in an oblique fashion because it tends

15   to grow back less like that.  Then we have a lot of soft tissue

16   and muscle that used to be to the little finger on top of that,

17   but I like to continue to follow it to be sure that this little

18   point of bone that we remove doesn't start growing back and

19   growing into the end.  I had one just a few months ago that went

20   all the way to the end to the skin.  So I had to go in and

21   basically do the amputation all over again.

22   Q    Thank you, Doctor.

23           We have some pictures, I believe, of the post-surgical

24   hand, and this is -- I guess the top is his left hand, right, or

25   maybe --

```
1    A    Both of those are the left hand.

2    Q    Left hand.  I'm sorry.  And the next image, this is his

3    right hand?

4    A    This is the right hand.  And you see that.  It's pretty

5    smooth there.  He still has some puffiness there.  When we do the

6    amputation, we don't try to make it really pretty.  We try to

7    leave extra muscle and extra skin there because we know that the

8    skin is going to shrink and the bone underneath that is going to

9    continue to grow.  So it's like for your child buying a bigger

10   size pair of pants than what he really needs.  So we leave more

11   skin -- that's why it's kind of rumpled there that you see --

12   because that's going to shrink and there's going to be some

13   coverage if the bone tries to move out more.

14              MR. DAVID:  And that was -- Ms. Paula, that was 7I,

15   pages 5 and 7 of plaintiff's exhibits.

16   BY MR. DAVID:

17   Q    And all of your treatment for Wilfred Bradley -- the medical

18   bills and medical records are already in evidence -- are related

19   to this accident?

20   A    All related to his accident.  Yes, sir.

21   Q    This February 14th, 2018, crash?

22   A    Yes, sir.

23              MR. DAVID:  Thank you so much for your time today.

24              THE WITNESS:  Thank you.

25              THE COURT:  You may begin your cross when ready.
```

CROSS-EXAMINATION

BY MR. WYNNE:

Q    Good morning, Dr. Henderson.  How are you?

A    Good morning.

Q    I'm going to be very brief.

A    Oh, take your time.

Q    So I want to talk to you a little bit about that February 28th, 2018, report you wrote.  Based upon your examination, Mr. Bradley's L-shaped laceration as of that time had healed pretty well, correct?

A    Yes, it had healed.

Q    And it had healed without an hematoma or infection?

A    Without what?

Q    Any hematoma or infection?

A    That's correct.

Q    And then you talked a little bit about the re-amputation procedure you performed on Mr. Bradley down the line.  That re-amputation procedure had several functions, correct?

A    It had several functions?

Q    Yes, sir.  Goals.

A    I don't understand your question.

Q    You performed the re-amputation procedure to achieve several goals, correct?

A    Yes, sir.

Q    And what were those goals?

1    A    What were those what?

2    Q    The goals.

3    A    The goals?

4    Q    Yes.

5    A    The goals are to be able to use his hand again and not bump

6    the stump like he was doing it because it stuck out and he'd hit

7    it on things and catch it on his pocket.  So this would eliminate

8    all of that.  It would be more streamlined.  It would probably

9    look better.  It may be a little bit weaker, but overall it would

10   be a better hand.

11   Q    And so in that February 28, 2018, report, those goals would

12   have been to improve the appearance, to make it more functional,

13   and make it free from injury; is that correct?

14   A    That's correct.

15   Q    Did you achieve those goals?

16   A    Yes, I think we did.

17   Q    Now, your examination on February 28, 2018, did you perform

18   a physical examination of the plaintiff?

19   A    Of his hand.

20   Q    Of his hand?

21   A    Yes, sir.

22   Q    Did you perform an examination of any other part of his

23   body?

24   A    No.  We take -- we really don't.  We take blood pressure,

25   pulse, temperature, weight, height, but I didn't examine his

1   back.  I don't do that.  We took pictures of his leg.  He had a

2   tenderness -- he had a resolving hematoma on one of the legs

3   where he dove across the car, but I thought that would get along

4   all right.  So I only examined the parts that were injured that I

5   could improve.

6   Q    So you don't recall making any examination of the

7   plaintiff's neck or back?

8   A    Oh, no, I wouldn't do that.

9   Q    So you have no opinions in your report concerning --

10  A    No.  I mentioned that he had Dr. Muldowney that was seeing

11  him who's an orthopedic and a neck surgeon, spine surgeon, but I

12  didn't examine that.

13          MR. WYNNE:  Don, can you please pull Defendant's

14  Exhibit 8 at 3161, and can you please blow up the thorax region.

15  BY MR. WYNNE:

16  Q    Okay.  So, Dr. Henderson, can you please read for me your

17  written paragraph starting at he has spasms.

18  A    He said he had no hematomas, bruises, or swelling of his

19  anterior-posterior chest, but he does have general discomfort in

20  his right anterior chest and this is accentuated with palpation.

21  He has spasms to both sides of his neck as well as the upper

22  aspect of his back.  Mr. Bradley is a very muscular man.  He

23  states that he does not normally have pain, but he does now.

24  Q    Thank you, Dr. Henderson.

25          So in connection with -- on June 29, 2020, you signed a

1   work release sheet for Mr. Bradley, correct?

2   A    Signed a what?

3   Q    A work release sheet.

4   A    June 29th?  Let's see.  Yes, I did.  I said he would be

5   able to return to medium duty work with no climbing.

6   Q    Thank you, Dr. Henderson.

7        And you conducted the re-amputation procedure in this

8   case and it had its anticipated effect, correct?

9   A    Yes, sir.

10  Q    And, in fact, your description in that February 28, 2018,

11  report was that Mr. Bradley was doing amazingly well, correct?

12  A    He was doing what?

13  Q    Amazingly well.

14  A    Yeah.

15  Q    And, furthermore, on June 24, 2020, you opined that Mr.

16  Bradley had reached to the point where he could return to work as

17  long as the work is limited to medium duty work?

18  A    And not climbing.

19  Q    Thank you, Dr. Henderson.

20        Now, with respect to -- you had mentioned earlier

21  certain subjective complaints in this case from the plaintiff.

22  Your history was taken directly from the plaintiff, correct?

23  A    Yes.  Well, from the plaintiff, but I would have had some

24  records.  I had some medical records.  So it was taken from the

25  records and from him.

1  Q     And do you recall what those medical records were that you

2  relied upon in your report?

3  A     Do I know where they were from?

4  Q     What records you relied upon in connection with his report.

5  A     That would be in that report.  His medical records from

6  Lafayette General Medical Center, Dr. David Muldowney, Lady of

7  Lourdes Regional Medical Center, Acadian Medical Center, Mercy

8  Regional Medical Center.

9  Q     So those are the only records you relied upon along with

10 your examination in rendering your opinion in connection --

11 A     That's the only records I had at that time.  We routinely

12 try to get the medical records from a person's injury and that's

13 what we were able to get.

14 Q     Now, we had spoken in connection with this re-amputation

15 procedure.  Have you seen Mr. Bradley in connection with the

16 follow-up after that re-amputation procedure at all?

17 A     Have I seen the patient?

18 Q     Yes.

19 A     Yes.

20 Q     When's the last time you saw the patient?

21 A     Let's see.  The last time was on June 24th, 2020.

22 June 24th, 2020, is the last time I saw him.  At that time I

23 said he had a 16 percent permanent partial impairment of his

24 right hand as a whole.  That's when I filled out the work release

25 that you asked me about just a moment ago, and I said I would be

```
 1  happy to see him again if he has any problems and that he can
 2  come in on an as needed basis.
 3               MR. WYNNE:  Thank you, Doctor.
 4               MR. DILL:  One second, Your Honor.
 5                         (Conferring)
 6  BY MR. WYNNE:
 7  Q    And, Doctor, as of that visit, what was Mr. Bradley's hand
 8  strength?
 9  A    And of course it had improved a lot.  It was 105 in the left
10  hand and 80 pounds in the right hand.
11               MR. WYNNE:  Thank you, Doctor, and thank you for your
12  service.
13               THE COURT:  Mr. David, you may redirect.
14               MR. DAVID:  Very brief, Your Honor.
15               And thank you, Doctor, for your time today.
16                    REDIRECT EXAMINATION
17  BY MR. DAVID:
18  Q    The medium duty restriction for Mr. Bradley was only with
19  respect to his right hand, correct?
20  A    That's correct.
21  Q    So his whole body wasn't limited to medium duty work, just
22  with respect to his right hand?
23  A    Just his right hand.  Any other restrictions would have to
24  come from Dr. Muldowney.
25               MR. DAVID:  Okay.  Thank you so much, Doctor.  I
```

1    appreciate it.

2              THE COURT:  You may step down.  Thank you for being

3    here today.

4              Mr. David, do you have another witness?

5              MR. DAVID:  We do, Your Honor.  We call Dr. David Weir

6    to the stand, Your Honor.

7              THE COURT:  Dr. Weir will approach and be sworn in.

8              THE COURTROOM DEPUTY:  Do you solemnly swear that the

9    testimony you are about to give in this case will be the truth,

10   the whole truth, and nothing but the truth, so help you God?

11             THE WITNESS:  I do.

12   Whereupon,

13                        DR. DAVID LOUIS WEIR

14   was called as a witness; after having been first duly sworn, was

15   examined and testified as follows:

16                        VOIR DIRE EXAMINATION

17   BY MR. DAVID:

18   Q    Good morning.  Can you state your full name and business

19   address for the record.

20   A    David Louis Weir, 802 East Farrell Road.  It's Lafayette,

21   Louisiana.

22   Q    All right.  And you practice neurology here in Lafayette?

23   A    I do, yes.

24   Q    Tell the jury about your education and experience.

25   A    Yes.  I first went to Tulane University.  I then went to

1    Xavier University School of Pharmacy.  I then went on to LSU

2    School of Medicine.  I graduated in 1987.  I did a year of

3    internal medicine with the LSU system.  Then I did a year of

4    emergency room medicine.  Then I went on to the University of

5    Mississippi in Jackson, Mississippi, and I completed a neurology

6    training program.

7              Upon completion, I went back to LSU to do a year of

8    neurophysiology, study of the electrical function of the brain,

9    spinal cord, arms and legs.  Then I went into practice in East

10   Texas and established a neuroscience center in Longview, Texas,

11   and once established, I was offered a position in the Houma,

12   Morgan City, Thibodeaux area to do the same.  I completed that in

13   2006 and then was coerced to come to Lafayette, Louisiana, where

14   I initiated the Neuroscience Center of Acadiana and ultimately

15   ended up selling the Neuroscience Center of Acadiana to Lafayette

16   General and Ochsner Hospital.

17   Q    And you still practice?

18   A    Correct.

19   Q    Tell the jury if you specialize in anything in the

20   neurological field.

21   A    I do.  I have two areas of specialty.  One is

22   neurophysiology of course.  I do the electrical study of the

23   brain, spinal cord, both in the office and the operating room.

24   About 50 percent of my practice consists of that.

25             The other half of my practice consists of all other

1    neurology.  The major portion of it right now is post-traumatic

2    brain injury and headaches relating to post-traumatic brain

3    injury as well as any injuries that occur to the brain.

4           And, of course, I also do, you know, the other

5    neurologic disorders that come to the office, but that takes up

6    probably, you know, 20, 25 percent of my practice and the other

7    20, 25 percent would be other neurologic disorders.

8    Q    And a big part of your practice is treating people with

9    either post-traumatic headaches or even cervicogenic headaches

10   that are intractable, migraine-type headaches that can really be

11   debilitating, correct?

12   A    Yeah.  I'm a member of the American Academy of Neurology as

13   well as the American Headache Association and American Headache

14   Foundation of the United States.

15   Q    And you're board certified?

16   A    I am, yes.

17   Q    Okay.  In neurology?

18   A    Yes.

19           MR. DAVID:  Okay.  At this time, Your Honor, I'd like

20   to tender Dr. Weir as an expert in neurology.

21           MR. DILL:  No traversal, Your Honor.

22           THE COURT:  You may proceed.

23                        DIRECT EXAMINATION

24   BY MR. DAVID:

25   Q    And, Dr. Weir, sorry for putting you off from yesterday

1   because I know you came and we tried to get you in yesterday.

2   Did you get to hear Dr. Muldowney's testimony?

3   A    I did, yes.

4   Q    I'm going to save the jury the time, if I can.  You got to

5   hear the point where he talked about the headaches up until the

6   time Mr. Bradley came to see you?

7   A    I did, yes.

8   Q    Because you first saw Mr. Bradley about two years plus after

9   the accident, August 18th, 2020, correct?

10  A    That's correct.  Yes.

11  Q    And you were here yesterday to hear the evidence of him

12  complaining of headaches the day of the accident, later in 2018

13  to Dr. Muldowney, and 2019 to Dr. Bertuccini and Dr. Muldowney,

14  and then in '20 to Muldowney who referred -- Dr. Muldowney

15  referred -- I'm sorry.  Let me stop that.

16       You heard that testimony yesterday about that headache

17  history before he saw you, correct?

18  A    I did, yes.

19  Q    And did Dr. Muldowney refer Mr. Bradley to you?

20  A    He did, yes.

21  Q    And I want to keep this really to your reports like we

22  discussed and go through your treatment.

23       Let's go through your August 18th, 2020, visit.  Kind

24  of tell me how he presented when he came in.

25  A    Sure.  At that time he was a 52-year-old gentleman and he at

1    first described the accident that he had on Highway 90 between

2    Eunice and Elton.  He stated that he ran into the side of an

3    18-wheeler that had gone out across the highway.  It basically

4    tore off the entire top of his vehicle and he was thrown about

5    the inside of the vehicle and ended up laying over the front seat

6    and then was intermittently unconscious for an unknown amount of

7    time, but was extricated by the fire department initially for

8    about 20 minutes before the Acadian Ambulance arrival, and then

9    once they extricated him, Acadian Ambulance was attempting to

10   bring him by air to Lafayette General, but ultimately had to

11   bring him by ground because of the weather.

12         He complained of multiple things.  He had profuse

13   bleeding from his head.  He had profuse bleeding from his right

14   hand.  He had neck pain and back pain.  That was basically their

15   findings.  Then he was transported to the hospital at Lafayette

16   General.  At Lafayette General he underwent multiple studies, of

17   course.  He ultimately had his laceration sewed.

18   Q    And you just heard Dr. Henderson testify about the surgery

19   he did.  I'm going to skip ahead to 2019.  Then I think you talk

20   about him presenting with Dr. Muldowney as well in your report?

21   A    Correct.  Yes, he did.  He saw Dr. Muldowney for his neck

22   and back for some time.  Then because of the headache situation

23   that continued after Dr. Muldowney operated on his neck -- I'm

24   sure what the assumption was was maybe his neck pain and his

25   headaches would improve after the surgery, but they didn't and he

1    sent him to me for that.

2    Q    Okay.  Thank you.

3         And in your report, what did the imaging show?

4    A    Yeah.  So he had on MRI imaging a disc abnormality at C3-4,

5    and I should say those initial CT scans were of the head, the

6    neck, the chest, the thoracic area, and the lumbar spine that

7    showed no acute problems while in the emergency room, but he then

8    underwent MRI imaging by Dr. Muldowney and had a C3-4 disc

9    abnormality, about a three millimeter protrusion that was a

10   central protrusion, and then he had -- I think at that time that

11   was the only MRI he had.  Then we started talking about his

12   issues related to his headaches.

13   Q    And he had had headaches on and off at different varieties

14   and variations since the crash, correct?

15   A    That's correct.  Yes.

16   Q    Did he have a history of bad headaches before the crash?

17   A    He did not.  He gave me no real history of headaches, and

18   reviewing all of his medical records, I only found he had one

19   episode of headaches in his life that I could pick up out of

20   medical records.

21   Q    And they have records that go back to 1977, correct?

22   A    Correct.  Yes.

23   Q    So you related the headache injuries you were treating him

24   for that day and for the rest of the time you've treated Mr.

25   Bradley to this crash, correct?

```
1    A    Yes.  That's correct.

2    Q    Turning to page 2 of your report, he talks about some of his

3    neck and back problems or neck and upper back in that first

4    visit, but he also mentioned some depression.  Tell us, one,

5    about your practice and what it involves when it comes to

6    neurology and depression.

7    A    Well, depression in this scenario can come from likely two

8    areas.  Of course, if somebody has a head trauma, you've always

9    got to think, well, is it coming from his head, but in his case

10   he was depressed because of the fact that he couldn't go to work

11   he told me.  He was getting more and more depressed about what

12   would happen to his future basically.  He didn't give me any

13   history at that point of any problems with his memory or things

14   of that nature, so I didn't pursue it any further, but he was

15   having a lot of trouble sleeping and continued to have trouble

16   sleeping ever since the date of the accident which we attributed

17   mostly to his ongoing headaches and spinal problems.

18   Q    And he told you that all began with the crash, correct?

19   A    That's correct.  Yes.

20   Q    Did he have any previous history of trauma before this crash

21   that he related to you that was significant?

22   A    No.  I never did find any real significant history of trauma

23   that I'm aware of.

24   Q    And what was your impression on that day after that first

25   visit?
```

```
1              I'll help you out.  You diagnosed post-traumatic
2     headaches that day?
3     A    I did, yes.
4     Q    And what about cervicalgia?  What's that?
5     A    Cervicalgia is persistent neck pain.  Status post is after
6     his cervical spine surgery at 3-4.  It had occurred in August of
7     2019.  So it was coming -- basically it was chronic neck pain.
8     Q    And he had been treating his headaches, based on your
9     reports, with Advil and ibuprofen, Advil and Aleve, before coming
10    to see you and you told him to continue doing that?
11    A    Correct.  That's correct, yes.
12    Q    And that day he was doing pretty well and so you told him to
13    come back if his headaches get worse?
14    A    Yes, yes.  So he then came back a couple of months later and
15    gave us a little bit different history about his headaches, that
16    they had recurred and become more severe.
17    Q    Gotcha.  Consistent, but they had gotten worse since the
18    last time he saw you?
19    A    Yes.
20    Q    Why don't you tell the jury about that visit and what you
21    documented there about his problems.
22    A    Yeah.  So he had had some -- you know, if you go back to
23    right after the accident, he was having severe daily headaches,
24    but they had calmed down for multiple reasons, medications and
25    various things like that, his surgery, but then his headaches
```

1   started to come back and they started to be more like the

2   original headaches.  They were more associated with photophobia,

3   phonophobia.

4   Q    Tell the jury what that means.

5   A    Yeah.  Sure.  In headache medicine, what you do is you first

6   find the location of the headache and you say, well, is the

7   headache in a craniocervical junction, the area between the head

8   and the neck, or is it in the front of the head or is it in the

9   frontal parietal portion of the head, which the majority of his

10  headaches came from the frontal parietal area where he was hit in

11  the head and had about a ten centimeter laceration at the time of

12  the accident.

13          So what happened, initially he had really bad headaches

14  and had some photophobia, which is sensitivity to light,

15  phonophobia which is sensitivity to noise, and nausea.  So what

16  you do is you look for these components, the photophobia, the

17  phonophobia, the nausea, and the vomiting.  Those components

18  don't come out of the neck.  The neck doesn't produce

19  photophobia, phonophobia, nausea, or vomiting.  That's all within

20  the brain.  So we knew that these were transforming to what we

21  call transform migraines, post-traumatic headache that will

22  transform into a migraine.

23          So at the time when he came back again, he said that

24  his headaches were more intense, progressed and became much

25  worse.  They would last four to six hours.  The right

1    frontotemporal -- right frontal parietal region, which is the

2    area of his laceration, he would have photophobia, phonophobia,

3    nausea, and occasionally the headaches would create some severe

4    and would debilitate him and would cause him to lie down in a

5    quiet room until they resolved.

6    Q    I'm going back to that January 21st, 2021, note.  You

7    mentioned in the head, the right -- well, why don't you tell me

8    what the neurological examination of the head was and what that

9    means.

10   A    Sure.  So his head in the right parietal area of the scar,

11   we palpated that and he had some numbness in the area of the

12   scar, but he didn't have what we call a Tinel sign.  We look for

13   a Tinel sign in the scar region.  We tap the length of the scar

14   making sure that there's not one specific area that might be

15   causing a neuroma effect.  Like you heard from Dr. Henderson,

16   sometimes these scars, you know, could develop a neuroma and the

17   little nerve would be caught up in the scar and that would be,

18   you know, producing the headaches, but in his case that wasn't

19   the case.  His scar appeared to be just numb from the laceration

20   in the accident and had the neuroma effect.

21   Q    And this is January 21st, 2021, just under three years

22   post-crash.  Tell the jury about your experience -- this would be

23   a chronic headache situation, correct?

24   A    Yes, it is.  You know, when you look at headaches, the

25   American Headache Association who has large meetings every year

1    in Phoenix, Arizona.

2           What you look for in headache people is you want to try

3    to get their headaches controlled within about a year because the

4    brain learns how to have a headache.  There's neurologic

5    circuitry that is inside the brain.  There's these receptor

6    sites, neurotransmitters that initiate headache in the brain.

7           So what you've got to do is not allow that pattern to

8    develop, and so if that pattern develops, intermittently you can

9    calm it down with various medicines, anti-inflammatories,

10   Percocet.  The surgery took some pressure off the neck and

11   reduced one of his triggers for headaches, but what happened was

12   that he had this ongoing problem that had developed over time and

13   intermittently got worse and it got worse again in January of

14   2021.

15   Q    And what were your recommendations going forward in January

16   of 2021?

17   A    So in January, what we did was what we routinely do.  We put

18   him on an oral blocking agent called Zonegran.  It's an

19   anti-convulsant and it's a medication that blocks headaches.  So

20   we put him on 100 milligrams and asked him to go up to 200

21   milligrams.  We put him on a drug called diclofenac which is an

22   anti-inflammatory drug.  He would take that twice a day.  The

23   Zonegran he was just supposed to take just at night every single

24   night.  The diclofenac, he takes one twice a day to avoid the

25   headaches, but we also gave him a little bit more specific

1    migraine drug called Maxalt—MLT.  It's a pill that melts on the

2    tongue.  It's a triptan drug that was invented in the late '90s

3    or came out in early 2000s and it aborts headaches of migraine

4    type.

5            So we told him to take the kind of nonspecific

6    anti—inflammatory drug, diclofenac, along with the Maxalt to

7    abort the headaches that did occur.  As far as the headache

8    blocking ability, we would put him on the Zonegran and try to get

9    the Zonegran to try to block these headaches from ever occurring.

10   Q    And then you talk about you'd follow up in two months and

11   you mention about --

12   A    Yeah.  You know, so there's another group of medicines that

13   are available to us.  One is a CGRP agent which is one of the

14   neurotransmitters in the brain that is on the end of the little

15   nerve sites where it's nerve to nerve and it's called the CGRP.

16   It's a calcitonin gene related protein receptor.  We have drugs

17   available where we can interrupt that cycle that starts in the

18   brainstem and goes into the brain.

19           So I told him that if these weren't going to work, we'd

20   give him CGRP agent like Aimovig, which ultimately we put him on,

21   or we would use Botox to block his headaches, which is probably

22   one of the most effective treatments for post-traumatic

23   transformed migraines available.

24   Q    Thank you, Doctor.

25           And he follows up in a couple of months.  Why don't you

1    tell me how he presents that day.

2    A    So, yeah.  He comes back at this point and he's having, you

3    know, a fairly dramatic decrease in his headaches.  He went from

4    three to four a week to one or two a week with the Zonegran as a

5    blocking agent.  He also thought that the duration of the

6    headaches were less than the four to six hours.  He basically,

7    you know, said that he was doing better, you know, with that

8    treatment and felt that treatment was becoming effective for him.

9    Q    And he's still seeing Dr. Muldowney for neck and back pain?

10   A    Correct.  He's still seeing Dr. Muldowney regarding his neck

11   issues and his back problems that Dr. Muldowney was taking care

12   of.

13   Q    Thank you.

14        And he still carries a diagnosis of post-traumatic

15   headaches?

16   A    Correct.  Yeah.  Post-traumatic headache with transformed

17   migraines that were associated with photophobia, phonophobia, and

18   mild nausea, and then his cervicalgia, his neck pain status post

19   his surgical procedure at C3-4, and he had -- he complained of

20   low back pain that was being managed also by Dr. Muldowney at

21   that time.

22   Q    Fair enough.

23        THE COURT:  And I'm going to caution you.  Y'all are

24   talking over each other.

25        MR. DAVID:  I'm sorry, Your Honor.  Thank you.

1          THE COURT:  Wait for counsel to finish his question and

2    then you may answer and let's wait until the witness completes

3    his answer.

4          MR. DAVID:  Yes, sir.

5          THE COURT:  Thank you.

6    BY MR. DAVID:

7    Q    And, Doctor, following up on June 8th of 2021, at this point

8    he was about to have a back surgery, but it got pushed back some,

9    correct?

10   A    That's correct.  Yes.

11   Q    Tell me how he presented that day.

12   A    So at this point he was having a lot more headaches for a

13   couple of reasons.  You know, one, that he had been found to have

14   some kidney problems.  So he couldn't take his

15   anti-inflammatories, couldn't take diclofenac, couldn't take

16   Aleve, couldn't take ibuprofen.

17          And then he didn't know, you know, whether the other

18   medicines were okay to take, and in fact they weren't.  The

19   Zonegran is not okay to take when you have renal insufficiency.

20   So he had more headaches at that point.  His headaches had become

21   three times a week and he wasn't taking much in the way of

22   medication for it, and he was also being worked up for some kind

23   of a kidney dysfunction problem.

24   Q    What is renal insufficiency?

25   A    Renal insufficiency is the inability of the kidney to filter

```
1    --
2              THE COURT:  Let me stop you right there.
3              Approach.
4         (Whereupon, a sidebar conference was had as:)
5              MR. DAVID:  It's in his records where he talks about
6    it.
7              MR. DILL:  Judge, that's not his expertise and it's not
8    in his report.
9              MR. DAVID:  It's in his records that he had renal
10   insufficiency and had to get off certain medications.  I'm trying
11   to explain he left these medications to go on other medications.
12             THE COURT:  Is his expertise in that?  He doesn't treat
13   that.
14             MR. DAVID:  I don't know that.  He's not a nephrologist
15   for sure.  Yes, sir.
16             THE COURT:  I'm going to sustain the objection.
17        (Whereupon, the sidebar conference was concluded.)
18             THE COURT:  Mr. David, you may proceed subject to the
19   Court's ruling.
20             MR. DAVID:  Thank you, Your Honor.
21   BY MR. DAVID:
22   Q    With respect to the medication change, what changes in
23   medication were made in this June 8th, 2021, visit due to the
24   problems he was having?
25   A    Sure.  So we picked up a couple of other agents.  The CGRP
```

```
 1   agents are very effective and they don't interact with the kidney
 2   function.  So we picked a CGRP agent by the name of Aimovig and
 3   it's an injection once a month into the arm typically and it
 4   blocks headaches.
 5           The second thing we did, we put him on Maxalt-MLT, ten
 6   milligram.  It's a triptan melt.  I asked him to use it by itself
 7   without any anti-inflammatories, and it shouldn't be a problem to
 8   his kidney used only intermittently.
 9   Q    And I think you just talked about Aimovig in the last visit
10   when you were discussing it, but tell the jury what that medicine
11   does and what your experience is with your patients that have
12   post-traumatic headaches.
13   A    Yeah.  So, you know, post-traumatic headache patients who
14   take Aimovig, it's been found to be very effective.  It reduces
15   the frequency and the severity of the headache by about
16   50 percent in trials.  Basically, you know, what we found in his
17   case, it can have an enhancing effect over time as you continue
18   to take it.  So my hope was that we would hopefully block at
19   least, you know, a good portion, half or more, of his migraine
20   headaches, and then we could use the Maxalt to abort the
21   remainder of the headaches that were hopefully less severe.
22   Q    Thank you, Doctor.
23           His physical exam -- that neurological exam, rather,
24   that day for his cervical lumbar spine, how were those on
25   June 8th, 2021?
```

1    A    Yeah.  So on that day he was very tender at the right

2    cranial cervical junction.  That's the junction between the skull

3    and the neck.  He had limited range of motion of about 60 degrees

4    bilaterally of his neck, and then his lumbar, he was diffusely

5    tender to palpation of his lumbar spine on that day.

6    Q    Okay.  Thank you.

7              And your impression that day, does it change?

8              MR. DAVID:  Hang on, Doctor.  We have an audio problem.

9              THE COURT:  Okay.  Thank you, Mr. David.  I was looking

10   in the opposite direction reading the transcript.

11                      (Pause in Proceedings)

12             MR. DAVID:  Proceed, Your Honor?

13             THE COURT:  You may.

14             MR. DAVID:  Thank you.

15   BY MR. DAVID:

16   Q    Doctor, I forgot what I said, but let's talk about -- I

17   think it was about your impression that day, had it changed when

18   it comes to the post-traumatic headaches.

19   A    No, it did not.  It was the same post-traumatic headache

20   with transformed migraine.  He had a little bit increase in the

21   frequency.  He continued to have his neck problems, neck pain.

22   He continued to have low back pain.  He had, you know, his hand

23   injury that we just noted, and he had his depression that

24   continued.

25   Q    Thank you.

1           And at the end in your recommendations you say he could

2    use Aimovig 140-milligram.  What dosage does Aimovig come in?

3    A    It comes in two doses, a 70-milligram dosage and a

4    140-milligram dosage, and what's been found in the studies is

5    that the 70-milligram dosage is not very effective.  So most

6    people in headache clinics like ours don't use the 70 very often.

7    So we went directly to the 140 to try to block the headaches.

8    Q    Thank you.

9           And I think you even talked about in your deposition

10   that your plan would be if the Aimovig was helpful, that would be

11   something he could use moving forward to control the headaches,

12   correct?

13   A    Yes.  That's correct.

14   Q    And what about the Maxalt?  Is it the same?

15   A    Maxalt is the same, yes.  He could use that as long as he

16   needed to to abort any headaches that would occur if that

17   combination would work.

18   Q    Fair enough.  He comes back to see you October 4th of

19   2021, correct?

20   A    Yes.  October 4th of 2021, yes.

21   Q    Tell us how he presented that day and how he was doing.

22   A    So at that point he was having about three of the headaches

23   per week.  They would go to seven to eight out of ten on a visual

24   analogue scale, which is a pain scale, zero being no pain, ten

25   being the worst pain.  He continued to use the Maxalt.  He was

1    using a combination of Maxalt and Tylenol to try to abort the

2    headaches.  He had taken Aimovig for one month in June and he got

3    a good effect out of it, but unfortunately he developed other

4    medical problems and couldn't get the medication for some reason,

5    the specifics of which I'm not sure, and he had been without the

6    medication for a while.  So his headache frequency picked back

7    up, you know, to the three days per week.

