UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

**WILFRED BRADLEY**                                    **CASE NO.  6:19-CV-00056**

**VERSUS**                                                         **JUDGE ROBERT R. SUMMERHAYS**

**MOUNTAIN LAKE RISK, ET AL.**

## RULING

Before the Court is a Post-Trial Motion for New Trial, and/or Remittitur, and for Judgment as a Matter of Law, filed by Defendants Mountain Lake Risk Retention Group, Inc., U.S. Xpress, Inc., and George Fiorucci.[1] Plaintiff Wilfred Bradley opposes the motion.[2] For the reasons that follow, the motion is GRANTED IN PART and DENIED IN PART.

### I.
#### BACKGROUND[3]

This case arises from a collision on February 14, 2018, involving an automobile driven by Wilfred Bradley and an 18-wheeler owned by U.S. Xpress, Inc. and driven by its employee George Fiorucci. The accident occurred at the intersection of U.S. Highway 190 ("US 190") and La. Highway 26 ("LA 26") in Jefferson Davis Parish, Louisiana, at around 5:00 a.m. Traffic on US 190 is favored. The intersection of these two highways is controlled by a flashing yellow caution light for traffic on US 190 and a flashing red light and stop signs for traffic on LA 26.

At the time of the accident, Bradley was traveling west on US 190 at 55 mph (the maximum speed limit), heading to work. Fiorucci, who was in the course of making a delivery of products to Walmart for his employer, was traveling south on LA 26, intending to turn on US 190 and head

---

[1] ECF No. 128; *see also* ECF Nos. 132, 134.
[2] ECF No. 140.
[3] The Court cites to the page numbers generated by CM/ECF throughout this opinion.

east. As Fiorucci approached the intersection at US 190, he stopped at the stop signs and blinking red lights.[4] As he looked towards westbound traffic on US 190, he could see an eighth to a quarter of a mile. A white, Yukon XL was travelling westbound on US 190 and put on its left turn signal.[5] Fiorucci waited for the SUV to begin its turn into a Chevron station parking lot and then immediately began to make a left turn in order to head eastbound on US 190.[6] Fiorucci did not see Bradley's vehicle, which was travelling about six seconds behind the Yukon, until he was part way through his turn, with his tractor in the eastbound lane on US 190 and his trailer all or partially on LA 26.[7] By the time Fiorucci saw Bradley's vehicle, he was looking straight at Bradley through his windshield.[8] The two vehicles violently collided, resulting in multiple injuries to Plaintiff, including the amputation of the small finger on his right hand, neck and back injuries requiring surgery, a concussion, and a laceration to his head.

The case proceeded to trial before a jury from August 1, 2022, through August 5, 2022. The jury returned a verdict finding Defendants solely responsible for the accident and awarding damages in the following amounts:

| | |
|---|---|
| Past Medical Expenses | $293,000.00 |
| Future Medical Expenses | $500,000.00 |
| Past Lost Wages | $125,000.00 |
| Future Loss of Earning Capacity | $241,000.00 |
| Past Physical Pain & Suffering and Mental Pain & Suffering | $690,892.00 |
| Future Physical Pain & Suffering and Mental Pain & Suffering | $400,000.00 |

---

[4] ECF No. 136 at 11.
[5] *Id.* at 12.
[6] *Id.*
[7] *Id.* at 12-13, 32-33, 81.
[8] *Id.* at 12-13, 33.

| | |
|---|---|
| Past & Future Disability and Loss of Enjoyment of Life | $250,000.00 |
| Disfigurement and Scarring | $500,000.00 |

In total, Plaintiff was awarded $2,999,892.00.[9]

## II.
### LEGAL STANDARDS

### A.    Judgment as a Matter of Law

A judgment as a matter of law ("JMOL") is proper where the Court finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[10] This standard is only met "if the facts and inferences point so strongly and overwhelmingly in the movant's favor that jurors could not reasonably have reached a contrary verdict."[11] To defeat such a motion, the opposing party "must at least establish a conflict in substantial evidence on each essential element of their claim."[12] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[13] In evaluating whether substantial evidence supports the verdict, the Court "must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury."[14]

---

[9] ECF No. 122 at 1.
[10] Fed. R. Civ. P. 50(a); *see also Kim v. American Honda Motor Company, Incorporated*, 86 F.4th 150, 159 (5th Cir. 2023).
[11] *Kim* at 159 (quoting *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013)).
[12] *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011)).
[13] *N. Cypress* at 620 (quoting *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., LLC*, 878 F.3d 478, 485 (5th Cir. 2017)); *see also Kim* at 159 n.12 ("Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions") (quoting *Threlkeld v. Total Petroleum, Inc.* 211 F.3d 887, 891 (5th Cir. 2000)).
[14] *Kim* at 159 (quoting *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 333 (5th Cir. 1997)).