8    Q    And what was your impression that day?

9    A    So, yeah, he had -- again it was pretty obvious that he was

10   still having these post-traumatic headaches with transformed

11   migraine and all of the other, you know, factors that were being

12   followed by the other doctors.

13   Q    And he was no longer able to take Zonegran or NSAIDS?

14   A    That's correct.  He could never take that again because he

15   had, you know, the kidney dysfunction.  So he won't be allowed to

16   take any more anti-inflammatories for the remainder of his life

17   like Motrin, ibuprofen, naproxen, diclofenac.  He wouldn't be

18   allowed to take that anymore.

19   Q    And you want him to continue on the Aimovig and the Maxalt,

20   correct?

21   A    That's correct.  Yes.

22   Q    He follows up with you on May 12th of 2022?  I'm sorry.  I

23   might have skipped a few records there.

24   A    January 13?

25   Q    Yes, January 13.  How was he doing then?

1  A    So on January 13th he -- let's see if I skipped one.

2           THE COURT:  Mr. David, is he referring to an exhibit?

3           MR. DAVID:  Yes, sir.  I'm sorry.  All of these are

4  exhibits.

5           MR. DILL:  Your Honor, I'm sorry.  We don't have a

6  record from that visit.

7           MR. DAVID:  What visit?

8           MR. DILL:  January 13.

9           MR. DAVID:  We don't have that one either, Doctor.  If

10 you can just skip forward to May 12, 2022.

11          THE COURT:  Approach.

12      (Whereupon, a sidebar conference was had as follows:)

13          THE COURT:  So he can't testify as to a document that

14 has not been produced in discovery.

15          MR. DAVID:  I just skipped by it, Your Honor.  I don't

16 know if it was in discovery, but it's not in the record for sure.

17          THE COURT:  Did he refer to any of that in his

18 question?  Do I need to instruct?

19          THE CLERK:  The question was:  He follows up with you

20 on May 12th, 2022?  I'm sorry.  I might have skipped a few

21 records there.  January 13.  Yes, January 13.  How was he doing

22 then?

23          MR. DAVID:  But he didn't answer any questions.

24          THE COURT:  Well, there's a reference to

25 January 13th.  That leaves it open for the jury.  So what I'm

1   going to do is instruct them that there's been reference to a

2   January 13th appointment that is not in evidence.  So you

3   should disregard any answers with respect to January 13th.

4          MR. DAVID:  Yes, sir.

5          THE COURT:  Are you good with that?

6          MR. DILL:  I'm good.

7          While we're here, are we close to a spot where we can

8   take a restroom break?

9          MR. DAVID:  I'm almost done.

10          THE COURT:  If you've got five minutes?  Can you do it

11  in five minutes?

12          MR. DAVID:  I think so.  I have to look at my notes.

13  If you want to break right now, that's fine.

14          THE COURT:  Why don't we break now.

15    (Whereupon, the sidebar conference was concluded.)

16          THE COURT:  Okay.  I'm going to give the jury a break,

17  but before you go, I just want to give you an instruction.  There

18  was a reference in one of the answers to a

19  January 13th appointment.  That evidence is not in the record.

20  So you are to disregard any reference to a

21  January 13th appointment.  We'll stick to what is in evidence

22  here.

23          MR. DAVID:  Thank you, Your Honor.

24          THE COURT:  We'll take a brief recess and allow you to

25  stretch your legs.

1           Okay.  All rise for the jury.

2                   (Jury Exited the Courtroom)

3           THE COURT:  You may be seated.

4           MR. DAVID:  Thank you, Your Honor.

5           THE COURT:  All right.  We're going to take a break on

6    our end as well.  Anything we need to address?

7           MR. DILL:  Judge, there was one comment and I almost

8    got to my feet and I decided not to where the doctor indicated

9    that he could use one of these drugs forever.  I want to make

10   sure that the witness is cautioned that there is a limitation

11   here on future medicals that he cannot address because of the

12   Court's ruling.

13          MR. DAVID:  And, Your Honor, I am duty-bound to try to

14   get as close to the line as possible, but not cross it.  In his

15   deposition there are pages and pages about Aimovig, and if

16   Aimovig is successful aborting headaches, that would be the plan

17   going forward.  So that's all I've gotten out of him, and my plan

18   is to show that it has been successful through my client's

19   testimony and let the jury figure it out from there.  I'm not

20   going to have him go into detail.

21          THE COURT:  And, you know, as long as it hues and you

22   come close to the line, I'm fine with that, but when it crosses

23   the line in forever long term, that crosses the line.

24          So I would caution the witness that we need to confine

25   our testimony to the present and not opine on what might happen

1    in the future or his needs in the future going forward.  All

2    right?  That was based on the Court's ruling.  It's nothing you

3    did wrong.  It's an evidentiary ruling by the Court.

4              Anything else?

5              MR. DILL:  Nothing else, Your Honor.

6              MR. DAVID:  No, sir.  Thank you, Your Honor.

7              THE COURT:  All right.  Thank you.

8              And just by way of comment -- and I'm not picking on

9    you, Mr. David, and I think that things have been going very

10   smoothly, but there are a couple of instances where you commented

11   on the evidence and I want to stay away from that.  Okay?

12             MR. DAVID:  Yes, sir.

13             THE COURT:  All right.  And I've instructed the jury --

14   for example:  And you were here yesterday to hear evidence of him

15   having headaches the day of the accident, later in 2018 to

16   Dr. Muldowney, and in 2019 to Dr. Bertuccini.  I don't think

17   we've heard evidence from Dr. Bertuccini.

18             MR. DAVID:  And Your Honor is referencing the records

19   that we presented yesterday.  He was here with Dr. Muldowney.  We

20   put the records on the screen from Dr. Bertuccini where he

21   documented the headaches in May of 2019.

22             THE COURT:  Again, we need to be very clear on that

23   because when we summarize the evidence, it can leave a

24   misimpression with the jury.  You know, again I think defendants'

25   counsel could have objected to that and I would have sustained

```
1    the objection to that question, but I want to save time going
2    forward so that we don't have to keep interrupting.  I want to
3    point that out.
4              MR. DAVID:  And, Your Honor, I want to make sure that I
5    don't want any further afoul of the Court.
6              I think there's enough evidence in this case right now
7    for the jury to make the determination about whether Mr. Bradley
8    is going to need Aimovig going forward to take care of his
9    chronic headache condition and I'll let the jury have that in
10   their purview, but there is enough evidence for them to consider
11   right now.  So I'm not going to ask him will he need Aimovig more
12   likely than not forever because you've asked me not to do that.
13             He testified in his deposition that that would be the
14   plan if the Aimovig worked and it has worked and the records show
15   it has worked and it's been filled.  Prescriptions are in
16   evidence right now that they've been filled, and Mr. Bradley will
17   testify that the Aimovig has been helpful for him.
18             So I would think that's enough for the jury to consider
19   that issue even without him saying that and that's what I want to
20   make sure.  I don't want you to be upset with me when we're
21   talking about that because the truth is it helps him and it's
22   been an amazing relief for him to have the Aimovig.  And who's
23   going to pay for it, him or someone else?  We don't know.  The
24   jury will decide that, but that's a real issue.
25             And then they talked about Aimovig almost half the
```

1   deposition it felt like.  I read it again for like the third time

2   this week last night and that's what he said.  He said if he

3   responds well to it, that would be the plan going forward.

4              THE COURT:  As long as you hue to the Court's rulings

5   and that ruling is that he is not allowed to talk about the

6   defendant's future needs.  That witness cannot testify as to

7   that.

8              Anything else?

9              MR. DILL:  No, Your Honor.

10             MR. DAVID:  No, sir.

11             THE COURT:  All right.  Very good.  We will stand in

12  recess and we'll be back hopefully in about ten minutes.

13                         (Recess)

14             THE COURT:  Please be seated.

15             Before we have any additional discussion, I just need

16  to review the record because I want to readdress this Aimovig

17  question.

18                   (Pause in Proceedings)

19             THE COURT:  All right.  As the Court indicated, you

20  have my ruling on futures on this witness, and my concern is

21  there is discussion in the deposition of Aimovig, but it is

22  purely with respect to the current or the past course of

23  treatment.  There's nothing in there about future.  So we're

24  going to stay away from that, but the argument that you raised as

25  I'm reading it here, you cannot argue to the jury something that

1    is not in the record.

2              MR. DAVID:  If I can, Your Honor -- oh, go ahead.  Are

3    you done?  I'm sorry.

4              THE COURT:  You can't argue with evidence that's not in

5    the record.  You can argue fair inferences from what's in the

6    record, but you've got to hue closely to that.  There may be an

7    objection and the Court would likely sustain that objection if

8    you venture beyond a fair inference of what's in the record.  And

9    Stokes can only rely on what's in the record.

10             MR. DAVID:  So there's a few questions, though,

11   Your Honor.

12             THE COURT:  Okay.

13             MR. DAVID:  And I hate to even say it because I don't

14   want to lose right here.  I think we have enough in the record

15   right now to tell the jury you've heard the testimony of

16   Dr. Muldowney and Dr. Weir.

17             THE COURT:  You mean in closing argument?

18             MR. DAVID:  Yes, sir.  Closing argument.

19             I hate to preview that right now.  I feel like I'm

20   showing my hand, but I have to.  I want to talk to the Court

21   openly about this.

22             We've had two doctors who's treated him for his

23   headaches that talked about them being chronic and they're not

24   going away after all these years.  He's got this headache

25   condition.

1          In his deposition they asked him what would be the plan
2   for Aimovig and they said, well, if it works for him, that would
3   be the plan going forward.  He didn't say he will need in the
4   future.  They're going to try it out.  We're demonstrating right
5   now how Aimovig has been transformational for him.  So the jury
6   can make that inference that, okay, he has a chronic headache
7   condition that needs treatment.  They've talked about this could
8   be the plan if it works for him.
9          THE COURT:  But the kidney condition isn't going to --
10         MR. DAVID:  Oh, the kidney condition.  The kidney
11  condition is not part of that, Your Honor, no.  Aimovig is not
12  that.
13         THE COURT:  If it prevents it from being a future
14  course of conduct or future course of treatment.
15         MR. DAVID:  Oh, no.  I'm sorry, Your Honor.  He took
16  him off the medications that affected the kidney.  Aimovig is not
17  one.  He testified to that in his deposition as well.  I can make
18  that clear for the jury.  Thanks for telling me that.  I didn't
19  realize that that was an issue.
20         MR. DILL:  That was the issue I raised earlier, Judge,
21  that he said that -- the doctor testified a little while ago that
22  he took him off and he can't get on that again in the future, and
23  that's why I was saying I didn't object, but we were getting out
24  there -- and that's why we had the Rule 26 objection.  What he's
25  saying is I'm going to run past the Court's order on this, on

1    what you said about the future.

2             And we're going to show he's an (a)(2)(B) witness.  He

3    was referred by Mr. David.  So, you know, he's now circling all

4    the way around Rule 26 and saying I've got enough to get it in

5    anyway.

6             THE COURT:  No.  That's not coming in.

7             MR. DAVID:  And, Your Honor --

8             THE COURT:  That's not coming in.

9             MR. DAVID:  I just want to make sure I clarify because

10   I don't want this Court to think any worse of me than it already

11   does.  Everything he said is in his report.

12            THE COURT:  Mr. David, we all have a role here.  You

13   have a role here.  Mr. Dill has a role here.  None of this is

14   personal.  All right?

15            MR. DAVID:  Oh, I know that.  I'm talking about my

16   conduct here.

17            Everything he has said, I have been -- the words are in

18   his report.  And they asked him in his deposition why is he

19   taking Aleve and diclofenac.  He said those are bad for his

20   kidneys.  He didn't say that all of that caused his kidney

21   problem.  He just said he had to get off of those because of his

22   kidney problems.  And he said in his deposition that the Aimovig

23   is different.  In fact, Mr. Bradley stopped taking it because he

24   was worried that that would hurt it, too.  He said, no, no, no,

25   Aimovig is good, and got him back on it.

1    So the renal issue I feel is like a nonissue.  I wasn't

2    trying to make it an issue.  I just wanted to let the jury know

3    that the reason why he's not taking Aleve, Advil, and diclofenac

4    is because those are drugs that hurt his kidneys, but the Maxalt

5    and Aimovig do not and he's been on those for months now and

6    successful.

7            It's been demonstrated to the Court -- to the jury, I'm

8    sorry, that this is a chronic condition that will not go away.

9    It's been treated actively now for years.  And I'm going to argue

10   to them that based on the evidence, he'll have -- you know, he

11   ought to have it going forward, and I don't think I need a doctor

12   to say more likely than not to do that.  I think the jury can

13   make that determination on their own.  I'm sure -- well, any

14   questions for me, Your Honor?

15           THE COURT:  Mr. Dill, are you satisfied?

16           MR. DILL:  Not really, Judge.  I mean, I think the

17   future medicals is a burden that has to be carried by medical

18   testimony.

19           THE COURT:  And that's what I ruled.  I told him I

20   sustained that objection.  You know, I told you you're not

21   allowed to talk about the futures and you can't talk about it in

22   closing argument unless there's evidence to support it and

23   there's not evidence to support it.

24           MR. DAVID:  Your Honor, I just -- I want you to -- if I

25   can explain it.

1           In his deposition –– the order said keep him to his

2     reports in his deposition.  In his deposition and here in

3     testimony he's saying that would be the plan if it worked, to put

4     him on it.  It's working.  And the price –– he's had five

5     prescriptions in the last –– they're all in the record of him

6     getting them filled and it's working for him.  His next report is

7     going to be that he's doing better again with the medication.

8     How can the jury not make the inference?

9           Now, Mr. Stokes, I can see you saying he can't testify

10    about it because we're not letting him rely on his discussions

11    about future treatment with Dr. Weir, but certainly the evidence

12    of what these cost, the evidence of how often he's getting them,

13    the fact that he's got a chronic condition ––

14          THE COURT:  It has to be a fair inference.  The

15    argument that the doctor testifies he's been successful on this

16    treatment, that he's going to need it for the –– that he's going

17    to be on it and spending –– have expenditures to cover it for

18    five years, ten years, twenty years, where's the evidence of

19    that?

20          MR. DAVID:  Well, it's chronic.  It's never going away.

21    He's going to need headache treatment for the rest of his life,

22    Your Honor.

23          THE COURT:  Well, again, this witness cannot testify as

24    to future needs.

25          MR. DAVID:  Yes, sir.

1          But I think both witnesses, he and Dr. Muldowney,

2     talked about it being chronic and never going away and he needs

3     treatment for these headaches, and I think the jury -- that's

4     plenty for the jury to have to make the decision whether or not

5     he should have that going forward.

6          THE COURT:  You're arguing with me now.  I've ruled and

7     I'm not going to revisit that ruling.  The original ruling on

8     this was to exclude this witness because of the failure to comply

9     with the disclosure requirements, you know, and that was a

10    failure, but I allowed this witness to come in and testify based

11    on the factors for exclusion because it can be prejudicial to the

12    plaintiff and I did it in a very limited way that I felt

13    satisfied those elements and is consistent with the case law that

14    I cited to you.

15         MR. DAVID:  Yes, sir.

16         THE COURT:  And we're not going to revisit that.

17         MR. DAVID:  And I think Your Honor even said I skirted

18    close to it, but I have not crossed the line, correct?  Am I

19    right in that interpretation so far?

20         THE COURT:  I don't think Mr. Dill would disagree that

21    both sides have to advocate for the client and approach the line,

22    and I don't fault any party for advocating for their clients, but

23    you have to comply with the Court's ruling.  Future medicals are

24    not a subject that I'm going to allow this witness to testify to,

25    and, you know, we're going to need -- we may need to address this

1    down the road, but, you know, you're putting me in the position

2    of blessing your closing argument before you've even closed your

3    case.

4              MR. DAVID:  I didn't mean to do that, Your Honor.  I'm

5    just trying to be as forthright with the Court as I can.  So I

6    feel like with the evidence we have right now -- I was not going

7    to ask Mr. Stokes, even though he's an expert and has priced

8    these things, about that because he relied on his conversation --

9    multiple conversations with Dr. Weir when it came to that, but

10   with Mr. Theriot, we have the cost of the Aimovig and I was going

11   to have him do the calculations.

12             And I hate to tell what I'm doing, but we have doctors

13   saying this is chronic.  It's never going away.  This is the

14   treatment protocol we have.  This was our plan to do it and it's

15   working.  I think that that's enough for the jury to have an

16   inference.

17             And the jury may say that's not enough and the jury may

18   say, well, I think that's enough that it's more likely it's going

19   forward, and I want to be able to give them that option, Your

20   Honor, because that's the truth in the case.  There's nothing

21   hidden about it.  It's exactly what he said in his deposition.

22   The prices are in the record, the pharmacy records, of all the

23   prescriptions he's filled.

24             THE COURT:  Who are we talking about?  Stokes?

25             MR. DAVID:  Not Stokes.  Mr. Theriot, the economist.

1    They always do calculations.

2         THE COURT:  The economists, life care planners, if

3    they're not doctors in their own right, have to rely on --

4         MR. DAVID:  For sure.

5         THE COURT:  -- testimony and evidence from other

6    doctors, and if that's not in the record, they can't rely on it.

7         MR. DAVID:  Fair enough.

8         And I'm not talking about -- this is the economist.  So

9    he doesn't rely on any doctors at all.  The economist -- just

10   like two weeks ago I saw at trial.  In every trial the future

11   medicals get blown up to heck.  So I'm just talking about him

12   doing the calculation.  That's it, Your Honor.

13        THE COURT:  All right.  And what I'm telling you is

14   you've got the Court's ruling.  This witness can't testify as to

15   future medicals.  As far as other experts that rely on medical

16   testimony, they can only opine or testify to matters that are in

17   the record.  You can't get in excluded testimony through an

18   economist or through a life care planner.

19        And to the extent that you're arguing or trying to

20   suggest that inference, I'm not going to bless an argument at

21   this time, but you can only argue the evidence and fair

22   inferences from that, and if there's not evidence in the record,

23   that may be an unfair inference to argue from and the Court would

24   sustain an objection to that.

25        MR. DAVID:  Can we brief that issue tonight so we can

1   talk about it before our closings tomorrow?

2           THE COURT:  I'm always happy to talk about this with

3   counsel.

4           MR. DAVID:  I've thought about this so much, Your

5   Honor.

6           THE COURT:  As long as we don't -- you know, I will

7   tell you y'all are on track.  If we were into next week on this,

8   then I would have an issue with the interruptions, but I promised

9   or I represented to this jury we're going to finish in five days

10  and it looks like you're coming under.  So I'm willing to address

11  it with you, but I'm not going to -- I've told you what my view

12  is on it and that view is not going to change.  No matter how

13  much you argue with me, it's not going to change.

14          MR. DAVID:  Yes, sir.  Thank you.

15          THE COURT:  All right.  Thank you.

16          MR. DAVID:  While the jury is out, can I do a proffer

17  real quick with Dr. Weir?

18          THE COURT:  A proffer on what?

19          MR. DAVID:  On future medical treatment.

20          THE COURT:  It's out of the hearing of the jury.

21          MR. DILL:  I don't have an objection to doing it right

22  now, Your Honor.

23          THE COURT:  Yeah.  How long do you want to go on it?

24          MR. DAVID:  Not long, Your Honor.  I really didn't plan

25  to do it.  I thought we had what we needed.

1          THE COURT:  All right.  Then let's proffer it.  You may

2     proceed.

3          MR. DAVID:  Thank you.

4          And he's already been accepted as an expert in

5     neurology, right, Your Honor, for the proffer, the purposes of

6     the proffer?

7          THE COURT:  My understanding is he was accepted.  There

8     was no objection and no traverse.  So you may proceed.

9          MR. DAVID:  Thank you.

10    BY MR. DAVID:

11    Q    Dr. Weir, in conjunction with your previous testimony, what

12    are your future plans for Wilfred Bradley when it comes to the

13    Aimovig and Maxalt he's been taking now for quite some time with

14    you?

15    A    Well, because of the effectiveness of it, especially as of

16    his last visit in May of 2022, I'd continue that as long as it

17    was effective.

18    Q    And he's gotten the prescriptions filled in March, April,

19    May, June, and July of this year?  They're in evidence.  Teche

20    Pharmacy Drugs.  I think it's Plaintiff's Exhibit 7, I believe.

21          He's been compliant with your treatment protocols,

22    correct?

23    A    Yes.

24    Q    And the Aimovig is helping to quell his headaches, correct?

25    A    Yes.  Aimovig has reduced his headaches from two to three

1    severe debilitating migraines a week to two or three mild

2    headaches a month.

3    Q    And the Maxalt is helping abort those headaches he is

4    getting?

5    A    Yes.

6    Q    What would be your future recommendations for Mr. Bradley

7    when it comes to his headache protocol and treatment?

8    A    I would say that we'd keep him on the Aimovig and we would

9    basically have him have an injection once a month, you know, and

10   as long as it's effective and as long as it doesn't create any

11   problems with any other, you know, organs or things of that

12   nature -- for instance, if we couldn't control his blood pressure

13   or something.  You know, you monitor those things continuously,

14   and if he has no problems, you know, relating to that drug, which

15   he shouldn't, then we continue it indefinitely.

16   Q    And how do you monitor that treatment of Mr. Bradley going

17   forward with respect to his medication?

18   A    Well, of course it will take a couple of people.  He has a

19   renal doctor right now that will take care of that issue.  He'll

20   have a primary care doctor, a family doctor, who will take care

21   of looking over all of his general medical problems, and we'll

22   monitor him in our office, you know, for the things that we feel

23   to be potentially side effects of that drug.  If he doesn't have

24   any problems with that drug, we'll continue it indefinitely.

25   Q    And how often would you see him per year going forward?

1    A    I'll see him every six months.

2    Q    I guess we asked this a little earlier, but with his chronic

3    headaches that he has, are these just going to go away?

4    A    No.  They're not going to go away.  I mean, they've kind of

5    proved now that even with -- if you look at the Aimovig therapy

6    over the last year, every time Aimovig was taken away from him

7    for two or three months, his headaches came back to the two or

8    three severe debilitating headaches per week, and every time you

9    put him back on the Aimovig, his headaches reduced dramatically

10   to two to three mild headaches a month.

11   Q    So going forward, how long will he need headache medication

12   of some sort to take care of the chronic headache condition he

13   has?

14   A    Based on the American Headache Society and the American

15   Headache Foundation, anybody who has post-traumatic headaches

16   that have them into the fourth year -- and then really you start

17   looking at it after the first year -- is very difficult to treat.

18   After two years, it's going to be long-term treatment.  He is

19   now, you know -- what is he now?

20   Q    Fifty-three, I think.

21   A    February of '18.  So he's four years and five months.  So he

22   is way beyond anybody's calculations of the fact that this is a

23   chronic ongoing long-term headache problem that needs to be

24   addressed by somebody trained to take care of difficult

25   headaches.

1    Q    And you're that person, correct?

2    A    Yes.

3    Q    So how long in the future will he need to have some type of

4    headache medication to avoid and control his headaches?

5    A    I've always said in this kind of scenario that it's a

6    long-term plan, indefinite, lifetime, however long he lives.

7    Q    And right now he's taking Aimovig -- I might be saying it

8    wrong -- Aimovig for control and Maxalt to abort headaches,

9    correct?

10   A    Yes.

11   Q    And he'll need that type of treatment going forward for the

12   rest of his life?

13   A    Correct.  Yes.

14   Q    And as of right now, your best medical opinion more likely

15   than not is that he will need Aimovig and Maxalt going forward

16   indefinitely?

17   A    Yeah.  Now, there is one issue that has developed with the

18   renal disease.  Now, Maxalt, this is something that could

19   aggravate his blood pressure.  He may need to be changed to one

20   of the new CGRP oral agents that would abort his headache at some

21   point.  Very similar in cost and it would be used in the exact

22   same manner.  Should he develop an uncontrolled problem with his

23   pressure based on what the other doctors are dealing with, we

24   would change it to like Nurtec or -- that would probably -- or

25   Ubrelvy, one of those two agents.  That would be the only change

```
 1   we'd make going forward.
 2   Q    So he'll need Aimovig going forward likely for the rest of
 3   his life indefinitely for control, correct?
 4   A    Correct.
 5   Q    And then he'll need Maxalt going forward monthly for the
 6   rest of his life, or if he has problems with blood pressure,
 7   another replacement medication to abort headaches that's similar
 8   in cost?
 9   A    Correct.  It's a CGRP agent just like the Aimovig and those,
10   you know, have not been shown to have these big problems like the
11   triptan drugs, like Maxalt, with blood pressure, a surge in blood
12   pressure.
13   Q    And just to make sure I have this covered fully.  His
14   options going forward are control the headaches with medication
15   or just suffer them?
16   A    That's correct.  Yes.
17             MR. DAVID:  No further questions, Your Honor.
18             MR. DILL:  I'm not going to cross the proffer, Your
19   Honor.
20             MR. DAVID:  Do you want me to put Stokes on real quick,
21   Your Honor?  I can do it at the next break.  That's fine with me,
22   whatever you want to do.
23             THE COURT:  We'll play around with the next break and
24   see if we can time it.  Let's go ahead and bring the jury in.
25             MR. DAVID:  Thank you, Your Honor.
```

```
 1                    (Jury Entered the Courtroom)

 2              THE COURT:  All right.  Please be seated.

 3              Mr. David, you may proceed.

 4              MR. DAVID:  Thank you, Your Honor.

 5    BY MR. DAVID:

 6    Q    When we wrapped up before we took a break, Dr. Weir, we had

 7    talked about your October 4th, 2021, visit.  Dr. Weir, that

 8    last October 4th, 2021, visit we just discussed, at the end you

 9    talk about Mr. Bradley continuing on the Aimovig -- I've been

10    saying it wrong -- because you specifically say that Aimovig will

11    not affect his renal insufficiency and has worked well when he's

12    tried it, correct?

13    A    That's correct.  Yes.

14    Q    Okay.  And then you continue with the Maxalt as well because

15    that won't affect his renal problems as well, correct?

16    A    Correct, except for the fact that if the Maxalt would push

17    his blood pressure up, then we may have to make an adjustment,

18    but that's it.

19    Q    Okay.  Thank you so much.

20              And turning now to the next visit in the record is

21    May 12th of 2022, and why don't you tell me about your clinical

22    summary of that date in that record.

23    A    Yeah.  So he returned that day.  He was 53 at that point.

24    He had visited in January and had missed a couple of his Aimovig

25    prescriptions and had recurrence of his headaches back to two to
```

1    three per week.  Then we got him back on the Aimovig at that

2    point consistently from January through May and it had reduced

3    his headaches down to two to three mild headaches per month at

4    that point, and he was successfully treating the milder headaches

5    with Tylenol and Maxalt.

6    Q    And what does that mean that, okay, he's taking Aimovig and

7    a couple of times for different reasons he got off them

8    temporarily and had an increase in headaches and gets on the

9    Aimovig and has a reduction in headaches.  What does that tell

10   you as a neurologist?

11   A    What it tells you is the brain is that the brain is going to

12   continue to have these headaches long term.  He's more than four

13   and a half years post-injury, and he's going to continue having

14   these headaches unless he's on these medications.

15            MR. DILL:  Objection, Your Honor.  Sidebar.

16        (Whereupon, a sidebar conference was had as follows:)

17            THE COURT:  You're eliciting --

18            MR. DAVID:  My question was very limited.

19            MR. DILL:  He crossed the line, Judge.

20            THE COURT:  All right.  I'm going to instruct the jury

21   that this doctor is not here to testify with respect to what is

22   going to be needed in the future.  I mean, that was the Court's

23   ruling and then he disregarded it.  His testimony about future

24   medication is --

25            MR. DAVID:  And, Your Honor, if I can, note my

```
1    objection, but he can definitely talk about the chronicity of the
2    situation and it not going away on its own.
3              THE COURT:  He can talk about -- I mean, that's a
4    current diagnosis.
5              MR. DAVID:  And he can talk about what it's like right
6    now.
7              THE COURT:  Not about what he needs in the future.
8              MR. DILL:  He just testified he'll need it going
9    forward in the future.  That's what he just said, Judge.
10             THE COURT:  I'm instructing the jury.  Stay away from
11   that.
12        (Whereupon, the sidebar conference was concluded.)
13             THE COURT:  Just a point of procedure and an
14   instruction for the jury, the present witness here is not being
15   admitted for purposes of talking about future needs.  He is
16   talking -- he is being admitted and his testimony is being
17   admitted purely for purposes of his diagnosis and treatment of
18   the plaintiff, not as to what those future needs are going to be.
19   So to the extent that the witness opines or has opined about what
20   might be needed in the future, you are to disregard that, and,
21   again, only evidence in the record.
22             You may proceed, Mr. David, subject to the Court's
23   rulings.  Let's hue closely to that.
24             MR. DAVID:  Thank you, Your Honor.
25             THE COURT:  Thank you.
```

BY MR. DAVID:

Q    And, Doctor, without talking about anything when it comes to future treatment, I want you to explain to me what it means to you as a neurologist that he got better with the medications you're prescribing and then got worse when he was off them?

A    Well, it means that the medicine Aimovig was suppressing the headaches, and when he got away from the Aimovig, the headaches were allowed to occur.

Q    And the Maxalt also helps him abort headaches when he gets them?

A    Correct.  The Maxalt is an abortive agent.  So if he develops a headache, the Aimovig doesn't do anything for an acute headache.  The Maxalt is the one that aborts the acute headache.

Q    Okay.  And I guess what is your overall impression as of May 12th, 2022, when you saw him last?

A    I felt that he continued to have post-traumatic headaches and that they were triggered by cervicogenic problems and that the Aimovig was effectively blocking the headaches except for two to three mild headaches a month.

Q    And without mentioning anything about future treatment, for these chronic headaches that Mr. Bradley's suffering, is there any chance -- not any chance.  Is there any likely scenario where his headaches just abort and go away on their own?

        THE COURT:  Don't answer that.  We're getting into the future.