**B.      New Trial**

In a diversity case, a district court "must apply the new trial and remittitur standard of the forum in which it sits."[15] Under Louisiana law, "[a] new trial may be granted . . . to all or any of the parties and on all or part of the issues."[16] A new trial must be granted if "the verdict or judgment appears clearly contrary to the law and the evidence."[17] A new trial may be granted in any other case "if there is good ground therefore, except as otherwise provided by law."[18] In determining whether to grant a new trial based on evidentiary grounds:

> [A] trial judge may evaluate the evidence without favoring either party, and draw its own inferences and conclusions. Most significantly, the district court has authority to evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. However, because a motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations, the jury's verdict cannot be set aside on that ground if it is supportable by any fair interpretation of the evidence.[19]

Thus, despite permitting the trial court to re-evaluate credibility determinations, the jury's findings are still to be given high deference.[20]

Under Louisiana law, remittitur is available when the jury's award "is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances."[21] If the trial court finds the verdict is so excessive that a new trial should be granted, it may enter a remittitur as an alternative to a new trial, but only with the

---

[15] *Alonso v. Westcoast Corp.*, 920 F.3d 878, 889 (5th Cir. 2019) (citing *Fair v. Allen*, 669 F.3d 601, 604 (5th Cir. 2012).
[16] La. Code Civ. P. art. 1971.
[17] La. Code Civ. P. art. 1972.
[18] *Id*.
[19] *Pitts v. Louisiana Med. Mut. Ins. Co*., 2016-1232 (La. 3/15/17, 9–10); 218 So.3d 58 (citations omitted).
[20] *Fair*, 669 F.3d at 605.
[21] *Echeverry v. Jazz Casino Co., L.L.C.*, 988 F.3d 221, 236 (5th Cir. 2021) (internal quotation marks omitted).

consent of the party adversely affected, and "only if the issue of quantum is clearly and fairly separable from other issues in the case."[22]

### III.
#### ANALYSIS

**A.      New Trial on Liability**

Defendant moves for a new trial on liability, arguing "the jury's decision to find Mr. Bradley free from any fault in connection with the accident is against the great weight of the evidence and irreconcilable with applicable law."[23] Defendants note that at Plaintiff's deposition, he testified that he did not see Defendants' 18-wheeler until he was in front of the Chevron station at the intersection where the collision occurred, but at trial, he testified he saw the 18-wheeler as he was "coming up to the store."[24] Defendants assert this testimony requires that some fault be attributed to Plaintiff, because it shows Plaintiff failed to traverse the intersection "with the requisite 'caution' under the circumstances."[25] According to Defendants, Plaintiff admitted he could see Defendant's tractor-trailer "hundreds of feet before impact," but never slowed his vehicle from 55 mph prior to the collision.[26] Defendants point to the testimony of Michael Gillen (Plaintiff's accident reconstructionist) that the tractor-trailer moved into the roadway 7.5 seconds before impact.[27] Defendants argue that "even providing Mr. Bradley with a perception response time of 2 seconds . . ., a typical nighttime value, in the remaining 5.5 seconds Mr. Bradley never slowed his vehicle whatsoever. . . ."[28]

---

[22] La. Code Civ. P. art. 1814.
[23] ECF No. 134 at 12.
[24] *Id.* at 12 (citing ECF No. 137 at 202, 228).
[25] *Id.* at 14.
[26] *Id.* at 14-15.
[27] *Id.* at 14.
[28] *Id.* at 14-15 (citation omitted).

The Court finds the jury's verdict is supported by a fair interpretation of the evidence. Plaintiff testified at trial that he saw the 18-wheeler as he "was approaching— . . . coming up to the store."[29] As Bradley got closer to the store, he saw the 18-wheeler pulling out, but believed it was going to stop. Gillen testified that when the 18-wheeler began its forward movement (7.5 seconds before impact), it was ten feet behind the fog line of the intersection, and travelling at a maximum speed of five miles per hour.[30] In light of this evidence, the jury could have found Bradley's belief that the 18-wheeler would stop at or close to the fog line to be reasonable, as Bradley was on the favored highway. Gillen additionally testified the front of Fiorucci's tractor arrived at the fog line 4.9 seconds before impact.[31] At 3.4 seconds before impact, the front of Fiorucci's tractor reached the dedicated westbound turn lane, and at 2.4 seconds pre-impact, the front of the tractor was "reaching" the eastbound lane.[32] Thus, Bradley had 4.9 seconds or less before impact to perceive Fiorucci had failed to yield the right of way to traffic on the favored highway and then react to that failure. Gillen testified perception-reaction time in dark conditions is a minimum of two seconds, and visual clutter will increase the average reaction time.[33] He further testified by the time Fiorucci's tractor crossed into the intersection, Bradley did not have sufficient time or distance to stop his vehicle.[34]

The jury was instructed that "[a]nyone who finds himself in a position of imminent peril, without sufficient time to consider and weigh all the best means available to avoid that impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may