1          MR. DAVID:  Yes, sir.  Can we approach very briefly,

2   Your Honor?

3          THE COURT:  Yes.

4       (Whereupon, a sidebar conference was had as follows:)

5          MR. DAVID:  I thought when you were here you said he

6   could answer that question, but not talk about treatment.  I

7   asked that and you said that was fine.

8          THE COURT:  Well, you're asking about his prediction

9   about what is going to be happening in the future.  He can talk

10  about his current treatment.

11         Mr. Dill?

12         MR. DILL:  You're right.  He's predicting what's going

13  to happen in the future without the Aimovig.  So he's backdooring

14  what you told him he can't come through the front door with.

15         MR. DAVID:  I'm not asking about treatment, only about

16  the fact that these headaches after four and a half years are not

17  going to go away.  That's all I want him to say.

18         MR. DILL:  And that's predicting the future.

19         MR. DAVID:  That's not what the ruling was.  It was

20  about medical treatment.  He talked about the Aimovig in his

21  deposition.

22         THE COURT:  First off, he does not talk about future

23  use of Aimovig.  Do you have a citation to the deposition where

24  he has testified that as of the diagnosis he made in his current

25  treatment, that he did not believe it would go away?  Do you have

1   that in the deposition?

2           MR. DAVID:  I may be able to find it, Your Honor.

3           THE COURT:  And this is a break because he was not

4   properly disclosed and my condition of allowing him in is that

5   you hue closely to my rulings as far as what he can testify to.

6           MR. DAVID:  Can I go get the deposition real quick?

7           THE COURT:  Yes.

8           MR. DAVID:  My tired eyes are reading this as fast as I

9   can.

10                  (Pause in Proceedings)

11           THE COURT:  You knew this was going to be the case

12   based on the Court's ruling, but we are going to hue to the

13   deposition.

14           MR. DAVID:  I wanted you to understand this background,

15   too, for our previous discussions.  It's hard for me to read this

16   quickly.  I'm just -- the question is on page 46 when

17   Mr. Wynne was asking him what the plan is for the Aimovig and

18   whether it works and how you do it.

19           THE COURT:  All right.  Stop.  It states here -- this

20   is starting at the bottom of page 45, line 20, that seems to read

21   through page 46, line 11.  It appears to be impressions based on

22   current treatment.  It doesn't have any future aspects to it.

23           MR. DAVID:  Yes, sir.

24           THE COURT:  And it doesn't opine as to whether he is

25   likely to continue to have headaches into the future.  It's not

 1  in there.  It's not in that section.  That's expert testimony as

 2  to what's going to -- you know, what's the likelihood he's going

 3  to continue to have those symptoms.

 4          MR. DAVID:  And that's in his report, about him having

 5  chronic post-traumatic headaches that are four and a half years

 6  old.  That's all I was trying to get is that at four and a half

 7  years he's going to have headache problems going forward.

 8          THE COURT:  In his report?  In Stokes' report?

 9          MR. DAVID:  No.  In his report he talks about all the

10  post-traumatic headaches.  He's an expert neurologist talking

11  about his treatment right now.

12          MR. DILL:  Judge, we've done this for hours on this

13  thing and then you ruled because he is an A2B expert.  He was

14  referred by counsel and I'm going to show the record when I get

15  up.  And you led him up and let him get into this with the

16  provision that he couldn't go into the future medicals.

17          MR. DAVID:  He did say that one thing.  I did not try

18  to go --

19          THE COURT:  Likelihood of the future, about whether

20  symptoms will go into the future, is future medical.

21          MR. DILL:  I agree.  And, Judge, we're dangerously

22  close to a mistrial at this point.

23          THE COURT:  Let's not go into that.

24          MR. DAVID:  Yes.

25      (Whereupon, the sidebar conference was concluded.)

```
1                    THE COURT:  You may proceed.

2                    MR. DAVID:  Thank you, Your Honor.

3                    THE COURT:  But proceed subject to the Court's rulings.

4                    MR. DAVID:  Thank you, Your Honor.

5                    THE COURT:  Thank you.

6    BY MR. DAVID:

7    Q    Do you recall being deposed back in October of 2021, a

8    little less than a year ago, by Mr. Wynne?

9    A    Yes, I do.

10   Q    Okay.  And he asked you some questions about Aimovig in that

11   deposition, right?

12   A    Yes, he did.

13                   MR. DILL:  Objection, Your Honor.  He can't read a

14   deposition.

15                   MR. DAVID:  I'm not reading it.  I'm trying to track

16   exactly what the Court just told me.

17                   THE COURT:  Ask the question.  We don't need to read

18   from the deposition because he's here to testify.

19                   Please proceed subject to the Court's ruling.

20   BY MR. DAVID:

21   Q    And at that point you thought the Aimovig had calmed down

22   the intensity and reduced the frequency of the headaches,

23   correct?

24   A    That's correct.  Yes.

25   Q    Did it eliminate them altogether?
```

```
1    A     No.

2    Q     And you wouldn't expect that to eliminate altogether?

3    A     No, not typically.  I haven't seen any really strong reports

4    on the drug that say it's one hundred percent effective, no.

5    Q     Okay.  And that success of the Aimovig quelling the

6    headaches and making them lesser made you optimistic, more

7    optimistic for Aimovig than the other medications you had given

8    him, correct?

9    A     Yes.

10   Q     But your impression is typically with patients, given your

11   experience, if the Aimovig gave them some good results after one

12   injection, you would expect additional injections to increase the

13   efficiency of the drug?

14              MR. DILL:  Judge --

15              MR. DAVID:  I'm asking a question.

16              MR. DILL:  -- I'm going to object.  Same thing we had

17   at sidebar.

18              MR. DAVID:  I can read him the answer if you want.

19         (Whereupon, a sidebar conference was had as follows:)

20              MR. DAVID:  I read the exact question.  I read it

21   exactly word for word.

22              MR. DILL:  He's referring to future medicals, Judge.

23              MR. DAVID:  It was in the deposition.

24              THE COURT:  My ruling was they could cover what was in

25   the deposition.  The reason I did not allow future medicals was
```

1   because it wasn't covered in the deposition.  He can hue close to

2   that line if he sticks to what was asked in the deposition and

3   that's nowhere near close to a mistrial.

4           MR. DILL:  Thank you, Your Honor.

5           MR. DAVID:  Would you like me to show the witness the

6   answer just so he doesn't --

7           THE COURT:  No.  Just ask the question and limit it and

8   make sure he understands.

9       (Whereupon, the sidebar conference was concluded.)

10  BY MR. DAVID:

11  Q    And if you'd answer this question in a yes or no fashion, it

12  would be great.  I'm going to ask the exact same question again.

13          (As read:)  But your impression is typically with

14  patients, given your experience, if the Aimovig can give them

15  good results after one injection, you would expect additional

16  injections to increase the efficiency of the drug?

17  A    Yes.

18  Q    And how is Aimovig administered?

19  A    It's a subcutaneous injection.  It's about a half-life of

20  about 28 days, and because of the pharmacokinetics of the drug,

21  half of it is eliminated every 28 days.  So it accumulates in

22  your system on a month-to-month basis, and therefore you can

23  predict that it would be more protective over time until it

24  reaches five half-lives which would be about five months.

25  Q    And it just levels off at that point?

1    A    Correct.

2    Q    If doesn't become ineffective.  It just levels off?

3    A    No.  It stays effective, but just the level of Aimovig

4    available in the bloodstream and brain is higher each month until

5    you've reached five months.

6    Q    And you said it's an injection.  Does Mr. Bradley have to

7    inject himself or is it administered by someone else?

8    A    He has to do it himself or have somebody inject it for him.

9    Q    In what way?

10   A    It's simple.  I mean, it's like taking -- this is a perfect

11   example of it.  It looks just like this except there's a little

12   button on the end.  You take it and you push it against your arm,

13   you push the button, and you wait until the second click --

14   there's two clicks, the first click when you push the button and

15   the second click when the medicine has already been delivered.

16   Then once it's been delivered, on the second click you take it

17   off.

18              MR. DAVID:  Thank you so much.  I think those are all

19   the questions we have, Your Honor.

20              THE COURT:  Thank you, Mr. David.

21              Mr. Dill, you may proceed with cross when you are

22   ready.

23              MR. DILL:  Thank you, Your Honor.

24                         CROSS-EXAMINATION

25   BY MR. DILL:

1    Q    Doctor, on your initial visit of August 18th, 2020 --

2              MR. DILL:  And, Mr. Don, if you could pull up Defense

3    Exhibit 8C, page 1086.

4    BY MR. DILL:

5    Q    Doctor, on that initial visit in your clinical summary, you

6    indicate that he had a positive loss of consciousness in the

7    accident.  That's from the history given by Mr. Bradley himself,

8    correct?

9    A    Yes, sir.  That's correct.

10   Q    All right.  You reviewed the emergency room records, didn't

11   you?

12   A    I did.

13   Q    And there was no indication in the emergency room records

14   that there was a loss of consciousness, was there?

15   A    Well, yes, but the problem with the emergency room records

16   and the ambulance records is nobody could access the patient for

17   20 minutes.  So you wouldn't expect him to be unconscious for

18   greater than 20 minutes.

19   Q    But the answer to my question is there was no loss of

20   consciousness noted in the emergency room record, correct?

21   A    That's correct.

22   Q    And there was none noted in the ambulance record?

23   A    Correct.

24   Q    If we go down to the last paragraph of that page, his

25   current complaints at that time -- and this is August 18th of

1  2020 -- were what, Doctor?

2  A    In regards to his headache?

3  Q    Well, I want to go through the whole paragraph.  His current

4  complaint included headaches that occurred only once or twice per

5  week, correct?

6  A    Correct.

7  Q    They reached an intensity of four of ten level, correct?

8  A    That's correct.

9  Q    And immediately after the accident, his headaches were very

10  frequent and on a daily basis?

11  A    Correct.

12  Q    That's what he told you?

13  A    Right.

14  Q    Now, you were here yesterday, weren't you?

15  A    I was, yes.

16  Q    And going back to what he told you, he said when he had

17  them, he had photophobia and phonophobia and you thought he was

18  likely having migraines, right?

19  A    Correct.

20  Q    And photophobia is light sensitivity, right?

21  A    Yes.

22  Q    It means you can't be in bright lights at all?

23  A    Correct.

24  Q    And phonophobia means sound bothers your ears and it makes

25  your headache worse, right?

1   A    That's correct.

2   Q    You were here for the entirety of Dr. Muldowney's testimony

3   yesterday?

4   A    I don't think I was here for the entire thing, but I was

5   here for about two-thirds of it.

6   Q    Were you here for my cross-examination?

7   A    Yes.

8   Q    So you saw me go through page for page for page and in the

9   first year he didn't report a single headache, right?

10  A    Well, I also saw the other -- the plaintiff attorney go back

11  on some of those same notes and show that there were in fact

12  headaches on some of those days.  You were looking at the Review

13  of Symptoms and wasn't looking at the body of the report.  So

14  there were some days that he did in fact have headaches.

15  Q    Did you study all of those records, Doctor?

16  A    Most of them, but I don't remember if I did all of them.

17  Q    When somebody is having migraine headaches with photophobia

18  and phonophobia, those are intense, aren't they?

19  A    Well, they can be intense.  I mean, intensity is the part

20  where, you know, you look at the visual analogue scale.  They can

21  be mild.  They can be moderate.  They can be intense.

22  Q    But in those reports he was checking off each time -- or not

23  checking off that he was having any headaches or dizziness or any

24  of this, correct?

25  A    Whether he or somebody else was checking that off I don't

1   know.  As Dr. Muldowney stated, that's a push button apparatus,

2   and EMR is notorious for being pretty bad when it comes to Review

3   of Systems questions.

4         MR. DILL:  If we can go to the next page, 1087, please,

5   Mr. Don, at the top of the page.  If you could blow the first two

6   paragraphs up, please.

7   BY MR. DILL:

8   Q    His second complaint was neck pain, right?

9   A    That's correct.  Yes.

10  Q    And at that time he was reporting a two of ten intensity?

11  A    Yes.

12  Q    And he told you it may reach a five of ten on days where he

13  was more active?

14  A    That's correct.  Yes.

15  Q    And what did he report to you for most days?

16  A    Yeah.  On most days he reported that the pain was like he

17  described as a stiffness.

18  Q    His third complaint was what, Doctor?

19  A    Upper back pain.

20  Q    And he also characterized that as a stiffness, correct?

21  A    Correct.

22  Q    And it ranged from a two to a four out of ten, correct?

23  A    That's correct.  Yes.

24        MR. DILL:  Okay.  And if I could have the next full

25  paragraph, please, Mr. Don.

1    BY MR. DILL:

2    Q    His final complaint on that date was mild depression?

3    A    Yes.

4    Q    And he said it was primarily because he was not able to

5    work?

6    A    That's what he thought it was, yes.

7    Q    Well, in this visit he didn't mention anything about his

8    lumbar spine, did he?

9    A    Not that I'm aware of, no.

10            MR. DILL:  All right.  If we could go to the bottom of

11   that page, the Review of Systems, please, Mr. Don.

12   BY MR. DILL:

13   Q    The frequency and duration of the headaches that he reported

14   to you was one to two days per week and ten to twenty minutes in

15   duration?

16   A    That's correct.  Yes.

17   Q    Now, you were asked some questions earlier or you indicated

18   earlier he was referred by Dr. Muldowney.

19            MR. DILL:  Could I have 2913, please.

20   BY MR. DILL:

21   Q    This is part of your record, is it not, Doctor, the note

22   from Lafayette Bone and Joint --

23            MR. DILL:  If you could blow up the whole thing,

24   Mr. Don.

25   BY MR. DILL:

416

1   Q   -- indicating that their office had received a call from

2   Mr. David's office asking that he be referred to you by

3   Dr. Muldowney?

4   A   That's correct.  Yes.

5   Q   Have you seen patients at the request of Mr. David before?

6   A   I have, yeah.

7   Q   Quite a few?

8   A   Probably four or five at least.

9   Q   And, Doctor, on your causal analysis, how do you go about

10  determining whether or not a particular complaint is related to

11  an event in time?

12  A   Well, the main thing is we look at whether or not that event

13  occurred -- ever occurred on a frequent basis prior to that event

14  in a temporal sort of a way.  And then you look at the injuries

15  sustained.  You know, he struck his head on some object in the

16  car and had a large laceration pertaining to the headaches, and

17  then gave a subjective history of loss of consciousness, had to

18  be extricated.

19         So all of those things are fitting.  The mechanism is

20  fitting.  And then you go on to look at the sequence of events

21  that occur after it and it looks like he's had intermittent

22  headaches over the last four and a half years.

23  Q   So let's talk about the temporal -- you said there's a

24  temporal element to it and I want to know what's your magic

25  number?  At what point beyond an event, if someone is not having

1   a headache, that you say I can't relate that?

2   A    Well, he had headache in the emergency room.  It's

3   documented in the medical records.

4                       (Pause in Proceedings)

5             MR. DILL:  May we resume, Your Honor?

6             THE COURT:  You may.

7   BY MR. DILL:

8   Q    Doctor, I lost track of where you were in your response.

9   A    Yeah.  We were talking about his headaches, and I said he

10  had -- you know, it was documented by the ambulance.  It was

11  documented by the emergency room.  It was then subsequently

12  documented by Dr. Muldowney intermittently.

13            So he didn't say he had a headache every day.  He said

14  he had a headache two or three times -- the times when they were

15  worse, two to three times per week.  So I wouldn't expect him to

16  have a headache every time he showed up at a doctor's office.

17  Q    Right.  So let's back up and break this down.

18            If I have a head injury and cut my head in an accident

19  and I have a headache and don't have a headache for a month and

20  then I begin having migraine headaches, you're going to relate

21  that back to that original accident?

22  A    Yes.

23  Q    What about six months?

24  A    Well, six months is getting a little long, you know, but if

25  you had intermittent headaches -- and he said he had headaches

1    daily for a while.  And then he was being treated for his neck.

2    The medications that he was getting treated for his neck, the

3    injections, would reduce the headaches.  So, you know, I don't

4    think this is an unusual story, and he does, you know, report

5    headaches intermittently through the records.

6    Q    Actually what he reported to you in the beginning on your

7    first visit about two years after this accident was that in the

8    beginning they were every day and they were associated with

9    photophobia and phonophobia, right?

10   A    Correct.

11   Q    They weren't intermittent?

12   A    For about a week or so they weren't that way as I understood

13   it, something like that.

14            MR. DILL:  All right.  Mr. Don, if we could go to 3985.

15   BY MR. DILL:

16   Q    In March of '21 --

17            THE COURT:  What exhibit is this?

18            MR. DILL:  It's still out of 8C and they're Bate

19   numbered inside that exhibit.

20            THE COURT:  Okay.

21            MR. DILL:  And, Mr. Don, if you could give me the first

22   full paragraph, please.

23   BY MR. DILL:

24   Q    All right.  At that time his headaches had improved and he

25   was having a headache one to two days per week?

1    A    That's correct.  Yes.

2    Q    Then you saw him again in June of '21 and he was –– at that

3    time his headaches were becoming worse again, correct?

4    A    If you could put back that original paragraph there that you

5    started the question on.

6          THE COURT:  Can we put up that original page?

7    A    Yeah.  I see what you're talking about.  Thank you.

8          THE COURT:  I believe there's a question pending.  Are

9    you withdrawing the question?

10         MR. DILL:  I am going to withdraw the question, Your

11   Honor, and I'm actually done.  Thank you, Doctor.

12         THE WITNESS:  You're welcome.

13         THE COURT:  Mr. David, you may commence redirect when

14   ready.

15         MR. DAVID:  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17   BY MR. DAVID:

18   Q    The defense brought up the fact that I referred Wilfred

19   Bradley or asked Dr. Muldowney's office to make sure the headache

20   referral went to you.  I've also referred people to you who

21   aren't in litigation, right?

22   A    Correct.  Yes.

23   Q    One is a very close family member, correct?

24   A    Correct.  Yes.

25   Q    And you helped him control his headaches?

1    A    Yes.

2    Q    You said his condition has waxed and waned, right, they come

3    and go?

4              THE COURT:  Mr. David, do you want to take a minute?

5              MR. DAVID:  I'm fine.  I'm sorry, Your Honor.  I can

6    finish, Your Honor.  I'll be real quick.  I'm sorry.  I don't

7    know why I'm doing this.  I never do this.  Is it okay, Your

8    Honor?  I'll finish up.

9              THE COURT:  Yes.  Proceed, please.

10             MR. DAVID:  I didn't expect for that to happen.

11   BY MR. DAVID:

12   Q    You were talking about -- Mr. Dill showed you one particular

13   record where Mr. Bradley's headaches weren't as bad, but headache

14   conditions wax and wane, don't they?

15   A    Yes, and in his case based on a lot of factors.  He was

16   receiving intermittent cervical injections, intermittent lumbar

17   injections, all of which contained steroid injections with a

18   local anesthetic.  Especially when you give them in the neck, you

19   can expect the headaches to decrease for a while, the length of

20   the injection.  Plus he was taking oral medicines,

21   anti-inflammatories as well as Percocet, intermittently that all

22   could have reduced his headaches.

23   Q    And you do relate his post-traumatic headaches and migraines

24   and the headaches you described in your testimony to this crash,

25   correct?

1   A      I do, yes.

2   Q      And here as we sit four and a half years later, he still

3   carries that same diagnosis of post-traumatic headaches, right?

4   A      Correct.

5   Q      Is it common in your experience as a neurologist for people

6   who have lots of injuries going on to either mask or underreport

7   things like headaches?

8   A      Yeah.  I mean, especially if they have a neck problem that's

9   pretty significant, then they concentrate on that problem, and

10  they think that in their mind -- you know, a layperson believes

11  that as soon as the doctor fixes the neck problem, then the other

12  problem close to it or that he believes to be related to it is

13  going to go away.  Frequently we find that that does not happen.

14  I see this very frequently in the orthopedic spine, you know,

15  industry where they see the patient a year or two and finally

16  realize that the headaches are not going to go away.

17  Q      They think they may be cervicogenic or from the neck and it

18  turns out they're from somewhere else?

19  A      Correct.  And those headaches probably have two components.

20  They have a post-traumatic component of the brain and

21  post-traumatic component of the neck.  So once the brain has a

22  headache for one year, two years, three years, four years, it's a

23  multiplier as to the fact that the brain learns how to have

24  headaches, and all those neurotransmitters in the brain and

25  nerves in the brain, which there's millions and millions, right,

```
 1    they learn how to have headaches just like several other things
 2    that we take care of.  The brain learns how to do it and then it
 3    repetitively does it over time.
 4    Q    When you say learn --
 5            THE COURT:  Let's make sure we hue -- we're getting --
 6    you're toeing the line and it's about to go over.
 7            MR. DAVID:  Yes, sir.  I just want to clarify what
 8    learn means.
 9            THE COURT:  Understood.  You may proceed.
10    BY MR. DAVID:
11    Q    You're not saying the brain learns to deal with headaches,
12    just that it learns that headaches are part of what happens?
13    A    No.  To get into the details with a neurophysiologic
14    explanation, it's all about the neurotransmitters and the
15    depletion of certain ones.
16    Q    The only question I'm asking is as the brain learns these
17    headaches for year one, two, three, four and a half, it's not
18    diminishing the headaches?
19    A    No.  It's not diminishing, no.  It's increasing the risk of
20    headache.
21            MR. DAVID:  That's what I wanted to clarify.
22            Thank you.
23            THE COURT:  You may step down.  Thank you for appearing
24    today.
25            Mr. David?
```

1              MR. DAVID:  I'm sorry about that, Your Honor.

2              THE COURT:  No.  You're fine.  No need to apologize.

3              MR. DAVID:  Thank you, Dr. Weir.  I appreciate it.

4              We'd call Mr. Jensen Bergeron, Your Honor, if you're

5    ready for me to call the next witness.

6              THE COURT:  Yes.  The witness will approach and be

7    sworn.

8              THE COURTROOM DEPUTY:  Please raise your right hand.

9              Do you solemnly swear that the testimony you are about

10   to give in this case will be the truth, the whole truth, and

11   nothing but the truth, so help you God?

12             THE WITNESS:  I do.

13             THE COURTROOM DEPUTY:  Thank you.

14             THE COURT:  You may proceed, Mr. David, when you're

15   ready.

16             MR. DAVID:  Thank you, Your Honor.

17   Whereupon,

18                     JENSEN JOHN BERGERON

19   was called as a witness; after having been first duly sworn, was

20   examined and testified as follows:

21                   VOIR DIRE EXAMINATION

22   BY MR. DAVID:

23   Q    Mr. Bergeron, can you state your full name and current

24   business address for the record.

25   A    Jensen John Bergeron, 1602 Pinhook, Suite 303.

1    Q    And you're a licensed professional counselor?

2    A    Yes, sir.

3    Q    What does that mean?

4    A    I have a master's degree in community counseling and then

5    I'm required to do an additional 3,000 hours worth of supervised

6    formal training required to do ongoing, continuing education, and

7    qualified to work with a range of populations in terms of mental

8    health and behavioral health issues.

9    Q    And you're from Lafayette and still live in Lafayette?

10   A    Correct.

11   Q    Where did you go to school?

12   A    Undergrad at UL and then my master's from the University of

13   Denver.

14   Q    And how long have you been practicing as a licensed

15   counselor?

16   A    Seventeen years at this point.

17   Q    All right.  And tell us about your practice.  What does your

18   practice involve?

19   A    About half of the clients I see, which I'm typically

20   caseload-wise seeing between 20 and 25 individuals a week, about

21   half of those are personal injury or workers' comp related

22   referrals that are individuals with chronic pain, post-traumatic

23   stress and significant adjustment issues, folks that are trying

24   to get back to work or adjusting moving forward with their life.

25            The other half of my clients are adolescent on up,

1  individuals, families, and again it's a lot of the same type of

2  improving coping and adjustment to depression, anxiety, traumatic

3  stress experiences.  I actually get some overflow referrals from

4  the local VA offices if there's individuals with post-traumatic

5  stress or other adjustment issues that they're not able to handle

6  at the time.

7  Q    So you have a lot of experience dealing with post-traumatic

8  stress disorder?

9  A    Yes, sir.

10  Q    Gotcha.  And your expertise is a licensed professional

11  counselor?

12  A    Yes.

13          MR. DAVID:  I'd like to tender Mr. Bergeron as a

14  licensed professional counselor.

15          MR. DILL:  Brief traverse, Your Honor.

16          THE COURT:  You may.

17                VOIR DIRE EXAMINATION

18  BY MR. DILL:

19  Q    Good morning, Mr. Bergeron.

20  A    Yes, sir.

21  Q    You've not been to med school, correct?

22  A    No, sir.

23  Q    What is your degree in?  I'm sorry.  I missed it.

24  A    My master's degree?

25  Q    Master's degree.

```
 1    A    A master's degree in community counseling.

 2    Q    Community health science?

 3    A    Community counseling, yes.

 4    Q    Oh, counseling.  I'm sorry.  I apologize.  I wear hearing

 5    aids and I'm having a hard time hearing.

 6    A    No problem.

 7    Q    With your license, are you allowed to prescribe medications?

 8    A    No, sir.

 9    Q    Are you allowed to diagnose?

10    A    Yes, sir.

11    Q    All right.  Are there any limitations on that?

12    A    There are some limitations in terms of the extent to which I

13    would diagnose.  What typically -- what's considered best

14    practice is going to be a collaboration with someone who's

15    probably going to do more formal testing, but in terms of initial

16    diagnosis and treatment, I'm well-qualified to treat any type of

17    mental health issue.

18    Q    You do not do testing?

19    A    Not formally.  My testing would be -- the portion of my

20    testing would be the clinical interview process and referral if

21    necessary.

22              MR. DILL:  No further questions.  No objection, Your

23    Honor.

24              THE COURT:  Very good.  Thank you.

25              Mr. David, you may commence when ready.
```

1              MR. DAVID:  And is he accepted by the Court as an

2    expert as a licensed professional counselor, Your Honor?

3              THE COURT:  If there's no objection or further

4    traverse, he's accepted.

5              MR. DAVID:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7    BY MR. DAVID:

8    Q    Mr. Bergeron, I'm going to walk through your reports with

9    you, but tell me when you first saw Wilfred back in January of

10   2021, how did he present?

11   A    A little guarded, appeared uncomfortable.  Our initial

12   discussion revealed no previous counseling history and he was a

13   little bit concerned.  He was complying with the referral that my

14   understanding came from Dr. Muldowney, but he was a little

15   unsteady, a little uneasy about the whole situation.

16   Q    And you got to know Wilfred pretty well over time in the

17   course of your treatment, correct?

18   A    I did.  Very active participant.  A lot of discussions.  You

19   know, I only saw him six times, but over that course I was able

20   to make some degree of progress in terms of kind of establishing

21   a therapeutic relationship and an understanding of what his

22   strengths and weaknesses were in terms of coping and adjustment.

23   Q    Is he a pretty quiet guy?

24   A    Very quiet.  There were times when he opened up more, but it

25   almost -- it typically, in my experience, took lots of open-ended

1    questions and encouragement to try to get him to kind of feel

2    safe and open up a little bit in that environment.

3    Q     Is he a big complainer?

4    A     Not in my experience.

5    Q     So tell me about that January, 2021, visit.  Tell me what

6    you noted in that visit.

7    A     In the initial visit, primarily the goal was to get a

8    history of his experience and perspective on what was causing the

9    emotional distress.  He talked a lot about the accident and his

10   injuries, shared a lot of details and information and appeared to

11   be really invested in getting better, seemed very motivated to

12   get through the medical part of things and get back to normal

13   daily activities, including work and other activities.

14   Q     And he presented to you with right hand -- or told you about

15   his right hand, back, neck injuries and his head injury in the

16   accident?

17   A     Correct.

18   Q     And what kind of symptoms was he experiencing that day that

19   you documented?

20   A     Mood issues in terms of he seemed irritable, frustrated.  He

21   also demonstrated some sadness and emotionality around certain

22   topics that we discussed.  A lot of -- you know, one of the

23   things we kind of jumped into right off the bat was a lot of

24   misplaced emotion, aggression and frustration in particular

25   because he seemed to be having trouble -- he seemed to be --

1   everything turned into an issue of just frustration and something

2   he was having trouble getting to.  Not a lot of discussion

3   initially of thoughts of disappointment, sadness.

4   Q     You noted his features of PTSD; is that right?

5   A     Yes.

6   Q     What is PTSD?

7   A     Post-traumatic stress disorder is a mental health diagnosis

8   where a precipitating event has occurred where an experience of

9   life or death circumstances or even in some cases perception of

10  life or death circumstances have been experienced.  Sometimes

11  with physical injuries, sometimes without, and typically what you

12  see is some level of re-experiencing.  It could be nightmares,

13  even just really invasive thoughts and memories about the

14  traumatic experience.  You often see changes and disruptions in

15  mood, isolation, and kind of retraction from normal social

16  activities and connections.  He seemed to be experiencing several

17  of those at the time.

18  Q     Which of those was he experiencing?  You list a bunch of

19  them in your report.

20  A     My recollection is that he was isolating.  We talked a good

21  bit about family and other connections that he had just pulled

22  away from, which was concerning in terms of -- you know, from a

23  treatment standpoint, which is really my expertise, what I'm

24  looking for is existing coping and supports and opportunities to

25  improve coping and supports.  So he seemed to be really

```
1    withdrawn.  And then in my experience it seemed like from his
2    injuries and overall circumstances, he wasn't able to physically
3    do or emotionally sustain a lot of the things that had helped him
4    in the past.
5    Q    And I'm looking at your report.  You talk about, like you
6    kind of said, difficulty modulating, pervasive anxious and
7    depressive moods?
8    A    Yes, sir.
9    Q    You talked about the isolative behavior?
10   A    Yes, sir.
11   Q    And a degree of re-experiencing the accident at various
12   times.  What do you mean by that?
13   A    Yes, sir.  A lot of it, from my recollection, was
14   ruminating, just really focusing on it, thinking about it, and
15   one of the things that we discussed was the difficulty of -- you
16   know, often with post-traumatic stress, specific triggers or --
17   it could be an individual or something that they come across.
18            In some cases the pain from the physical injuries that
19   were sustained during an accident or an injury can also be a
20   reminder.  That's one of the things we talked about in terms of
21   even just, you know, the injury to his hand and other
22   pain-related, you know, doctor appointments.  It can be a number
23   of different things.  Part of the treatment process is to help
24   adjust and cope to that where it's less traumatic and less
25   disruptive.
```

1    Q    You mentioned that his emotional and psychological

2    functioning appear to be affected by his current physical

3    symptoms and limitations.  Did you observe any outward

4    indications of pain that he was in in your experiences with him?