---

[29] ECF No. 137 at 202.
[30] ECF No. 136 at 80-81; 91-92, 94.
[31] *Id.* at 94.
[32] *Id.*
[33] *Id.* at 102.
[34] *Id.*

appear to be the better method."[35] The jury was further instructed that Fiorucci had a duty to stop at the intersection, and that he could not enter the intersection until he "yielded the right of way to all vehicles which [were] approaching so closely from another roadway as to constitute an immediate hazard."[36] Here, the evidence showed that after waiting for the Yukon to turn, Fiorucci immediately began his approach and turning maneuver without looking to see if there was any traffic behind the Yukon.[37] Under these circumstances, the Court finds the evidence supports the jury's verdict finding Defendants solely at fault for this accident. Accordingly, Defendants' motion for a new trial on liability will be denied.

**B.    Judgment as a Matter of Law, New Trial or Remittitur for Future Medical Costs**

At the close of evidence, Defendants moved for judgment as a matter of law, seeking dismissal of Plaintiff's claims for the future medical costs of Aimovig (an injectable medicine used for the prevention of migraines) and for future counseling with Jensen Bergeron (a licensed professional counselor), arguing no medical testimony was offered in support of these two components of Plaintiff's claim for future medical expenses.[38] The Court deferred ruling.[39] The jury awarded Plaintiff $500,000.00 in future medical expenses. Defendants now renew their motion for judgment as a matter of law for the future costs of Aimovig and counseling.[40] Alternatively, Defendants seek a new trial, or remittitur, on Plaintiff's claim for future medical expenses. Defendants contend at most, the evidence at trial supported an award of $291,000.00 in future medical expenses, and there was no legally sufficient evidentiary basis for the jury's award of an additional $209,000.00 for future medical expenses. Plaintiff argues the jury's verdict is

---

[35] ECF No. 113 at 8.
[36] *Id.* at 7.
[37] ECF No. 136 at 12-13.
[38] ECF No. 137 at 241; ECF No. 138 at 18.
[39] ECF No. 138 at 20.
[40] ECF No. 128 at 2; ECF No. 134 at 21.

legally sound, contending "[t]he jury ostensibly awarded the additional $209,000 in future medical treatment for Wilfred's non-surgical medical care as prescribed by his treating physicians, including but certainly not limited to medical appointments . . . , medication, and psychological examinations."[41]

Prior to trial, Defendants filed a motion in limine seeking, *inter alia*, to limit the testimony of Dr. Weir and Jensen Bergeron, as well as any testimony by Plaintiff's economist and vocational rehabilitation expert that relied upon such testimony, due to Plaintiff's failure to comply with the disclosure requirements of Rule 26(a)(2).[42] The Court granted Defendants' motion with respect to Dr. Weir and Bergeron, ruling their testimony would be limited to that of fact witnesses, and limiting the testimony of Plaintiff's economist and vocational rehabilitation expert in conformity with the Court's Ruling.[43] The same day, counsel for Plaintiff filed a motion for partial reconsideration, which Defendants opposed.[44] On the first morning of trial, the Court granted the motion for reconsideration in part. In particular, the Court ruled that Dr. Weir would be permitted to testify at trial in conformity with Federal Rules of Evidence 702 and 703, provided such testimony was discussed at his deposition.[45] The Court specifically prohibited Dr. Weir from testifying that Plaintiff would require the use of Aimovig for the remainder of his life, and it prohibited Plaintiff's economist from testifying to the cost of Aimovig for the remainder of Plaintiff's life.[46] The Court ruled Bergeron could testify to the extent his testimony was reflected in his records provided to defense counsel.[47]

---

[41] ECF No. 140 at 28.
[42] ECF No. 75.
[43] ECF No. 100 at 11, 13, 19.
[44] ECF Nos. 102, 103.
[45] ECF No. 135 at 19.
[46] *Id.* at 21, 22.
[47] *Id.* at 26.

At trial, Dr. Weir testified that on June 8, 2021, he changed Plaintiff's medications to include Aimovig and Maxalt-MLT (another migraine medication), due to Plaintiff's recent diagnosis of renal insufficiency.[48] Plaintiff's counsel then asked Dr. Weir, "And I think you even talked about in your deposition that your plan would be if the Aimovig was helpful, that would be something he could use moving forward to control the headaches, correct?" to which Dr. Weir responded, "Yes. That's correct."[49] Plaintiff's counsel then elicited testimony from Weir that Plaintiff would never "be allowed to take any more anti-inflammatories for the remainder of his life like Motrin, ibuprofen, naproxen, diclofenac."[50] Counsel then asked, "And you want him to continue on the Aimovig and the Maxalt, correct?" to which Weir responded, "That's correct. Yes."[51]