5    A    That was based on his report and my understanding of his

6    circumstances.

7    Q    Fair enough.

8           Just in your experience sitting with him, could you see

9    him in pain, the way he sits and the way he communicates with

10   you?

11   A    Yes, sir.  I do remember he moved around a good bit.  I

12   actually keep both a couch and a rather firm office chair in my

13   office as an option for individuals, especially with back, neck,

14   spine, other types of injuries.  So he was -- from what I

15   remember, he sat in the sturdier, firmer chair and moved around a

16   good bit.

17   Q    I'm going to go over your report.  You testify without

18   notes?

19   A    Yes, sir.

20   Q    It says in that first visit he became emotional at times in

21   the session.  What did you mean?

22   A    He became tearful a couple of times during our initial

23   conversation.

24   Q    And you talked about being unable to function or cope with

25   stress.  Tell us what you meant by that.

```
1   A     Well, one of the things that we worked with over the course

2   of our sessions was him struggling with feelings of inadequacy,

3   feeling like less of a man?  Even, not being able to physically,

4   you know, again more obvious things like work and being able to

5   earn income, but also just not being able to do things around his

6   house, not be able to work out, which was something that was,

7   from my recollection, important to him.  So just not feeling like

8   himself and being very down about that.

9   Q    And you talked about the importance of maintaining a healthy

10  level of behavioral activation is part of the largest system of

11  self-care and coping with his current circumstances.  What did

12  you mean by that?

13  A     Yes, sir.  One of the healthier things for people with

14  specifically post-traumatic stress is to try to do stuff you

15  would normally do even if it's in a modified capacity.  My

16  background in mental health and also with some vocational

17  rehabilitation experience, the idea is approaching everything

18  that's difficult with a mind frame of how can I adjust and modify

19  my approach to it and even my own expectations of myself in order

20  to kind of move past it and deal with it.

21         So there was definitely some early discussions about --

22  you know, a typical example in my practice would be I can't lift

23  weights anymore.  Well, if you can't lift weights, at least go

24  for a walk.  Do some type of modified activity.  If you can't go

25  to the camp and duck hunt, at least go to the camp and just hang
```

1    out with your friends.  Do different modified activities.  So

2    there was some discussions with him, a lot of discussions with

3    him about those types of adjustments and modifications.

4    Q    Do you recall your diagnosis on that first visit?

5    A    Yes, sir.  I diagnosed adjustment disorder with depression

6    and anxiety with features of post-traumatic stress.

7    Q    And what does adjustment disorder mean?

8    A    Adjustment disorder is typically going to require -- what it

9    typically represents is someone who might be going through a

10   particular set of challenges or difficulties and where their

11   normal coping and life skills and relationships might be able to

12   help them through.  A lot of times it's a different type of

13   circumstance or situation that they may be less familiar with, or

14   in Mr. Bradley's example, he wasn't able to do some of the

15   healthy things and was struggling to maintain healthy

16   relationships because of what was going on with him physically

17   and emotionally.

18   Q    And your diagnosis when you first saw him of that adjustment

19   disorder, mixed anxiety, depression, the PTSD, features of PTSD,

20   were all related to this February 14th, 2018, crash by your

21   experience and your history?

22   A    To the best of my understanding.

23   Q    The next visit was February 23rd, 2021.  How did he

24   present then when he came to see you?  How was he feeling?

25   A    Continuing to struggle, continuing to deal with pain,

1    continuing to deal with a lot of irritability that was affecting
2    relationships in his life.
3            So that second session we spent -- I spent a lot of
4    time presenting him with some ideas for him to start to develop
5    some greater self-awareness, to kind of feel -- to help him feel
6    more so in control of his emotions in a productive manner.
7    Q    And I saw the eight basic emotions and he was having
8    problems confusing some of those.  Explain that to the jury.
9    A    I have a list that I keep on my white board in my office
10   that typically when folks come in, I either can hand out a copy
11   or have them take a picture on their phone as a means of -- what
12   often happens -- and, you know, in Mr. Bradley's case, struggling
13   with a lot with again frustration, irritation, and that simple
14   tool sometimes can be helpful in terms of spreading out.  As
15   opposed to drinking from a fire hose, it's kind of like spraying
16   it out of smaller hoses.
17           So what I was working on was increasing his
18   self-awareness of a broader range of emotions that he might be
19   dealing with and he took to it well.  He seemed a little
20   reluctant at first or had a little bit of trouble kind of getting
21   into some of the examples because typically specific examples for
22   an individual is going to be the most helpful way for them to be
23   able to relate to those ideas.
24           And so one of the things he was experiencing is a lot
25   of -- feeling a lot of difficult emotions, but then those things

1  being exhibited primarily through anger and frustration which was

2  really affecting him and his relationships in a negative way.

3  Q    You mentioned his difficulty in your report distinguishing

4  between shame and guilt.  Why was that significant?

5  A    Well, for our purposes, guilt I like to define as a function

6  of our conscience.  So if I've made a mistake in some regard or

7  am not able to meet my own expectations, it's understandable that

8  there would be some level of distress or being unsettled about

9  it.

10       So, for example, if I'm not able to support the people

11  in my life in a manner that I feel like is appropriate,

12  financially, emotionally, or otherwise, it's understandable to

13  have a negative and emotional reaction.  It doesn't necessarily

14  have to be problematic, but it would prompt to action whereas

15  shame is more accurately identified in a distinguished manner as

16  more of a negative self-assessment of inadequacy, less than.

17       So it's a distinction between I failed at a particular

18  task that I was trying to achieve versus I am a failure, and

19  Mr. Bradley was really struggling with some of that less than,

20  negative, you know, self-identity because of what he was going

21  through.

22  Q    Thank you.

23       And your diagnosis didn't change after that visit,

24  right?

25  A    No, sir.

1    Q     Did you diagnosis ever change?  It was the same diagnosis?

2    A     My diagnosis did not.  There was later a recommendation.

3              MR. DILL:  Objection, Your Honor.  Sidebar.

4         (Whereupon, a sidebar conference was had as follows:)

5              MR. DAVID:  I don't know what's he's going to say.  I

6    told him not to talk about Dr. Savant.  So I don't know.

7              MR. DILL:  He said that he maintained the same

8    diagnosis, which he did in all six of these records, and he was

9    just getting ready to say something about later something

10   changed.  I have no idea where it's going, but it's not in his

11   report.

12             THE COURT:  You can ask a question, but make sure that

13   he does not go into Dr. Savant.  You can direct on that.

14             MR. DAVID:  Yes, sir.  Thank you.

15        (Whereupon, the sidebar conference was concluded.)

16             THE COURT:  Mr. David, you may proceed subject to the

17   Court's ruling.

18             MR. DAVID:  Thank you.

19   BY MR. DAVID:

20   Q     We're going to keep it to your records and your treatment.

21   Okay?

22   A     Yes, sir.

23   Q     Thank you very much.  I appreciate it.

24             Okay.  In March of 2021, you see him again.  Tell me

25   how Mr. Bradley's doing on that visit.

1    A    Continuing to experience –– one of the other frustrations

2    that came up in discussion on a regular basis was his concern

3    about receiving necessary care and uncertain about his future

4    prognosis.

5    Q    Okay.  I've been in deposition with you.  You don't use

6    notes at all.  You just remember all of this stuff?

7    A    There were six notes involved.  If it was larger than that,

8    I absolutely would have brought them.

9    Q    Okay.  So you remember Mr. Bradley well?

10   A    Yes.

11   Q    Okay.  So talk about what y'all did in that visit.

12   A    That visit was really a review of the actual implementation

13   of the information that I presented previously.

14   Q    So tell me how that happens in the process.

15   A    My impression was that he had been actively thinking about

16   some of those things, and the way that I like to do it is taking

17   some specific examples within his life that he's been trying to

18   implement those adjustments in.

19   Q    You note there that the client's ongoing internal struggle

20   over the long–held belief that a man should not show weakness,

21   fear, and other vulnerabilities that involve him asking for help.

22   What did that mean to you and why was that important in your

23   treatment?

24   A    It appeared really relevant because of the presentation of

25   what appeared to be a genuine desire to get better, to address

1    the symptoms, to do whatever was necessary to make progress

2    towards the full restoration goals, but there seemed to be a

3    reluctance or fear around opening up to others.

4            He was very responsive to me and actively engaged in

5    sessions, but he seemed very concerned about the idea of opening

6    up and voiced as much about actively opening up to some of the

7    people, say, in his family, friends, people in his everyday life.

8    Even in regards to just asking for help with little things really

9    upset and bothered him.  So it's something I directed a lot of

10   attention to.

11   Q    In what way?

12   A    Well, part of the process is that we engaged in was right up

13   front the idea that the goal of counseling is not to foster

14   dependence on counseling as much as it is to improve his coping

15   and the utilization of supports around him.

16           He was really struggling with -- he had no issues with

17   really thinking through and adopting some of the cognitive

18   behavioral principles of being aware of his thinking and how he

19   was dealing with his emotions.  It was that next step that was a

20   struggle, that was asking for help and asking for support and

21   just a listening ear even from those around him.  It was a very,

22   very unfamiliar -- part of his distress was more so being someone

23   who people had -- from his perspective, people had come to him

24   for help and support that he felt no longer able to do.

25   Q    And your next visit in September of '21.  How was he on that

1   day?

2   A     The September -- can you refresh my memory?

3   Q     (As read:)  I note that when he presented, he had varying

4   levels of physical pain, fatigue, and emotional and psychological

5   distress.  What did you mean by that?

6   A     His pain did not seem to be getting better from his reports

7   and from his experience.  So part of the adjustment process is

8   separating out.  One of the things that we talked a good bit

9   about was the -- what can I change versus what are things at the

10  moment beyond my control.

11        And so for him to -- again with the emphasis of what

12  can I make adjustments around, how can I improve my perspective

13  and attitude around those things, and what are some things like

14  physical pain that may or may not change in a significant way.

15  Again, I stay out kind of the medical prognosis part and focus

16  more on the adjustment piece with Mr. Bradley.

17  Q     Gotcha.  And the client expressed -- you note in your

18  September, 2021, report, that Mr. Bradley expressed less

19  confidence in his ability to cope emotionally, psychologically,

20  relationally with his pain, limitations and circumstances.  What

21  did that mean?

22  A     One of the things that was really upsetting to him was his

23  level of irritability which seemed to be affecting his

24  relationships, and that if there was a family gathering or if

25  there was some other activity where he would normally be there

1    and want to be there, he would find he would get more aggravated,

2    whether it was noises, you know, little kids cutting up.

3            People that were frustrating or irritating, family

4    members, whoever, he was really bothered that he found it less --

5    he found himself less able to stay for very long or kind of be in

6    the presence of a lot of noise or, you know, things that --

7    whereas when he was at home by himself, he could control his

8    environment, the noise level, level of comfort, those kind of

9    things.  It really bothered him because he really was feeling a

10   lot of loneliness at the time.

11   Q    Is that a symptom or one of the elements of having this

12   adjustment disorder that you just diagnosed him with?

13   A    It certainly can be.

14   Q    And for Mr. Bradley it is?

15   A    For Mr. Bradley it was one of the more significant issues.

16   Q    What's the way that you taught him to cope with this social

17   anxiety he's having?

18   A    Selectiveness in small doses.  So, again, a lot of times

19   there's an all or nothing disposition.  So what I really

20   encouraged with Mr. Bradley is, look, even if you're not going to

21   stay the whole time, at least go say hello to the people that you

22   really want to see, you know, and then tolerate it as long as you

23   can or, you know, a firm defined period.  The other part was

24   being proactive about seeking out individuals that he felt

25   comfortable with on a one-on-one or smaller basis.

1    Q    Are there things that you told him in your treatment that he

2    should avoid in terms of just interaction socially?

3    A    Picking his battles was kind of the recommendation in that

4    regard because one of the things that we talked about is how much

5    he missed work, how much he missed that feeling of consistency

6    and productivity and stuff with work.

7          One of the things we talked about was picking your

8    battles and pushing yourself, which, again, all of my counseling

9    for an individual like Mr. Bradley is increasing functioning at

10   home, increasing functioning in the community with the eventual

11   goal of getting back to some kind of work.  So those

12   conversations with me start pretty early in that case.

13   Q    And you want him to get back to work, right?

14   A    Absolutely.  I think if he were able to physically,

15   emotionally, or otherwise get back to work, I think it would be

16   very healthy for him.

17   Q    And he wants to go back to work, right?

18   A    That's my understanding.

19   Q    And with his diagnosis, what's the best kind of job that he

20   should have?

21          MR. DILL:  Objection, Your Honor.

22   (Whereupon, a sidebar conference was had as follows:)

23          MR. DILL:  It's not in his report and it's beyond his

24   expertise.

25          MR. DAVID:  Just with respect to his treatment, the

1   adjustment disorder.  I can rephrase it if you want.

2          THE COURT:  My ruling is to the extent it's in his

3   report.  The defendant has an expert to address that and we have

4   the records.  To the extent it's in the report, he can testify to

5   it.  If it's not in the report -- and you're going to have to

6   guide me because I do not have the report right here in front of

7   me.

8          MR. DILL:  Your Honor, I've let him go a long way.

9          MR. DAVID:  The report says vocational future.  I want

10  to ask him what does that mean, the vocational future.

11         THE COURT:  He can testify as to vocational future.

12  You know, I'm not going to parse this.  You can take it up on

13  cross-examination if you need to, if you feel you need to address

14  it.

15         MR. DAVID:  Thank you, Your Honor.

16      (Whereupon, the sidebar conference was concluded.)

17         THE COURT:  Mr. David, you may proceed subject to the

18  Court's ruling.

19  BY MR. DAVID:

20  Q    I was looking at your November visit and you talk about his

21  vocational future.  Just from your experience as a professional

22  licensed counselor, what did you mean by vocational future for

23  Mr. Bradley?

24  A    My hope was -- and in our discussion -- let's see.  The best

25  way to answer this is that acknowledging that there would be some

1    dependence or a high level of dependence on his physical

2    abilities, but that from an emotional and psychological

3    standpoint, him getting back to work would be very healthy, even

4    if it was with ongoing emotional supports and other treatment.

5            So the hope was going to be that in some capacity he

6    would be able to get back to work, and in terms of his

7    personality, previous work experience, and just disposition, that

8    it be an environment where he felt relatively comfortable

9    socially and emotionally and working from that point.

10           In my experience from a vocational standpoint, just

11   getting back on your feet is a really big deal.  So I often have

12   discussions with clients that, you know, maybe their first job,

13   if you're able to get back to some type of work, isn't going to

14   be career-wise what you do for the rest of your life, but to

15   really think in terms of steps and taking into consideration to

16   set himself up for success as opposed to failure in terms of

17   finding something that was going to be appropriate.

18   Q    Thank you, Mr. Bergeron.

19           MR. DAVID:  I'll try to speed this along, Your Honor.

20   BY MR. DAVID:

21   Q    The last time you saw him was in December of 2021.  Tell me

22   how he presented on that particular day.

23   A    That was a telehealth appointment if I'm remembering

24   correctly.

25   Q    Yes, it was.

444

1    A    Stressed.  He was having issues with transportation.  He was

2    still recovering from a recent procedure, if I remember

3    correctly, and was in a place of having to ask for help and

4    support.  So he was both struggling with that anger.  Also, there

5    was a degree of recognizing that it wasn't so awful.  I guess

6    there was some degree of progress, but it certainly appeared that

7    he was still -- still had a long way to go in terms of the

8    adjustment process.

9    Q    And he's only a month out of back fusion when he sees you.

10   So you said he was experiencing daily pain and limitations?

11   A    Yes, sir.

12   Q    You go into pretty big detail about the nightmares and vivid

13   memories he's having.  Explain that to the jury.

14   A    Yes, sir.  For him, what I remember the most is the things

15   he saw and heard.  He was very, very clear and very kind of

16   emotive about kind of waking up in a panic and being distressed

17   about -- or one of the things that he reported distinctly

18   remembering is, you know, somebody saying he was going to bleed

19   out.  There were -- you know, it was a very chaotic situation.

20   He remembers being stuck and it taking them some time for them to

21   remove him.  It elicited a bit of a panic response even in that

22   moment in retelling of it, and he was able -- yet he was able to

23   kind of persist with, you know, talking through it.

24        I introduced -- I don't remember honestly if it was

25   that session or previously -- kind of a paced breathing

1    technique.  When he gets upset, to take kind of a deep breath,

2    hold it, and then let it out, and it seemed to help him be at a

3    little bit more ease to be able to continue with the kind of

4    processing of the traumatic memory.

5    Q    Is it safe to say here you are almost four years -- or here

6    he is almost four years after the crash and he's still having

7    these vivid memories and nightmares and reporting them to you?

8    A    Yes, sir.

9    Q    And he noted to you -- he told you that he also remembers

10   seeing smoke coming from the engine and being physically unable

11   to remove himself from the vehicle, right?

12   A    Yes, sir.

13   Q    And you said that comes with feelings of frustration and

14   fear.  Tell the jury what you mean, what you observed and what

15   you saw.

16   A    His experience of frustration in our discussion was a lot

17   about feeling helpless, helpless that he was ever in that

18   situation, helpless that he hadn't been able to fully recover

19   from the physical injuries, the emotional injuries, kind of a

20   sense of I should be past this at this point.  And, again, there

21   was a lot of struggle there with wanting to always go to anger

22   when feeling other emotionally uncomfortable things.  So things

23   like fear, but also a sadness and helplessness.

24        So there was a lot of work on -- and for the purpose of

25   him being able to deal with those emotions in a way where it was

1    more cathartic and he was able to express and kind of move past.

2    What he seemed to be experiencing was that it was more

3    paralyzing, you know, and he would just withdraw not to show

4    those emotions to others and then also to just try to contain it

5    as opposed to kind of leaning into the expression and the feeling

6    part of it.

7            Part of the process of desensitization with

8    post-traumatic stress and adjustment issues is dealing with it

9    with support in a safe environment so that you prove to yourself

10   that you can feel those things, think about those things, and

11   still be able to bounce back and move forward from it.

12   Q    Thank you.

13           And you talked about -- and you might have just

14   discussed this a little bit, but you guided him with some

15   grounded techniques involving deep breathing and visual cues in

16   his current present-day environment.  What are the visual cues as

17   part of that?

18   A    There's a visual grounding technique that you can use

19   anywhere.  In his particular case in that situation, it was

20   talking to him, you know, electronically at that point, and part

21   of the process of dealing with really intense memories,

22   especially traumatic memories, is reminding yourself that you're

23   not actually back in that traumatic situation.

24           On an emotional level -- and it's interesting -- and on

25   a neurological level even, post-traumatic stress typically kind

1    of lodges itself in a more primitive part of the brain.  So in

2    his case it was to continue describing what he was seeing and

3    hearing and feeling, to slow his breathing to regain his sense of

4    control, and then the visual grounding involves planting your

5    feet kind of firmly on the ground and focusing on different

6    points in the room that you're in -- in his case I believe it was

7    his living room, if I remember correctly -- to try to kind of

8    pull himself back to the recognition of I'm in a safe place even

9    though I'm experiencing unsafe feelings and emotions.  I mean, it

10   seemed to be helpful.  He still seemed very upset, but it also

11   appeared to be pretty helpful to him.

12   Q    And you last saw him a few months ago, and just answer this

13   question in a yes or no fashion without expounding.

14          The last thing you have in your report is the counselor

15   and client discussed the potential benefit of further explanation

16   of the client's mental health through a formal psychological

17   evaluation.

18   A    Yes.

19          MR. DAVID:  No further questions.  Thank you.

20          THE COURT:  We're at 12:15, Mr. Dill.

21          MR. DILL:  It's short.

22          THE COURT:  All right.  Let's do that and we'll break

23   for lunch after Mr. David has redirect.

24                        CROSS-EXAMINATION

25   BY MR. DILL:

1    Q    All right.  Mr. Bergeron, when you first met with him on

2    January 26th of 2021, in addition to the issues he talked to you

3    about about this accident, he also raised some other issues that

4    were causing him some emotional problems, correct, that being

5    loss of family members?

6    A    Yes, sir.

7    Q    That was in the distant past, wasn't it?

8    A    I don't remember the time frame of those losses.  What I

9    remember is it was in the context of a lack of support and me

10   exploring who were the people in his life that he considered

11   supports and was closest to.

12   Q    He had experienced some personal losses in his lifetime and

13   I'm assuming he discussed those with you?

14   A    Yes, sir.

15   Q    And I apologize for having to get it in here, but it's part

16   and parcel of his emotional well-being, correct?

17   A    Yes, sir.

18   Q    He lost his son?

19   A    Yes, sir.

20   Q    And he lost two brothers?

21   A    Yes, sir.

22   Q    Did he discuss any other family member losses?

23   A    Not to my recollection.

24   Q    And you could tell he had an adjustment disorder associated

25   with those losses in the past, correct?

```
 1   A    Bereavement and adjustment are different and distinguished

 2   on a couple of different factors.  My understanding of his

 3   experience is that he had been functioning adequately, even if

 4   still experiencing some bereavement.  I didn't have any

 5   information suggesting that it was impairing his function

 6   personally or professionally.

 7   Q    He became very emotional when he discussed those issues with

 8   you in the encounter, correct?

 9   A    Yes, sir.

10   Q    Okay.  Now, you diagnosed an adjustment disorder with mixed

11   anxiety and depressed mood with features of PTSD.  Is this the

12   book that you guys use?  Is that the Bible for counselors?

13   A    Yes, sir.

14   Q    Is there a more current version?

15   A    Not that I'm currently utilizing.

16   Q    Very good.

17        So what you guys do is you have these different things

18   that you can diagnose and there are features that have to be

19   there and there's certain criteria you have to meet?

20   A    Yes, sir.

21   Q    What are the diagnostic requirements or the diagnostic

22   criteria for an adjustment disorder?

23   A    An adjustment disorder -- I'm not able to quote them

24   verbatim, but in practice --

25        MR. DILL:  May I approach, Your Honor?
```

```
1              MR. DAVID:  Well, let him answer the question.

2              THE COURT:  Show Mr. David what you're going to show

3    him.

4              MR. DAVID:  Can he answer the question first and then

5    he can follow up?

6              THE COURT:  Well, I think he testified -- ask the

7    question.

8    BY MR. DILL:

9    Q     Would you like the book to be able to quote it for me?

10   A     Sure.

11             MR. DILL:  May I approach, Your Honor?

12             THE COURT:  Is that the predicate that you were

13   requesting?

14             MR. DAVID:  Well, he was mid-answering the question is

15   all I'm saying, Your Honor, and he cut him off with would you

16   like the book and I didn't want him to not answer the question.

17   So I'm happy for him to have the book or not have the book.  I

18   really don't care.  I just didn't want him not to be able to

19   answer the question he was asked.

20             THE COURT:  Mr. Dill, you may approach.

21             MR. DILL:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23   BY MR. DILL:

24   Q     Now, Mr. Bergeron, do I have it tagged appropriately?  Is

25   that the correct section?
```

1   A     Yes, sir.

2   Q     What are the diagnostic criteria?

3   A     (As read:)  Development of emotional or behavioral symptoms

4   in response to identifiable stressors occurring within three

5   months of the onset of the stressors.  Symptoms of behavior are

6   clinically significant as evidenced by one or both of the

7   following:  Marked distress that is out of proportion to the

8   severity or intensity of the stressors, taking into account the

9   external context and the cultural factors that might influence

10  symptoms, severity, and presentation.

11          Symptoms, impairment, and social occupational and other

12  important areas of functioning.  The stress-related disturbance

13  does not meet the criteria for another mental disorder and is not

14  merely an exacerbation of pre-existing mental disorders.  The

15  symptoms do not represent normal bereavement.  Once the stressors

16  or its consequences have terminated, the symptoms do not persist

17  for more than an additional six months.

18  Q     You did not see him within the first three months of this

19  accident, correct?

20  A     No, sir.

21  Q     Do you have any records from any facility about any of the

22  issues that he had developed in those three months?

23  A     No, sir.

24  Q     You diagnosed him as adjustment disorder with mixed anxiety

25  and depressed mood with features of PTSD.  You did not diagnose

1   him with PTSD, did you?

2   A    No, sir, not at that time.

3   Q    He did not meet the diagnostic criteria from your review,

4   correct?

5   A    I was more focused at the time on what was going on

6   functionally, and later as I thought about it, it was more

7   relevant in terms of justifying additional treatment.  That's

8   when I requested a more thorough look, more formal evaluation

9   into the diagnosis.

10  Q    On your first visit -- I think you indicated that you were

11  going to see him for eight sessions.  Am I correct?

12  A    That was my understanding at the time.

13  Q    And you only saw him for six?

14  A    Yes, sir.

15  Q    And the last time you saw him was in December of 2021,

16  correct?

17  A    Yes, sir.

18         MR. DILL:  No further questions, Your Honor.

19         Thank you, sir.

20         THE COURT:  Redirect?

21         MR. DAVID:  Thank you, Your Honor.  Very briefly.

22                    REDIRECT EXAMINATION

23  BY MR. DAVID:

24  Q    Mr. Bergeron, in your experience and your practice, is it

25  often that people come to see you long after an event finally

1  complaining and getting the treatment they need?

2  A    Often.  It's more likely that it's longer than what would be

3  clinically most beneficial.

4  Q    Was there any other explanation for the stressors that

5  Mr. Bradley was going through rather than this crash and all the

6  subsequent injury and problems he was having?

7          THE COURT:  All right.  Don't answer the question.

8          Objection?

9          MR. DILL:  Objection.

10         THE COURT:  Basis for the objection or do you want to

11  approach?

12         MR. DILL:  It's what we discussed at sidebar, Your

13  Honor.  It's not within the four corners.

14         MR. DAVID:  Well, we can approach if you want to, Your

15  Honor.  I hate to do that.  I'm sorry.

16     (Whereupon, a sidebar conference was had as follows:)

17         THE COURT:  Is it in the report?

18         MR. DAVID:  Well, the answer is it's not in the report,

19  but he just insinuated that he didn't have any problems and

20  treatment before, so it's not related to the injury and it

21  doesn't meet the diagnostic criteria, and I'm laying out that,

22  heck, no.  The problems he's having are related to this crash and

23  he documented that.  That's not in the report, but it can close

24  this gap.  The stressors were ongoing.

25         THE COURT:  The problem is that that requires expertise

1    to connect the symptoms to the specific incident.

2            MR. DAVID:  That's all in his report.  He just

3    insinuated because it wasn't diagnosed in three months, it's not

4    related, which is absolutely not any rule, law, or practice, and

5    I'm just trying to distinguish that.

6            THE COURT:  I'm going to give him some latitude based

7    on what you brought out on cross, but I don't want to venture

8    beyond that.  You merely address that.

9            MR. DAVID:  That was my last question.

10        (Whereupon, the sidebar conference was concluded.)

11           MR. DAVID:  Could you repeat the last question?

12        (Whereupon, the question was read by the court reporter.)

13   A    Not to my knowledge.

14   BY MR. DAVID:

15   Q    And you still relate all of your treatment and the PTSD

16   features and the adjustment disorder to this February 14th,

17   2018, crash, correct?

18   A    Yes, sir.

19           MR. DAVID:  No further questions, Your Honor.

20           THE COURT:  All right.  We're about 12:20.  That clock

21   is a little bit fast.  What I'm going to do is we're going to

22   break for lunch and I'm going to give you until ten till 2:00,

23   1:50, to come back.  That gives you about an hour and a half.

24           Again, I'm going to caution you.  Don't discuss this

25   case with anyone.  Don't do any independent research.  And,

1    again, counsel and the parties are not allowed to talk to you.

2    So if you see them during the lunch break, that's why they're not

3    talking to you.  So at this time we will take a recess until

4    1:50.

5                    (Jury Exited the Courtroom)

6            THE COURT:  All right.  You may be seated.

7            All right.  Any issues to discuss before we break for

8    lunch?

9            MR. DILL:  Judge, something happened when we were at

10   the end of Dr. Weir and you asked Mr. David if he needed a break

11   and I couldn't see or hear or figure out what was going on.  I

12   just wanted to make sure I didn't miss something.

13           THE COURT:  Well, Mr. David got emotional.  He teared

14   up.  I'm assuming it was because of a question that he asked.

15           MR. DAVID:  It was.

16           THE COURT:  I'm not sure that the jury saw it, but it

17   appeared -- I asked if he wanted to take a break so that we could

18   send the jury out if we needed to.

19           MR. DILL:  Thank you, Judge.  I appreciate it.

20           THE COURT:  No problem.

21           MR. DILL:  I was just confused.

22           THE COURT:  No.  I mean, you're sitting behind.  I was

23   trying not to bring attention to everything, but, you know, it's

24   been a long trial.

25                All right.  We'll take a lunch break.

1                       (Recess)

2           THE COURT:  Please be seated.

3           Any housekeeping before we bring in the jury?

4           MR. DAVID:  Yes, sir.  Just a minute, Your Honor.  I've

5    talked to Mr. Dill, and to save time, the plaintiffs are going to

6    make a proffer for Mr. Larry Stokes, the vocational

7    rehabilitation counselor and life care planner, and for John

8    Theriot, the economist.

9           And, Jim, make sure you agree with everything I'm

10   saying here.

11          The stipulation is one for purposes of a proffer.  This

12   is a proffer right now that we're making if that's okay, Your

13   Honor.

14          First, this is a proffer that Larry Stokes is an expert

15   in vocational counseling and life care planning, that John

16   Theriot is an expert economist, that Larry Stokes, if called to

17   testify fully, would rely on the testimony from Dr. Weir today

18   and previously that Aimovig, based on Dr. Weir's proffer as well

19   as his testimony, that the Aimovig would be necessary to maintain

20   or curtail Wilfred Bradley's headaches on a monthly basis and the

21   Maxalt used to curb the headache on a monthly basis and that

22   would be needed for the duration of his life.  That's what they

23   would testify to if they could.

24          MR. DILL:  I have no problem with the stipulation, Your

25   Honor.  As part of the proffer we would like to proffer as

1    Defense Exhibit A a copy of Mr. Stokes' reports that he prepared

2    in this case just to put in the record.