Shortly thereafter, while the jury was excused, defense counsel asked the Court to caution Weir about the limitations on his testimony previously ordered by the Court.[52] Plaintiff's counsel responded, "In his deposition there are pages and pages about Aimovig, and if Aimovig is successful aborting headaches, that would be the plan going forward. So that's all I've gotten out of him, and my plan is to show that it has been successful through my client's testimony and let the jury figure it out from there."[53] Given the Court's ruling on the motion in limine, Dr. Weir was cautioned to limit his testimony "to the present and not opine on what might happen in the future or his needs in the future going forward."[54] Plaintiff's counsel then argued to the Court at length that it was his belief that there was "enough evidence" in the record for the jury to make an award

---

[48] ECF No. 137 at 58-59. Dr. Weir actually first prescribed Maxalt-MLT on January 21, 2021, and continued to do so throughout his treatment. ECF No. 137 at 54-55; ECF No. 123-11 at 2, 3, 7, 9, 12.
[49] ECF No. 137 at 61.
[50] *Id.* at 62.
[51] *Id.*
[52] *Id.* at 65.
[53] *Id.*
[54] *Id.* at 65-66.

for the future cost of Aimovig, even without counsel eliciting testimony from Weir that Plaintiff would "need Aimovig more likely than not forever."[55] The Court then reviewed Weir's deposition testimony, advised counsel it found no discussion of any future need for Aimovig, and instructed counsel that he could not "argue to the jury something that is not in the record," but only "fair inferences from what's in the record" in light of the Court's prior ruling on the motion in limine.[56] Counsel continued to re-argue that it was his belief that there was sufficient evidence in the record for the jury to "make the inference" that Plaintiff should be awarded the cost of future treatment with Aimovig.[57] The Court reiterated counsel was not to ask Weir about the future use of Aimovig.[58] Counsel then stated he wanted to conduct his closing argument in a manner that would permit the jury to award damages for the future cost of Aimovig.[59] The Court again advised Plaintiff's counsel that he was not to "talk about the future[] [medicals with Dr. Weir] and you can't talk about it in closing argument unless there's evidence to support it and there's not evidence to support it."[60] Plaintiff's counsel once again argued this should be a permitted topic in his closing argument.[61] The Court once again instructed Plaintiff that "[f]uture medicals are not a subject that I'm going to allow this witness to testify to."[62] Plaintiff then stated that he would not address the future cost of Aimovig with Mr. Stokes (Plaintiff's vocational lifecare planner), because Stokes had formulated that information through conversations with Dr. Weir. However, he did intend to elicit testimony about the future cost of Aimovig through his economist, John W. Theriot.[63] The

---

[55] *Id.* at 67; *see also id.* at 68-77, 87-89.
[56] *Id.* at 68-69; *see also id.* at 87-88.
[57] *Id.* at 70.
[58] *Id.* at 71.
[59] *Id.* at 72.
[60] *Id.* at 72.
[61] *Id.* at 73.
[62] *Id.* at 74.
[63] *Id.* at 75.

Court again instructed Plaintiff, "as far as other experts that rely on medical testimony, they can only opine or testify to matters that are in the record. You can't get in excluded testimony through an economist or through a life care planner."[64] Beyond that, the Court stated it would not "bless" Plaintiff's closing argument at that time, but he would be required to limit his argument to evidence in the record and any fair inferences from that evidence.[65] Counsel then made a proffer of Weir's testimony addressing his opinions as to Plaintiff's future medical treatment.[66]

Shortly after testimony resumed, counsel for Plaintiff elicited testimony from Dr. Weir that Plaintiff would have headaches "long term" without continued use of Aimovig and Maxalt.[67] Defense counsel objected, and a sidebar conference was held.[68] The Court sustained Defendants' objection, noting Dr. Weir had ignored the Court's prior cautionary instruction to not testify about future medical needs, and then instructed the jury:

> [T]he present witness here is not being admitted for purposes of talking about future needs. He is talking—he is being admitted and his testimony is being admitted purely for purposes of his diagnosis and treatment of the plaintiff, not as to what those future needs are going to be. So to the extent that the witness opines or has opined about what might be needed in the future, you are to disregard that, and again, only evidence in the record.[69]

Soon thereafter, Plaintiff's counsel asked Weir, "Is there any likely scenario where his headaches just abort and go away on their own?" The Court instructed the witness not to answer the question.[70]

---

[64] *Id.* at 76.

[65] *Id.*

[66] *Id.* at 77-82. Specifically, Dr. Weir proffered that Plaintiff would require treatment for his headaches for the remainder of his life, and that he would continue to treat that condition with Aimovig and Maxalt, provided those medications continued to be effective and did not cause any medical complications. He further testified he would continue to see Plaintiff every six months. *Id.*

[67] *Id.* at 84.

[68] *Id.*

[69] *Id.* at 85.

[70] *Id.* at 86.