3            MR. DAVID:  No problem, Your Honor.

4            And then John Theriot would testify consistent with his

5    report that says, well, aside from the adjacent level surgery,

6    that -- I'm sorry.  Larry Stokes would also testify that if

7    Mr. Bergeron had talked about the future medical treatment, there

8    would be about $3,500 in future counseling as well.

9            MR. DILL:  No objection to the proffer, Your Honor.

10           THE COURT:  And the proffer about Aimovig and Maxalt

11   are in the reports thankfully that Mr. Dill just talked about,

12   but also they're in the Teche Drugs that are in evidence as well

13   for the source of the cost of those drugs.

14           MR. DILL:  And, Judge, just to make the record clear,

15   the reason I'm proffering the reports is Mr. Stokes' reports do

16   not include Aimovig.  They have Maxalt.  Aimovig is not in the

17   reports.  And it was for only 12 years in his report.

18           THE COURT:  Okay.

19           MR. DAVID:  I'm basing it on the proffered testimony

20   today.  Any objection to my proffer?

21           MR. DILL:  No objections, Your Honor.

22           THE COURT:  Very good.  Anything else?

23           MR. DAVID:  I think we're good, Your Honor.

24           Is there anything you want to talk to us about with

25   those issues?

```
1              THE COURT:  No.
2              Okay.  Are y'all going to agree to a stipulation on
3    that that can be read to the jury?  How are you going to approach
4    that proffer?
5              MR. DILL:  That was just a proffer for appellate
6    purposes.
7              THE COURT:  You're not going to follow up with a
8    stipulation or anything?
9              MR. DILL:  Not for the jury.
10             THE COURT:  Just to preserve the record.
11             MR. DAVID:  Yes, sir.
12             THE COURT:  Okay.  Some people do it differently.  Some
13   people, that will result in a stipulation, but no stipulation.
14             MR. DILL:  No, sir.
15             THE COURT:  All right.  Very good.
16             And now you're going to proceed with the plaintiff?
17             MR. DAVID:  Mr. Larry Stokes and Mr. John Theriot.
18   Yes, sir.
19             THE COURT:  Okay.  Very good.
20             MR. DAVID:  To talk about what they can't talk about.
21             THE COURT:  Right.  Very good.
22             Let's go ahead and bring the jury in.
23                  (Jury Entered the Courtroom)
24             THE COURT:  Please be seated.
25             Mr. David, you may call your next witness.
```

1           MR. DAVID:  Thank you, Your Honor.

2           At this time the plaintiff calls Mr. Larry Stokes.

3           THE COURT:  Mr. Stokes will approach and be sworn in.

4           THE COURTROOM DEPUTY:  Please raise your right hand.

5           Do you solemnly swear that the testimony you are about

6      to give in this case will be the truth, the whole truth, and

7      nothing but the truth, so help you God?

8           THE WITNESS:  I do.

9           THE COURTROOM DEPUTY:  Thank you.  You may be seated.

10     Whereupon,

11                         LARRY STOKES

12     was called as a witness; after having been first duly sworn, was

13     examined and testified as follows:

14                    VOIR DIRE EXAMINATION

15     BY MR. DAVID:

16     Q    Good afternoon, Mr. Stokes.  How are you doing?

17     A    Great.

18     Q    Can you state your full name and business address for the

19     record.

20     A    Yes.  My name is Larry Stokes.  My business address is 3501

21     North Causeway Boulevard, Metairie, Louisiana.

22     Q    The plaintiffs are calling you as a vocational

23     rehabilitation counselor as well as a life care planner.  Why

24     don't you tell the jury about your expertise and your education

25     in those fields.

1  A    Yes.  Sure.

2        So my education is that I have a bachelor's degree in

3  education and I followed that -- I entered the Navy and I got a

4  Master of Science degree in counseling from the psychology

5  department of Southern Illinois University.

6        I entered the Navy as I said.  When I got out, I

7  started working as a vocational rehabilitation counselor.  I'm a

8  counselor that specializes in working with people who get hurt,

9  helping them get back to work or figuring out what they might be

10 able to do in their careers for the future.  While working, I

11 went back to school and I got my doctorate and Ph.D. in

12 counseling.  I specialize in rehabilitation counseling and I

13 minored in research and that was from the University of New

14 Orleans and I finished that in it 1998.  After that I took some

15 post-doctoral studies in life care planning -- and I'll explain

16 that in a second -- at the University of Florida.

17       So vocational rehabilitation really has to do with the

18 work and wages and the ability to work and earn wages.  The life

19 care planning is about medical care, what's needed by a patient

20 and then researching the costs associated with that medical care.

21 Q    Thank you so much.

22       And just to sum up, the vocational rehabilitation work

23 you do is trying to find what particular people like Mr. Bradley

24 who are injured, what kind of jobs they can do going forward?

25 A    Yes.

1   Q    And assess kind of their past performance and their

2   educational background, things like that?

3   A    Yes.  We do evaluations that include their vocational

4   profile, their education, their work history, their skills.  We

5   conduct vocational testing.  We conduct vocational analysis to

6   try to find out about jobs.  We research the labor market to find

7   out what jobs are available, and then we -- carrying all the way

8   through, we can help place people into jobs.

9   Q    And you use testimony and evidence to put together future

10  medical treatment plans as well or sometimes they're called life

11  care plans and you have expertise in that as well?

12  A    Yes.  I'm licensed as a rehabilitation counselor in

13  Louisiana, license number 001, and I'm licensed as a mental

14  health counselor, license number 097.  I also have board

15  certifications in rehabilitation counseling, case management, and

16  I'm board certified in life care planning.

17  Q    License number 001.  What did that mean?

18  A    That means I was the first person licensed in the state.

19            MR. DAVID:  At this time we'd like to tender Mr. Stokes

20  as an expert in vocational rehabilitation as well as life care

21  planning.

22            MR. DILL:  Brief traverse.

23            THE COURT:  Yes.  You may proceed.

24                      VOIR DIRE EXAMINATION

25  BY MR. DILL:

1    Q    Dr. Stokes, correct?

2    A    Yes.

3    Q    You are not a medical doctor, correct?

4    A    No, sir.

5    Q    As a life care planner you rely on the opinions of

6    physicians to tell you what care will be needed in the future?

7    A    Yes, physicians and other allied health professionals such

8    as counselors, psychologists.

9            MR. DILL:  Thank you.

10           No further traverse, Your Honor.  We accept.

11           THE COURT:  Thank you.

12           You may proceed.

13    (Whereupon, a sidebar conference was had as follows:)

14           MR. DAVID:  I feel like I've done it already, but I

15    just want to lodge my objection for the record to his testimony

16    being limited just to make sure I'm covered.

17           THE COURT:  Okay.  The objection is overruled.

18           MR. DAVID:  Yes, sir.  Thank you.

19    (Whereupon, the sidebar conference was concluded.)

20                        DIRECT EXAMINATION

21    BY MR. DAVID:

22    Q    Talk about the work you did in this case on the vocational

23    side, the job side for Wilfred Bradley.

24    A    Sure.

25           Well, I first evaluated Mr. Bradley in 2019.  I met

1    with him and conducted an interview to gather background

2    information, conducted some vocational testing, read and reviewed

3    medical records, multiple medical records about his conditions,

4    and I conducted a vocational analysis.

5              What I found, just in summary, was that he had been a

6    scaffold builder and he was not going to be able to do that any

7    longer.  So in Louisiana we have a hierarchy, and the hierarchy

8    is that we first assess whether someone can go back to the job

9    they were doing at the time of the injury.  If they can, then

10   there's no rehabilitation needed.  If they can't, then we go to

11   their past work experience and try to figure out, well, if they

12   can do something they've done in the past, that's an easier route

13   back to the workforce.

14             So the first thing I did was to look at that.  My

15   opinion was that he could not return to work as a scaffold

16   builder, but he had done some work in the past.  He mostly had

17   laboring jobs, but he had also done some security guard work at a

18   prison.  So there are -- the restrictions I was working under,

19   the physical restrictions, were light work.

20   Q    And where did you get that physical restriction from?

21   Dr. Muldowney?

22   A    Dr. Muldowney.

23   Q    And you also talked to Dr. Henderson?

24   A    I did.  I had a consultation.  The first report that I did,

25   I consulted with Dr. Henderson because he was the one that was

1  talking about the physical restrictions with the hand.  So I

2  consulted with him, but I used light as a benchmark for what he

3  would be able to do in the future.

4  Q    Did you also incorporate what Dr. Muldowney said I believe

5  when he spoke to you and yesterday for the jury that light duty

6  along with no bending and stooping, things like that?

7  A    Yes.  Dr. Muldowney's treating for the neck and low back

8  whereas Dr. Henderson is treating for the hand.  So we had

9  restrictions for both.  The good news is that it all kind of

10 wraps up into one person.

11         So if the least restrictive is light, then light it is,

12 and there's five levels of physical demand defined by the

13 Department of Labor.

14         Sedentary is mostly seated, lifting no more than about

15 ten pounds.  There can be some standing and walking.

16         Light is the next category and that is defined as

17 lifting up to 25 pounds, frequently 10.  So 25 pounds

18 occasionally, frequently 10.  Standing and walking can be about

19 five to five and a half hours per day.  And there's some other

20 postural demands like bending, stooping, crouching, crawling,

21 those sorts of things.

22         So what we do is to take that profile I talked about

23 earlier, look at the restrictions that this person has, and then

24 adjust their profile for that and then match them to the types of

25 jobs that they could do based on all of that, all of the profile,

1    including the physical capacities.

2    Q    When you met with Wilfred that first time, did you talk

3    about what his past work had been and what his past experience

4    is, educational, things like that?

5    A    Oh, yes.  I took a complete history, the medical history and

6    the educational history, just so we have an understanding.  He

7    had an eighth grade education at Eunice Junior High School, but

8    he got a GED.  And he had done some vocational work, some welding

9    training.

10           His work history included that he was a scaffold

11   builder.  Laborer.  He had done some car detailing work, oil

12   field construction, concrete laboring work, a boiler maker

13   helper.  He had done some car service work, and then the security

14   guard was about nine months, but at the time of the injury he was

15   a scaffold builder.  That was mostly what he did in his career.

16   Q    Okay.  Thank you so much.

17           And so after talking with his doctors, what was your

18   assessment on the orthopedic complaints on the neck and back

19   injury and the hand only?  What kind of jobs would he fit into?

20   A    Well, the security guard was one of the options.  He could

21   go back and do the security guard work because it was light.  He

22   would be limited to the type of post.  And I'm not talking about

23   an armed security guard.  We're just talking about an unarmed

24   security guard.  And he would have to take light post assignments

25   which means that he would be limited in the amount of jobs that

1  he could take and the type of jobs, the type of assignments he

2  could take.

3  So what I found, based on his skill level and his

4  vocational test scores -- I did administer some vocational

5  testing in that initial assessment and he scored fairly low on

6  the educational achievement.

7  Q   What does that mean?  One, what does fairly low mean, and

8  then, two, what does that translate to in your expertise?

9  A   Sure.

10  So I did the Woodcock Test of Achievement.  This is an

11  academic test testing reading and arithmetic, which were the two

12  basic functions of most jobs.  In reading he scored low; letter

13  word identification, low average; passage comprehension,

14  understanding what you're reading, low; and the math composite

15  was low.

16  He had tested low on applied problems and calculation.

17  What that means is that he's not going to be able to do skilled

18  jobs from an academic standpoint.  Even though he has a GED, he's

19  not functioning in those subjects on this test at the GED level.

20  He's below that.

21  Q   And what does that mean that he's not good for -- not set up

22  for skilled jobs?  What does skilled jobs mean?

23  A   Things that would require a great deal of reading and

24  understanding or a great deal of math would not fit him.  And

25  skilled could be other things like using his hands.  Well, we

1    knew he had skills using his hands.  He had been a scaffold

2    builder and the like, but he had some limitations with the hand.

3    So we had to consider that as well.  So --

4    Q    Based on his -- I'm sorry.  Go ahead.

5    A    That's all right.

6          The test scores indicate that there -- it's almost like

7    you start with a pool of jobs that is available to someone and

8    then you start figuring out what they can't do to get down to

9    what they can do.

10   Q    And did you figure out what Wilfred's earning capacity was,

11   what he was able to earn or had the capacity to earn at the time

12   of this incident?

13   A    Well, based on what the history was and the information I

14   had, he had worked in scaffold building.  He said that he made

15   about $23 per hour.  The occupational scaffold builder -- the

16   Department of Labor researches jobs with employers and employees

17   to figure out what people are getting paid, what employers are

18   paying.  So there are statistics published by the Bureau of

19   Labor, statistics that we use.

20         The range for a scaffold builder was $26,880 to

21   $57,190.  That's the range of the 25th percentile on up to the

22   90th percentile.

23   Q    Do you think a lead scaffold man would be on the higher end

24   of that percentage?

25   A    A lead scaffold man would be on the higher end or at least

1  at the median.  Median was $41,420.

2  Q    And what was the high?

3  A    The high was $57,190.

4        When I looked at his earnings at $23, if you figure

5  that out on a full-time schedule, that equated to about $47,840,

6  which was slightly above the median which is the

7  50th percentile.  That's the point at which half the people

8  doing that job earn below and half the people doing that job earn

9  above.

10 Q    Did you factor into your earnings calculations any per diems

11 or overtime?

12 A    No.  Overtime couldn't be calculated because it wasn't with

13 any -- it wasn't reported with any regularity.  I did get some

14 payroll records, but he didn't always earn overtime.  He did when

15 he worked over 40, but it was too variable to come to any

16 calculation.  You'd have to look at other numbers to figure that

17 out.  So, no.  Per diem is something to replace meals and lodging

18 and travel expenses.  So me that's not a wage.  So I don't count

19 that in the wages.  People do.  I mean, they consider it their

20 earnings when they get per diem and they add it to their

21 earnings.  I get that, but as far as a vocational evaluation is

22 concerned, it doesn't get factored into the earnings.  It's about

23 what do you get paid a wage to do this particular job.

24 Q    Just so I could understand exactly what it was, the median

25 for his earning capacity was what number?

1    A    The median was $41,420.

2    Q    And the high would be?

3    A    $57,190.

4    Q    Per year?

5    A    Right.

6    Q    How do you know how long he would work into the future?

7    A    Well, you don't.  We just assume a regular worklife schedule

8    up until the time of retirement.  Usually we look at -- the

9    retirement age now is anywhere from 65 to 67, but I don't

10   calculate earning capacity into the future.  I leave that to the

11   economists to calculate.

12   Q    That's the next person we hear from, Dr. Theriot?

13   A    That's the next person, right.

14   Q    Thank you so much.

15        So what was the net result of your vocational

16   evaluation when you talk about what he could earn when the

17   accident happened as a lead scaffold man versus maybe going back

18   and working some security role?

19   A    Well, at the time that I met him, he actually wasn't capable

20   of working because he was post-surgery, but projecting the future

21   for him to say what his rehabilitation potential and earning

22   capacity would be, I looked at alternative jobs outside of the

23   scaffolding.

24        The security guard, that paid in a wage range for him

25   in the light category $17,090 to $22,150 per year and the average

1   was $19,620.  So if he could return to that, that would be about

2   what he could earn.

3          Parking lot attendant was another occupation that I

4   identified.  That range was $16,150 to $19,600 per year.  The

5   average was $17,875.

6          I also thought, because of his mechanical ability, car

7   parts, like a sales clerk in a parts store.  That's a light job,

8   and it paid in the range of $17,450 to $27,360 per year.  The

9   average for that job is $22,405 per year.

10          So based on my assessment, if you look at what he

11   earned pre and you look at what he can earn post, there is a

12   difference, and I calculated that difference utilizing full-time

13   schedules to be anywhere from $30,390 to $31,690 per year.  That

14   would be the difference in what he could earn before and what he

15   could earn after.

16   Q    Thank you so much.  I appreciate that.

17          And you actually met with Wilfred twice, right?

18   A    Three times.

19   Q    Three times.  I've sorry.  Three times.  Why is it important

20   to meet with him?

21   A    Well, I had originally opened the case and done the

22   evaluation and conducted a report on the vocational outlook.

23   Sometime later there was indication in the records, of course,

24   and in interviewing him, that he was going to have ongoing

25   medical treatment.  So I was asked to do a life care plan.

```
 1              So the next report was basically a life care plan.  So
 2   I consulted with Dr. Henderson for the first report for the
 3   physical restrictions, but on the second report I consulted with
 4   the surgeons, Dr. Muldowney and Dr. Henderson.
 5   Q    And we're about to go to the life care plan, but just
 6   finishing up the vocational side, why was it important to meet
 7   with Wilfred Bradley a couple of times and see him in person and
 8   ask him questions to assess his vocational abilities?
 9   A    Because I need to evaluate him to be current with
10   information.  Things change in people's lives.  Sometimes they go
11   back to work.  Sometimes they get better.  Sometimes they don't
12   get better.  So I needed to know what his current status was.
13              I also wanted to know if anything had happened in the
14   meantime to cause him to get worse or get better.  So I looked at
15   what his treatment was.  I looked at what any vocational
16   preparation was.  Sometimes people go back and get some training
17   so they can go back to work.  So I needed to be current with the
18   information.  That's why I evaluated him three times.
19   Q    And the first time you saw him was important because you
20   wanted to get the full assessment and have some testing done,
21   correct?
22   A    Correct.
23   Q    And all of that was really important for you in formulating
24   opinions in this case?
25   A    Yes.
```

1   Q   And the net result on the vocational side is that Wilfred

2   has a net loss per year in earnings of what number?  What range?

3   A   It was $30,390 to $31,690 per year using the examples of the

4   jobs that I had.

5   Q   Now let's shift to the life care planning side.

6          For your life care planning for the future, you relied,

7   for purposes of your testimony here, is based solely on

8   Dr. Muldowney's recommendations, correct?

9   A   Yes.

10  Q   Dr. Henderson didn't recommend specific future treatment for

11  this matter, correct?

12  A   He was finished.  He told me he would follow him a couple of

13  times and that would be it.  There was really nothing else for

14  him to do.

15  Q   So Dr. Muldowney.  Talk about your conversations with

16  Dr. Muldowney.  Were you here to hear -- you didn't hear

17  Dr. Muldowney's testimony yesterday, did you?

18  A   No.  I came today.  I think he testified yesterday.

19  Q   Tell the jury about your conversations with Dr. Muldowney

20  and what your findings were in terms of future orthopedic spine

21  treatment.

22  A   So for life care planning, we consult with the doctors as

23  you heard earlier.  You know, we rely on them for their

24  information.  So I consulted with Dr. Muldowney on two occasions

25  throughout the time of this case.  I mean, I think I opened this

1    case in 2019, October 28th of 2019.

2            So over time I consulted with Dr. Muldowney to find out

3    what were his recommendations for treatment so that as a life

4    care planner I can do research in the market and price out what

5    that would cost so that you would know how much that would be.

6    So we pull it all together like that.

7    Q    And what did Dr. Muldowney -- I know it's a bunch of things,

8    but what did Dr. Muldowney recommend?  He talked about it

9    yesterday some in terms of future treatment for Wilfred.

10   A    So I had four reports.  So I think I'll go to the latest

11   report because that's the latest information because things

12   change.  I mean, things increase over the years in costs because

13   of additional services.  And then, for example, Dr. Muldowney had

14   recommended a surgery.  He since had a surgery.  So it went in

15   the life care plan and then in the next life care plan it comes

16   out because it's already done.

17           So here's what Dr. Muldowney said.  I'm going to kind

18   of go line by line.  He would need some follow-up post-operative

19   for one year and there's a schedule of visits per year.

20   Q    Wait.  We might be putting the cart before the horse.  Just

21   generally tell the jury what Dr. Muldowney's recommendations were

22   for future treatment for Wilfred and then we'll get down to the

23   nuts and bolts.

24   A    Okay.  So for future treatment he would need surgery.  He's

25   going to need a lumbar surgery and he's going to need all the

```
 1    things that go with that, pre-operative labs, pre-operative
 2    imaging, post-operative labs and imaging, post-operative physical
 3    therapy, et cetera.  So that's primarily what Dr. Muldowney said.
 4    Everything pretty much has to do with the surgery that he's
 5    recommending.  The only thing that was not included or grouped
 6    with that surgery is a wellness program.  That's physical therapy
 7    that is ongoing and I didn't consider that to be lifetime.
 8    Q    Okay.  Gotcha.
 9    A    That was the only thing.  Everything else was for a short
10    period.
11    Q    So now if you can, if you kind of can go not too
12    laboriously, but at least itemize for the jury what items
13    Dr. Muldowney recommended.
14              And let me back up, too.
15              When Dr. Muldowney makes these recommendations, you
16    just take his recommendations and find out the price of those
17    items, correct?
18    A    That's right.  What I do is I consult -- I talk with him.  I
19    take down the recommendations, but I confirm it in a letter to
20    him that summarizes everything and give him another opportunity
21    to look at it to see do I have this right, is there something
22    more that he needs that you haven't said or you haven't thought
23    about, or do you want to take anything off.  You know, give him a
24    chance to look at it.  So he confirmed everything twice for me.
25    Q    In writing?
```

1    A    Yes.

2    Q    Okay.  And so now if you can, talk about the laundry list of

3    things that Wilfred's going to need with respect to this second

4    back surgery in the future for the jury.

5    A    So he needs a follow-up with the surgeon, of course,

6    post-operatively, and he needs a primary care physician.  I think

7    you heard earlier some testimony about other problems he's having

8    with the kidney, stuff like that.  He would need post-operative

9    physical therapy.  He would need the surgery itself of course.

10            He would need some labs like a metabolic panel, blood

11   count, x-rays, PT prothrombin counts for blood clotting, EKG,

12   lumbar x-rays, CAT scans, MRIs, medication.  The medication he

13   said at the time was oxycodone and Hydrocodone for brief periods

14   of time after the surgery for pain.  He needed a wellness program

15   which I said was monthly into the future.  A handyman around the

16   house, some lawn maintenance, and a housekeeper for a short

17   period of time.

18   Q    Just after the surgery he's going to have them for the

19   future of his back?

20   A    Yeah.  He can't do those things.

21   Q    When you talk about the medication and this household help,

22   this is just right after the surgery he's going to have in the

23   future?

24   A    That's right.

25   Q    Nothing between now and having that surgery in the future?

1   A    No.  He deferred to Dr. Weir on the medicines.

2   Q    Thank you.

3   A    So do you want the total?

4   Q    Yes, sir, please.  What do all of those items total up?

5        And you price each one of those items.  How do you get

6   the prices?

7   A    I call people in the market.  I called, for example,

8   physical therapy.  I called physical therapy providers and asked

9   them what the rates and the charges are.  We research and try to

10  get at least three samples of each item to get a range of what

11  something might cost.  So I did that, put it all together in a

12  plan, and totaled it all up.

13  Q    And what was the total?

14  A    So the total for one time only in short-term costs, which is

15  most of it, based on Dr. Muldowney only, is $189,834.90.  That's

16  the low end because things cost in the range, a low end and a

17  high end.  The high end is $262,948.77.  So that's everything

18  that's one time or short term.  Then the annual cost for the

19  wellness $540 to $840.  That would be a year, per year.

20  Q    And I want to make sure the jury understands this.  So that

21  big number between about $190,000 and $260,000, that's for that

22  low back adjacent level surgery in the future, correct?

23  A    Correct.

24  Q    And all the attendant-type care associated with that

25  surgery?

1    A      Everything is associated with that surgery, yes.

2    Q      What is this $540 to $840 per year?

3    A      That's a wellness program.  When I consulted with

4    Dr. Muldowney, he recommended a wellness program.  Some people

5    equate it to a gym membership.  It's not exactly a gym

6    membership.  They're usually affiliated with hospitals or

7    clinics.  It's a supervised exercise program so that someone is

8    not just in a gym working out.  They supervise and they have

9    classes and things.

10            When I talked to him, I sort of asked him do you really

11   think he needs this, and he said yes, and I said, you know, this

12   is kind of a thing that gets questioned a lot about whether

13   someone needs a gym membership or maybe they needed one anyway.

14   He said, no, he needs a wellness program for his life.

15   Q      And even though Wilfred's big on working out, he thought he

16   needed a little more structure?

17   A      Yes.

18   Q      I want to make sure the jury understands, too.  So that

19   larger number, the $189,000 to $262,000 is only for that future

20   surgery and that care, correct?

21   A      That's it.  That and anything related to that surgery.

22   Q      That surgery is going to happen based on Dr. Muldowney's

23   testimony maybe ten to twenty years from now, correct?

24   A      Correct.

25   Q      The $540 to $840 a year, what is that for?  You just said --

1   is it basically for a wellness gym type program?

2   A    To maintain what he gets from the surgery, to maintain his

3   ability to function.  It's a wellness program.

4   Q    So outside of the surgery that he'll have to have in the

5   future, do your numbers include any amounts for any future doctor

6   visits?

7   A    Any future doctor visits?  No.  There's one -- one primary

8   care physician pre-surgery, and there's one -- there's a

9   follow-up with the surgeon for surgery.  That's it.

10  Q    I want to make sure you understand my question, too.

11           Outside of the surgery, outside of the larger number

12  that was just for the surgery, does your life care plan you

13  created here create any money at all to see any doctor in the

14  future?

15  A    No.  Nothing unrelated to the surgery, no.

16  Q    Does your life care plan presented today provide any money

17  at all to cover any medication in the future?

18  A    The only medication --

19  Q    Other than the surgery?

20  A    Well, I have medication in here, yes.

21  Q    Only about Dr. Muldowney?

22  A    Oxycodone and Hydrocodone is after the surgery and that's

23  it.

24  Q    That's just for a few months after the surgery, correct?

25  A    That's correct.  One month actually.

1   Q    And so you provide these numbers.  You don't even total up

2   or add up the annual cost of the wellness program.  Those are

3   numbers that Mr. Theriot takes and puts into a final economic

4   report; is that right?

5   A    I add up the annual cost and then I do a calculation on life

6   expectancy to see what it would be, but I really refer to the

7   economist on how much that is because I do not inflate money over

8   time to figure out what the index of inflation is for medical

9   services nor do I discount it back to present value.  That's not

10  really something I do.  So I don't do that.

11  Q    And I don't want to belabor this anymore, but the amount you

12  talked about for vocational losses of that $30,000 to $31,000 per

13  year, that's the entirety of the result you have for his

14  vocational losses in this matter, right?

15  A    Per year, yes.

16  Q    And then you just talked about for that future lumbar

17  surgery and the wellness program, that's the entirety of the

18  medical expenses in your life care plan for this trial, correct?

19  A    For Dr. Muldowney, yes.

20          MR. DAVID:  Your Honor, I believe those are all the

21  questions I have.  Thank you.

22          THE COURT:  Mr. Dill, you may proceed with cross when

23  ready.

24          MR. DILL:  Thank you, Your Honor.

25                          CROSS-EXAMINATION

1    BY MR. DILL:

2    Q     Good afternoon, Dr. Stokes.

3    A     Good afternoon.

4    Q     You told us you rendered three reports in this matter, the

5    first being July 20 of 2020?

6    A     I wrote four reports in this matter.

7    Q     All right.  I'll stand corrected then and we'll get to them

8    here in a minute.

9           In your first report, July 20, 2020, you met with him

10   on October 29th, 2019, and conducted an interview; is that

11   correct?

12   A     Yes.

13   Q     And the purpose of that interview was so that you could get

14   the information to go forward?

15   A     Yes.

16   Q     You did a pain assessment asking him his levels of pain?

17   A     Yes.

18   Q     And you did a health habits and personal safety as well as a

19   mental health interview, correct?

20   A     Yes.

21   Q     Other medical problems?

22   A     Yes.

23   Q     Limitations and restrictions?

24   A     Yes.

25   Q     Environmental limitations and restrictions?

1   A    Yes.

2   Q    And an assessment of activities of daily living, correct?

3   A    Yes.

4   Q    In that interview he reported to you that he was

5   experiencing pain in his neck and upper back and had sensitivity

6   in his right hand; is that correct?

7   A    Yes.

8   Q    He told you he had problems lifting with his right hand

9   greater than 25 pounds?

10  A    Yes, he did.

11  Q    And he told you he had problems dealing with climbing,

12  crouching, crawling, twisting, and reaching overhead?

13  A    Yes, sir.

14  Q    He did not mention any headaches in that visit, did he?

15          MR. DILL:  If I could have the ELMO, Ms. Paula.

16  BY MR. DILL:

17  Q    Doctor, in your report of July 20, 2020, under Medical

18  Opinions Review -- I'm sorry.  That's not what I wanted.  Go

19  ahead and look at your notes, Doctor.

20  A    My notes from my evaluation?

21  Q    Actually your report is what I'm interested in, not your

22  notes.

23  A    Okay.  And I was just checking my notes because I did three

24  evaluations.  So I wanted to see what he reported at what time,

25  but I don't have any notes or in my report where he complained of

1    headaches at that time.

2    Q    All right.  He didn't mention any issues with his low back,

3    did he?

4    A    I think he did.  The reason for the referral, I thought he

5    had injured his back and his head and of course the amputation of

6    his finger in his dominant hand, but in the limitations, he

7    mentioned limitations with his neck and upper back.

8    Q    It was his upper back he mentioned, correct?  It was not his

9    low back?

10   A    Yes.

11   Q    In that meeting with you back in 2019, he didn't mention any

12   issues in the interview with regard to anxiety or depression, did

13   he?

14   A    No.  I don't believe he did, no.

15   Q    Had he made those complaints, you would have noted those

16   clearly in your assessment?

17   A    Yes.

18   Q    In addition to doing your interview with Mr. Bradley, you

19   reviewed the records of Dr. Muldowney that he had generated up to

20   that point in July of 2020?

21   A    Yes.

22   Q    It would be fair to say, Mr. Stokes, you made no mention of

23   any complaints of lumbar or low back pain to Dr. Muldowney during

24   that period of time?

25   A    That he had made no mention to Dr. Muldowney or that I --

483

1    Q     That you saw in those reports.

2    A     No, I did not.  Dr. Muldowney, when I consulted with him,

3    said he was dealing with the cervical problems at the time.

4    Q     With regard to the headaches, you made no mention in your

5    recorded complaints of headaches in your July, 2020, report?

6    A     No.  I don't believe I had, no.

7    Q     In his interview with you, he told you about the physical

8    activities that he was engaging in for exercise?