In his closing argument, counsel for Plaintiff stated:

I think to cover his future doctors and to cover future medication he's going to need based on the evidence you've heard $500,000 is an appropriate number. You may think not. You may think $291,000. You may not think headache medication is required. If that's the case, I would hope that you would put more money on his pain and suffering for him not having that going forward.[71]

With respect to Jensen Bergeron, the testimony at trial was that he saw Plaintiff six times between January and December of 2021.[72] Bergeron diagnosed Plaintiff with adjustment disorder with depression and anxiety and features of post-traumatic stress.[73] At the conclusion of his direct testimony, Plaintiff's counsel stated, "The last thing you have in your [final, Dec. 2021] report is the counselor and client discussed the potential benefit of further explanation [sic] of the client's mental health through a formal psychological evaluation," to which Bergeron responded, "Yes."[74] On cross-examination, Bergeron testified that he requested a formal psychological evaluation to determine whether Plaintiff should have a diagnosis of PTSD.[75]

Based on the testimony permitted at trial, Plaintiff's economist calculated Plaintiff's future medical expenses would be between $207,000 to $291,000.[76] This range included the cost of an adjacent level lumbar fusion ten or twenty years in the future with Dr. Muldowny (as well as associated costs), and a lifetime wellness program.[77] While Defendants concede evidence in the record supports up to $291,000 in future medical expenses, they assert there is no evidentiary basis

---

[71] ECF No. 138 at 103.
[72] ECF No. 137 at 110-130; *see also* ECF No. 123-12.
[73] ECF No. 137 at 116.
[74] *Id.* at 130.
[75] *Id.* at 135.
[76] *Id.* at 192. This range of cost was upwardly adjusted by applying the Medical Consumer Price Index (MCPI). *Id.* at 191.
[77] *Id.* at 157-162. Specifically, the associated costs were inclusive of pre- and post-operative labs and imaging, a pre-operative visit with a primary care physician, post-operative visits with Dr. Muldowney, post-operative medication, post-operative physical therapy, and post-operative handyman, lawn maintenance and housekeeping services. *Id.*

in the trial record to support the additional $209,000 awarded for future medical expenses.[78] Defendants contend the testimony of Dr. Weir and Mr. Bergeron cannot support the award, because not only was their testimony insufficient to satisfy Plaintiff's burden of proof, but it was elicited in violation of the Court's Ruling *in limine*, as well as an "explicit instruction at trial to Dr. Weir to confine his testimony to the Court's Ruling."[79] In sum, Defendants contend there is no legally sufficient basis for the jury's award of an additional $209,000 in future medical expenses, "other than Plaintiff's counsel's speculation during closing argument."[80]

Plaintiff contends the jury's award is legally sound, asserting "the jury ostensibly awarded the additional $209,000 in future medical treatment for Wilfred's non-surgical medical care as prescribed by his treating physicians, including but certainly not limited to medical appointments with Drs. Muldowny, Weir, Savant, Blalock, and Mr. Bergeron, medication, and psychological examinations."[81] Plaintiff additionally argues there was sufficient evidence in the record for the jury to award damages for future treatment from Dr. Weir with Aimovig and Maxalt for Plaintiff's "post-concussive, chronic headaches," because Plaintiff testified he "would continue to fill the Aimovig and Maxalt prescriptions" and he already has a post-trial appointment scheduled with Dr. Weir.[82] Plaintiff notes these medications cost approximately $1,400 per month, and therefore, Bradley's medication alone will cost $458,640.00 over the remainder of his life, without an upward

---

[78] ECF No. 134 at 25.

[79] ECF No. 137 at 26-27.

[80] *Id.* at 27.

[81] *Id.* (footnotes omitted).

[82] ECF No. 140 at 28-29. Plaintiff additionally argues future costs of these prescriptions was properly awarded based on Dr. Weir's testimony that Plaintiff filled the prescriptions from March through July of 2022. *Id.* at 28. However, this testimony was offered during a proffer session. Further, as Defendants correctly point out, the evidence in the record shows only that Plaintiff filled his prescriptions from March through May of 2022. ECF No. 141 at 7 (citing ECF No. 123-6 at 6; ECF No. 123-7 at 84-88).

adjustment for inflation.[83] Plaintiff further notes the jury specifically requested to review Plaintiff Exhibit No. 6 ("Medical Expense Recapitulation") during deliberations, which listed Plaintiff's "prescription costs and the visit costs for Dr. Weir, Dr. Savant, Jenson Bergeron, Dr. Muldowny, Dr. Henderson, and Dr. Blalock."[84]

First, Plaintiff's speculation that the additional $209,000 in future medical expenses could be inclusive of appointments with Dr. Muldowney and medication prescribed by him is problematic, because such an award would constitute impermissible double recovery, as the cost of such visits was included in the calculations presented to the jury by Plaintiff's vocational rehabilitation expert and expert economist.[85] Further, the Court disagrees that the jury's award "ostensibly" includes the cost of future medical treatment with Drs. Savant and Blalock. Neither Dr. Savant nor Dr. Blalock was called to testify at trial, nor was any stipulation entered with regard to their treatment of Plaintiff. Thus, there is no basis in the record for the jury's award of future medical expenses to include any future treatment costs for those providers.[86] As to Jensen Bergeron, nothing in his testimony addressed future treatment, and therefore there was no evidentiary basis for the jury to include such costs in its award.[87]

---

[83] *Id.* at 29. The evidence in the record shows Plaintiff's cost for Aimovig and Maxalt in January 2022 was $1,100.08, and in March, April and May of 2022, the cost for both prescriptions increased to $1145.76. ECF No. 123-6 at 6; ECF No. 123-7 at 84, 86. Dr. Stokes testified that Plaintiff's life expectancy is 27.3 years.