9    A     Yes.

10   Q     He told you he was working out with weights six days per

11   week for an hour and a half per day?

12   A     Yes.

13   Q     He told you that he was running wind sprints and doing

14   boxing workouts at that time?

15   A     Yes.

16   Q     What was the date of that again?

17   A     The date of the evaluation?

18   Q     The evaluation, yes, sir.

19   A     Now, you're talking about the July 20th, the July 20th,

20   2020, report because I was looking also at the one that was

21   previous, which is the February 24th of 2020.

22   Q     Your report was July of 2020, but your interview with him

23   was in 2019, wasn't it?

24   A     Correct.  Well, the first one was.

25   Q     What was the date of the interview in 2019?

1    A    The date of the interview in 2019 was October 29th, 2019.

2    Q    Now, the second report I have is April 29, 2021.

3    A    No.  Well, July 20th of 2020.  I have four reports.

4    February 24th, 2020, is my original report.  Then I have a

5    report dated July 20th of 2020.

6    Q    I'm missing a report.  That's the problem.  Let's go to the

7    April 29, 2021, report.

8    A    Okay.  That's the third report, April 29th, 2021.

9    Q    And at that time he had completed his treatment with

10   Dr. Henderson and was treating with Dr. Muldowney?

11   A    Yes.

12   Q    In your clinical interview with Mr. Bradley, he reported to

13   you he was suffering headaches on the right side of his head two

14   to three times per week for one to two hours at a time?

15   A    Yes.

16   Q    You also noted in that report that Dr. Muldowney had

17   recommended that he perform light duty and stated that he was

18   capable of work activities?

19   A    Yes.

20   Q    Did he restrict him from repetitive bending and lifting?

21   A    No.  It wasn't included in the restrictions at that time,

22   no.

23   Q    You talked to Dr. Henderson at that time about his ability

24   to work and Dr. Henderson said he could go to medium duty work at

25   that time, correct?

1    A    With the right hand, yes.  He was assessing the right hand

2    function.  He had no limitations on the left hand.

3    Q    Now, the next report I show is December 20, 2021; is that

4    correct?

5    A    December 20th, 2021.  Yes, sir.

6    Q    And as part of that report, you did an updated evaluation

7    with Mr. Bradley on November 30th of 2021?

8    A    Yes.

9    Q    At that time he was one month post lumbar surgery?

10   A    Yes.

11   Q    He was doing well and walking two and a half miles every day

12   and continuing to advance his activities as tolerated?

13   A    Yes.

14   Q    Under your vocational analysis, you made a statement

15   regarding his physical restrictions, and Dr. Muldowney

16   recommended that Mr. Bradley perform light duty with no

17   repetitive bending or lifting once he is released to return to

18   work six to twelve months post-operatively, correct?

19   A    Yes.

20   Q    What is the definition of light duty work, please?

21   A    Light duty work is equivalent to light work which is a

22   maximum lifting of 20 pounds with frequent lifting up to 10.

23   Standing and walking can be five to five and a half hours per

24   day.  It could include some postural demands such as bending,

25   stooping, crouching, crawling, those sorts of things.  It depends

1    on the job.

2    Q    What is the definition of medium duty?

3    A    Medium is lifting up to 50 pounds occasionally with frequent

4    lifting up to 25 mounds.  Significant walking.  It could be eight

5    hours per day.  And the other postural demands could be

6    significant such as bending, stooping, crouching, crawling.

7    Q    What is the definition of heavy duty work?

8    A    Heavy duty work is lifting up to 100 pounds occasionally

9    with frequent lifting up to 50 pounds.  Very physical work.

10   Hardly any of it would be seated.  It would be moving around

11   throughout the day up to eight hours.

12   Q    Under Defendants' Exhibit Number 7 --

13        MR. DILL:  Mr. Don, if you could pull up Bate number

14   5156 and I will need the bottom paragraph.

15   BY MR. DILL:

16   Q    Dr. Stokes, have you ever reviewed this note?

17   A    I don't know what it is.

18   Q    This is from Dr. Muldowney's report.

19        MR. DILL:  If we could drop back out so he can read the

20   date of January 11th, 2022, and if you could blow that bottom

21   paragraph up for me, please, Mr. Don.

22   BY MR. DILL:

23   Q    Were you aware that Mr. Bradley went to Dr. Muldowney in

24   January of 2022 two months after his back surgery and was

25   released to lift 50 pounds maximum in his weightlifting program?

1   A    I'd have to look and see if I have that record.  If I have

2   it, I reviewed it.

3   Q    Is that something you don't recall reviewing?

4   A    Well, I don't recall offhand the date.  So I was looking to

5   see if I have that record.  It's January 11th?

6   Q    Of 2022.

7   A    2022.

8           MR. DAVID:  Your Honor, may we approach real quick?

9           (Whereupon, a sidebar conference was had as follows:)

10          MR. DAVID:  I want to object.  I'm limited to the four

11  corners of his report and he's asking about medical treatment

12  after he issued his last report.  Is the lid off the report now?

13  It was due and filed in December, 2021, and you're asking him

14  about --

15          MR. DILL:  You asked him about his capacity to work and

16  I'm just cross-examining.

17          THE COURT:  Your testimony was limited to a cutoff date

18  of that report because you're forward looking.  You have him

19  calculating it out into the future.

20          MR. DAVID:  I just wanted to make sure because if we

21  can talk about other medical treatment, I have lots of medical

22  treatment I'd like to talk with him about.  The Court might not

23  like me to do it, but...

24          THE COURT:  I mean, you can't ask him about matters

25  that I have ruled are excluded, but you're not limited to a

 1    cutoff.  Otherwise, I would have stopped you from eliciting all

 2    of that testimony.  So he's allowed to cross-examine on that.

 3              MR. DAVID:  Thank you, Your Honor.

 4              THE COURT:  All right.  Very good.

 5         (Whereupon, the sidebar conference was concluded.)

 6              THE COURT:  All right.  Mr. Dill, you may proceed.

 7              MR. DILL:  Thank you, Your Honor.

 8    BY MR. DILL:

 9    Q    Did you find it?

10    A    I did.  I received this report.  I do have the

11    January 11th report and I did read it, but I received it

12    Friday, like this past Friday, and so I couldn't write a report

13    reflecting anything that it said.

14    Q    I understand.  That report indicates he's actively lifting

15    weights at that time?

16    A    Yes.

17    Q    As a vocational expert, have you ever seen a doctor release

18    a back surgery fusion patient to weightlifting 50 pounds two

19    months after his surgery?

20    A    Not that I can recall, no.  Usually the neck surgeries will

21    end up in a 50-pound lifting restriction, but not low back, no.

22    Q    The question I think I have is if he can actively weightlift

23    at that point, he should be able to go and do at least a light

24    duty job at that point in time, shouldn't he?

25    A    Yes, based on the definition.  I mean, what this says is we

1    will increase his lifting to a 50-pound maximum.  It doesn't say

2    that he's at that point as of January 11th, but it's indicating

3    that he should be able to increase to that point, which would be

4    medium work.

5    Q    And if he can run sprints and lift weights, he could do a

6    light duty job at that point in time?

7    A    It seems so, yes.  When I took the history, he told me that,

8    about the sprinting and lifting weights and shadowboxing.  I have

9    to work within the limits that the doctors say.

10   Q    I understand.

11        You listed a number of jobs and his job at the time of

12   this accident was a lead scaffold builder, right?

13   A    Lead scaffold builder.  He said he was a lead man.

14   Q    What does that mean to you as a vocational guy when you say

15   he's the lead man?

16   A    Meaning he has some supervisory responsibility for some of

17   the people working with him on his crew.  It's not usually a

18   supervisor or manager.  It's typically the senior guy that knows

19   how to do things and maybe shows other people how to do it.

20   Q    Now, you calculated a number of -- or you testified there

21   are a number of jobs in the economy that he can do.  Of the jobs

22   that you found, what are the hourly rates that correspond to

23   those numbers that you gave us?

24   A    I didn't calculate it that way.  I did annual wages, but I

25   could give it to you if you want me to calculate that.

```
 1   Q    I would like to know what that is if you wouldn't mind.
 2             And there were three different jobs, correct?
 3   A    Yes.
 4   Q    The first one was security guard, right?
 5   A    Yes.
 6             So just to set this up, annual wages are based on the
 7   standard work year of 2,080 work hours in a work year.  So to get
 8   the number, you just divide the annual wages by 2,080.
 9             So for the security guard on the low end, the hourly
10   wage rate equivalent would be $8.22, and I'm going to round for
11   these purposes.  $8.22.  The high end is $10.65.
12   Q    All right.  You said parking lot attendant?
13   A    Sure.  I'm going to write these down.  $7.76 to $9.42.
14             And the parts sales clerk?
15   Q    Yes, sir.
16   A    $8.39 per hour to $13.15 per hour.
17   Q    Doctor, there are many, many more jobs in our local economy
18   at an entry level that pay substantially more than that, aren't
19   there?
20   A    I don't think so, not substantially more than anywhere from
21   $7.76 to $13.58.
22   Q    The fast food industry is not paying well above that?
23   A    The what?
24   Q    Fast food industry.
25   A    Fast food industry?
```

1  Q    Yes, sir.

2  A    On some occasions it is, yes, but it's part time.  It's not

3  equivalent to the 40-hour full time.

4  Q    There are none that are offering full time in the economy?

5  A    Hardly any in fast food, no.

6  Q    There are no jobs that are better in the light duty category

7  that Mr. Bradley is suited for that would pay more than the jobs

8  that you have outlined there?

9  A    Not that I could identify, no.

10  Q    And you didn't find any jobs for him that would give him any

11  sort of supervisory capacity as he had at his old job, did you?

12  A    No.

13  Q    You did some testing in this case.  Do you from time to time

14  rely on testing of other people that's already been done to

15  formulate your opinions?

16  A    Not vocational testing.  Typically if I rely on testing, it

17  would be -- I would defer usually to a neuropsychologist in a

18  brain injury case for intelligence and achievement testing

19  because they perform that testing and their tests are -- they're

20  giving a full battery of anywhere from one to two to three days

21  worth of testing, but that's the only thing.  Vocational testing,

22  I don't think I really ever defer to anyone else.  I prefer to do

23  my own testing and see if we can get a comparative score.

24  Q    You know how to do the test?

25  A    Yeah.

1    Q    And your testing is accurate?

2    A    Yes.

3    Q    So another vocational expert could certainly rely upon the

4    testing you've performed to formulate opinions and be accurate?

5    A    Oh, sure.  I could rely on other experts who do vocational

6    testing and utilize test scores, but I prefer to get another

7    measure.  I mean, if someone gives an intelligence test, then why

8    wouldn't I give one, too, and see how they compare.  You get more

9    information.

10             MR. DILL:  I have no further questions.

11             Thank you, sir.

12             THE COURT:  Mr. David, any redirect?

13             MR. DAVID:  Yes, I do, briefly, Your Honor.

14             THE COURT:  Thank you.

15             You may proceed when you're ready.

16                      REDIRECT EXAMINATION

17   BY MR. DAVID:

18   Q    First, Mr. Stokes, you were just shown a January, 2022,

19   report from Dr. Muldowney talking about 50-pound limitations?

20   A    Yes.

21   Q    And you were asked on the spot to opine about that.

22             Did you know that Dr. Muldowney testified in this court

23   yesterday that that was only about very regulated upper body type

24   workouts, like maybe a flat bench press, to make sure he's not

25   putting any strain on his body and that it had nothing to do with

1    the lifting and bending you would do associated with a job?

2              THE COURT:  Let me stop you there.  You're summarizing

3    evidence.  You can break that up and just lead him through it.

4              MR. DAVID:  Yes, sir.  Thank you, Your Honor.

5              THE COURT:  Because the jury can't rely on what you say

6    the witnesses testify to.  They have to rely on what the witness

7    said.  So you can break that up.  I'll allow you to proceed.

8              MR. DAVID:  Thank you, Your Honor.

9    BY MR. DAVID:

10   Q    If Dr. Muldowney testified yesterday that that 50-pound

11   weightlifting requirement was really only about some isolated

12   bench press type maneuvers, that wouldn't be medium duty work,

13   would it?

14   A    Probably not.  I don't know any of the specifics.  I was

15   only given the information in the question.

16   Q    If Dr. Muldowney specifically said his limitations for work

17   are light duty, that's what you're relying on in this case,

18   correct?

19   A    Yes.  And what I had done was assume that early on because

20   we didn't have final restrictions, and then Dr. Muldowney, when

21   he assigned restrictions, it was light work.  So we were accurate

22   on the assessment.

23   Q    So if we're going to rely on doctors to set -- because you

24   can't independently say, oh, I think Wilfred is sedentary or I

25   think he's heavy duty.  That's not part of what you do, correct?

1  A   That's not part of what I do.  Either a doctor does that or

2  physical or occupational therapist who conducts a functional

3  capacity test does that.

4  Q   Any vocational counselor doing their job has to rely on what

5  the doctor says the limitations are, correct?

6  A   Yes.

7  Q   An employer cannot hire somebody or they hire at their own

8  peril if they go beyond some doctor's limitations, correct?

9  A   Yeah.  They would be taking a risk and so would the person

10  who's applying for the job if they're trying to get a job outside

11  their restrictions.

12  Q   So as an expert vocational rehabilitation counselor, you

13  could never rely on one report that a doctor's already said is

14  not indicative of weight restrictions for work that he's light

15  duty, correct?

16  A   No.  That's why I would consult with him and ask him.

17  Sometimes it's not very clear.  So I ask what do you mean by that

18  and how does that work in the world of work so that I could

19  assess in this case Mr. Bradley to figure out what he could do.

20  Q   And when you talked to him a month before that report,

21  Dr. Muldowney told you light duty restrictions for life?

22  A   Yes, he did.

23  Q   There were some questions about what you saw in certain

24  medical records.  You would certainly defer to the doctors in

25  terms of what was in their medical records and what they opined

495

1    to about when Wilfred Bradley's headache and back condition

2    began, correct?

3    A    Well, I would read and review the records to determine the

4    status and ability, but I'd certainly defer to the physicians on

5    what they can do, what they can't do, what they recommend for

6    treatment, what they don't recommend, that sort of thing.

7    Q    I'm not going to rehash it again, but you weren't here

8    yesterday to see anything about headaches and back problems

9    documented throughout his treatment, were you?

10   A    No.

11   Q    And your job in this case was not to go looking for records

12   and trying to document everything in each record, correct?

13   A    No.  I summarized the records for the relevance it has to

14   what I'm doing, the life care planning and the vocational

15   evaluation.

16   Q    Fair enough.

17        It wasn't an audit of all records?  You were just

18   looking to determine what the limitations are for work and what

19   kind of future medicals he will need?

20   A    That's right.

21   Q    Opposing counsel also asked you about access to different

22   jobs in this area, and you talked -- some of those jobs, the fast

23   food, are all part-time jobs.  For Mr. Bradley to look for a job

24   in this area, will he have some limitations in doing that given

25   his many medical maladies and things he has going on?  Is there a

1    lost access component of him going looking for any jobs he can
2    anywhere?
3    A    Yes.  And I said that in my report, that although there are
4    some jobs that I believe he could do in the market, in the area
5    in which he lives, there's not a lot available, and he would have
6    a loss of the access to the jobs in the sense that the whole
7    range of jobs aren't available to him that would be available to
8    someone who didn't have limitations or restrictions.
9    Q    And when it comes to him finding a job, he has to
10   accommodate the light duty restrictions?
11   A    Yes.
12   Q    Also, he has to accommodate the hand restrictions.  You
13   talked about Dr. Henderson, correct?
14   A    Yes.
15   Q    And we have medical records from this year talking about
16   ongoing chronic headaches as well, correct?
17   A    Yes.
18   Q    And so any future employer will have to consider all the
19   ongoing treatment he has and problems he has for employment,
20   correct?
21   A    Yes.
22              MR. DAVID:  No further questions, Your Honor.
23              Thank you.
24              THE COURT:  You may step down.
25              THE WITNESS:  Thank you, sir.

```
1              THE COURT:  Mr. David, we've gone a little bit over an
2    hour.  Who do you have next?
3              MR. DAVID:  I would think Mr. Theriot will be quick.  I
4    don't want to keep anybody from a break.  Mr. Theriot would be
5    quick and then we'd hope to try to put the plaintiff on.
6              THE COURT:  How much time do you think you have with
7    Mr. Theriot?
8              MR. DAVID:  Fifteen minutes tops.
9              THE COURT:  Can y'all go another 15, 30 minutes and
10   we'll take a break before the plaintiff?
11             All right.  Let's call Mr. Theriot.
12             MR. DAVID:  The defense calls Mr. John Theriot to the
13   stand.
14             THE COURT:  Mr. Theriot will approach and be sworn in.
15             THE COURTROOM DEPUTY:  Do you solemnly swear that the
16   testimony you are about to give in this case will be the truth,
17   the whole truth, and nothing but the truth, so help you God?
18             THE WITNESS:  I do.
19             THE COURTROOM DEPUTY:  Thank you.
20   Whereupon,
21                       JOHN W. THERIOT
22   was called as a witness; after having been first duly sworn, was
23   examined and testified as follows:
24                    VOIR DIRE EXAMINATION
25   BY MR. DAVID:
```

1   Q    Mr. Theriot, can you state your full name and address for
2   the record.
3   A    My name is John W. Theriot and my address is 611 North
4   Causeway Boulevard, Metairie, Louisiana.
5   Q    And you are an economist?
6   A    Yes, I am.
7   Q    Okay.  A forensic accountant, correct?
8   A    Yes.
9   Q    Why don't you tell the jury about your education and
10  experience just briefly about your expertise.
11  A    Sure.  I graduated from Nicholls State University in 1983
12  with a Bachelor of Science.
13  Q    Mr. Theriot, your expertise, not Nicholls State.
14  A    Hey.  Easy.
15       And then even worse, later I attended Tulane University
16  where I got a master's degree in accounting.  So that's my
17  educational background.  And I started -- right out of Nicholls,
18  I started with a CPA firm that I'm with in -- it was in New
19  Orleans at the time.  I moved to Metairie.  Malcolm M. Dienes,
20  LLC, and I've been with the firm now for 40 years.
21       While there, I became a certified public accountant,
22  certified forensic accountant, and basically forensic accounting
23  is a discipline where we do kind of like investigation type of
24  work.  That's what we do.  And sometimes it's in the courts.
25  Sometimes it's not.  Sometimes I go into a company and

1    investigate things that are happening there and sometimes it's in

2    a setting like this.  So here I'd be here as a certified forensic

3    accountant and economist.

4    Q    Great.  Thank you so much.

5         And so what were you asked to do -- well, I guess at

6    this point we'll tender you as an expert economist.

7              THE COURT:  Do you want to traverse?

8              MR. DILL:  No, Your Honor.  No traverse.

9              THE COURT:  He's accepted.

10             You may proceed when ready.

11                          DIRECT EXAMINATION

12   BY MR. DAVID:

13   Q    Tell me what you did in this case, Mr. Theriot.

14   A    What I do is I review a bunch of documents.  I have a file

15   here and a list of documents that I review, and it's going to be

16   things like tax records, other expert reports likes Dr. Stokes

17   who we just saw testify, and ultimately what I'm doing is making

18   calculations of Mr. Bradley's loss of earnings.

19             He's going to have what we call a past loss of

20   earnings, loss of earnings from the date of the accident up until

21   today, the trial date, and he'll have a future loss of earnings

22   as you just heard Dr. Stokes talk about, future loss of earnings

23   from the date of trial to the end of his worklife expectancy.  So

24   that would be the earnings calculations that I make.

25             And then I also refer to and rely on the testimony of

500

```
 1    Dr. Stokes and he relies on the testimony of medical doctors,
 2    which we just heard, regarding a type of life care plan.  He just
 3    went over those costs, those medical costs, that are going to be
 4    incurred.
 5            So I'll sum those up and then I might have to do --
 6    just like on the wellness he talked about, I'm going to have to
 7    do a present value calculation on that because that could be
 8    until the end of his life expectancy.  So I'll have to do a
 9    calculation on that.
10            So ultimately that's what I'm going to do.  I'm going
11    to do these three or four different types of calculations.  I've
12    done them already and I'm going to provide them today to the
13    jury.
14    Q    Okay.  What is Mr. Wilfred's life expectancy?
15    A    Yes.  His --
16    Q    How do you come to that number?
17    A    I look at a generally published table.  You know, anybody
18    that's in this industry that's referring to life expectancy
19    refers to the Bureau of Labor statistics.  It's a federal
20    government table.  And you basically look at somebody's age, the
21    fact that they're a male, and it tells you that he will -- I hate
22    to say this, but his life expectancy is 27.3 years from today,
23    the date of trial.  So 27.3 years.
24    Q    Gotcha.  Okay.  So the government statistics say he's going
25    to live for almost 28 more years?
```

1    A    That's correct.

2    Q    Let's talk about the vocational calculations you did first

3    in terms of past lost earnings and past lost earning capacity.

4    A    Yes.  For the past loss, as I stated, the past loss is the

5    loss from the date of accident up until today, the trial date,

6    and that's approximately four and a half years.  So it's pretty

7    simple math here.

8            What we do is we take his earnings at the time of the

9    injury.  With Apache he was making $23 an hour.  Dr. Stokes just

10   testified to that.  I have earnings records that show that.  I

11   have pay stubs and so forth.  I have employer records from the

12   employer saying he was making $23 an hour.  So I had data to

13   support that, but also Dr. Stokes and his testimony also

14   suggested that and in reports that he's provided to me along the

15   way.

16           So $23 an hour times 2,080 hours a year, that's the

17   standard workweek.  That's 40 hours a week times 52 weeks a year.

18   So that's $47,840.  So that's to suggest during his -- during the

19   time of his injury up until today -- so if you just take $47,840,

20   you multiply that times four and a half years, that number is

21   going to be -- I'm going to do it in a minute.  I'm sorry.  That

22   number is roughly $214,000, but in cases here in federal court,

23   I'm asked to consider the tax consequence.

24   Q    I don't believe so.  You don't have to consider any tax

25   consequences.

1   A   Okay.  So that's easy.

2           So then that calculation is the $214,000 I just

3   mentioned.  So the past loss of earnings would be $214,000.  Then

4   I also do a past loss of fringe benefits.  So I look at another

5   government table, a Bureau of Labor statistics table, and it

6   tells me -- there's all kind of benefits an employer can offer,

7   but the typical ones are some type of retirement like a 401(k)

8   plan and health insurance.  The government table tells me that

9   the average employer pays roughly 14.69 percent of wages as

10  fringe benefits.

11          So if he's losing wages, he's going to lose the fringe

12  benefits on those wages.  So 14.69 percent of that $214,000 is

13  roughly $31,000.  So his past loss of earnings and fringe

14  benefits is roughly those two numbers together which would be

15  $245,000.  So the past loss of earnings and fringe benefits is

16  $245,000.

17          MR. DAVID:  Your Honor, can we approach real quick?

18          THE COURT:  Yes.

19      (Whereupon, a sidebar conference was had as follows:)

20          MR. DAVID:  His report has the calculations both ways.

21  It's my understanding that a case sitting in diversity --

22          THE COURT:  It's optional under Louisiana law.

23          MR. DAVID:  In maritime it's different.  I want to make

24  sure I'm not running afoul of anything with the Court.

25          THE CLERK:  This is the Louisiana statute.  This is the

1   pattern.

2             MR. DAVID:  It says do not consider it.

3             THE COURT:  But yet the comments say it's optional.

4             MR. DAVID:  That was my understanding.  I saw y'all

5   talking.  I wanted to make sure I was good.

6             THE COURT:  Well, there's contrary commentary, but I

7   think you're good.

8             Any objection to that, Mr. Dill?

9             MR. DILL:  No.

10             THE COURT:  All right.

11         (Whereupon, the sidebar conference was concluded.)

12   BY MR. DAVID:

13   Q    Okay.  So I didn't want to steal your thunder there.  So you

14   use the number $47,840 annually as the lost earnings number,

15   correct?

16   A    That's correct.  Yes.

17   Q    And that's based on actual lost earnings.  We just heard

18   from Dr. Stokes talking about earning capacity looking at

19   government statistics, but your number -- you could use that, the

20   high end that was $57,000, but $47,000 is based on his hourly pay

21   and what he actually made working for Apache at the time of the

22   accident, correct?

23   A    That's correct.  Yes.

24   Q    So that's the number you used?

25   A    Yes.

504

1    Q    And what did you offset that number with?  Did you have him

2    going back to work?

3    A    I do.  And for the future loss -- so we just talked about

4    the past loss.

5    Q    I'll let you finish the past.  You were talking about just

6    past.

7              So for the past, you said when you figure out the last

8    four and a half plus years from the accident until now, what are

9    his lost earnings total?

10   A    Yes.  His lost earnings are $214,000 and his loss of fringe

11   benefits is $32,000.

12   Q    So what's the total?

13   A    Which $245,000 is what I just told the jury, $245,000.

14   Q    Okay.  And let's talk about the future.  Tell me how the

15   future differs from the past and your calculations and we'll talk

16   about the offset.

17   A    When we do the future loss, we have to do what's called --

18   we do similar.  We start with the earnings base of $47,840 and we

19   have to make a calculation out into the future to the end of his

20   worklife expectancy and that's another government table that we

21   look at.  It tells us the worklife expectancy for someone almost

22   54 years old today, that his worklife would be another eight

23   years roughly, a little bit over eight years, but eight years

24   roughly.

25              So in essence here I'm doing a calculation of the

1    47,840-dollar wage base times eight years, but we have to do a
2    couple of things to that.  Since it's for the future, if given an
3    award today, we have to do what's called discount that back to
4    present value.  So we have to figure out what the long-term
5    treasury bond rate is and we reduce that by the effects of
6    inflation and that's how you come up with a discount rate.  So
7    you apply a discount rate to that.  So the number is not just
8    $47,840 times eight.  It's $47,840 less some discount back to
9    present value to take into consideration the discounting formula.
10          And then we have to do --
11   Q    I just want to make sure the jury understands.  So the
12   calculation you did for Wilfred working if this accident had not
13   happened, the crash had not happened, it would be that he would
14   have stopped working at age 62?
15   A    That's right.  That's what the table takes us to, and the
16   table -- a lot of times people look at me like that and go
17   really, that just doesn't seem right, because the table considers
18   absences from the workforce.  It considers that -- you know, the
19   table is everybody in the population of the United States.  So
20   some people get out of the workforce.  Some people stay in.  Some
21   people have illnesses that get out of the workforce for various
22   reasons.  So it's not to say he's only going to work eight more
23   years -- it is to say he's going to work eight more years, but
24   for the rest of his life.  So he may have absences from the
25   workforce, but overall he'll work eight more years.

1  Q    But if he was the kind of person who showed up to work every

2  day and worked every year, he might have worked longer than age

3  62, correct?

4  A    Well, yes.  I mean, someone could work to -- and we know

5  lots of people that do work past 62 years old.  That's very

6  common today, 65, 66.  Social Security -- full Social Security is

7  66 years old.  So a lot of people work until they can collect

8  full Social Security.

9  Q    And I do want to talk about the numbers you used for future

10  earning capacity.  You used the same base salary based on his

11  actual earnings, that $47,840 number?

12  A    Yes.  That's correct.

13  Q    And did you offset that by putting him back to work at

14  another job like Mr. Stokes was talking about?

15  A    Yes, I did.  Dr. Stokes gave me a list of jobs that he could

16  return at.  So I added all of those up and took an average of all

17  of those because it was three different jobs.  We just heard him

18  testify to that in different ranges of pay.  The average of all

19  of those was $16,920.  So right around $17,000 was the average of

20  those two.

21         So from there what I do is I do a calculation.  So I

22  make the calculation first on the $47,840 times eight years

23  discounted back to present value and that number is $374,000.

24  Then I reduce that number by the amount that we're saying he can

25  earn.  He can earn $16,920 a year for eight years.  So I reduce

1    it by $133,000 and I come up with a net loss of earnings of

2    $241,000.  So the future lost earnings from today to the end of

3    his worklife expectancy in eight years is $241,000.

4              Then I do the same fringe benefit calculation on that.

5    I multiply the $241,000 times 14.69 percent fringe benefits and

6    that number is $35,000.  So when you add that to the $241,000

7    loss of earnings, that's $276,000.  So the future loss of

8    earnings and fringe benefits is $276,000.

9    Q    I missed that one.  Okay.  So with fringe benefits, it's

10   $276,000?

11   A    Yes.

12   Q    I hope my handwriting is okay.

13             And what was the total if he didn't go back to work?

14   So the $276,000 is going back to work.  If he didn't go back to

15   work, what is that number?

16   A    That number is $374,000.

17   Q    Okay.  Gotcha.  This is all through age 62, correct?

18   A    That's correct.

19   Q    Let's talk about the future life care plan and what the

20   future medical costs will be when you factor that in.  How do you

21   factor in medical inflation versus regular inflation for wage

22   numbers?

23   A    Yeah.  We just talked about the discounting mechanism that

24   we use, that long-term treasury bond rate less inflation.

25   Inflation is called CPI, consumer price index.  So we talked

1    about how we discount earnings back.

2            When you're dealing with medical care, future medical

3    care, you have to apply the MCPI, medical consumer price index.

4    So the medical CPI gives us different rates than the regular CPI.

5    As we all know, medical inflation is much greater than regular

6    inflation.  So the cost of medicine seems to go up a lot more

7    than anything else, your milk and your bread and your regular

8    goods, but the cost of medical care goes up.  So when you apply

9    the discounting formula to medical care type items, you actually

10   have a growth rate.

11           So where with earnings you're discounting it back to

12   present value, for medical it's growing.  So, for example, to

13   give somebody -- you know, say you want to award somebody a

14   dollar over ten years.  So for medicines, you can't just give

15   them ten dollars.  You have to give them a little more than ten

16   dollars today because inflation is going to -- the medical

17   inflation is going to eat that money up and you're not going to

18   be able to buy those goods over the next ten years that you would

19   need to buy if you only gave ten dollars.  So you might need to

20   give $10.50, some number like that, but that's how the formula

21   works and the mechanism.  So it actually grows the cost of those

22   of medical costs.

23   Q    Thank you.

24           And the only medical costs you considered were the

25   ones -- for this portion are the ones that Dr. Stokes talked

1    about which are the back surgery costs associated with that,

2    including the post-surgical visits and treatment and that

3    wellness or gym type, I guess, service that Dr. Muldowney

4    recommended as well, correct?