[84] ECF No. 140 at 29; *see also* ECF Nos. 114, 120.

[85] *See e.g.* ECF No. 137 at 158-161; *see also* ECF No. 136 at 172-173; n.77, *supra*.

[86] The Court additionally finds Plaintiff's reliance on the jury's request to review Plaintiff's Exhibit No. 6 is misplaced. While that document did show a single charge of $400 from Dr. Savant, it contains no information regarding Dr. Blalock. Clearly any award of future medical expenses based solely on a document that Plaintiff saw a medical provider one time would be improper. Further, Dr. Savant's treatment notes were redacted to omit her recommendations for future treatment. *Compare* ECF No. 83-10 at 5 *with* ECF No. 123-13 at 5.

[87] The Court notes in Plaintiff's proffer of Stokes testimony, he assessed future medical costs for Mr. Bergeron at $3,500—far short of the excess $209,000 awarded by the jury. ECF No. 137 at 140.

Finally, the Court finds the award cannot be supported by the cost of medications prescribed by Dr. Weir. The only evidence properly before the jury supporting this assertion was as follows: due to Plaintiff's renal insufficiency, Plaintiff will never again be able to take anti-inflammatories, which is why Dr. Weir changed Plaintiff's prior medication to Aimovig and continued to prescribe Maxalt;[88] if those medications were helpful, Plaintiff could use them moving forward as they would not affect his kidneys;[89] Plaintiff testified that Aimovig has "been great" for his headaches;[90] Plaintiff filled his prescription for Aimovig in January, March, April and May of 2022, and he filled his prescription for Maxalt in January and April of 2022;[91] Plaintiff testified his next appointment with Dr. Weir "should be in October or something."[92]

Louisiana law requires that future medical expenses "be established with some degree of certainty," which is accomplished with "proof by a preponderance of the evidence [that] the future medical expenses will be medically necessary."[93] Here, the only fact established with any degree of certainty is that Plaintiff will never again be able to take anti-inflammatories. The evidence did not establish that Plaintiff would require treatment with Aimovig for the remainder of his life. Even the proffered report of Plaintiff's vocational rehabilitation expert only included costs for the future use of Maxalt for twelve years; it included no calculation at all for the future use of

---

[88] ECF No. 138 at 58-59, 62. As previously noted, Dr. Weir first prescribed Maxalt at Plaintiff's second visit on January 21, 2021 (before he learned of Plaintiff's renal insufficiency) and continued to do so throughout Plaintiff's treatment. *See* n.48, *supra.*

[89] ECF No. 138 at 61.

[90] ECF No. 137 at 239-40.

[91] ECF No. 123-6 at 6; ECF No. 123-7 at 84, 86.

[92] ECF No. 137 at 240. Evidence that was improperly presented to the jury (and therefore will not be considered by the Court) was that Plaintiff would continue to have headaches long term "unless he's on these medications," and Dr. Weir's testimony regarding future medical needs.

[93] *Menard v. Lafayette Ins. Co.*, 2009-1869, p. 13 (La. 3/16/10); 31 So.3d 996, 1006; *Baack v. McIntosh*, 2020-01054, p. 13 (La. 6/30/21); 333 So.3d 1206, 1216.

Aimovig.[94] Because the Court can only speculate as to what expenses were included in the jury's award of future medical costs, judgment as a matter of law is inappropriate.[95]

Defendants alternatively seek a new trial or remittitur on the award of future medical expenses. For the reasons discussed, the Court finds the jury's award for future medical expenses exceeds that which is supportable by the evidence. Therefore, the Court will conditionally grant Defendants' Motion for Remittitur and will reduce the award of future medical expenses to $291,000.00, recognizing Plaintiff has the right to reject the remittitur and elect to submit to a new trial. If Plaintiff rejects the remittitur, the Court will grant a new trial solely on the issue of future medical expenses.

## C.    New Trial or Remittitur on General Damages

Defendant moves for a new trial on the jury's general damage award, or alternatively remittitur, arguing the award is excessive and "tainted by sympathy and inflamed passions."[96] According to Defendants, "[F]rom opening statement onward U.S. Xpress was vilified as an uncaring corporation, which sent its unwitting employee to a dangerous intersection. In both opening and closing this narrative was put forth, inflaming the jury's ire against the corporate

---

[94] Further, even had this topic not been excluded by the Court, and even if the evidence at trial did support Plaintiff's need for lifetime treatment for migraines, there would still be a question of whether Aimovig, at a cost of more than $1,000 per month, was the only option. In his treatment notes and his deposition, Dr. Weir discussed possible treatment with Botox, likely a less expensive option. Further, it would seem that at some point a generic version of Aimovig will become available, further reducing the cost of such treatment. However, because this area of inquiry was excluded by the Court, Defendants did not have the opportunity to raise such issues.