5    A    That's correct.

6    Q    And after you factored in medical inflation, what's the

7    future cost of that back surgery and wellness?

8    A    Yes.  He just provided us a range, and then I did the --

9    applied the medical inflation to the costs that were future costs

10   and it was --

11   Q    What's the low and the high, I guess?

12   A    It was a 207,000-dollar low to 291,000-dollar high.

13   Q    And that's based on the doctor's recommendations and

14   Mr. Stokes' testimony about what Wilfred Bradley will need in

15   terms of future medical treatment with respect to his future back

16   surgery and wellness only, correct?

17   A    That's my understanding, yes.

18             MR. DAVID:  No further questions.

19             Thank you, Your Honor.

20             THE COURT:  You can cross when ready.

21                      CROSS-EXAMINATION

22   BY MR. DILL:

23   Q    Good afternoon, Mr. Theriot.  Jim Dill.  I'm not sure we've

24   met before.

25             You began with a base wage rate, but you had in your

```
 1    possession his 2016, 2017, and 2018 tax returns, correct?

 2    A    Yes, I did.

 3    Q    What was his 2018 annual income?

 4    A    His 2018 income that I have is $6,372.

 5    Q    That was the year of the accident?

 6    A    That's correct.

 7    Q    And what y'all did to calculate his annual salary that you

 8    used was assumed he would work full time all year and calculated

 9    or multiplied it by 2,080, correct?

10    A    That's correct, yes.

11    Q    In 2017 how much did he make?

12    A    $15,380.

13    Q    He was working the same job, wasn't he?

14    A    I believe he started there in September of 2017, yes.

15    Q    What did he make in 2016?

16    A    In 2016 he made $41,420.

17    Q    So for your purposes, you assumed he would have consistent

18    employment all year when his tax returns reflected he had years

19    with highs and lows, correct?

20    A    Yes.  That's correct.

21    Q    You also calculated -- or not calculated, but you supplied a

22    fringe benefit based on a government table.  Did you look and see

23    what his employer's fringe benefits were and use that number?

24    A    The pay stubs -- I don't believe there were fringe benefits

25    on the pay stubs at that time and it might be because he might
```

1    not have been -- I'm not sure, but my assumption was he wasn't

2    with the employer long enough to get on a fringe benefit plan

3    yet.

4    Q    He didn't have any fringe benefits there?

5    A    No, he did not.

6    Q    So all you do is you take all the numbers and you crunch

7    them down and it's a math problem.  You set up the formula for

8    us, and if the jury finds he made less money per year, then all

9    they have to do is multiply it by the factors that you gave out

10   today, correct?

11   A    Yes.  I think that's correct.

12               MR. DILL:  No further questions, Your Honor.

13               Thank you, sir.

14               THE COURT:  Thank you.

15               MR. DAVID:  No follow-up, Your Honor.

16               THE COURT:  Okay.  You may step down.

17               We'll go ahead and take a brief recess and allow the

18   jurors to stretch their legs.

19               Mr. David?

20               MR. DAVID:  Yes, sir.  We can excuse the jury.  I just

21   want to talk to you when we're done.

22               THE COURT:  We can do that.

23               Let's all rise for the jury.

24                    (Jury Exited the Courtroom)

25               THE COURT:  Please be seated.

512

```
 1                  Mr. David.

 2                  MR. DAVID:  My only concern is I'd love to be done with

 3      my plaintiff today.  What I really don't want to have, though, is

 4      I do my direct of him and then tomorrow his cross-examination in

 5      the morning.  So I imagine I'll be 45 minutes with my plaintiff.

 6                  What do you think?

 7                  MR. DILL:  Probably about the same, Judge.

 8                  THE COURT:  Forty-five minutes?  Is that what you said?

 9                  MR. DAVID:  Yes, sir, I would hope so.

10                  THE COURT:  So that would --

11                  MR. DILL:  That's lawyer time, Judge.

12                  THE COURT:  Yeah.  That's lawyer time.  You always add

13      20 to 50 percent.  About an hour and a half.  We can go a little

14      bit late and see if we can finish up.  We'll get air conditioning

15      until 6:00 just in case.

16                  MR. DAVID:  I don't think we'll go close to that long.

17      I just don't want him to be stopped on the stand.

18                  THE COURT:  We'll try to power through.  We're not

19      going to hit 5:00 o'clock and I'm going to say we all have to

20      vacate.  We'll try to go -- I don't want to keep the jury here

21      too late, but I'll let you finish.

22                  MR. DAVID:  Thank you so much.

23                  THE COURT:  All right.  Very good.  We'll try to keep

24      this short, the break that is.

25                            (Recess)
```

```
 1                THE COURT:  Please be seated.

 2                All right.  Are we ready to bring the jury in or do we

 3    have some --

 4                MR. DAVID:  I don't think we do, Your Honor.  We're

 5    just very concerned about the timing.  That's the only issue.

 6                THE COURT:  Okay.  Well, we've got an hour and a half.

 7    That will put us about 5:30.

 8                MR. DILL:  I'm okay either way.

 9                MR. DAVID:  As long as he gets done today, I'm fine,l

10    Your Honor.  I'll be my 45 minutes.  Just be yours.

11                THE COURT:  We'll make it work.

12                All right.  Let's bring the jury in.

13                     (Jury Entered the Courtroom)

14                THE COURT:  Please be seated.

15                Mr. David, you may call your next witness.

16                MR. DAVID:  Yes, sir.  I call the plaintiff,

17    Mr. Wilfred Bradley.

18                THE COURTROOM DEPUTY:  Do you solemnly swear that the

19    testimony you are about to give in this case will be the truth,

20    the whole truth, and nothing but the truth, so help you God?

21                THE WITNESS:  I do.

22                THE COURTROOM DEPUTY:  Thank you.

23    Whereupon,

24                          WILFRED BRADLEY

25    was called as a witness; after having been first duly sworn, was
```

```
 1   examined and testified as follows:
 2                    DIRECT EXAMINATION
 3   BY MR. DAVID:
 4   Q    Hey, Wilfred.  Can you state your full name and current
 5   address for the record.
 6   A    Wilfred Bradley.  280 Olivia.
 7   Q    What town?  Can you hear me okay?
 8   A    Eunice, Louisiana.
 9   Q    Are you a little nervous?
10   A    Yeah.
11   Q    Do you want to be here?
12   A    Not at all.
13   Q    Where did you grow up?
14   A    Between Eunice and Sulphur, Louisiana.
15   Q    Real close with your family?
16   A    Yeah.
17   Q    Who's in your family that you were close with growing up?
18   A    Brothers, cousins, grandmother, mother, sisters.
19   Q    They all live around Eunice with you?
20   A    Right.
21   Q    I want to talk about your work and who you worked for before
22   the accident.  Where were you working at the time of this
23   accident?
24   A    I was working in Sulphur for Apache at the Indorama
25   industrial plant.
```

1    Q    And what kind of work were you doing?

2    A    Scaffold building.

3    Q    What does that mean?  Tell the jury -- and you were a lead

4    man?

5    A    I was the lead man, yes.

6    Q    Tell the jury what that entails work-wise for you.

7    A    It's A lot of work.  It's a lot of walking, a lot of

8    climbing.  It's a lot of overhead lifting.  It's a lot of

9    pulling, a lot of pushing.

10          If I had have to build a scaffold for one of them light

11    fixtures, you have to go five by five, six foot boards.  You have

12    to climb the legs.  You've got to bring a ladder.  You've got to

13    run the horizontals.  Most legs are ten feet, seven feet, five

14    feet, three feet.  You start off with ten feet and you have to

15    stab it -- it has a male port (phonetic).  We call it a male

16    port.  You have to stab it, put the runners to where it's square.

17    You climb the legs, hook up, take your boards.  They pass your

18    boards up to you.  We call them the working boards.  You put the

19    working boards on.

20          From that point we start again the same thing, put

21    braces so it doesn't shake, doesn't fall over.  From that point

22    me being the lead man, if we're building a 20-foot scaffold, it

23    will usually be three people.  When it comes to putting the deck

24    on, I'm putting the deck on by myself, everything after that.

25    The deck may hold seven by four boards.  It may hold six foot

1    boards.

2              So they would pass it up to me.  I would get on my

3    knees, put one, put each board.  From there they throw me the

4    runners.  I put it around so nobody can fall.  Then you'll put

5    the gate so we just can come up, put the ladder, stab another

6    leg, wrap it around, put the braces.

7    Q    I can tell that that makes you excited.  You're talking

8    about it a lot?

9    A    Yeah.  I love it.

10   Q    You enjoyed that job?

11   A    Yeah.  I love it.

12   Q    How long did you do scaffolding?

13   A    Between 15 to 20 years.  I started in '97.

14   Q    It just came up.  Did you have benefits working with Apache?

15   A    Yes.  Medical benefits.

16   Q    You had medical benefits?

17   A    Yes.

18   Q    And before that you worked for Turner Industries?

19   A    Right.

20   Q    Did you have benefits working for them, too?

21   A    Right.

22   Q    And Turner had laid y'all off the year before?

23   A    Yeah.

24   Q    Talk about how -- as quickly as you can -- the weight you

25   had to lift for Apache.

```
 1   A    Apache.  Heavy stainless boards, and if there's other
 2   boards, say, for instance it's five by seven, I have to stand on
 3   it and reach -- I have to stand on it and reach that board out to
 4   him so he can grab it and he can place it so we can stand on it.
 5   Go to the next side.  You do the same thing.  So you're always
 6   reaching out.  It's either up -- you're pulling up, reaching out.
 7   Q    What's the highest you ever worked doing scaffolding work?
 8   A    Maybe 150 feet.
 9   Q    And working for Apache, what did you make?
10   A    I think it was $23.25 and $65 a day per diem.
11   Q    $23.25 and $65 day per diem?
12   A    Yes.
13   Q    There's a picture of your vehicle right after the day of the
14   crash taken by U.S. Xpress's investigator and this is the back of
15   your trunk, right?
16   A    Right.
17   Q    And what's in there?
18   A    Work boots, weightlifting belt, tools for the car.  I can't
19   see anything else.
20   Q    Pretty good picture of who you worked for before the crash?
21   A    Yeah.
22   Q    I do want to talk about some of the crash and what happened.
23   How far away is this intersection from your house?
24   A    This intersection?  Probably I'm going to say 13 miles.
25   Q    Okay.  And are you familiar with the intersection?
```

1    A    Very familiar with it.

2    Q    Been down this road many, many times?

3    A    A thousand times or more.

4    Q    And at the time of this crash while you had been working for

5    Apache, you went down it every day?

6    A    Five days a week.

7    Q    In all your experience driving down this road, did an

8    18-wheeler ever pull out in front of you at that stop sign?

9    A    No.

10   Q    What time did you typically wake up in the morning to go to

11   work back around February 14th, 2018, working for Apache?

12   A    Probably around 4:00, 4:00 a.m.  Get up, maybe lay in the

13   bed for five minutes.  Get up.  Brush my teeth, wash my face.

14   Turn the TV on.  Sit down and watch TV.  Then make sure before I

15   leave, which was around probably 4:45 I would guess.  I didn't

16   look at the clock.  Make sure all the doors are locked and get in

17   the car and take off.

18   Q    And tell me what you can recall as you're going down the

19   road on February 14th, 2018, before the accident.

20   A    Just driving normal.  I don't know what day it was.  Just

21   driving.

22   Q    Was there some fog that day?

23   A    Yeah.

24   Q    Moderate?

25   A    Yeah.

1    Q    You could still see?

2    A    Oh, yeah.

3    Q    You had your low beams on on your vehicle?

4    A    Yeah.

5    Q    Was your vehicle in good shape?

6    A    Yeah.

7    Q    Was it a Volkswagen Passat?

8    A    Yeah.

9    Q    And it had headlights that worked?

10   A    Yeah.

11        MR. DILL:  Your Honor, at this juncture I'm going to

12   enter an objection on the leading.

13        THE COURT:  You know, I'm going to allow him to lead,

14   but I'd like to limit the leading questions so we can hear the

15   testimony directly, but I'm going to overrule that objection.

16        MR. DAVID:  Thank you, Your Honor.

17   BY MR. DAVID:

18   Q    And as you're approaching the intersection at US 190 and

19   Highway 26, tell me what you saw in front of you.

20   A    I'm approaching -- I'm coming up -- coming up to the store.

21   I see the 18-wheeler.  The closer I get to the store, I see the

22   18-wheeler pulling out.  So I'm like, okay, he's going to stop.

23   So I seen him shifting gears.  I keep going thinking he's going

24   to stop.

25        So I just -- like right when I got in front of the

520

1   store, I cursed.  He would not stop.  Then I hit the horn.  When

2   I hit the horn, I hit the brakes.  All I seen was it started

3   turning -- all I seen was that gas tank and I was like it's over

4   and the first thing came to my mind was turn this car.

5           So when I turned the car, it was like -- it was like

6   stay up, man.  Just stay up long enough.  Don't panic.  Stay up.

7   And when you stay up, just make sure you turn that car, you don't

8   hit that tank, and when I hit the tank, I was like this.  I can

9   see -- I felt like I touched the trailer.  I was like this.  I

10  was up and I just dove on the passenger side and I don't remember

11  nothing.

12          So when I wake up, I see my ring finger.  I'm like

13  this.  When I wake up, I see the bone of my ring finger.  So as

14  I'm getting up, all I see is smoke coming from the front of the

15  car.

16  Q    What was in your mouth?

17  A    Glass.  So I'm like this.  So I pull up and I'm like with

18  the smoke, this car is going to explode.  Now I'm in panic mode.

19          So I'm like getting out of the car, getting out of the

20  car, and this girl, this black girl, half her face is damaged

21  from a car wreck she told me later and she has one eye, and she's

22  looking at me and that one eye is open extremely wide and she's

23  just looking at me saying stay in the car, sir.  I'm like, no,

24  get me out of this car.  Get me out of this car.  Sir, you've got

25  to stay in the car.  I don't know what happened after that.  When

521

```
 1   I looked up again, I seen the paramedics standing in front of the
 2   car.
 3   Q    And that lead-up to the scene, from the time you saw the
 4   18-wheeler into the collision, was it quick?
 5   A    It was quick.  I did not want to hit that.  I wish I would
 6   have missed it.  It's not worth my health.  This anxiety I'm
 7   having, it's just not worth my health.
 8   Q    Were you distracted in any way at the intersection?
 9   A    No.  I don't do phones.  The car didn't even have a radio.
10   When I bought the car, it didn't have a radio.  If I wouldn't
11   have gotten in the wreck, it still wouldn't have had a radio.
12   Q    And you saw that 18-wheeler right before you hit it,
13   correct?
14   A    Yes.
15   Q    And what did you do inside that vehicle when you saw the
16   18-wheeler?
17   A    I cursed, hit the horn, hit the brakes.  When I seen that
18   fuel tank, I was like it is over, there's no coming back from
19   this, and I just tried to turn the car.  That's why if you look
20   at the car, the driver's side is a little bit more crushed
21   because I turned it.  I was just trying to -- I was in survival
22   mode just trying to survive.  I didn't know if I was going to
23   come out of it, but I was just trying to survive.  I was in
24   survival mode.  I just couldn't hit it straight.
25   Q    Were you sitting up straight?
```

522

```
 1   A    I was sitting up straight, and by the grace of God, I didn't
 2   get decapitated.  If I would have panicked and just -- it would
 3   have took me off probably right here.
 4   Q    Did you duck at all before the collision?
 5   A    I duck a split second before I hit that truck.  I was that
 6   close to the truck.  I was that close to the truck.  I still see
 7   me hitting that truck.
 8   Q    What pains did you feel after the impact?
 9   A    When I tried to get up, I thought I broke my back and my
10   neck.  I was in some serious pain, serious pain.  When the girl
11   was telling me to stay in the car, I just had to get out.  I was
12   still in the seat belt.  Then when I looked up again, I seen the
13   paramedic, and then this guy comes around and he opens my
14   driver's side door and I'm not knowing that I had a gash.  I
15   didn't even know I was bleeding.  And he grabs me and he pulls me
16   and I scream that I'm in a seat belt, I'm in a seat belt, and he
17   says, okay, buddy, I'm sorry.  He takes a big ole' knife and just
18   cuts the seat belt off.
19           And I don't know what was said between him.  All I
20   remember is him asking me does the seat lay down.  I was like,
21   yeah, it lays down, and then from there I just heard some noise
22   in the background.  I didn't even see.
23   Q    The person who cut the seat belt and cut your car door off,
24   do you know who he worked for?
25   A    No.  I don't know.  He just was a guy that came around and
```

1    tried to help me, cut the seat belt off.  He tried to pull me out

2    first and then he cut the seat belt off.

3    Q    Do you know if he's a volunteer fire department worker or

4    you don't know?

5    A    I don't know.  I didn't ask.

6    Q    Fuzzy?

7    A    I was out of it, man.

8    Q    Let's talk about the injuries you had from the accident.

9    Your neck first.  Tell the jury when you first started having

10   neck pain.

11   A    Oh, immediately when I woke up.

12   Q    And they've heard about your medical treatment.  You did

13   physical therapy?

14   A    Yeah.

15   Q    What else did you do to treat your neck?

16   A    I used a TENS machine just to try to relieve the pain,

17   relieve the stiffness because it's stiff a lot.  Especially in

18   the morning it's stiff.  So I will try to do that.

19   Q    Are you talking about right now or are you talking about

20   back then?

21   A    Back then.  I didn't even have a TENS machine back then.  I

22   would just go to therapy and he would put this heating pad on the

23   back of my neck and let me sit there for about 20 minutes.

24   Q    And eventually you had surgery, right?

25   A    Yeah.

1   Q    How's your neck now?

2   A    The surgery helped a lot.  It will be stiff in the morning,

3   but it's nothing I can't deal with.  I'm a man.  I should be able

4   to deal with that.

5   Q    What do you go to take care of your neck?

6   A    I bought a TENS machine and also a cordless massager that I

7   use a lot.

8   Q    How long do you use a TENS unit?  What is a TENS unit?

9   A    Like a little shock therapy.  Whatever joints that's hurting

10  or stiff or sore, you turn it on until it cuts off.

11  Q    And how long do you do that TENS unit?

12  A    Twice a week.

13  Q    What about the massager?

14  A    I probably use the massager almost every day.  I like it.

15  Q    What do you massage with the massager?

16  A    My neck, my shoulders, my neck.  There's like a little wide

17  prong and I just sit there and just let it massage it.  I'll get

18  a little narrow prong and just stick it in there in the shoulders

19  just to release the tension.

20  Q    What about your back?  How's your back pain doing now?

21  A    Better.

22  Q    Tell the jury about what you experience day-to-day, good

23  days and bad days when it comes to your low back.

24  A    A good day I can feel like maybe a one or a two.  I'm pretty

25  good at handling pain.  I've always been.  On a bad day I'm

525

1    laying on the floor, you know, trying to do exercises, the

2    stretches.  Physical therapy gave me some stretches to do.  So I

3    use that to try to release it, stretch the hamstring out, do

4    kickbacks, do all of that just to release the stress of the lower

5    back.

6    Q    The hamstring and kickback routine, that's what the physical

7    therapist taught you?

8    A    Yeah.

9    Q    Explain that to the jury.  What is that?

10   A    I have bands.  I work out a lot.  I have bands.  I will hook

11   the bands to something like outside, put my foot in, hold this,

12   lean back to get my butt strong.  The stronger I get my butt,

13   it's going to help my lower back in the long run.  So I do that.

14   I lay on my back.  You've got to stretch your hamstring to

15   release the tightness in your lower back.  I take a volleyball, a

16   big ball you sit on, lay down on my back, put it on my knee and

17   push against it.  It's resistance.  All of that just helps the

18   back.  That's what he showed me.

19   Q    And there's been a lots of talk -- you've been here for the

20   trial -- about you working out.  This is some of the workouts you

21   do now, correct?

22   A    That's what I do now, yeah.

23   Q    How often do you do these workouts now?

24   A    It's not really workout.  I call it physical therapy.  I

25   probably do that three times a week.

1  Q    And the band work?  You said bands.  Explain to the jury
2  what you mean by bands.
3  A    A resistance band.  Say, for instance, most ladies don't
4  want muscle.  So you get resistance bands.  It's easier on the
5  joints, too.  For an old cat like me, it's easier on the joints.
6  So I like that and I use that to stretch, lay down on my back.
7  You can do a lot with resistance bands.  You can take it with
8  you, you know.  So I always have resistance bands.  I always have
9  resistance bands.
10  Q    And do use that TENS machine and massager for your back at
11  all?
12  A    No, because I live alone.  So I don't -- no.  I just do the
13  stretches with that.  I just live alone.  I don't have nobody to
14  put it on and put it in the proper places.
15  Q    Backing up with respect to your back.  When's the first time
16  you had back pain after this crash?
17  A    When I woke up.
18  Q    Before this crash, in the year or two before the crash,
19  doing all the heavy duty work you did and working out, did you
20  have any neck or back pain that kept you from doing anything?
21  A    No.  I was good.
22  Q    Since this accident, have you had back pain persistently?
23  Has it come and gone?
24  A    It comes and goes.  It comes and goes.  I'm not a
25  complainer.  So I'm not going to -- every time I see the doctor,

```
 1    I'm not going to -- if my back is hurting when I'm filling out
 2    the paper, I'm going to say it.  If it's not, I'm not going to
 3    say it.  I'm not going to complain.  That's not me.  That's not
 4    who I am.
 5    Q     What about your upper back?
 6    A     Upper back is the scary part.  To this day that's the scary
 7    one because I could be driving, and if that hit me, I pray to God
 8    I'm not on a bridge because I would be terrified.  The pain is so
 9    intense that I will have to make sure I get across that bridge,
10    pull off on the side of that road and just lay that seat back
11    down and just relax.  Just talk to myself.  You need to relax.
12    Calm down.  It's a scary pain.  The low back is just a pain.
13    It's not a scary pain, though.  This is a scary pain.
14    Q     And your right hand, talk about what happened with your
15    right hand, not just your finger, but the whole hand.
16    A     This happened in the wreck.  I never seen this finger, but
17    the day of the surgery when he had the surgery, he left a nub on
18    and you could still feel the finger, you know.  You could still
19    feel the finger moving, but the nub was very sensitive.  I mean,
20    very sensitive.
21          You know, sometimes you meet people and you forget and
22    you reach your hand out to shake their hand.  They don't realize
23    and they squeeze and I would just jerk my hand from them.  And
24    they're like what you doing?  Man, this finger is extremely
25    sensitive.  Putting my hands in my pockets, extremely sensitive.
```

1   So when he decided to -- made the decision to remove the other

2   part of the finger, I was very happy.  Yeah, very happy.

3   Q    Tell us about the second surgery.  So you had the second

4   surgery to avoid that pain you were talking about?

5   A    Yeah.  It was sensitive.  That nub is sensitive.  It's like

6   you can feel the nerves.  So even if you grab my hand like this

7   and squeeze it, I'm going to feel this, you know.  So it was

8   extremely sensitive.

9   Q    Do you have any sensitivity or pain as it is now?

10  A    No.  He did a great job.  I can feel the finger sometimes,

11  but other than that, that's it.

12  Q    What do you think about the look of your hands when you look

13  at them?

14  A    I'm cool like this.  I try just to keep my hand like this.

15  I don't like this look.

16  Q    How come?

17  A    Deformed.

18  Q    What did you say?

19  A    It's deformed.

20  Q    What about shaking hands?  Has that changed shaking hands

21  now?

22  A    I can shake hands now.

23  Q    I want to talk about your workout regimen before.  What is

24  this jerking you're doing?  I've seen it several times.  I've

25  known you for a long time.  I'm talking about just right now.

1   Tell me about this jerk.

2   A    I've got a twitch.  It just comes.

3   Q    Had you ever had that twitch before the incident?

4   A    No.

5   Q    But you've had it since?

6   A    Yeah.

7   Q    Let's talk about your working out before.  Tell the jury

8   about your workout regimen before this training you'd do.

9   A    I like hard workouts, punishing workouts.  I only would do

10  it for an hour, but I make that hour work for me.  I'm going to

11  work.  I don't like workout partners.  I don't want a workout

12  partner because they talk and I don't want to do no cardio.  I've

13  lifted weights for a long time, but I'm not a fan of weights.  I

14  actually hate weights, but I was so big, I had to lift weights,

15  and I love to run.  I love to do HIIT programs.  I won't be able

16  to do that anymore, but band work, ab work.  Anything that's

17  going to get my heart elevated, that was me.

18  Q    And so tell us some specifics.  Tell the jury some specifics

19  about the exact exercises you would do before this incident.

20  A    For instance, see them two boxes under that desk, right?  I

21  would put -- say if I was in a gym or in my house, I would take

22  two dumbbells.  I would put it on each side of the stands to lock

23  it in so I can't fall.

24        So what I would do is I would jump.  I would make sure

25  the bottom of my feet hit that box.  I would come down and do a

1    push up.  That's one.  Come up and do the same thing.  Now that's
2    two.  It's called a HIIT.  I'm trying to get to ten.  When I get
3    to ten, I get up and I walk.  I keep these little clocks with me,
4    and I would do -- run in place for 30 seconds, as hard as I can
5    for 30 seconds.  From there, walk.  Grab my 35-pound dumbbells.
6    Now I'm doing snatches.
7              The whole workout is to keep my heart rate up, to keep
8    my heart strong and keep my lungs strong.  That's my HIIT
9    program.  Other people may have a different way they do theirs.
10   That's how I did mine.  Anything to keep my heart up, that's what
11   I like.
12   Q    And I think we have some pictures, Plaintiff's 3.  Tell the
13   jury what these pictures are that we're looking at.
14   A    The top one is probably the best stress release workout.
15   You can't see it, but I've got a big ole' tractor tire on it.  As
16   a matter of fact -- yeah, the top one.  I've got a tractor tire
17   on it.  I made like a little stand and I've got a 25-pound plate
18   on top of the tractor tire.  I'm pulling the tractor tire
19   probably 25 yards one way, 25 yards other way.  That's one rep.
20   You're doing six.  You're doing three reps.  The hardest workout
21   I probably did in my life.  It's good for stress.  It's great for
22   stress.  You're screaming and you're hollering.  It's fun,
23   though.
24             The second picture, playing softball.  I'm in the
25   dugout.

1    Q    And you enjoy playing softball?

2    A    Yeah.  I used to love it.  I played for like 35 years.

3    Q    And you saw an old softball buddy coming into the

4    courthouse?

5    A    Yeah.  Coming in the first day Monday, I hadn't seen him in

6    years, but he said, hey, man, I recognize you.  So I had to look

7    at him.  I was like okay.  The officer was Perry Gallow, the

8    ex-chief of police of Opelousas.

9    Q    And y'all played softball together for years?

10   A    Yeah.

11   Q    What are the sports you liked playing before the accident?

12   A    Basketball.  I loved playing tennis.

13   Q    You're a tennis player?

14   A    Uh-huh.

15   Q    You like doubles?

16   A    Hate it.

17   Q    Where did you play?

18   A    I like singles.

19   Q    Where would you play tennis?

20   A    At the tennis park.

21   Q    In Eunice?

22   A    Yeah.

23   Q    Let's go to the next one on Exhibit 3.  When I saw these at

24   first, I didn't know what the mask thing was back in the day.  I

25   guess you were before your time.  COVID has come along since

1    then.  This is 2017, right?

2    A    Yeah.  See the tire that's leaning up against the fence,

3    that's the tire I'm pulling in a previous picture.

4    Q    Why would you wear a mask back then?

5    A    I seen it on YouTube.  So seeing that on YouTube, you know,

6    I got to try it being me, but what I did, I took the other side,

7    put some super glue on the other cartridge.  I put some super

8    glue and put some duct tape so I couldn't breathe.  So I only had

9    one side that I could breathe out of.  That was just to get my

10   lungs and my heart strong.

11   Q    And why are you wearing this yellow jacket?

12   A    To sweat to get that salt and everything out of my body,

13   whatever.  I love to sweat.  This here, I've got -- I can't see

14   it, but I know what it is.  It's some kind of brick, a heavy

15   brick, and I'm walking 80 yards back and forth.

16              That's snatches.  That's a good cardio workout and

17   stress reliever.

18   Q    Next.  What is this one?

19   A    That's after work.  It's called a farmer's walk.

20   Q    Where was this?

21   A    Sulphur.

22   Q    This is after work at the plants?

23   A    After work at the plant.

24   Q    Why are you working out over there?

25   A    Because when I was working there, it was -- traffic in

```
 1  Sulphur –– there's a bunch of plants.  Everybody get off at 5:30.
 2  I-10 –– you will be backed up on I-10 for an hour.  So instead of
 3  me having to sit an hour, get home, then go work out, I went to
 4  this place and worked out.  So by the time I would get to the
 5  interstate, it would be free and I can get on.  I call it a
 6  farmer's carry.
 7  Q    Go to the next one.
 8            Okay.  What's this one?
 9  A    Probably the easiest workout I can do, boxing.  It's
10  probably the easiest thing you can do.
11  Q    And you love boxing?
12  A    I love to watch it, yeah.
13  Q    Did you ever help train some boxers?
14  A    I had A giant.
15  Q    A giant.  What do you mean?
16  A    He was a giant.  6'10', 480 pounds.
17  Q    What was his name?
18  A    Ryan Frank.
19  Q    And how was he when he got done with you or you got done
20  with him?
21  A    280.  All his work.  I just gave him information.  I didn't
22  do anything but talk and yell.
23  Q    And tell us about this one.  What is this setup?
24  A    A heavy bag I made on my tree.  What I'm doing there is by
25  looking at it, it's extended out.  I'm punching it as fast as I
```

1   can for 100 punches.  Get cardio up.  That's all.  That's kind of

2   tough, but...

3   Q     What's this last one?

4   A     This is snow, one of them days it snowed, and I'm hitting a

5   heavy bag.  I call it -- it's a heavy bag, but I call it an upper

6   cut bag so I can throw upper cuts with it.

7   Q     And this is less than a month before this crash?

8   A     Yeah.

9   Q     Have you done any of these workouts since this crash?

10  A     These particular workouts?

11  Q     Yes, sir.

12  A     No.

13  Q     Is your workout regimen quite different now?

14  A     After the back surgery happened, I've walked a lot.  I've

15  walked a lot.