[95] "Except in those cases in which it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, the court may not arbitrarily reduce the amount of damages, for to do so would deprive the parties of their constitutional right to a jury." 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 2815 (3d ed. 2023); *Thomas v. Hughes*, 27 F.4th 995, 1008-09 (5th Cir. 2022); *Foradori v. Harris*, 523 F.3d 477, 503 (5th Cir. 2008). Here, the Court cannot determine whether the jury's award for future medical expenses includes the costs of Aimovig and counseling with Bergeron, and if so, the amount awarded for same.

[96] ECF No. 134 at 17 (emphasis omitted).

defendant."[97] Specifically, Defendants cite to Plaintiff counsel's opening statement where, after outlining the fault of Fiorucci, he stated, "Why else are we suing U.S. Xpress? It's just a bad choice. Why put this dangerous left turn with these double stop sign red lights into your route that day? You're right here at the Walmart. Go this way."[98] Defendants additionally cite to counsel's closing argument, where he stated, "Going to this foggy intersection was a mistake. . . . It's been four and a half years denying responsibility. That's U.S. Xpress's business decision."[99] Defendant contends "Plaintiff's entire negligent supervision argument against U.S. Xpress was in violation of a Pre-trial motion *in limine* order, which excluded any reference to U.S. Xpress' direct negligence."[100] According to Defendants, the purpose of their motion was "to preclude such inflammatory rhetoric as it is inherently prejudicial. Nevertheless, . . . Plaintiff inflamed the passions of the jury with arguments concerning the inadmissible direct negligence of a corporate defendant."[101]

The Court finds Defendants have overstated the reach of the Order in limine. The Order to which Defendants refer excluded, "1) Any argument or reference to the relative financial positions of Defendants and Plaintiff; and 2) Reference, testimony, or evidence related to U.S. Xpress, Inc.'s hiring, training, supervision or retention of George Fiorucci, or entrustment of a vehicle to George Fiorucci."[102] The Court finds the statements in Plaintiff's opening and closing argument do not violate that Order. Moreover, Defendants did not object to these statements at trial. "Failure to

---

[97] *Id.* at 20.
[98] *Id.*; *see also* ECF No. 135 at 44-45.
[99] ECF No. 138 at 110; ECF No. 134 at 20-21.
[100] ECF No. 134 at 21.
[101] *Id.*
[102] ECF No. 80 at 1.

object during trial results in waiver."[103] While trial courts "may order a new trial if improper closing argument irreparably prejudices a jury verdict or if a jury fails to follow instructions," they must "consider the record as a whole and not merely isolated remarks."[104] Here, the jury was instructed to "not let bias, prejudice or sympathy play any part in [their] deliberations," that "[a] corporation and all other persons are equal before the law and must be treated as equals in a court of justice," and that the statements of counsel were not evidence, but merely argument.[105] It is presumed that the jury followed the Court's instructions, and no evidence has been presented in an effort to show that the jury failed to do so.[106] Finally, the Court finds the statements cited by Defendants do not "rise to the level of severity that would require a new trial to avoid a miscarriage of justice."[107] As Defendants have not shown the jury failed to follow the Court's instructions, and they have not shown that any impropriety in Plaintiff's closing argument irreparably prejudiced the verdict, the Court will deny Defendants' motion for a new trial on damages.

In the alternative, Defendants seek a remittitur of the $1,840,892 awarded for general damages, arguing that award is excessive.[108] They separately seek a remittitur of the portion of the general damages awarded for "Disfigurement and Scarring" (i.e., $500,000), arguing it too is excessive.[109] Plaintiff opposes the motion, arguing the jury's award is not excessive in light of the particular facts and circumstances of this case.[110]

---

[103] *Stanton v. Jarvis Christian Coll.*, 477 F.Supp.3d 561, 574 (E.D. Tex. 2020), *aff'd*, 20-40581, 2022 WL 738617 (5th Cir. Mar. 11, 2022); *see also Warner v. Talos ERT LLC*, 2:18-CV-01435, 2023 WL 6340422, at *3 (W.D. La. Sept. 28, 2023).
[104] *Heckman v. Gonzalez-Caballero*, 65 F.4th 222, 226 (5th Cir. 2023) (internal quotation marks omitted).
[105] ECF No. 113 at 1-2.
[106] *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ("juries are presumed to follow the court's instructions"); *Louisiana Newpack Shrimp Co., Inc. v. Indigo Seafood Partners, Inc.*, 22-30653, 2023 WL 5316473, at *2 (5th Cir. Aug. 17, 2023).
[107] *Basden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 n.17 (5th Cir. 2012).
[108] ECF No. 128 at 2; ECF No. 134 at 17-21.
[109] ECF No. 128 at 2; ECF No. 134 at 27-30.
[110] ECF No. 140 at 24.