16  Q     Tell the jury about your walking.  What kind of walking do

17  you do?

18  A     I hate walking.  I hate it with a passion.  I walk slow like

19  I'm in a grocery store.  It takes me -- to walk a mile, it

20  probably takes me 35, 40 minutes.  I try to do two and a half to

21  three miles when I do it.  I hate it.  Right now I'm trying to

22  get my abs stronger so my back can be stronger.  Having a big gut

23  don't help none, help my lower back, and I'm punching the tree,

24  which is super easy.

25  Q     Why don't you punch the heavy bag anymore?

1   A   Because a heavy bag, I can't really turn.  The torque on my

2   back is going to -- I feel it, you know.  I feel it.  So I'm not

3   going to take a chance.  So I go punch the tree, which is boring

4   and it's -- I have to sing at least to get some cardio in because

5   if I don't sing -- I'm doing that for 48 minutes.

6   Q   What about before the accident?  Did you run sprints?

7   A   That's probably my favorite thing to do.  I love track and

8   field.  That's how I took a lot of my weight off, running

9   sprints.

10  Q   What kind of sprints would you run before the accident?

11  A   Before the accident, on a good day, I would run 300-yard

12  sprints at probably 85 percent of my speed, try to hold it, but

13  it's not as hard as a HIIT workout because when I run it, I've

14  got to walk back.  I walk back slow and then maybe take a couple

15  of minutes, two or three minutes, and do it again, walk back,

16  take a couple of minutes.  It's hard, but it's not long.

17  Q   Since the accident do you sprint like that ever?

18  A   No.  I probably do something light, maybe 40 yards at 35,

19  40 percent of my speed.  That's really a jog.

20  Q   If someone looked at you, would they think you're sprinting

21  when they watch you do it?

22  A   No.  They'll probably look at me thinking what is he doing.

23  Q   How long has it been since you did any of that?

24  A   Before the last back surgery.  I don't remember when.  I

25  don't do it because I can't do it the way I want to do it, so...

536

1    Q    I didn't ask you about your headaches.  When did you first

2    have a headache after this crash?

3    A    The day of the crash.

4    Q    Did you have any headache problems before the crash?

5    A    No.  I never had headache problems.

6    Q    And how long have you had headaches since the crash, ever

7    since the crash?

8    A    Yeah.  They come and go.  Sometimes I just deal with them.

9    At one time I would take -- for the pain, the pain I was in, I

10   would take Aleve or Advil, you know.  I was told you don't take

11   the same pill like that twice on a regular basis.  You've got to

12   cross them.  So I would do that.

13   Q    Do you like taking medication?

14   A    I hate it with a passion.

15   Q    And how bad have your headaches gotten in the past couple of

16   years?

17   A    They've been pretty bad.  They come and they go, but since

18   we started this, it's stressful.  I'm thinking when I get home,

19   I'm going to release it.  No.  The last two days I've had

20   headaches that felt like the top of my head was coming off.  I'm

21   like you shouldn't feel like that while you were in the

22   courtroom.  Why do you feel like that now?  I would just lay down

23   on the floor, turn the lights off, turn the TV down and watch

24   YouTube.  I mean, it felt like the top of my head was coming off,

25   man.

1    Q    And that was even taking the Aimovig?

2    A    Yeah.  I don't take the headache medicine all the time, but

3    the one where I take the shot, I like that.  I really like that.

4    I don't like taking pills.  So I'm not going to -- I don't even

5    take my blood pressure pill on a regular basis like I should.  I

6    just don't like taking pills.  And I've got a thing of pills.  I

7    don't remember the name of the pills.  I just look at them and

8    feel like I'm 86 years old all the pills I'm taking.

9    Q    But the shot you take for headaches, you've been taking that

10   every single month?

11   A    I took it every single month.  I know I stopped taking it

12   when they told me my kidneys was acting up.  My mind went from

13   fighting a headache to fighting dialysis and maybe fighting an

14   early death, you know, from kidney disease.

15   Q    When you got off the Aimovig, did your headaches get worse?

16   A    They got worse.  My brother's on dialysis.  I can't get on

17   dialysis.

18   Q    When you got back on the Aimovig, did it help your

19   headaches?

20   A    It did great.  See, the injection, I ain't got to take it

21   every day.  I love it.

22   Q    So that injection you take once a month is helping you a lot

23   with your headaches?

24   A    Oh, yeah.

25   Q    I'm sorry.  What did you say?

1    A    Yes, sir.

2    Q    And it's your plan to keep taking those injections, correct?

3    A    Yeah.  I would like to.

4    Q    Do you think your headaches will hurt worse without them?

5    A    Yeah.  Last night it was one of the worst.  These last two

6    nights was one of the worst.

7    Q    I don't want to spend too much time talking about it, but e

8    have to talk about PTSD and things like that psychologically.

9    Tell the jury about the psychological effects of what you've been

10   going through.

11   A    Oh, man, these four years has been rough.  I don't wish this

12   on anybody.  I wish me and Mr. -- I hope I don't disrespect his

13   name -- Mr. Fiorucci would have never crossed paths.  I wish this

14   would have never happened.  There's no amount -- there's no

15   amount of money that's going to get me back to what I used to be.

16   I won't be back to me.  I wasn't a rich man.  I worked hard for

17   it.  I'm good at saving my money.  I was able to help my mom,

18   help my grandmother before she passed, help my sisters.  I don't

19   need a new truck.  I'd rather drive an old car.  You know, I

20   don't need designer.  I'm good at Ross's.  You know, so this has

21   been rough.  I don't even have -- the last month and a half I

22   don't even have an icebox.  My icebox went out.  I can't even

23   afford one.  I go get ice like every two or three days.

24   Q    Your fridge is out?

25   A    My fridge is out for the last two months, almost two months,

1    yeah.

2    Q    Tell the jury what you do to help out your mom.  Your mom

3    lives in Eunice?

4    A    Yeah.  She lives in Eunice.

5    Q    What's her name?

6    A    Georgia Thomas.

7    Q    What would you do to help out your mom before this incident?

8    A    Flip her mattress, move her furniture, pay her bills.  She

9    would ask sometimes and I would just pay it.  I paid the cable

10   bill five straight years every month.  I didn't ask my sister or

11   anything to help.  I'm constantly going to the store for her.

12   She lives alone.  I live alone.  So my other sister works out of

13   town.  So being that I'm free right now, I do a lot for her.

14   Q    I want to go back to the psychological.  Tell the jury about

15   any nightmares you may have.

16   A    The nightmares.  It's basically me hitting the truck all

17   over again.  Three things I always see is that tank, that fuel

18   tank, that trailer because I was so close to it when I just had

19   to dive, and the young lady that was looking at me through the

20   mirror.  I see that a lot, you know, I mean, through the glass.

21   Q    And do you think about it during the day, too?

22   A    Yeah.  I'm alone a lot.  I'm kind of a loner to be honest

23   with you.  Sometimes I like it like that, you know.  I don't care

24   about being around people all the time.  So I sit back and I do a

25   lot of thinking, and like if you would have just left home a

1    little later, a little earlier, you wouldn't be in this position

2    you're in.  You wouldn't be struggling the way you are, you know.

3    Q    Did you have feelings like that before the accident?

4    A    No.  Man, I was good.  I was good.

5    Q    Did you date girls and go out and have fun?

6    A    Yeah, I did.  I actually had a little girlfriend for a short

7    period of time.

8    Q    You'd take her out to dinner?  You could afford to do that?

9    A    Oh, yeah.  I could afford to do that.

10   Q    Can you do that now?

11   A    No.  I wouldn't even ask a girl to take her out.  It would

12   be embarrassing.

13   Q    You own a house, right?

14   A    Yeah.

15   Q    How's your house doing?

16   A    It needs work.  Before the accident I was going to -- I had

17   a buddy I went to school with.  He does house moving, house

18   leveling.  He gave me a price on leveling my house.  So at the

19   time I couldn't afford it.  So I was going to try to maybe

20   enlarge it.

21   Q    How have you been helping out?  Like before this accident,

22   how would you help out your sister and your daughter, things like

23   that?

24   A    Okay.  My sister, she would always come, could you pay my

25   car?  Would you pay this car note?  Could you pay that?  Okay.

1    I'm going to pay it.  I'm going to pay it.  I'll pay you back.

2    She doesn't pay me back.  I don't even ask.  My daughter, she has

3    two kids.  She works, but if she needs something, I'm going to

4    give it to her.  She works, but at that time she wasn't -- she

5    don't make the money I was making.

6    Q    And you say your daughter.  It's your ex's daughter, right?

7    A    Yeah.  It's not my biological kids.

8    Q    You had a son?

9    A    I had a son.

10   Q    And he passed away?

11   A    Yeah.

12   Q    What do you call your daughter?  What's her name?

13   A    Melissa Miller.

14   Q    And Melissa, she has kids?

15   A    Yeah, two.

16   Q    Are those kind of like your grandkids?

17   A    Yeah.

18   Q    Are your limitations affecting your relationship with

19   Melissa and her kids?

20   A    Yeah.  I can't do -- like they was playing baseball this

21   summer, softball.  She was playing baseball -- I mean, she was

22   playing softball and he was playing baseball.  I wanted to get

23   out there and show them how to field ground balls, how to turn on

24   a pitch, show her how to catch.  All I could do is scream from

25   the fence.  I'm like I can't do nothing.

1              MR. DAVID:  Let me check my notes.  I'm getting close,

2    Your Honor.

3    BY MR. DAVID:

4    Q    And we didn't talk about anxiety.  You had anxiety since the

5    incident?

6    A    Yeah.

7    Q    Explain that for the jury.

8    A    I know about anxiety.  I know about depression firsthand.

9    You go from having a bank account and having savings, you know,

10   life is pretty good for me.  I either left too late, too early,

11   and got into an accident.  It turns my whole life upside down.  I

12   go through my money within like eight months and all the money is

13   gone.  The pain, dealing with pain, dealing with dreams and can't

14   be me.  I just can't be me.  I can't do what I want to do.

15             And I'm not the type of person to go tell somebody my

16   problems.  I don't want to put my problems on nobody else.  I'm a

17   man.  I deal with my problems my way.  I have to deal with them.

18   That's how I look at life.  That's my problems, not nobody

19   else's.  I'm not going to go tell nobody that I'm struggling.

20   It's embarrassing.  It's humiliating.  So I'm just going to deal

21   with it, man, and leave it all inside.

22   Q    What about depression?

23   A    Depression is very real, very real.  Put it like this.  I

24   could sit in a hot house all day with the doors closed and the

25   house would be -- I wouldn't turn on the air conditioner.  I sit

1    in the hot house all day with the doors closed.

2    Q    Why don't you turn on the air conditioner?

3    A    Can't afford it.  I would rather be hot in the day and sleep

4    cool at night.  If my grandkids come, then I will do it, but

5    other than that -- this whole summer it could be 102 degrees

6    outside, I will not turn that AC on and keep the doors closed.  I

7    don't want nobody looking in my house.  I don't like people that

8    I don't know coming to my house.  If I meet people coming to my

9    house, I meet them outside.  If President Biden come to my house,

10   I'm going to meet him outside.

11              MR. DAVID:  Thank you for your time.  I appreciate it.

12              THE COURT:  Mr. Dill, you may cross when ready.

13              MR. DILL:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15   BY MR. DILL:

16   Q    Good afternoon, Mr. Bradley.

17   A    How are you doing, Mr. Dill?

18   Q    I'm good.  Are you ready to go?

19   A    Yes, sir.

20   Q    All right.  A few minutes ago when Mr. David was asking you

21   some questions, he asked you about when you were getting to the

22   store and I was trying to keep up, but I thought I heard you say

23   I was coming to the store and I see the 18-wheeler pulling out

24   and I kept thinking he was going to stop and thought he was going

25   to stop.  Was that what you said?

544

```
 1    A     If that's what it says, that's what I said.

 2    Q     On the date of the accident it was moderately foggy, right?

 3    A     Yes, sir.

 4    Q     And I heard you say earlier you were familiar with the

 5    intersection?

 6    A     Yes, sir, very familiar with it.

 7    Q     Very familiar.  And it usually took you 15 to 20 minutes to

 8    get there from home?

 9    A     Yeah.

10    Q     The speed limit on the highway was 55 miles per hour?

11    A     Yes, sir.

12    Q     Did they have a yellow sign with a cross on it to indicate

13    that the intersection was coming up ahead?

14    A     Maybe so.  I don't remember, but maybe so.

15    Q     About 500 feet out?

16    A     I don't remember the feet.

17    Q     Did it have a little sign on it that had 50 miles an hour on

18    it?

19    A     I don't remember ever having seen a 50 mile an hour sign

20    that way.

21    Q     Do you recall if you needed your windshield wipers that day?

22    A     I don't think so.  I don't recall.

23    Q     In the mile before you got to the area of the convenience

24    store, you don't recall seeing any other vehicles on the roadway,

25    do you?
```

1   A    No, because if you're coming up from Basile, you're coming

2   westbound.  There's a dip.  There's a slight incline.  So when

3   you're coming from Basile, you can't see until you come up that

4   slight incline and you see the rest of the road until you get to

5   the intersection.

6   Q    Is that the little hill you told me about in the deposition?

7   A    Right.

8   Q    How far from the intersection is that little hill?

9   A    I would guess maybe -- I don't know.  Maybe a mile or a

10  little more than a mile.  I don't know.

11  Q    In the last half mile it's straight and level?

12  A    Yes, sir.

13  Q    You never saw the white SUV that was ahead of you in the

14  video, did you?

15  A    I don't remember seeing it, no, sir.

16  Q    You told me in your deposition, sir, that the first time you

17  saw the 18-wheeler was in front of the store?

18  A    Yeah.

19  Q    You were in front of the store itself?

20  A    Yeah.

21  Q    So when you told me earlier you kept thinking that the

22  18-wheeler was going to stop, did you see it when it was on the

23  side pulling out into the road?

24  A    Yes.

25  Q    The fog was thick, but when you got to the area where the

546

1   store and where the lights were, it brightened up and you could

2   see, couldn't you?

3   A    Yeah.

4   Q    Can you tell me how fast you were going?

5   A    Going 55.

6   Q    All right.  Do you recall giving your deposition in this

7   matter?

8   A    Yeah.

9        MR. DILL:  May I approach, Your Honor?

10       THE COURT:  You may approach.

11  BY MR. DILL:

12  Q    I'm going to give you the deposition from May of 2020, and

13  if you give me a moment, I'll get the date for you.  Page 46.

14  I'm sorry.

15  A    Okay.

16  Q    Line 16.  Let me rephrase the question.  Do you know how

17  fast you were going when you impacted with the truck?

18  A    No, sir.

19  Q    Could you tell me how far you could see in front of you as

20  you traveled down Highway 190 with your low beam lights on?

21  A    I could see.  I can't put feet, but I could see.

22  Q    If you turn to page 47 at line 6 when I asked you the

23  question, "Before you got to the area of the accident, how far in

24  front of you could you see as you traveled down Highway 190,"

25  what was your response at line 8?

```
 1    A    I couldn't -- I couldn't tell you, man.

 2    Q    And that was your answer -- that was a quote from the

 3    deposition, right?

 4              THE COURT:  Let me stop you.

 5              Mr. David, you stood up.

 6              MR. DAVID:  I'm sorry.  It's not impeachment.  It's the

 7    same answer, but I'm not going to object.  He can answer, Your

 8    Honor.  I didn't object.

 9              THE COURT:  Okay.  Mr. Dill, you may proceed.

10              MR. DILL:  Thank you.

11    BY MR. DILL:

12    Q    After the accident your attorney sent you to Dr. Muldowney?

13    A    Yes.

14    Q    The pain that you had before the surgery limited the

15    movement of your neck by making it stiff?

16    A    Stiff with pain, yes.

17              MR. DILL:  Mr. Don, could I please have surveillance

18    video clip number one.

19              And, Your Honor, before we play it, may we approach

20    real quick?

21              THE COURT:  Yes.

22         (Whereupon, a sidebar conference was had as follows:)

23              MR. DAVID:  I renew my objection.  Go ahead.

24              MR. DILL:  We have a stipulation to the authenticity of

25    the video, Judge.  I just wanted to make sure that it was in the
```

```
 1    record that we've stipulated that the time stamps are accurate
 2    and the video is authentic and the one that is not dated is from
 3    September 18th, 2018.
 4              MR. DAVID:  And you can represent that when you put it
 5    on.
 6              THE COURT:  Okay.  So there's no objection other than
 7    what I've overruled.
 8              MR. DAVID:  I completely object, but, yes, sir.
 9              THE COURT:  And you were able to review the excerpts
10    and you don't have any additional that you wish to put in?
11              MR. DAVID:  No, sir.
12              THE COURT:  Okay.
13         (Whereupon, the sidebar conference was concluded.)
14              THE COURT:  Mr. Dill, you may proceed when ready.
15              MR. DILL:  Thank you, Your Honor.
16              At this time we'd like to show a video from
17    January 11th, 2019.  Pursuant to the stipulation between the
18    parties, the video is authentic and the time stamps represent the
19    dates that they are shown on those that have it, and the one that
20    doesn't have it, the time stamp or the date it was shot was
21    September 18 of 2018.
22              Mr. Don, could you press play, please.
23    BY MR. DILL:
24    Q    Mr. Bradley, this is your home?
25    A    Yeah.  You had me followed.
```

```
 1    Q    And that is you getting out of the vehicle here?

 2    A    No.

 3    Q    That's not you?

 4    A    That's me, yeah.

 5    Q    And these -- strike that.

 6              MR. DILL:  Mr. Don, you can take it down, please.

 7    BY MR. DILL:

 8    Q    That was you, Mr. Bradley, correct?

 9    A    Yes, sir.

10    Q    In the month before your surgery, can you tell me what your

11    pain level was in your neck?

12    A    A month before the surgery, probably about a six or seven.

13    I don't remember the exact number I gave you.

14    Q    At the time I took your deposition in May of 2020, where was

15    your back pain located?

16    A    Where was my back pain located?

17    Q    Yes, sir.

18    A    My mid to upper back, mid to upper back.

19    Q    And you knew the difference between your midback and your

20    low back, right?

21    A    Yes, sir.

22    Q    And I apologize for jumping around, but I'm going to try to

23    move quickly.

24              Once Dr. Henderson removed the rest of your little

25    finger, it was a lot better, right?
```

1    A    Yes, sir.

2    Q    And the injury to your ring finger healed as well, correct?

3    A    It's healed, but it doesn't work the same.

4    Q    You have a little bit of loss of power in that hand,

5    correct?

6    A    Right.

7    Q    You started working out after the accident again before you

8    had the neck surgery, correct?

9    A    Yeah.

10   Q    One of the things that stressed you was weight gain, wasn't

11   it?

12   A    Yeah, very much so.

13   Q    The other thing that stressed you the most was not being

14   able to work?

15   A    Very much so.

16   Q    And the exercises is what you used to relieve that stress,

17   correct?

18   A    You mean after the accident?

19   Q    Before and after.

20   A    Before it was just trying to be in the best condition I

21   could be in.  Afterwards it was keep moving.  Don't stop moving.

22   I had an older person tell me just don't stop moving.

23   Q    At the time of your deposition in May of 2020, you were

24   running sprints at 50 to 100 yards at 40 to 50 percent of your

25   speed, correct?

```
 1              MR. DAVID:  Are you referencing a page?

 2              THE COURT:  Let me stop you.  Either object or not.

 3              MR. DAVID:  Your Honor, we can approach.

 4         (Whereupon, a sidebar conference was had as follows:)

 5              MR. DAVID:  If he's going do reference a deposition, he

 6    needs to say the page.

 7              MR. DILL:  I'm not reading from the deposition.  I'm

 8    reading my question.

 9              THE COURT:  But you said at the time of your

10    deposition --

11              MR. DILL:  I said at the time --

12              THE COURT:  All right.  One at a time.

13              MR. DILL:  At the time of your deposition -- I was

14    giving him a date reference to go to -- you were doing these

15    workouts.

16              MR. DAVID:  Okay.  You're can't impeach him until he

17    says something.

18              MR. DILL:  I one hundred percent agree with that.

19              MR. DAVID:  The last impeachment was the same answer.

20    It's not appropriate.

21              MR. DILL:  It wasn't the same answer.

22              THE COURT:  I'm happy to hear your objection, but when

23    you stand up, I don't know what you're requesting from the Court.

24    So there is no objection?

25              MR. DAVID:  No objection.
```

```
1              (Whereupon, the sidebar conference was concluded.)
2                   THE COURT:  Mr. Dill, you may proceed.
3                   MR. DILL:  Thank you.
4    BY MR. DILL:
5    Q    Back in May of 2020 you were running 50 to 100-yard sprints
6    at 40 to 50 percent of your speed, correct?
7    A    Yes, sir.
8    Q    The boxing that you did was to get a lot of calories burned
9    and to keep up your strength, correct?
10   A    The boxing was just -- it's easy.  It's not really --
11   anybody that does hard work, boxing is probably one of the
12   easiest workouts you can do.
13   Q    You were soft tapping a tree boxing at that time, correct?
14   A    Yes.
15   Q    In May of 2020?
16   A    Right.
17   Q    And you were doing that three times to four times per week?
18   A    Oh, no.  Your hands can't take it that much.  Your hands
19   can't take it like that.  Probably like once or twice a week
20   because your knuckles, even though you're not swinging hard,
21   you're hitting a tree.  You're hitting something solid.  So, no,
22   it wasn't three or four times a week, but I was doing it.  It was
23   easy.
24   Q    I'm going to ask you about the headaches auction you were
25   having back in May of 2020.  They were on the right side of your
```

1  head where the cuts were?

2  A    Yes, sir.

3  Q    And you didn't have any other problems associated with the

4  headaches, did you?

5  A    Just had headaches.

6  Q    You didn't have any light sensitivity or hearing

7  sensitivity?

8  A    Just had headaches.

9  Q    And other than the midback pain, the neck pain, the cut on

10  your head, your finger and your shin, you didn't have any other

11  complaints from the accident when I took your deposition in May

12  of 2020; is that correct?

13  A    If that's what I said.  I don't remember.  I talked to so

14  many people.

15  Q    And you were asked some questions about depression.  You had

16  depression before the accident that caused a heart attack for

17  you, correct?

18  A    Yes.

19  Q    And that was a long time before the accident, right?

20  A    A long time before the accident, but I had depression for

21  many, many years.

22  Q    Now, you gave a second deposition to Mr. Wynne, correct?

23  A    Yes.

24  Q    And that was in October of 2021?

25  A    Right.

1   Q     Back around that time you had gotten a prescription for

2   Aimovig, but you didn't take it, correct?

3   A     No.  It was in the icebox.

4   Q     You didn't want to take it?

5   A     I don't want to take no medicine.

6   Q     In fact, after this accident, you took very little

7   medication, correct?

8   A     Yeah.  Advil and Aleve.

9   Q     You weren't getting narcotic medication from Dr. Muldowney

10  in the early part of your treatment after this accident, were

11  you?

12  A     When I had the initial hand surgery, I think his name was --

13  I think the doctor's name was Dr. Benoit.  He came up to me and

14  he was like this narcotic I'm about to prescribe for you is

15  highly addictive.  Watch how you take it.  And I just took heed

16  to what he said.  Plus I don't like taking medication.  I just

17  had to deal with the pain sometimes.

18          MR. DILL:  Mr. Bradley, those are all the questions I

19  have.  I thank you very much.

20          THE WITNESS:  Thank you.

21          THE COURT:  Mr. David, you may redirect when you're

22  ready.

23                     REDIRECT EXAMINATION

24  BY MR. DAVID:

25  Q     Wilfred, in your May 20th, 2020, deposition, no one asked

1   you about low back pain, did they?

2   A    I don't remember.

3   Q    But when you talked about you doing boxing and boxing a

4   tree, you're not talking about you boxing with people?

5   A    No, no.  I don't spar with nobody.  Just a tree to keep

6   movement, just to keep the blood flowing, to get the heart

7   moving.  That's it.

8   Q    And you're not even torquing your body?

9   A    It hurts.  I can't.

10  Q    Just hands?

11  A    Just like this, just like this.

12  Q    He asked about past depression.  Before this accident had

13  you ever treated with any type of psychologist or counselor for

14  depression?

15  A    No, no.

16  Q    Had anyone ever diagnosed you with depression?

17  A    No.  I never told nobody that I had depression.  That would

18  be a sign of weakness.

19  Q    When you say depression, was that sadness about losing

20  family members?

21  A    Yeah.  A lot of family members were buried within a

22  three-year span.  Four family members, you know, in a five-month

23  span, a brother -- my only two brothers and a son.  My son,

24  brother four days later, five months later my other brother.  So

25  I didn't know how to deal with that.  I never talked to anybody

```
 1    about that.  I figured it was my problem, my family's problem.  I
 2    wouldn't even talk to my family about it.  I figured I've just
 3    got to deal with this.
 4    Q    And that was back in 2005?
 5    A    Yeah.
 6    Q    Thirteen years before this incident?
 7    A    Yeah.
 8    Q    And you weren't missing work and you weren't missing
 9    anything you did because of your grief about losing family
10    members, correct?
11    A    No.  I had to work.  I don't like asking anybody for
12    anything.  I feel that's what men should do is work.
13    Q    Was that bereavement or grieving for lost family members
14    anything like the depression and anxiety you've had since this
15    crash?
16    A    No, man.  When my son passed, I was -- I was suicidal.
17    Q    I understand.  I'm so sorry, Wilfred.  I hate to even ask
18    you these questions.  I know that's difficult, losing a child.
19    A    No.  You don't know.
20    Q    Mr. Dill asked about Aimovig.  Aimovig has been great for
21    your headaches, right?
22    A    Yeah.  You mean the shot?
23    Q    Yes, sir.
24    A    It's been great, yeah.
25    Q    And, in fact, based on the records we have, you've filled it
```

1   this entire year, haven't you?

2   A    Yeah.

3   Q    You've taken that shot every month?

4   A    Yeah.

5   Q    And you have a prescription to fill it next month, right?

6   A    Yeah.  I've got prescriptions to fill it.  I've got the

7   prescription.  My next visit should be in October or something.

8           MR. DAVID:  Thank you, Wilfred, for your time, buddy.

9   You can come down now.

10          THE COURT:  He's got some tissues over there.

11          MR. DAVID:  Can I approach, Your Honor?

12          THE COURT:  Yes.

13          MR. DAVID:  Your Honor, the plaintiff rests.

14          THE COURT:  Okay.  As we discussed earlier today, we

15  are going to have a meeting with counsel tomorrow morning to

16  discuss instructions for the jury.  So instead of 8:15, I'm going

17  to have you come in at 9:15 and we're going to shoot to start at

18  9:30.  And as far as counsel, counsel will meet at the ordinary

19  time and we'll shoot to start a meeting about 8:30.

20          MR. DAVID:  Yes, sir.  Thank you.

21          THE COURT:  All right.  All rise for the jury.

22          And let me give the instruction.  Of course, as always

23  since I'm sending you home, you are not to research anything

24  about this case, any of the parties in the case.  You're not to

25  talk to anybody about this case except for the fact that you are

```
 1    serving on jury service and the time that you have to be here.

 2    So we'll see you tomorrow morning.

 3                 All rise.

 4                      (Jury Exited the Courtroom)

 5                 THE COURT:  Please be seated.

 6                 As far as the jury instructions, I think we hope to get

 7    a rough draft by tomorrow morning.

 8                 THE CLERK:  Yes.

 9                 THE COURT:  Okay.  And we'll spend some time going over

10    that.  I think that a lot of the instructions are agreed to.  So

11    it should not take too long.  There may be a few disputes.

12                 Any other housekeeping matters?

13                 MR. DILL:  Judge, I'd like to make a Rule 50 motion to

14    dismiss the claim for the costs of the Aimovig in the future as

15    well as the future treatment with Dr. Bergeron.

16                 MR. DAVID:  And, Your Honor, I'd like time to brief

17    this and talk about it tomorrow morning first.  I think there's

18    plenty of evidence here that the jury can rely on to award his

19    future treatment.  If you could look at the law -- and I haven't

20    had this researched for today.  Juries can rely on past medical

21    treatment to determine future treatment.  You don't have to have

22    a doctor even say.  They can look at the past pattern, and if

23    it's obvious, they can say we're going to award that in the

24    future.  They have the purview to do that.

25                 In this case they have multiple doctors who have talked
```

1    about his headaches are chronic and they're not going to stop.

2    They have doctors talk about how the Aimovig and Maxalt have been

3    treating his headaches successfully.  They have the pharmacy

4    records that show exactly what that cost in the past.  They see

5    it's filled every single month this year, including last month.

6    They see Mr. Wilfred Bradley talk about how it's helping him a

7    bunch and how he wants to continue taking it in the future.  I

8    think they certainly have the discretion and the information they

9    need and the inferences they need to award future damages.

10            THE COURT:  Let me stop you.  He's made the motion.  We

11   can address this tomorrow morning because I don't think it's

12   going to take us an hour frankly to finish up the jury

13   instructions.  I don't want written briefing from y'all, but what

14   I will do, Mr. Dill, you've made the motion and you've stated the

15   grounds.  I'll allow Mr. David to make an oral argument opposing

16   the motion, and if you want to reply to that, you can, and we'll

17   decide that during our meeting tomorrow on the record.

18            MR. DAVID:  All orally you said, Your Honor?

19            THE COURT:  Yeah.  I'm not sure there's a whole lot of

20   legal argument with this.  I mean, it's purely -- I know the

21   standard for the motion.  It's purely is there evidence in the

22   record that a reasonable trier of fact could find in favor of the

23   plaintiff on that issue.

24            MR. DAVID:  Thank you, Your Honor.

25            THE COURT:  Point me to the evidence that a reasonable

 1   juror could find for the plaintiff on that issue and that's
 2   really what I'd be looking for.
 3                MR. DAVID:  Thank you, Your Honor.
 4                THE COURT:  All right.  Anything else?
 5                MR. DILL:  Nothing else, Your Honor.
 6                THE COURT:  All right.  Very good.  We are in recess.
 7   We're adjourned for today.  I'll see y'all back before
 8   8:30 tomorrow morning.
 9                                (Proceedings Adjourned)
10                          _  _  _
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          Certificate

2  I hereby certify this ^ day of September, 2022, that the

3  foregoing is, to the best of my ability and understanding, a true

4  and correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7                              /s/ LaRae E. Bourque

8                              Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25