Due to the nature of general damages, they cannot "be fixed with pecuniary exactitude," and therefore the jury has great discretion in its assessment of damages.[111] The Fifth Circuit generally applies the "maximum recovery rule" to determine whether an award is excessive.[112] Under that rule, where the matter is tried to a jury, the Fifth Circuit will uphold a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published Louisiana case.[113] This rule serves to preserve as much of the jury's award as possible.[114]

In support of remittitur of the overall general damage award, Defendants cite the Court solely to federal cases involving application of federal statutory or maritime law which, as noted above, are irrelevant.[115] Plaintiff cites the Court to a published decision issued by the Louisiana Fourth Circuit Court of Appeal, *Thornton v. National Railroad Passenger Corporation*.[116] In *Thornton*, an Amtrak employee was replacing springs on a railcar when the wood supports gave way, "pinning Mr. Thornton's hands between 'pinch points' for a period of approximately five minutes."[117] Plaintiff's injuries included "lacerations on the left and right hands, as well as fractures of the right small finger, and to both the left ring and small finger," ultimately requiring the amputation of his left small finger and a pin fixation of his left ring finger.[118] The jury awarded $1.5 million in general damages. On appeal, Defendant asserted the trial court erred in not granting a remittitur of the general damage award. The Fourth Circuit (applying Louisiana law) held the jury did not abuse its discretion, because the award was "not excessive" under the particular facts

---

[111] *Jones v. Mkt. Basket Stores, Inc.*, 2022-00841, p. 15 (La. 3/17/23); 359 So.3d 452, 464; La. Civ. Code art. 2324.1.

[112] *Id.* at 236; *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019).

[113] *Echeverry*, 988 F.3d at 236-37.

[114] *Id.* at 237.

[115] *See e.g. Foradori v. Harris*, 523 F.3d 477, 505 (5th Cir. 2008).

[116] *Thornton*, 2000-2604 (La.App. 4 Cir. 11/14/01); 802 So.2d 816, *writ denied*, 2001-3282 (La. 3/15/02); 811 So.2d 907.

[117] *Thornton*, 802 So.2d at 818.

[118] *Id.*

of the case, noting "Mr. Thornton was pinned down for at least five minutes, suffering mental and physical agony," and was "impaired with permanent disabilities as a result of his disfigured hands."[119]

The Court finds *Thornton* sufficiently analogous to the award to Bradley for scarring and disfigurement. Bradley had two surgeries connected to the amputation of his small finger on his right hand, resulting in a noticeable scar and a permanent disfigurement. Dr. Henderson testified Bradley will possibly require a third surgery in the future. He additionally suffered a large laceration and permanent scarring to his scalp (with the area of that scar remaining numb as of trial), as well as permanent surgical scars on his neck and back. However, unlike *Thornton*, Bradley also suffered cervical and back injuries (requiring injections and ultimately two surgeries), migraines, and mental injuries resulting from nearly being decapitated. The appellate court in *Thornton* issued its decision affirming the jury's $1.5 million general damage award in November of 2001. Adjusting for inflation to the time of Bradley's injuries, that award converts to $2,105,335.40.[120] Once the 50% multiplier is added, the amount increases to $3,158,003.09, which is $1,317,111 more than the general damage award in this matter. Thus, the Court finds Defendants have not satisfied the standard for remittitur, and therefore the Court declines to order a remittitur on the basis that the general damages award, or the portion awarded for scarring and disfigurement, is excessive.

---

[119] *Id.* at 824.
[120] *See* CPI Inflation Calculator from the Bureau of Labor Statistics, available at https://www.bls.gov/data/inflation_calculator.htm; *see also Longoria v. Hunter Express, Limited*, 932 F.3d 360, 367 n.6 (5th Cir. 2019).

**IV.**

**CONCLUSION**

For the reasons provided,

IT IS HEREBY ORDERED that Defendants' Motion for New Trial, and/or Remittitur, and for Judgment as a Matter of Law [ECF No. 128] is GRANTED IN PART and DENIED IN PART. Specifically, the motion for remittitur of the amount awarded for future medical expenses is conditionally granted as follows: within twenty-one (21) days from the date of this Ruling, Plaintiff shall file a written notice to the Court stating whether he accepts or rejects the remittitur of the award for future medical expenses from $500,000 to $291,000. If Plaintiff accepts the remittitur, an amended final judgment, consistent with the findings herein, shall be rendered. If Plaintiff rejects the remittitur, this case will be set for a new trial on the issue of damages for future medical expenses. In all other respects, Defendants' motion is denied.

THUS DONE in Chambers on this 1st day of March, 2024.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE